## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**STEPHEN OROSS, III**                              :

      Plaintiff                              :    CIVIL ACTION
                                 :
                                 :    NO. 21-
        v.                              :

                                 :
                                 :
**KUTZTOWN UNIVERSITY**

    and                              :

**DR. KENNETH S. HAWKINSON,**                              :
President of Kutztown University, in his
individual capacity                              :

    and                              :

**JESUS PEÑA**, Vice-President for Kutztown:
University Division of Equity, Compliance and
Legal Affairs, in his individual capacity   :
                                 :
    Defendants                              :

## COMPLAINT

### I.    PRELIMINARY STATEMENT

1.    Plaintiff Stephen Oross, III a tenured professor of Psychology at Kutztown University, received a new heart on February 24, 2021. Although the transplant saved his life, he will be forever immuno-compromised and immuno-suppressed by the high dosages of drugs he needs to prevent organ rejection. After months of intensive cardiac rehabilitation, Dr. Oross was ready to return to work for the 2021 fall semester, but because of his elevated risk for infection, and particular vulnerability to Covid-19 and correspondingly elevated risk for serious illness or death, it was medically necessary for

him to resume his teaching and other professional duties remotely, not in person. The University denied

this reasonable and practically feasible request, and forced him onto a leave without pay ("LWOP").

Without engaging in an interactive accommodation process as required by federal law and its own

policies, KU issued an ultimatum. If Professor Oross does not produce a "full-duty" medical release to

teach on campus and in person by December 29, 2021, it will terminate his medical benefits at the

stroke of midnight, thereby cutting off his access to the anti-rejection drugs and other extensive medical

services he needs to stay alive. That, in all likelihood, will be followed by the loss of his job.

Professor Oross brings this action for disability discrimination against the University ("hereafter

KU"), under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §793 *et seq*., ("Section 504"),

*as amended by the Americans with Disabilities Amendments Act,* 42 U.S.C. § 12101, and

retaliation for his protected opposition to its illegal actions that have left him with a Hobson's choice to

survive financially or survive the virus. Dr. Oross seeks declaratory and injunctive relief requiring KU to

return him to active duty with accommodations, restore all the emoluments of employment he has lost or

will lose as a result of its illegal actions, and compensate him for physical and emotional distress and

other losses he has suffered because of them. He also brings individual capacity claims under Section

1983 against Dr. Kenneth S. Hawkinson, KU's president, and Jesus Peña, its Director of Equity and

Legal Compliance, for compensatory and punitive damages for their intentional violation of his federal

statutory and Constitutional rights.

## II.    JURISDICTION AND VENUE

2.    The Court has jurisdiction under Section 504, 29 U.S.C. §794 *et seq.* Because all of

Plaintiff's claims arise under federal law, jurisdiction is also predicated on 28 U.S.C. Sec. 1331.

3.      Venue lies in this court pursuant to 42 U.S.C. §12117(a) because all of the events that give rise to this Action took place in this district.

## III.      PARTIES

4.      Dr. Stephen Oross is a citizen of the United States and a qualified person with a disability under Section 504 who resides at 17 Carlie Court, Fleetwood, PA 19522.

5.      Defendant Kutztown University, is one of the 14 universities in the Pennsylvania State System of Higher Education (PASSHE), with administrative offices at 15200 Kutztown Rd., Kutztown, PA 19530.

6.      KU is a program or activity that receives federal funds, and a covered employer under Section 504. 29 U.S.C. §794 (b)(2).

7.      Defendant Dr. Kenneth S. Hawkinson, who is sued in his individual capacity, is a resident of Pennsylvania and the President of KU since July 1, 2015.

8.      Jesus Peña, who is sued in his individual capacity, is a resident of Pennsylvania and KU's Vice President for Equity, Compliance, and Liason for Legal Affairs located at 2 Old Main, Kutztown, PA.

## IV.     STATUTORY AND REGULATORY BACKGROUND

9.      Section 504 makes it illegal for a covered employer to discriminate against a qualified individual on the basis of a disability in regard to employment opportunities and the terms and conditions of employment. 29 U.S.C. §794 (d).

10.     The statutory definition of discrimination under Section 504 includes, among other things, "not making reasonable accommodations to the known physical or mental limitations of an

otherwise qualified individual with a disability who is an applicant or employee," including, *inter alia,* denying job opportunities because the individual needs an accommodation, or otherwise depriving them of equal employment opportunity because of their disabilities. 42 U.S.C. §12112 (b)(5)(A); 29 C.F.R. 1630.9 (b); 29 C.F.R. §1630.2 (o)(2)(ii).

11.     Upon receiving a request for reasonable accommodation from an otherwise qualified person with a disability, the employer must initiate an interactive process designed to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2 (o)(3).

12.     Section 504 prohibits employers from limiting, segregating, or classifying any employee in a way that adversely affects his or her employment opportunities or status on the basis of disability. Likewise, it forbids employers from employing standards, criteria, or methods of administration which have the effect of discriminating against such individuals unless they are job-related and consistent with business necessity. 29 C.F.R. §1630.5; §1630.7.

## V.        FACTUAL STATEMENT

### A.        Dr. Oross is a Qualified Person with a Disability

13.     Since he came to KU in 2002, Professor Oross has been a highly regarded professor, a productive researcher, and a valued colleague in KU's Department of Psychology.

14.     During his years at KU, Dr. Oross has taught a full range of psychology courses, but his primary areas of pursuit and special expertise are in experimental psychology, developmental disabilities, and developmental neuroscience.

15.     Before coming to Kutztown, Professor Oross earned his doctorate degree in experimental and developmental psychology from Vanderbilt University in 1987. He completed separate post-doctoral fellowships in Visual Perception and Developmental Disabilities, and then spent 15 years in research faculty positions at Vanderbilt, the Eunice Kennedy Shriver Center, and the University of Massachusetts Medical School with grant support from the National Institutes of Health.

16.     In addition to his almost two decades of teaching and service to KU, Professor Oross has authored and co-authored multiple peer-reviewed scientific papers, presented works at many national and international conferences, and received recognition and high praise for his work from subject experts around the world.

17.     Dr. Oross was awarded tenure at KU and promoted to Associate Professor in 2008.

18.     Professor Oross's long battle with heart disease began with a "widow maker" heart attack in July, 2014.

19.     During the course of the ensuing extensive medical treatment and cardiac rehabilitation, Dr. Oross sustained additional severe neurological and physical damage to his heart and other body systems. He underwent a double by-pass, as well as surgeries to install a pace maker and an internal de-fibrillator, and was confined to a wheelchair for almost two years. Since then, he has regained the ability to ambulate independently, but only with a cane.

20.     After a year-long medical leave, Dr. Oross returned to KU in the Fall of 2015 and resumed his full-time teaching load as well as his other professional responsibilities.

21.     During the past decade, KU has increasingly offered on-line course options to students across a wide variety of disciplines, including psychology.

22.     Even before he received certification for teaching on-line courses in 2015, Professor had taught some classes in a remote format, but after that certification he taught 23 of his courses on-line, including all of the ones he was scheduled to teach during the 2021-22 school year.

23.     According to its published marketing materials, distance education at KU is a "critical component to its mission to lead the University into the future."

24.     20 per cent of KU's course offerings for the 2021 Fall Semester are on-line.

25.     KU has a dedicated team of instructional designers, media producers, and technical support staff that collaborates with faculty "to ensure that the online experience reflects the rigorous education for which KU is known."

26.     In March, 2020, due to the Covid-19 pandemic, KU readily transitioned all of its in-person courses to an online delivery format. Likewise, faculty held office hours, and conducted most of its other professional obligations remotely, including faculty and committee meetings.

**B.      Fall 2020-2021**

27.     Dr. Hawkinson and the KU's administration's plan for re-opening the campus for the fall of 2020 drew an exceptional backlash from the entire University community, including faculty, students, parents and the general public. The backlash included, *inter alia*, news stories in the local press, a letter demanding action to protect health and safety signed by 1500 faculty, staff, and students, and a student demonstration in front of Hawkinson's own house.

28.     Some adjustments to the original plan were made, and the campus opened in the fall, but under the state's mandate to provide "flexible work arrangements," about 67% of KU's courses were delivered on-line.

**C.     Spring 2021: Medical Leave and Heart Transplant**

29.     During the fall of 2020 Dr. Oross taught his full academic load, held virtual office hours, and served on faculty committees all on-line, but his heart was failing.

30.     Because of his increasing debilitation, Dr. Oross was compelled to request a medical leave of absence for the 2021 Spring semester, which was approved by KU's Human Resources Manager, Jennifer Weidman, from January 19, 2021 - May 15, 2021.

31.     On February 24, 2021, Dr. Oross received a life-saving heart transplant at Hershey Medical Center.

32.     The original prognosis for Professor Oross's return to work post-transplant was 6-12 months, but after 5 months of extensive cardiac rehabilitation, his doctors released him to return full-time. Because of his compromised immune system, and the high levels of immuno-suppressant medications necessary to prevent organ rejection, it was medically necessary for him to continue working remotely, especially because the Covid-19 virus places him at significantly elevated risk for serious illness or death.

33.     Dr. Oross had all 3 vaccinations by August 16th, but for immuno-compromised and immuno-suppressed people, there is a high likelihood that the vaccine will provide little or no significant benefit against infection, and the consequences of even a mild exposure to the virus could be lethal for someone with chronic heart disease and a recent solid organ transplant.

34.     In late July, Dr. Oross met with the Chair of the Psychology Department in preparation for his return to work, and received permission to teach his classes for the 2021 fall semester on-line, and to conduct his office hours virtually. The Dean said he would forward the request

to Jennifer Weidman, Director of Human Resources.

35.     Other than teaching synchronously on-line, Dr. Oross requested no other changes to

the course requirements, materials, or learning objectives, and he required no other accommodations.

36.     The existing classroom technology at KU, and the corresponding technology he already

had in his own home after many years of teaching on-line would allow him and his students to see and

interact with each other in real time without requiring any significant difficulty or expense to KU.

**D.    KU's Return to Campus Mandate**

37.     The first day of classes for the 2021 Fall Semester was August 30, 2021.

38.     On August 8, 2021, Dr. Hawkinson issued a "Guide for Fall Semester: Covid-19

Information," stating that KU would be returning to a primarily face-to-face environment.

39.     Under Hawkinson's directive, classrooms would "closely resemble pre-Covid

configurations," and employees were expected to return to work on campus, without exception,

regardless of health conditions or disabilities that placed them at high risk for serious illness or death.

40.     In the Frequently Asked Questions ("FAQs") that accompanied the Fall Semester

Covid-19 Guide, Hawkinson stated that faculty would be required to conduct office hours in-person,

although that was subject to modification for faculty teaching primarily from off-campus locations, or as

needed to accommodate student needs or preferences.

41.     Faculty backlash was almost immediate because the directive did not satisfy the CDC's

guidance for Institutions of Higher Education (IHE's).

42.     Hawkinson's directive strongly encouraged vaccination, but did not require it.

Students were encouraged, but not required, to update KU about their vaccination status. Masks

would be required indoors, but there would be no social distancing requirements on-campus.

43.     By mid-August, some of the faculty had circulated an open letter to Hawkinson, on Facebook, demanding that vaccination be mandatory on-campus, as well as social distancing, regular testing for unvaccinated people, contact tracing. The CDC recommended all of these things, but none of them were required by the directive. Likewise, KU made none of the improvements the CDC recommended to make its buildings safe for students, staff, and faculty.

### E.     KU's Reasonable Accommodation Process

44.     KU's published process for "Requesting Employee Accommodations" is coordinated by the Disabilities Service Office ("DSO") upon receipt of an employee's completed request form and supporting medical documentation.

45.     The DSO forwards the request to the Director of HR, Jennifer Weidman, disclosing information, as necessary, regarding the nature of the employee's disability and functional limitations so that an appropriate determination on the reasonable accommodation request can be made.

46.     Both Weidman and the Director for DSO report directly to Jesus Peña, and he reports to President Hawkinson.

47.     KU's accommodation policy requires the HR Director to work closely with the employee's supervisor, manager, chair and/or Dean to gather the relevant information necessary to respond to the request and assess whether a particular accommodation will be effective.

48.     The policy provides that the HR Director or her designee "may convene a meeting to continue the interactive process to discuss the requested accommodation as well as alternative accommodations that may be effective in meeting the requester's needs."

49.    The policy provides that if the employee has a qualifying disability, "a reasonable accommodation, if available, should be provided."

**F.    Request for Accommodation and KU's Refusal**

50.    On August 2, 2021, shortly after Dr. Oross met with his Department Chair, but before he submitted a formal request for accommodation, he E-mailed Ms. Weidman to advise that he would be seeking approval to teach his classes on-line.

51.    Because his medical records are so extensive, he inquired what specific type of information she would need from his doctors.

52.    Ms. Weidman did not respond until a few hours after Dr. Hawkinson issued his Fall Covid Guidance on August 8th.

53.    Weidman told Professor Oross that there was "no provision for him to convert in-person courses to on-line modality for the Fall", and that "flexible work arrangements only pertained to the last academic year."

54.    Ms. Weidman stated that Dr. Oross could apply for ADA accommodation, but it would not [be] considered reasonable if it is a "fundamental alteration so significant that it changes the essential nature of the goods, services, facilities, privileges, advantages, or accommodations offered."

55.    Due to "the constraints within which we are operating at this time," Ms. Weidman told Dr. Oross that he could use "contiguous FMLA from Spring, which would be unpaid after he used the his 2 accrued personal days, and 15 of the sick days KU's policies allowed him to use in the fall semester." Thereafter, he would receive no pay, although his benefits would continue.

56.     The next day, August 9th, Dr. Oross asked Ms. Weidman to explain why changing the

delivery format for his classes would be a "fundamental alteration" that by definition, and without further

inquiry, would be unreasonable, and therefore not an available accommodation for himself or others that

are "being forced] to choose between surviving financial losses or surviving the virus."

57.     At least three other faculty members had requested remote work accommodations due

to health conditions that placed them at significant elevation for Covid-19 infection, serious illness, or

death, ("high risk faculty"), but KU rejected all of them at the behest of President Hawkinson and Vice

President Peña, who refused to allow the approval of any such accommodation, regardless of the

individual's circumstances or the reasonableness or feasibility of the request.

58.     This E-mail exchange with Ms. Weidman took place before Dr. Oross submitted a

formal accommodation request, and he noted that the framework for remote teaching and fulfilling other

professional obligations [had] been in place, available, and [ ] used for quite some time extending back

to actual pre-pandemic times."

59.     Weidman thereafter denied that her previous message had been intended as a

denial of an ADA request, but said her reference to "fundamental alteration" pertained to the  "shift of a

course scheduled as in-person to an on-line modality."

60.     On August 11, 2021, pursuant to Weidman's instruction, Dr. Oross submitted a written

accommodation request to DSO for "approval to teach fall courses and hold office hours on line."

61.     In support of his request, Dr. Oross submitted a letter from his treating cardiologist

stating that due to his heart transplant, he requires life-long immuno-suppressive medications to reduce

the risk of organ rejection. That risk is higher during first year, when he requires higher dosages, which

also places him at higher risk of infection.

62.     According to Dr. Oross's cardiologist, he should remain in a low risk teaching environment and work remotely to reduce risk of infection. Otherwise, she imposed no restrictions on his capacity to fulfill the essential functions of his job.

63.     On August 18, 2021, Professor Oross received notice from DSO that Weidman had denied his accommodation request two days before, because "changing course delivery would be a "fundamental alteration," as would holding his office hours on-line.

64.     As Director of HR, Weidman knew or had the duty to know that "fundamental alteration" is an erroneous and inapplicable legal standard for resolving requests for reasonable accommodation in the employment context.

65.     Weidman knew or should have known that the applicable legal standard for assessing the reasonableness and feasibility of an employee's request for accommodation is whether it constitutes an undue hardship, *i.e.*, whether it would entail significant difficulty or expense for the employer. 42 U.S.C. §1211 (b)(5)(A).

66.     All of Professor Oross's fall classes had been previously taught on line, his department had approved his request for the fall semester, and the accommodation involved no significant difficulty or expense because his courses were all designed to convert to an on-line delivery as needed.

67.     Because his accommodation request was denied, and it was not medically feasible for him to return to work, the only option Weidman gave him was an unpaid leave, which not only stopped his salary, but correspondingly deprived him of service credit toward his pension, or further accrual of sick, vacation, or personal time.

### G.   Protected Opposition and Speech on a Matter of Public Concern

68.   Among the other reasons for the widespread faculty criticism against Hawkinson in relation to the rollout of his Fall 2021 Plan was the blanket denial of remote teaching accommodations to high-risk faculty members.

69.   The CDC considers people with heart conditions, immunocompromise (weakened immune system), and solid organ transplant to be at significantly elevated risk for serious illness or death from Covid-19. That risk increases with the number of underlying conditions the person has. *See* CDC, "Covid-19: People with Serious Medical Conditions," July 1, 2021 (updated October 14, 2021).

70.   Among other things, the CDC's "Guidance for 'IHEs'" recommends "options for accommodations, modifications, and assistance to students, faculty, and staff at increased risk for severe illness that limit their exposure to risk and allow for education and or work opportunities (such as virtual learning, telework, and modified job responsibilities).

71.   As one faculty member put it to Hawkinson in an E-mail on August 20, 2021, the denial of remote teaching accommodations to high-risk faculty violated federal disability law, and was a concern that required a "speedy and complete response."

72.   Although Professor Oross started speaking out publicly about his own situation, not in the course of his job duties, or on KU's behalf, but as a private citizen on what had long been an issue of broad community concern, for faculty, staff, and students alike.

73.   On August 22nd, Professor Oross signed the "open letter" that had been circulating among faculty on Facebook ("FB"), and shared the link with the poster's remark that "it behooves the university administration to foster a culture of inclusiveness, where all constituents are encouraged to

consider themselves as active participants in keeping everyone safe."

74.     On August 24, 2021, Professor Oross shared a FB link to an upcoming radio

podcast on "Raging Chicken Press," hosted by a faculty member from the English Department, that

would "dig into" KU's back to campus plans, and more specifically, its refusal to grant faculty requests

to keep an all online schedule due to their high risk for Covid infection and its potentially dire

consequences. The podcast would "get into the story of one faculty member" [Professor Oross] who

was "being forced to make an awful choice between his job and his personal well-being."

75.     Professor Oross encouraged people to tune into the podcast to learn more about his

current situation and the status of KU's preparations for the upcoming fall semester. "Spread the word,"

he said. "People's lives depend on action."

76.     Later the same day, Dr. Oross sent a letter to Hawkinson requesting a restoration to

health sabbatical for the fall semester pursuant to the union contract and state law, which would provide

him with 18 weeks of leave at full pay.

77.     To support his request for sabbatical, Dr. Oross provided his cardiologist's letter

specifying the medical necessity for a remote work accommodation. He also summarized HR's refusal to

approve his request for reasonable accommodation.

78.     Although Dr. Oross did not appear on the Raging Chicken podcast that aired on August

25th, he gave his permission for them to discuss his own situation specifically, and also as part of the

larger context in which KU had taken intransigently refused to provide remote work or learning

accommodations for other faculty and students who needed them because they had disabilities and other

impairments that placed them at high-risk for Covid infection and serious complications.

-14-

79.     In a phone call on August 26th, Weidman told Dr. Oross that Hawkinson had denied his restoration to health sabbatical, and then confirmed it in writing on Friday, August 27th, stating that Hawkinson had asked her to review "the other options for the fall semester."

80.     Weidman had never previously presented any options other than LWOP, but now she wrote that KU was considering adding 2 "high demand" on-line psychology courses to the Fall schedule.

81.     Weidman did not identify what the classes were, purportedly because that had not been decided by the Department Chair and the Dean, but said that the unidentified, unscheduled, and unpublished classes would give Professor Oross "the ability to teach half-time and take half-time sick leave for fall."

82.     Weidman encouraged Dr. Oross "to discuss this with [his] Chair and [his] dean," and to let her know his decision by Monday, August 30th, which was the first day of classes.

83.     The Chair of the Psychology Department told Professor Oross that he had no knowledge of any demand for new psychology classes, had heard nothing about it from the dean, and had no idea what courses Weidman was referring to.

84.     Because the Psychology Department had no plans to offer any new courses, and classes were already underway, Dr. Oross told Weidman on August 30th that she had not given him sufficient details to provide a meaningful basis for a decision. What she had presented was "essentially an ultimatum, rather than an "iterative discussion designed to identify an acceptable accommodation."

85.     Notwithstanding those concerns, he asked Weidman to tell him what the courses would be, when they would start, and how students would know about them.

-15-

86.    Without providing any of that information, Weidman replied that because Dr. Oross was "not able to accept our offer," his only option was to continue on sick leave, which would allow his benefits to continue.

87.    Dr. Oross continued to post public health information and other materials on Facebook related to Covid, especially as it pertained to educational settings, including an article about faculty at the University of Wisconsin at Madison wanting answers on remote teaching requests for vulnerable members, and a CNN opinion piece entitled *"I'm a college professor, not a Covid guinea pig."*

88.    On September 5th, Raging Chicken Press publicized its upcoming Labor Day interview with Professor Oross about KU's refusal to provide him with an on-line teaching accommodation, which it characterized as having literally forced him to choose between his life and his livelihood.

89.    During the Labor Day podcast, Professor Oross explained that he decided to tell his story publicly because others are struggling and need support, and he felt an obligation to "step up to a higher degree of action." Otherwise, "KU can keep doing what it's doing."

90.    On September 10, 2021, Dr. Hawkinson issued an "Update" on Covid-19 issues after it "came to our attention that some members of our community have been planning a demonstration to protest the university's Covid-19 protocols."

91.    Hawkinson said that KU's "top priority" was reopening the campus to largely in-person instruction in a safe and secure environment.

92.    For people with impairments and disabilities that place them at higher risk for serious illness or death, returning to campus is inherently less safe than it is for people without those risks.

93.     Hawkinson said that his reopening plan was fully within the Covid-19 guidance from governmental authorities, including the CDC and other heath experts.

94.     No guidance from the CDC or any other governmental authority supported KU's no-accommodation, no-exceptions policy, which stood in direct contradiction to federal law that requires reasonable accommodation for qualified employees absent an undue hardship, and forbids discrimination against an employee because they need such accommodations.

95.     After Hawkinson's September 10th "Update," Professor Oross posted to FB that his "current professional status was unpaid leave for 2021 fall semester, followed by a summary of his unsuccessful efforts to secure a reasonable remote teaching accommodation, and the denial of his request for a restoration to health sabbatical.

96.     Dr. Oross also shared some of the rebukes Hawkinson received from faculty, students, and members of the public, including one message from a faculty member who described his treatment of colleagues with a need for accommodations as "notable for its mean spiritedness."

97.     Several faculty members aware of Dr. Oross's situation contacted the Philadelphia Inquirer, which ran a front page article on September 24, 2021 entitled "*A Professor Got a Heart Transplant, so He Wanted to Teach Online. His University said No.*"

98.     The same day the article ran on Page 3 of the Philadelphia Daily News with the front page caption "*No Mercy*".

99.     The Inquirer article was widely re-published across the nation and a broad, drawing wide criticism against KU and Hawkinson for their inflexible refusal to even consider making reasonable accommodations for faculty and staff on an individualized basis as required by federal law.

-17-

100.     Other similar articles soon appeared, including one in The Morning Call on September

26th entitled *Lehigh Valley College Students Say Schools Should Have Done More to Prepare for*

*Slew of Breakthrough Cases,* as well as a publication on September 29th in "Inside Higher Ed" called

*"Denied in a Heartbeat."* The sub-caption read *"Kutztown University didn't grant any remote*

*teaching requests this term, not even to an immunosuppressed professor with a new heart." The*

*case raises more questions about "blanket" accommodation bans."*

**H.     Ongoing Public Opposition and Participation Against KU's Violations**

101.     On October 4, 2021, Disabilities Rights of Pennsylvania ("DRP") wrote to Jesus Peña

explaining that KU's refusal to provide accommodations to Professor Oross violated federal disability

law, and seeking his reinstatement with accommodations, and the restoration of the pay and other

benefits that had been withheld since the beginning of his forced leave of absence.

102.     Professor Oross shared the first page of DRP's letter in a FB post on October 8th under

the heading "Brief update with more to follow."

103.     The following day, Dr. Oross posted a link to the "DOJ ADA Update: A Primer for

State and Local Governments," along with Weidman's August 9th E-mail construing his request to teach

remotely as a "fundamental alteration," even before he initiated the accommodation process.

104.     On October 11th, Dr. Oross began sharing FB notices for an upcoming student-led rally

at which he was scheduled to speak to protest KU's responses to Covid concerns, and its unreasonable

denial of requests for accommodations made by high-risk students, staff, and faculty.

105.     As reported by *Berks Regional News* the day after the October 18th rally, Dr. Oross

told the crowd that "we have the technology to do this. We've done it. I've done it. The whole campus,

the whole country did it."

**I.     KU's Retaliatory and Facially Illegal Full-Time, Full-Duty Ultimatum**

106.     On October 14th, in response to its letter to Peña 10 days earlier, DRP received a

letter from a lawyer for PASSHE stating that KU would be happy to engage in an interactive process

with Professor Oross if and when he desists from publishing his case in a public manner.

107.     KU had a legal obligation to engage in an interactive process before it denied Professor

Oross's request for accommodation, and before it placed him on a forced unpaid leave.

108.     PASSHE's untimely offer to engage in an interactive process was expressly conditioned

on the forfeiture of his statutory right to oppose KU's illegal and discriminatory actions against himself

and others, and his right to speak on a matter of public concern under the 1st Amendment.

109.     Just the day before, Weidman had communicated unambiguously that KU had no

intention of engaging in a meaningful interactive process, but was aggressively planning to push Dr. Oross

out of his job.

110.     Peña was aware of her communication to Dr. Oross because she copied him on the

letter. The PASSHE letter was copied to both Peña and Hawkinson.

111.     Weidman's October 13th letter purported to grant Professor Oross's "request" for

extended leave without pay from 9/23/21 through 6/23/22, a request he never made, unless he is

"released to full-time, full-duty" before then.

112.     Weidman did not define what she meant by "full-time, full-duty."

113.     Unless he produced a "full-time, full-duty" medical release by December 29, 2021,

Dr. Oross's medical benefits would expire at midnight, thereby leaving him with no access to the drugs

and medical treatment he needs to stay alive.

114.    If he is released to return to full-time, full-duty after 12/29/21, Weidman wrote, Dr. Oross would have "limited return to work rights," and would remain on extended unpaid leave until a position becomes available, in the same or equivalent classification, that KU intends to fill, and is not barred by seniority.

115.    Professor Oross posted Weidman's letter to FB with the query "did they just raise the stakes? So unnecessary."

116.    Weidman's letter made no pretense of being part of an interactive process.

117.    Weidman's letter was not in compliance with the requirements of federal law or KU's own published policy. There is no indication that she conferred with the DSO. She did not communicate with the Chair of the Psychology Department, the Dean, or Dr. Oross to gather the information that would be both relevant and necessary to assess whether a remote teaching accommodation would be reasonable, feasible, or effective, nor did she convene a meeting to discuss that or any other accommodation that might meet Dr. Oross's needs.

118.    Weidman had no institutional authority to unilaterally impose the conditions set forth in her October 13th letter upon Dr. Oross or any other employee, particularly a tenured professor, without express authorization from her direct superiors, Defendants Peña and Hawkinson.

119.    There is no policy or contractual definition at KU defining "full duty," and none of the contractually defined duties for full-time faculty are incompatible with a fully on-line teaching load.

120.    In an E-mail on October 21, 2021, Dr. Oross asked Ms. Weidman to define the term "full-time, full duty," and whether "full-time, full-duty" meant "full-time, in-person."

121.    By October 25th, after waiting 93 hours for an answer, Dr. Oross sent Weidman another

E-mail demanding a response, which he copied to the faculty, Hawkinson, Peña, and a number of other

KU administrators.

122.    On October 26th, Dr. Oross posted his E-mail to FB calling attention to the fact that

he had been waiting 113 hours for Weidman to define the term upon which she had conditioned his

medical benefits and continued employment, and disputing PASSHE's characterization of his advocacy

as a "PR battle." This, he said "is a battle regarding the caring, considerate, and ethical treatment of

valued employees (if indeed we are valued")."

123.    On October 27, 2021, about 129 hours after she received Dr. Oross's request, Ms.

Weidman wrote that "teaching in-person in the classroom is considered an essential function of his

faculty position, so that's what full-duty means."

124.    Teaching in-person in the classroom is not an essential function of the job. All of the

functions related to fulling the necessary duties and purposes of teaching (including office hours),

scholarship, and service, can be accomplished on a remote format, and had been so accomplished by

the entire faculty during the 2020 spring term, as well in large proportion during the entire 2021-21

academic year, and by Dr. Oross himself, both before the pandemic and during the 2020 fall semester.

125.    Dr. Oross posted Weidman's response on Facebook, summarizing the situation like this:

"I have a time line demanding that my health improves to a point that I am cleared to return to "in-

person" teaching before being permitted to conduct on-line courses. Additionally, if this timeline is not

met my benefits, my employment, and my retirement benefits are in jeopardy."

126.    Dr. Oross went on to say that "this time line WAS NOT established after consultation with my doctors or the transplant team at Penn State Milton S. Hershey Medical Center. Rather it appears to be another arbitrary administrative decision."

127.    KU's discriminatory and retaliatory actions against Professor Oross, as well as the acts and omissions of the individual defendants, all done intentionally and under color of state law, have denied him equal employment opportunity under federal law, financial losses, physical and emotional distress and other damages for which he is entitled to a fully compensatory remedy.

128.    The individual defendants had no reasonable basis for believing that their actions were legal, or in any way unsettled under Section 504, the First and Fourteenth Amendments, and Section 1983.

## VI.    CAUSES OF ACTION

### COUNT I: FAILURE TO ACCOMMODATE

129.    The allegations set forth in Paragraphs 1-128 are re-alleged and incorporated by reference herein.

130.    "No otherwise qualified individual with a disability in the United States, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. §794.

131.    Professor Oross has an impairment that substantially affects one or more major bodily functions and/or major life activities, including but not limited to, his heart functioning, his immune system, and his mobility in comparison with the average person. 42 U.S.C. §12102 (2).

-22-

132.     Because of his recent solid organ transplant, and ensuing immuno-compromise and suppression, he has a significantly higher risk of contracting the Covid-19 virus in comparison to the average person, and a significantly elevated risk of serious illness or death, he has significantly restrictions on the location and manner in which he can safely interact with others.

133.     Professor Oross is fully capable of performing the essential functions of his position as Associate Professor of Psychology at KU with reasonable accommodation, including teaching, scholarship, and service, and is a qualified person with a disability as defined by Section 504.

134.     Dr. Oross's request for a remote work accommodation in August, 2021 triggered KU's legal duty to initiate an interactive process to determine whether his limitations could be reasonably accommodated without significant difficulty or expense before it denied his request, and before it forced him onto unpaid leave, but it failed to do so. 29 C.F.R. § 1630.2 (o)(3).

135.     KU denied Dr. Oross's accommodation request without conducting an interactive process, based on an institutional delivery model that was applied to him without regard to his rights as a person with a disability under federal law, and without regard to whether his accommodation request was objectively reasonable, or whether it could be implemented without significant difficulty or expense.

136.     Dr. Oross's request for accommodation was reasonable, and KU's refusal to provide it constitutes discrimination because of his disability under Section 504.

**COUNT II: FACIAL INVALIDITY OF DEFENDANTS' FULL-DUTY REQUIREMENT**

137.     The allegations set forth in Paragraphs 1-136 are realleged and reincorporated by reference herein.

138.    The application of full duty work rules to a qualified person with a disability are antithetical to the statutory requirement that covered employers engage in an individualized, interactive process and  provide reasonable accommodations that allow the employee to perform the essential functions of the job he holds or desires, with or without accommodation. 42 U.S.C. §12112 (b)(3)(A).

139.    The imposition of a full-duty standard to prevent Professor Oross from returning to work with reasonable accommodations, and then forcing him onto unpaid leave solely in furtherance of that illegal policy, constitutes discrimination as a matter of law under Section 504.

## COUNT III:  INTENTIONAL DISCRIMINATION BECAUSE OF DISABILITY (DIRECT EVIDENCE)

140.    The allegations set forth in Paragraphs 1-139 are re-alleged and incorporated by reference herein.

141.    Section 504 forbids an employer from denying any employment opportunity to a qualified employee because of the need to make reasonable accommodation to the physical or mental limitations of that employee. 42 U.S.C. §12112 (b)(5)(B).

142.    KU pushed Dr. Oross onto an unpaid leave of absence because he requires a remote work accommodation which is reasonable, inherently feasible, and will allow him to fulfill all of the essential functions of his job.

143.    As a matter of law, KU's refusal to permit Professor Oross to return to work at all unless he can do so in-person, and without reasonable accommodation for his disabilities, constitutes intentional discrimination against him solely on the basis of his disability.

-24-

## COUNT IV:  INTENTIONAL DISCRIMINATION BECAUSE OF DISABILITY
### (PRETEXT)

144.     The allegations set forth in Paragraphs 1-143 are re-alleged and reincorporated by reference herein.

145.     There is no legitimate, non-discriminatory reason for KU's defiant refusal to comply with its obligations under Section 504, or to provide Dr. Oross with reasonable accommodations that it in no way contends would constitute an undue hardship.

146.     All of KU's efforts to hide its intentional discrimination against Professor Oross are pretexts for exactly that, including, but not certainly not limited to, a) its use of legal accommodation standards it knows to be applicable only to public accommodations, not employment, b) its blanket denial of accommodations to other high-risk faculty in express reliance on Hawkinson's return to campus directives, c) its denial of his request for a restoration to health sabbatical with no explanation, after it refused to provide accommodations that would have allowed him to return to work, d) its false and misleading "offer" of a teaching assignment for "high demand" classes that did not exist, and the withdrawal of that "offer" when he asked for details, e), the application of full-duty policies it knows to be *per se* violations of the Act as an express condition for the continuation of his medical benefits after an arbitrary date 6 months before the expiration of the LWOP it purportedly approved, but that he did not request, f) its threat to remove him from his position with limited or no return to work rights if he does not return to in-person teaching by December 29th, something it knows is not medically feasible and might even be deadly, and also knew would violate his rights as a tenured professor, g) its refusal to allow him even to teach classes scheduled to be delivered on-line unless he can teach in-person in the

classroom, when none of the students will be there, and other faculty scheduled to teach remotely

require no such release, and  h) KU knew that denying Professor Oross's request for accommodation

would impose significant institutional burdens on the Psychology Department, and would also interfere

with KU's own educational mission, whereas granting him the accommodation would entail no such

burdens or interference, and no expense.

## COUNT V: DISPARATE IMPACT BASED ON PROHIBITED STANDARDS, CRITERIA, OR METHODS OF ADMINISTRATION

147.    The allegations set forth in Paragraphs 1-146 are re-alleged and incorporated by

reference herein.

148.    Section 504 prohibits employers from utilizing standards, criteria, or methods of

administration that have the purpose or effect of discrimination on the basis of disability. 42 U.S.C.

§12112 (b) (3).

149.    Standards that screen out or tend to screen out an individual with a disability or a

class of such individuals constitute "discrimination" under Section 504 unless those standards or criteria

are job-related and consistent with business necessity.  42 U.S.C. §12112 (b) (6).

150.    The full-duty policy that KU applied to Dr. Oross constitutes a standard or qualification

criterion that has a disparate impact upon qualified employees with disabilities because it screens them

out or has a tendency to do so.

151.    No qualified person with a disability who needs an accommodation of any kind

can meet such a requirement, and only employees with disabilities are disadvantaged by it.

152.    KU's policy or practice to refuse remote work accommodations to high-risk faculty with disabilities for whom such accommodation are both reasonable and feasible, is a policy or method of administration that is not job-related or consistent with business necessity, and interferes with the implementation of the Act.

153.    As applied to Dr. Oross, KU's facially invalid no-accommodation, no-exceptions, and full-time full-duty requirements constitute illegal disability discrimination in violation of Section 504.

**COUNT VI: KU'S RETALIATION AND INTERFERENCE UNDER SECTION 504**

154.    The allegations set forth in Paragraphs 1-153 are re-alleged and reincorporated by reference herein.

155.    Section 504 forbids discrimination against any person because he has complained of or opposed any act or practice made unlawful by the Act, or participated in any manner in a proceeding related to the discrimination it prohibits. 42 U.S.C. §12203(a).

156.    Section 504 also forbids coercing, intimidating, threatening, or interfering with an individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, the protections of the Act. 42 U.S.C. §12203(b).

157.    Professor Oross engaged in protected activity under the Act, including, but not limited to, requesting reasonable accommodations, opposing KU's refusal to provide him with accommodations to which he held a good faith belief to entitlement, his public statements and other advocacy on his own behalf, and that of others, regarding KU's illegal refusal to comply with its duties under the Act, and to provide accommodations to himself and other high-risk faculty and students.

-27-

158.    KU was aware of Dr. Oross's protected activity, and took adverse actions against him because of it by, *inter alia*, a) denying him reasonable accommodations to which he was entitled, b) refusing to allow him to return to work at all unless he could do so without accommodations, c) threatening to terminate his medical benefits and his employment and/or force him into an involuntary retirement if he fails to produce a full-time, full-duty medical release in facial violation of the Act, and d) refusing to conduct an interactive process or otherwise complying with his legitimate requests for accommodation, and other statutory rights and benefits under the Act unless he desists from publicly opposing KU's illegal conduct.

159.    In addition to the actions stated in the preceding paragraph, KU interfered with Professor Oross's statutory rights by misrepresenting the legal standards for evaluating his entitlement to reasonable accommodation, denying accommodations based on an erroneous standard, imposing policies and requirements purporting to limit his right to invoke his statutory protections, including a fixed no-accommodation, no-exceptions and full-time, full-duty requirements, and threatening to terminate his medical benefits on the basis of those illegal standards, knowing that will leave him with no choice but to accept an involuntary retirement.

160.    KU's actions against Dr. Oross are materially adverse, and have caused him to suffer distinct and palpable injuries, including the deprivation of his right to equal employment opportunity and the emoluments thereof, including, *inter alia*, salary, leave accruals, and pension service credit, as well as emotional stress and existential anxiety.

161.    KU's treatment of Dr. Oross would be perceived as so materially adverse, threatening, and intimidating to any reasonable employee that they likely would be dissuaded from asserting their

rights, much less opposing or reporting violations of Section 504's requirements, thereby interfering with the implementation of the Act itself and undermining its statutory purposes.

## COUNT VII: SECTION 504 RETALIATION AND INTERFERENCE CLAIMS AGAINST HAWKINSON

162.    The allegations set forth in Paragraphs 1-161 are reasserted and incorporated by reference herein.

163.    Section 504 forbids any person from retaliating against an employee for their protected activities against conduct that the Act makes illegal, or from coercing, intimidating, threatening, and/or interfering with their exercise or enjoyment of those rights. 42 U.S.C. §12112 (b) (2) & (3).

164.    Defendant Hawkinson was aware of Professor Oross's request for accommodations, and his protected opposition as described in this Complaint.

165.    Hawkinson was angry about the escalation of public criticism against him and the University when it become known that KU had denied Professor Oross's request for accommodation.

166.    In retaliation for Professor Oross's protected activities, and to intimidate him from engaging in further opposition, coerce him into forgoing his entitlement to those rights, and interfere with his enjoyment of them, Defendant Hawkinson intentionally conducted, orchestrated and/or directed an illegal discriminatory course of conduct against Dr. Oross.

167.    Among other things, Hawkinson personally denied Professor Oross's request for a restoration to health sabbatical, without explanation or legitimate reason, and in deviation from previous practice, thereby depriving him of his income while KU kept him on involuntary leave.

168.     Hawkinson authorized his subordinates to use the illegal policies he devised in pursuit of his decision to fully open the campus in the midst of a pandemic to punish Professor Oross for his opposition, and to create new policies to employ against him, as necessary, and in defiance of Section 504's legal requirements, to force his silence and manipulate him into involuntary retirement in order to keep the medical benefits Hawkinson knows Professor Oross must have to survive.

169.     The illegal violations of Professor Oross's legal rights as outlined herein could not have happened without Hawkinson's personal knowledge, consent, and authorization.

170.     Hawkinson is personally liable for the retaliatory actions he took against Professor Oross with knowledge and/or deliberate indifference to his federal statutory rights, and in callous disregard for the risk to his health, livelihood, and his life.

171.     Hawkinson's actions constituted illegal coercion, intimidation, and interference with Professor Oross's statutory rights, for which he is also personally liable. 42 U.S.C. §12203(b).

**COUNT VIII: SECTION 1983 CLAIMS AGAINST HAWKINSON FOR DEPRIVATION OF FEDERAL STATUTORY RIGHTS UNDER SECTION 504**

172.     The allegations set forth in Paragraphs 1-171  are reasserted and incorporated by reference herein.

173.     Defendant Hawkinson, acting in his individual capacity and under color of law, orchestrated and directed the discrimination against Professor Oross intentionally, with a retaliatory and coercive motive, with knowledge and/or deliberate indifference to his federal statutory rights and in callous disregard for the risk to his health, all in violation of his federal civil rights under Section 504 and in violation of Section 1983.

174.    A reasonable public official in the place of Defendant Hawkinson would have known that his conduct violated Professor Oross's well-established rights pursuant to Section 504, and that his actions violated his obligations under Section 1983.

175.    Hawkinson's actions against Professor Oross were calculatedly outrageous and committed with actual malice.

## COUNT IX: SECTION 1983 CLAIMS AGAINST HAWKINSON FOR VIOLATIONS OF FIRST AND FOURTEENTH AMENDMENTS

176.    The allegations set forth in Paragraphs 1-175 are reasserted and incorporated by reference herein.

177.    Defendant Hawkinson, acting jointly and/or severally with KU and the administrators working under his control, and at his behest, engaged in a discriminatory course of conduct against Professor Oross to deny him statutory benefits, deprive him of his medical benefits and his employment, intentionally, with a retaliatory motive, and with knowledge and/or deliberate indifference to Dr. Oross's Constitutional rights and in callous disregard for those rights.

178.    Hawkinson was aware that Professor Oross's public opposition to his illegal policies and the application thereof, both to himself and to other high-risk faculty and students, constituted free speech on a matter of public concern that were protected by clearly established law from retaliation, interference, or other forms of coercive action by 1st and 14th Amendments and Section 1983.

179.    Professor Oross's speech and expressive activities pertained directly to matters of longstanding public concern involving health and safety to the University community during the pandemic, and KU's refusal to enforce federal civil rights protections for faculty and students with disabilities who

-31-

were entitled by law to reasonable accommodations, especially those whose impairments placed them at high-risk for Covid-related illness and death.

180.    Professor Oross's speech and other expressive activities took place on his own time and as a private citizen, and in public forums for citizens to express such concerns.

181.    Hawkinson's discriminatory and retaliatory actions were substantially motivated by, and in punitive response to Professor Oross's protected expression, and without legitimate justification or excuse, and would chill a person of ordinary firmness from engaging or continuing to engage in expressive activities related to matters of public concern.

182.    Hawkinson's actions against Professor Oross were calculatedly outrageous and committed with actual malice.

## COUNT X: PEÑA'S RETALIATION AND INTERFERENCE UNDER SECTION 504

183.    The allegations set forth in Paragraphs 1-182 are reasserted and incorporated by reference herein.

184.    Defendant Peña was aware of Professor Oross's request for accommodations, and his protected opposition under Section 504 as described in this Complaint.

185.    Peña intentionally orchestrated the application of KU's illegal policies to deny reasonable accommodations to Dr. Oross that he knew would prevent him from returning to work.

186.    Peña authorized and directed the HR Director to force Dr. Oross onto LWOP in violation of his rights under Section 504, and to manipulate him into involuntary retirement by threatening his medical benefits and his employment by way of policies he had a duty to know were illegal.

-32-

187.   Peña created and authorized the application of a full-time, full-duty policy designed for the specific purpose of retaliating against Professor Oross for his protected activities, to intimidate him from engaging in further opposition, coerce him into forgoing his entitlement to those rights, and interfere with his enjoyment of them.

188.   The illegal violations of Professor Oross's legal rights as outlined herein could not have happened without Peña's personal knowledge, consent, and authorization.

189.   Peña, acting jointly and/or severally with Hawkinson, and in full coordination with him, was responsible for all of the illegal actions taken by his subordinate administrators in violation of Professor Oross's rights under Section 504, all of which he authorized with full and intentional knowledge that they were illegal under the Act.

190.   Peña's acts and omissions actions against Professor Oross were taken intentionally, with a retaliatory motive, and with knowledge and/or deliberate indifference to his federal statutory rights, and he is personally liable for those actions under Section 504. 42 U.S.C. §12203(b) (2).

191.   Peña's actions constituted illegal coercion, intimidation, and interference with Professor Oross's statutory rights, for which he is also personally liable. 42 U.S.C. §12203(b) (3).

**COUNT XI: SECTION 1983 CLAIMS AGAINST PEÑA'S FOR VIOLATIONS OF PLAINTIFF'S FEDERAL STATUTORY RIGHTS UNDER SECTION 504**

192.   The allegations set forth in Paragraphs 1-191 are reasserted and incorporated by reference herein.

193.   Acting in his individual capacity and under color of law, jointly and severally with Hawkinson, and in furtherance of his policies, Peña orchestrated, authorized, and directed the

discriminatory actions against Professor Oross in retaliation for his protected activities, to intimidate him from engaging in further opposition, coerce him into forgoing his entitlement to his rights under Section 504, and interfere with his enjoyment of them.

194.    Peña, acting jointly and/or severally with Hawkinson, and at his behest, took these discriminatory actions against Professor Oross intentionally, with a retaliatory motive, and with knowledge and/or deliberate indifference to his federal statutory rights and in callous disregard for the risk to his livelihood, health, and his life.

195.    A reasonable public official in the place of Defendant Peña would have known that his conduct violated Professor Oross's well-established rights pursuant to Section 504, and that his actions violated his obligations under Section 1983.

196.    Peña's actions against Professor Oross were calculatedly outrageous and committed with actual malice.

## COUNT XII: SECTION 1983 CLAIMS AGAINST AND FIRST AMENDMENT VIOLATIONS

197.    The allegations set forth in Paragraphs 1-196 are reasserted and incorporated by reference herein.

198.    Peña was aware that Professor Oross's public opposition to his illegal policies and the application thereof, both to himself and to other high-risk faculty and students, constituted free speech on a matter of public concern that was protected from retaliation, interference, or other forms of coercive action by 1st and 14th Amendments and Section 1983.

199.    Peña, acting jointly and/or severally with Hawkinson, at his behest, and in full coordination with him, engaged, authorized, and directed in a discriminatory course of conduct against Professor Oross intentionally, with a retaliatory motive, and with knowledge and/or deliberate indifference to his Constitutional rights and in callous disregard for those rights, in punitive response to them, and without legitimate justification or excuse.

200.    A reasonable public official in Peña's position would have known that his conduct violated Plaintiff's well-established rights pursuant to the 1st and 14th Amendments and Section 1983.

201.    Peña's actions would chill a person of ordinary firmness from engaging or continuing to engage in expressive activities related to matters of public concern.

202.    Peña's actions against Professor Oross were calculatedly outrageous and committed with actual malice.

**WHEREFORE**, Dr. Oross respectfully prays for the following relief:

1.    A declaratory judgment that KU's refusal to provide him with reasonable accommodations constitutes discrimination against him on the basis of his disability under Section 504, as does its refusal to permit him to return to work without a full-duty medical release to teach in a physical classroom.

2.    A declaratory judgment that the actions of all the defendants, jointly and severally, constitute retaliation and interference for his protected opposition and participation in protected activity under the Act directly, and/or in violation of Section 1983.

3.    A declaratory judgment that the individual defendants' actions constitute retaliation in violation and the 1st and 14th Amendments and Section 1983.

-35-

4.      An injunction ordering KU to full-duty and to restore all of the emoluments of employment to which he would have been entitled had it not been for their illegal actions, including, but not limited to full back pay, and as well as pension benefits and contributions, interest, vacation, holiday, and sick accruals.

5.      Compensatory damages for the financial losses, emotional distress, and other compensatory losses he sustained as a result of KU' illegal actions.

6.      Compensatory and punitive damages against the individual defendants for the intentional and malicious violations of his federal statutory and Constitutional rights.

7.      Award Plaintiff and his counsel all costs and attorneys fees he has incurred or will incur in the prosecution of this action.

8.      Award all other relief which may be just and proper under the circumstances.

Respectfully submitted,

**LORRIE McKINLEY, ESQUIRE**
Attorney ID No. 41211
Counsel for Plaintiff

**McKINLEY & RYAN, LLC**
238 West Miner Street
West Chester, PA 19382
Telephone (610) 436-6060
Fax (610) 436-6804

DATE: November 15, 2021

-36-