**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

STEPHEN OROSS, III                    :

    Plaintiff                    :          CIVIL ACTION
                         :
                         :          NO. 21-5032
        v.                    :
                         :
                         :

KUTZTOWN UNIVERSITY, *et al.*:

    Defendants

**PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS**

In accordance with the Court's procedures, Plaintiff's counsel sent the following as a proposed

Joint Statement of Undisputed Facts to defense counsel on September 29th. Although the Court's

expectation is that the parties will cooperate in that process, and Plaintiff's counsel clearly

communicated that expectation and proposed a protocol for proceeding with the process, defense

counsel failed to provide any response until 8:19 p.m. on October 13th, the day before the parties'

cross-motions for summary judgment were due to be filed.[1] Having failed to cooperate, defense

counsel cannot expect Plaintiff's attorneys to drop their preparations for the brief and their Appendix on

such short notice. Furthermore, the revisions were extensive overall, far too much to expect Plaintiff's

counsel to comb through during the final stages of preparing their Motion, and included significant re-

writes of Rule 36 admissions as well as admissions Defendants made in their Answer. Not only are

those admissions binding, but Plaintiff has relied on them throughout the case to formulate discovery and

---

[1]     Plaintiff's counsel spoke to defense counsel just prior to the status conference on
October 11th and agreed to wait until the end of the day on October 12th for a response to the proposed
Joint Statement, which never came. The correspondence regarding the Joint Statement is attached at the
back of this document.

design litigation plans.

Under these circumstances, Plaintiff has filed his own Statement of Undisputed Facts, which is comprised in large part of binding admissions, which are highlighted in large Verdana font. The factual allegations in regular 12-point font have not been formally admitted, but cannot be reasonably disputed. They are annotated with references to the summary judgment appendix for the Court's convenience, which has been expanded to include materials necessary to remove any possible dispute pertaining to the allegations for which there is no formal admission.

## A.   STATUTORY COVERAGE

1.   KU is a program or activity that receives federal funds, and a covered employer under Section 504. 29 U.S.C. §794 (b)(2). **Complaint & Answer, ¶6.**

2.   The named Defendants are Dr. Kenneth S. Hawkinson, KU's President, and Jesus Peña, KU's Vice President for Equity, Compliance, and Liason for Legal Affairs. **Complaint & Answer, ¶¶7-8.**

3.   Defendants do not dispute that Plaintiff has a disability as defined by Section 504. **Exh. B, RFA No. 1.**

## B.   JOB HISTORY AND QUALIFICATION

4.*   Professor Oross satisfies the requisite skill, experience, education and other job-related requirements for his position as Associate Professor of Psychology. **Exh. BB.**

5.   Since he came to KU in 2002, Professor Oross has been a highly regarded professor and a productive researcher. **Complaint & Answer, ¶13.**

**6.*** Dr. Oross's personnel file shows all of the following:

    **a.** He earned his doctorate degree in experimental and developmental psychology from Vanderbilt University in 1987. He completed separate post-doctoral fellowships in Visual Perception and Developmental Disabilities, and then spent 15 years in research faculty positions at Vanderbilt, the Eunice Kennedy Shriver Center, and the University of Massachusetts Medical School with grant support from the National Institutes of Health. **Exh. BB.**

    **b.** In addition to his almost two decades of teaching and service to KU, Professor Oross has authored and co-authored multiple peer-reviewed scientific papers, presented works at many national and international conferences, and received recognition and high praise for his work from subject experts around the world. **Exh. BB.**

    **c.** Dr. Oross has taught a full range of psychology courses, but his primary areas of pursuit and special expertise are in experimental psychology, developmental disabilities, and developmental neuroscience. *Id.*

**7.** Dr. Oross was awarded tenure in and promoted to Associate Professor of Psychology in 2008. **Complaint & Answer, ¶¶6 & 17.**

**8.*** Based on KU's medical and FMLA files, there is no dispute about any of the following:

    **a.** Professor Oross had a serious heart attack in July, 2014. **Exh. CC.**

    **b.** During the course of the ensuing extensive medical treatment and cardiac rehabilitation, Dr. Oross sustained additional severe neurological and physical damage to his heart and other body systems. He underwent a double by-pass, as well as surgeries to install a pace maker and

an internal de-fibrillator. *Id.*

     c.     After a year-long medical leave, Dr. Oross returned to KU in the Fall of 2015 and resumed his full-time teaching load as well as his other professional responsibilities. **D-1004.**

## C.    SPRING 2020: THE PANDEMIC SHUTDOWN AND CONVERSION TO ONLINE INSTRUCTION

9.    After the Governor announced a state of emergency due to the Covid-19 virus, KU, along with most other institutions of higher education (IHEs) in the state, had to discontinue all in-person instruction by March 16, 2020. ***Gardner* Complaint & Answer, ¶¶ 24.**

10.    Pursuant to its Academic Continuity Plan, KU readily transitioned all of its in-person courses to an online delivery format. Faculty held office hours online, and conducted faculty and committee meetings remotely. **Complaint & Answer, ¶26;** ***see also Gardner* v. KU, et al., C.A. No. 22-1034, Complaint & Answer, ¶ 25.**

## D.    2020-21 ACADEMIC YEAR

11.    During the fall of 2020 Dr. Oross taught his full academic load, held virtual office hours, and served on faculty committees all on-line. **Complaint & Answer, ¶29.**

12.    Due to his heart condition, the University approved Dr. Oross for a medical leave of absence for the 2021 Spring semester, from January 19, 2021 - May 15, 2021. **Complaint & Answer, ¶30.**

-4-

13.    On February 24, 2021, Dr. Oross received a life-saving heart transplant at Hershey Medical Center. **Complaint & Answer, ¶31.**

14.    The CDC considers people with heart conditions, immunocompromise (weakened immune system), and solid organ transplant to be at significantly elevated risk for serious illness or death from Covid-19. See CDC, "Covid-19: People with Serious Medical Conditions," July 1, 2021 (updated October 14, 2021). **Complaint & Answer, ¶69.**

15.*    Because of his recent solid organ transplant, his longstanding heart condition, and high doses of immune-suppressing medications Professor Oross requires to prevent organ rejection, he is both immune-suppressed as well as immune-compromised, and at significantly higher risk for contracting the Covid-19 virus in comparison to the average person, and a significantly elevated risk for sever illness or death. **Exh. AA, at 11-12; 16; 28.**

16.    Pursuant to the CDC's guidance,"severe illness" encompasses the need for hospitalization, intensive care, a ventilator, or may result in death. **Exh. B, No. 35**.

**E.    2021-22 ACADEMIC YEAR**

17.*    Dr. Oross's doctors released him to return to work full-time for the 2021 fall semester provided that he do so remotely due to his high risk for serious illness or death if he contracts Covid-19. **Exh. M at 5.**

18.    According to the CDC, people at increased risk of severe illness or death, and those who live or visit with them, need to take precautions

to protect themselves from getting COVID-19. **Exh. B, RFA2 No. 34**.

19*.    Other than working remotely, the doctors placed no other restrictions on Dr. Oross

ability to return to his job. **Exh. M at 5**.

20.*    In July, 2021, Professor Oross communicated to his Dean his desire to return to

work and the safety issues that may preclude him from doing so in person. **Ex. K at 8**.

21.*    On July 27, 2021, the Dean forwarded the questions Dr. Oross presented

regarding KU's planned re-opening Covid-19 protocols to Jennifer Weidman, Director of Human

Resources, and she responded as follows on July 30th. **Exh. K at 9**.

      a.    There would be no mask requirement, so he could ask students to mask in

           class, but could not require it. *Id., at 8*.

      b.    There would be no vaccine requirement, so he could not ask students about

           their vaccination status. *Id*.

      c.    He would be required to hold office hours in person. *Id*.

      d.    There would be no social distancing, so he could ask people to sit further away,

           but classrooms would be back to normal layouts and capacities. *Id*.

      e.    No changes had been made to existing HVAC systems. *Id*.

22.    Weidman's responses were in line with President Hawkinson's

"Guide for Fall Semester: Covid-19 Information," which was first issued on

March 8, 2021. **Complaint & Answer, ¶39**.

23.*    Hawkinson's "Guide for Fall Semester" was re-published on or about August 8,

2021. **Exh. F at 5**.

24.     Under Hawkinson's Fall Guide, KU would be returning to a primarily face-to-face environment.Classrooms would "closely resemble pre-Covid configurations," and employees were expected to return to work on campus. **Complaint & Answer, ¶39**.

25.     Hawkinson's directive strongly encouraged vaccination, but did not require it. Students were encouraged, but not required, to update the University about their vaccination status. Masks would be required indoors, but there would be no social distancing requirements on-campus. **Complaint & Answer, ¶42.**

26.     Hawkinson stated that faculty would be required to conduct office hours in-person as part of the University's return to its normal practices. **Complaint & Answer, ¶40**.

27.     Nothing in the governing union contract provides that conducting office hours in person is an essential function of the job of an Associate Professor. **Exh. B, RFA 2 No. 4**.

28.*     Hawkinson's plan was to require all faculty to return to work in-person, without exception, even if they had health conditions or disabilities that placed them at high risk for serious illness or death. **Exh. Y at 15; 24**.

29.*     The CDC's "Guidance for "IHEs" recommends "options for accommodations, modifications, and assistance to students, faculty, and staff at increased risk for severe illness that limit their exposure to risk and allow for education and or work opportunities (such as virtual learning, telework, and modified job responsibilities). **Exh. W at 66; Exh. CC.**

-7-

https://www.cdc.gov/coronavirus/2019-ncov/community/colleges-universities/considerations.html#section4.

30.*    Hawkinson intended for there to be no changes in course modality to enable high-risk faculty to convert classes previously scheduled to be in-person to an online delivery format. **Exh. Y at 41; 65; Exh. G at 8.**

31.*    Hawkinson intended for there to be no protocol to allow employees not to come back to work on-campus due to Covid concerns. **Exh. Y at 23.**

### F.    PROFESSOR OROSS'S INFORMAL INQUIRY TO HR

32.    On August 2, 2021, before Dr. Oross submitted a formal request for accommodation, he E-mailed Ms. Weidman to advise that he would be seeking approval to teach his classes on-line and to ask what specific type of medical documentation she needed. **Complaint & Answer, ¶50 & 51; Exh. K at 6; L at 1.**

33.    On August 8th, Weidman told Professor Oross that there was "no provision for him to convert in-person courses to on-line modality for the Fall", and that "flexible work arrangements only pertained to the last academic year." **Complaint & Answer, ¶53; Exh. L-5.**

34.*    During the 2020-21 school year, 67 % of the University's faculty taught all of their courses online pursuant to the Governor's emergency order which required institutions of higher education to provide flexible work arrangements. **Exh. F at 2.**

35.    The "flexible work arrangements" available during the 2020-21 academic year did not require the employee to have a qualifying disability under federal or state disability law, and were by definition not intended

as "reasonable accommodations" for such disabilities. ***Gardner* Complaint & Answer, ¶33.[2]**

36.    Ms. Weidman stated that Dr. Oross could apply for ADA accommodation, but it would not [be] considered reasonable if it is a "fundamental alteration so significant that it changes the essential nature of the goods, services, facilities, privileges, advantages, or accommodations offered." **Complaint & Answer, ¶54**.

37.    Due to "the constraints within which we are operating at this time," Ms. Weidman told Dr. Oross that he could use "contiguous FMLA from Spring, which would be unpaid after he used the his 2 accrued personal days, and 15 of the sick days KU's policies allowed him to use in the fall semester." **Complaint & Answer, ¶55**.

38.    The next day, August 9th, Dr. Oross asked Ms. Weidman to explain why changing the delivery format for his classes would be a "fundamental alteration" that by definition, and without further inquiry, would be unreasonable, and therefore not an available accommodation for himself or others that are "being forced] to choose between surviving financial losses or surviving the virus." **Complaint & Answer, ¶56**.

39.    At least three other high-risk faculty had requested remote work accommodations but KU rejected all of them. **Complaint & Answer, ¶57.**

---

[2]        *See also* **Exh. V at 22; Exh. W at 26; 123.**

40.*  This E-mail exchange with Ms. Weidman took place before Dr. Oross submitted a formal accommodation request, and he noted that the framework for remote teaching and fulfilling other professional obligations [had] been in place, available, and [ ] used for quite some time extending back to actual pre-pandemic times." **Complaint & Answer, ¶58.**

41.   Weidman thereafter denied that her previous message had been intended as a denial of an ADA request, but said her reference to "fundamental alteration" pertained to the  "shift of a course scheduled as in-person to an on-line modality." **Complaint & Answer, ¶59; Exh. L at 7.**

42.*   Weidman stated that "there is a process to request an accommodation under the ADA" and that if Dr. Oross submitted such a request, "it would be evaluated and responded to according to that process." **Exh. L at 7.**

## E.   KU'S REASONABLE ACCOMMODATION PROCESS

43.   KU's published process for "Requesting Employee Accommodations" is coordinated by the Disabilities Service Office ("DSO") upon receipt of an employee's completed request form and supporting medical documentation. **Complaint & Answer, ¶44.**

44.   If the DSO Director concludes that the employee's medical documentation sufficiently establishes statutory protection, she sends an E-mail to HR Director Jennifer Weidman  with a description of the requested accommodation. Otherwise the request is denied. ***Gardner* Complaint & Answer, ¶71.**

45.   Although DSO determines whether an employee has a medical condition that qualifies them to move forward with the accommodation process, it does not make the decision as to whether an accommodation will be granted or denied. **Gardner** **Complaint & Answer, ¶72.**

46.   The DSO forwards the request to the Director of HR, Jennifer Weidman, disclosing information, as necessary, regarding the nature of the employee's disability and functional limitations so that an appropriate determination on the reasonable accommodation request can be made. **Complaint & Answer, ¶45.**

47.   KU Policy DIV-002 (the ADA Employee Policy") governs the disposition of requests for "Reasonable Accommodation for Employees." **Exh. B, RFA2 No. 18; *see also* Exh. D.**

48.   Responsibility for the implementation of the ADA Employee Policy rests with the Director of DSO, the HR Director, Jennifer Weidman, and Defendant Peña. **Exh. B, RFA2 No. 19.**

49.   Both Weidman and the Director for DSO report directly to Jesus Peña, and he reports to President Hawkinson. **Complaint & Answer, ¶46.**

50.   The ADA Employee Policy Employees requires that all accommodation requests be evaluated on an individual basis to determine whether the provision of such accommodation would create an undue hardship to the University. **Exh. B, RFA2 No. 20.**

51.   The policy provides that the HR Director or her designee "may convene a meeting to continue the interactive process to discuss the

requested accommodation as well as alternative accommodations that may be effective in meeting the requester's needs." **Complaint & Answer, ¶48.**

52.    The policy provides that if the employee has a qualifying disability, "a reasonable accommodation, if available, should be provided." **Complaint & Answer, ¶49.**

53.    Defendants do not dispute that the legal duty to provide reasonable accommodations under Section 504 provides no exception for inherent managerial rights, but requires such accommodation unless it constitutes an undue hardship. **Exh. B., RFA2 No. 30.**

### G.    2021 FALL SEMESTER REQUEST FOR ACCOMMODATION

54.    On August 11, 2021, pursuant to Weidman's instruction, Dr. Oross submitted a written accommodation request to DSO for "approval to teach fall courses and hold office hours on line." **Complaint & Answer, ¶60.**

55.    Other than teaching synchronously on-line, Dr. Oross requested no other changes to the course requirements, materials, or learning objectives, and he required no other accommodations. **Complaint & Answer, ¶35.**

56.    In support of his request, Dr. Oross submitted a letter from his treating cardiologist stating that due to his heart transplant, he requires life-long immuno-suppressive medications to reduce the risk of organ

rejection. That risk is higher during first year, when he requires higher dosages, which also places him at higher risk of infection. In support of his request for accommodation, Dr. Oross submitted a letter from his cardiologist stating that he should remain in a low risk teaching environment and work remotely to reduce risk of infection. Otherwise, she imposed no restrictions on his capacity to fulfill the essential functions of his job. **Complaint & Answer, ¶¶61-62; 32.**

57.    Martin sent the Resolution Form to Professor Oross on August 18, 2021, which stated that his accommodation had been denied because "changing course delivery would be a "fundamental alteration," as would holding his office hours on-line. **Complaint & Answer, ¶¶63; SO-1**.

58.    Defendants do not dispute that Dr. Oross's request for a remote work accommodation in August, 2021 triggered their legal duty to initiate an interactive process before they denied his request. **Exh. B, RFA2 No. 8**.

59.    The responsibility for conducting what KU defines as the "interactive process" is ordinarily delegated to the Employee Relations Manager (currently Alexis Martin). **Exh. B, RFA2 No. 21**. *See also* **Exh. V at 7; Exh. W at 14.**

60.\*    Martin has no independent authority to grant or deny an employee request for reasonable accommodation. **Exh. V at 34.**

**61.\*** Dr. Oross's accommodation request was denied without an interactive process. **W at 54.**

**62.\*** Martin did not speak with Dr. Oross about his request. *Id.,* **at 41.**

**63.\*** The only people Martin communicated with about Professor Oross's request for accommodation were Weidman and Peña. **Exh. V at 41.**

**64.\*** Weidman did not communicate with the Dean, the Department Chair, or Interim Chair before she denied Professor Oross's accommodation request. **Exh. W at 134.**

**65.\*** The only person Weidman spoke with about Professor Oross's request for accommodation was Peña. **Exh. X at 74-75.**

**66.\*** The decision to deny Professor Oross's request for accommodation was made before he submitted it based on the nature of his request, not his individualized circumstances. **Exh. X at 65; 76-79; 92; Exh. W at 37; 51; 133; Exh. V at 50-51.**

**67.\*** Martin prepared the Resolution Form for Weidman's signature and sent it to her on August 16th, noting that Dr. Oross's "original request is denied as is." **Exh. V at 42; Exh M at 7.**

**68.\*** Martin asked Weidman to let her know if the basis for the denial was not "in line with our previous discussions." *Id.*

**69.\*** Martin was referring to discussions that began in July, before Professor Oross submitted his request for accommodation. **Exh. V at 41; Exh. W at 37.**

**70.\*** As faculty requests to utilizing the ADA process to telework or work remotely were coming in, the administration was already in talks or developing broad language as to how they were going to deny them. **Exh. V at 13; 20-21; 30.**

71.*   Martin did not author the "fundamental alteration language," but used the template Weidman and Peña instructed her to use on all faculty requests seeking remote work accommodations for courses that were previously scheduled to be held in person. **Exh. V at 13; 20-21; 37; 43; Exh. W at 57.**

72.*   Martin used the same template to prepare denials for all of the high-risk faculty who requested remote work accommodations for the fall semester. **Exh. V at 43; Exh. DD.** *See also Gardner Complaint,* **¶83 and corresponding SED production at CG-46.**

73.   Neither the Dean nor the Department Chair objected to Professor Oross's request for a remote work accommodation. **Exh. B, RFA2 Nos. 10-11.**

74.   HR received no documentation from the Dean, the Department Chair or the Interim Chair stating, indicating, or suggesting that providing synchronous remote work accommodations to Professor Oross as he requested in August, 2021 would require significant difficulty or expense. **Exh. B, RFA2 No. 12.**

75.*   When Dr. Oross asked Martin for a written explanation as to why his request had been denied on the basis of fundamental alteration, she wrote to Weidman "does it seem like he's asking for a personal/specific to him explanation?" **Exh. M at 11.**

76.   The University has no policy calling for the denial of employee requests for reasonable disability-based accommodations on the ground that it "fundamentally alters" any of the University's course offerings, services or methods of operation or administration. **Exh. B, RFA 2 No. 25.**

77.    Defendants do not dispute that the applicable legal standard for employee accommodations under Section 504 is undue hardship, not fundamental alteration. **Exh. B, RFA2 No. 28.**

78.*    Allowing Dr. Oross to teach his 2021 fall semester courses online would not have entailed significant expense to the University, and that is not why it was denied. **Exh. X at 67; Exh. W at 93.**

79.*    Allowing Dr. Oross to teach his 2021 fall semester courses online would not have been practically infeasible, and that is not why it was denied. ***Id.,* at 53.**

80.*  The existing classroom technology at KU would allow Dr. Oross and his students to see and interact with each other in real time without requiring any significant difficulty or expense to KU. **Exh. H at 7.**

81.    Dr. Oross had been teaching online classes in the University starting in 2013. In 2015, he completed the University's certification program for online teaching. Thereafter, through the conclusion of the 2020 fall semester, he taught 22 classes online, including all of the courses he was scheduled to teach during the 2021-22 school year. **Complaint & Answer, ¶22;** *see also* **Exh. BB at 19**.

82.    According to its published marketing materials, distance education is a "critical component to of the University's mission to lead itself into the future. **Complaint & Answer, ¶23.**

83.    The University has a dedicated team of instructional designers, media producers, and technical support staff that collaborates with faculty

"to ensure that the online experience reflects the rigorous education for which [it] is known." **Complaint & Answer, ¶25.**

84.     Under the University's Course Design Principles and Models, synchronous online instruction takes place 100% remotely using Zoom or other video conferencing software, which allows for virtual interaction between instructors, students, and colleagues in real time. **Exh. B No. 13.**

85.     New technology had been recently installed across campus which "allows [ ] for synchronous instruction for Fall 2020 and beyond." ***Gardner* Complaint & Answer, ¶68.**[3]

86.*    15 per cent of KU's course offerings for the 2021 Fall Semester were fully on-line. Another 7% were delivered partially online. **Exh. J at 7.**

## H.     REQUEST FOR MEDICAL SABBATICAL

87.     On August 24, 2021, Dr. Oross sent a letter to President Hawkinson requesting a restoration to health sabbatical for the fall semester pursuant to the union contract and state law, which would provide him with 18 weeks of leave at full pay. **Complaint & Answer, ¶¶76.**

88.     To support his request for sabbatical, Dr. Oross provided his cardiologist's letter specifying the medical necessity for a remote work accommodation. He also summarized HR's refusal to approve his request

---

[3]     ***See also* Exh. H at 7; Exh. X at 86-87.**

-17-

for reasonable accommodation. **Complaint & Answer, ¶¶77.**

89.*    Hawkinson forwarded Dr. Oross's sabbatical request to Peña, Weidman, and the Provost, asking them to "Please advise." **Exh. N at 1.**

90.    In a phone call on August 26th, Weidman told Dr. Oross that Hawkinson had denied his restoration to health sabbatical. **Complaint & Answer, ¶79.**

91.*    Hawkinson denied Dr. Oross's request for sabbatical on the ground that his doctor had released him to return to work full-time. **Exh. Y at 95-97; Exh. W at 72.**

92.*    Hawkinson's decision to deny the sabbatical was not based on established criteria or past practice in the PASSHE system. **Exh. W at 69; 72; Exh. X at 99; Exh. Y at 95; 99.**

93.*    Dr. Oross's cardiologist had released him to return to work full-time in a low risk teaching environment, not in-person on KU's campus. **Exh. M at 5.**

94.    In an E-mail on Friday, August 27th, Weidman told Dr. Oross that Dr. Hawkinson had asked her to review "the other options for the fall semester." **Complaint & Answer, ¶79.**

95.    Weidman had never previously presented any options other than LWOP, but now she wrote that KU was considering adding 2 "high demand" on-line psychology courses to the Fall schedule. **Complaint & Answer, ¶80.**

96.*    The "offer" Weidman presented to Dr. Oross was not intended as a reasonable accommodation, but "to meet student need." **Exh. W at 77.**

97.   Weidman  did not identify what the classes would be.
**Complaint & Answer, ¶81**.

98.   Weidman encouraged Dr. Oross "to discuss this with [his] Chair and [his] dean," and to let her know his decision by Monday, August 30th. **Complaint & Answer, ¶82.**

99.   The first day of classes for the 2021 Fall Semester was August 30, 2021. **Complaint & Answer, ¶37**.

100.*   Dr. Oross told Weidman in an E-mail on August 30th that his Department Chair had not heard from the Dean that there were plans to offer any new courses for the fall semester, and the Chair saw no need for any such offerings. **Exh. N at 5;** *see also* **Exh. W at 81**.

101.*   Dr. Oross stated in his E-mail that Weidman had not given him sufficient details to provide a meaningful basis for a decision, so he was not able to accept or reject her proposal. **Exh. N at 5**.

102.*   Dr. Oross asked Weidman what the courses would be, when they would start, and how students would know about them. *Id*.

103.*   Without answering any of Dr. Oross's questions, Weidman replied in an E-mail on August 30th that because Dr. Oross was "not able to accept our offer," his only option was to continue on sick leave, which would allow his benefits to continue. **Exh. N at 7**.

104.   The Psychology Department did not offer any "high demand" courses to the Fall, 2021 schedule after the drop-add period, nor has it offered any such courses during the past 5 years. **Exh. B, RFA2 No. 17.**

## I.    PROTECTED ACTIVITY AND OPPOSITION

105.  Professor Oross's requests for disability-related accommodations and his communications related thereto with University administration, as described in his Complaint, constitute protected activity under Section 504. **Exh. B, RFA2 No. 39.**

106.  In late August, Professor Oross started speaking out publicly about his own situation, not in the course of his job duties, or on KU's behalf, but as a private citizen on what had long been an issue of broad community concern, for faculty, staff, and students alike. **Complaint & Answer, ¶72.**

107.  Professor Oross had a reasonable basis to believe that he was legally entitled to the remote work accommodations he requested beginning in the summer of 2021. **Exh. B, RFA2 No. 38.**

108.*  On August 22nd, Professor Oross signed the "open letter" that had been circulating among faculty on Facebook ("FB"), and shared the link with the remark that "it behooves the university administration to foster a culture of inclusiveness, where all constituents are encouraged to consider themselves as active participants in keeping everyone safe." **Exh. Q.**

109.*  On August 24, 2021, Professor Oross shared a FB link to an upcoming radio podcast on "Raging Chicken Press," hosted by a faculty member from the English Department, that would  "dig into" KU's back to campus plans, and more specifically, its refusal to grant faculty requests to keep an all online schedule due to their high risk for Covid infection and its potentially dire consequences. The  podcast would "get into" his how he was "being forced to make an awful choice

between his job and his personal well-being."

110.* Professor Oross encouraged people to tune into the podcast to learn more about his current situation and the status of KU's preparations for the upcoming fall semester. "Spread the word," he said. "People's lives depend on action."

111.* Dr. Oross continued to post public health information and other materials on Facebook related to Covid, especially as it pertained to educational settings, including an article about faculty at the University of Wisconsin at Madison wanting answers on remote teaching requests for vulnerable members, and a CNN opinion piece entitled *"I'm a college professor, not a Covid guinea pig."* **Exh. EE at 4.**

112.* Professor Oross shared the announcement by Raging Chicken Press publicizing its upcoming Labor Day show where he would be discussing KU's refusal to provide him with an on-line teaching accommodation, followed by the link to his interview. **Exh. EE at 6 & 9.**

113.* On September 9, 2021, Professor Oross shared a 2014 photo of himself from his cardiac rehab in 2014, and another taken 4 days after his heart transplant at PSU Hershey Medical Center. **Exh. EE at 11 & 13.**

114. On September 10, 2021, Dr. Hawkinson issued an "Update" on Covid-19 issues after it "came to our attention that some members of our community have been planning a demonstration to protest the university's Covid-19 protocols." **Complaint & Answer, ¶90.**

115. Hawkinson said that KU's "top priority" was reopening the campus to largely in-person instruction in a safe and secure environment.

**Complaint & Answer, ¶91.**

116.  For people with impairments and disabilities that place them at higher risk for serious illness or death, returning to campus is inherently less safe than it is for people without those risks. **Exh. B RFA2 Nos. 36 & 37**.

117.  Hawkinson said that his reopening plan was fully within the Covid-19 guidance from governmental authorities, including the CDC and other heath experts. **Complaint & Answer, ¶93.**

118.*  Dr. Oross, among other faculty, publicly disputed Hawkinson's statements on the faculty listserve and on social media. **Https://www.facebook.com/steve.oross.9.**

119.  Professor Oross had a well-established right under Section 504 to express opposition to what he alleged to be KU's failure to comply with its legal duties to provide disability-related accommodations for students and faculty at high risk for Covid-19 that was protected from retaliation, interference, or other forms of coercive action. **Exh. B, RFA2 No. 44**.

120.  The statements Professor Oross made to University administration, directly and indirectly through the faculty list serve and/or on social media regarding its refusal to provide him with remote work accommodations, and the legal basis therefore, constituted protected activity under Section 504 that was protected from retaliation, interference, or other forms of coercive action. **Exh. B, RFA2 No. 40**.

121.*  After Hawkinson's September 10th "Update," Professor Oross posted to FB that his "current professional status was unpaid leave for 2021 fall semester, followed by a summary of his

unsuccessful efforts to secure a reasonable remote teaching accommodation, and the denial of his request for a restoration to health sabbatical. **Exh. EE at 15.**

122.* Dr. Oross spoke to the press pertaining to his own situation and his concern about other high-risk faculty and students at KU.

123.* Defendants were aware that on September 24, 2021, the Philadelphia Inquirer ran a front page article highlighting the denial of Dr. Oross's request for accommodation entitled "*A Professor Got a Heart Transplant, so He Wanted to Teach Online. His University said No,*" with a picture of Dr. Oross. **Exh. R at 2; Exh. W at 95; Exh. X at 186; Exh. Y at 182.**

124.* The Inquirer article ran the same day in the Philadelphia Daily News with the front page caption "*No Mercy*". **Exh. R at 17.**

125.* Professor Oross shared both of the September 24th articles on FB, with a comment that Dr. Hawkinson and KU admin have made the front page for "one of their outstanding accomplishments. Clearly they have much to be proud of as a standout institution in the PASSHE system." **Exh. EE at 29.**

126. Other similar articles soon appeared that either featured or quoted Dr. Oross, including one in The Morning Call on September 26th entitled *Lehigh Valley College Students Say Schools Should Have Done More to Prepare for Slew of Breakthrough Cases.* ***Exh. R at 21; Gardner Complaint & Answer, ¶ 98.***

127. Defendants were aware of an article that appeared in the September 29th issue of "Inside Higher Ed": *"Denied in a Heartbeat."* The

sub-caption read "*Kutztown University didn't grant any remote teaching requests this term, not even to an immunosuppressed professor with a new heart.*" *The case raises more questions about "blanket" accommodation bans.*" **Exh. R at 12; *Exh. Y at 92.***

**128.*** On October 11th, Dr. Oross began sharing FB notices for an upcoming student-led rally at which he was scheduled to speak to protest KU's responses to Covid concerns, and its denial of requests for accommodations made by high-risk students, staff, and faculty. **Exh. EE at 47**.

**129.*** As reported by *Berks Regional News* and local WFMZ television the day after the October 18th rally, Dr. Oross told the crowd that "we have the technology to do this. We've done it. I've done it. The whole campus, the whole country did it." **P-123; *see also***

**https://www.wfmz.com/news/area/berks/students-staff-protest-k us-handling-of-covid-concerns/article_dc984152-312d-11ec-ad4a-efe 801e9493a.html.**

130. The public statements Professor Oross made on behalf of others regarding KU's denial of accommodations to high-risk faculty and students, as described in his Complaint, constituted protected activity under Section 504 that was protected from retaliation, interference, or other forms of coercive action. **Exh. B, RFA No. 41**.

### J.   THE FULL-TIME, FULL-DUTY RULE

131. On October 4, 2021, Disabilities Rights of Pennsylvania ("DRP") wrote to Jesus Peña explaining that KU's refusal to provide accommodations to Professor Oross violated federal disability law, and

seeking his reinstatement with accommodations, and the restoration of the pay and other benefits that had been withheld since the beginning of his forced leave of absence. **Complaint & Answer, ¶101**.

132.* On Dr. Oross's behalf, DRP requested that be provided a fully remote course load for the spring semester and permission to conduct his office hours remotely if needed based on his doctors advice. **Exh S.**

133.* Peña sent the DRP letter to Michael Ferguson, counsel for the KU. **Exh. X at 80**.

134.* Peña spoke with Hawkinson about the letter from DRP and told him that Ferguson would be responding to it. **Exh. X at 82-83**.

135.* On October 11th, in an E-mail copied to Peña and Ferguson, Weidman directed DSO to provide Ferguson with "all medical documentation provided by Steven Oross for his ADA request." **Exh. S at 10**.

136.* Under KU's accommodation policies and practices for employees, all such information is maintained by DSO and not shared with HR except to the extent necessary to enable it to determine whether the accommodation can be provided without undue hardship. **Exh. V at 15-17; Exh. W at 43**.

137.* Weidman does not supervise DSO. Peña supervises both HR and DSO. **SO-3; Exh. X at 28**.

138.* During the afternoon of October 11, 2021, DSO transmitted all of the medical documentation Professor Oross submitted in connection with his request for reasonable accommodation to Weidman, Ferguson, and Peña. **Exh. S at 10**.

**139.*** On October 14th, Ferguson responded to DRP's letter on behalf of KU, and copied Jesus Peña and on the letter. **Exh. S at 7.**

**140.*** Pena collaborated with Ferguson before the letter went out. **Exh. X at 89.**

**141.*** In his letter to DRP, Ferguson stated that KU would be happy to engage in an interactive process with Professor Oross but only if he stops publish[ing] all written information in a public manner. **Exh. S at 7.**

**142.*** Defendants do not dispute that an individual's right to the interactive process under Section 504 cannot be conditioned on their giving up other rights, including but not limited to the right to free speech. **Exh. W at 99.**

**143.*** In his letter, Ferguson provided DRP with the link to Professor Oross's FB account. **Exh. S at 7, n. 1.**

**144.*** Since late August, 2021, Professor Oross had used his public FB account to post a number of comments and articles pertaining to all of the following:

    **a.** Public health information regarding Covid-19. **Exh. EE at 1-52.**

    **b.** Campus and community implications of public attitudes regarding masking, vaccines, mandates, and refusal. *Id.*

    **c.** Concerns and frustrations of American college professors who feel unsafe teaching in-person without adequate Covid protocols in place,

    **d.** Legal information and theories about liability and employer ethics in relation to providing safe workplaces for employees in general, and those who are at high-risk. *Id.*

e.    Documents and commentary criticizing how KU had handled his request for accommodation, as well as that of other faculty and students whom he believed were being denied accommodations to which they were legally entitled. *Id.*

f.    Comments to raise awareness and express anguish about the consequences of Covid-19 for vulnerable people, including those recovering from solid organ transplants. **Exh. EE at 25.**

145.*   The first time Professor Oross shared "written information" between himself and KU's administration 'in a public manner" on FB was on October 8th, when he shared the first page of DRP's letter, Weidman's August 2nd response to his inquiry regarding his request to teach remotely, and his reply to her, all under the heading "Brief Update with More to Follow." **Exh. EE at 36.**

146.*   On October 11th and 13th Dr. Oross began sharing FB notices for an upcoming student-led rally at which he was scheduled to speak to protest KU's responses to Covid concerns, and its denial of requests for accommodations made by high-risk students, staff, and faculty. **Exh. EE at 47.**

147.*   The day before Ferguson's letter, Weidman sent a separate letter to Professor Oross in which she stated that his "request" for extended leave without pay from 9/23/21 through 6/23/22 was granted. **Exh. T.**

148.*   Dr. Oross did not ask for an extended leave without pay. **Exh. B, RFA2 No. 14.**

149.  In her October 13th letter, Weidman that unless he produced a "full-time, full-duty" medical release by December 29, 2021, Dr. Oross's medical benefits would expire at midnight. **Complaint & Answer, ¶111.**

150.* Weidman informed Dr. Oross that if he is released to return to full-time, full-duty after 12/29/21, he would have "limited return to work rights," and would remain on extended unpaid leave until a position becomes available, in the same or equivalent classification, that KU intends to fill, and is not barred by seniority. **Exh. T at 2.**

151.  Weidman did not define what she meant by "full-time, full-duty." **Complaint & Answer, ¶112.**

152.* Professor Oross posted Weidman's October 13th letter to FB with the query "did they just raise the stakes? So unnecessary." **P-343.**

153.  Peña was aware of Weidman's October 13, 2021 letter to Dr. Oross because she copied him on the letter. The PASSHE letter was copied to both Peña and Hawkinson. **Complaint & Answer, ¶110.**

154.* Neither Peña nor Hawkinson ever disavowed either Weidman's October 13th letter to Dr. Oross or Ferguson's letter on October 14th. **Exh. X at 126.**

155.  In an E-mail on October 21, 2021, Dr. Oross asked Ms. Weidman to define the term "full-time, full duty," and whether "full-time, full-duty" meant "full-time, in-person." **Complaint & Answer, ¶120.**

156.* Dr. Oross sent his October 21st E-mail to Weidman directly, and copied only the Dean and the Interim Department Chair. **Exh. T at 8.**

157.  By October 25th, after waiting 93 hours for an answer, Dr. Oross sent Weidman another E-mail demanding a response, which he copied to the faculty, Hawkinson, Peña, and a number of other KU administrators. **Complaint & Answer, ¶121.**

158.*  On October 27, 2021, Weidman wrote to Dr. Oross that "teaching in-person in the classroom is considered an essential function of his faculty position, so that's what full-duty means." **Exh. T at 16.**

159.*  Before issuing her October 13th letter to Dr. Oross, Weidman sought assistance from PASSHE's benefits office to highlight that he would not be allowed to teach his online winter class or his 2 online spring classes unless he had a medical release to teach in-person. **Exh. T at 3-6.**

160.*  Weidman  never saw a full-time, full-duty rule written anywhere, nor is there any such policy in the union contract. **Exh. W at 108.**

161.*  President Hawkinson did not know what "full-time, full-duty meant," or whether it had ever been applied to a faculty member at KU. **Exh. Y at 211.**

162.  There is no policy, contractual definition, or pre-existing job description defining "full duty" for an Associate Professor, much less one stating that teaching in-person in the classroom is an essential function of the job. ***Gardner*, Complaint & Answer, ¶112.**[4]

163.*  Dr. Oross posted Weidman's full-time, full-duty response on Facebook, summarizing the situation like this: "I have a time line demanding that my health improves to a point that

---

[4]       ***See also* Exh. W at 126-127.**

I am cleared to return to "in-person" teaching before being permitted to conduct on-line courses. Additionally, if this timeline is not met my benefits, my employment, and my retirement benefits are in jeopardy." **Exh. T at 16**.

### K. THE TRO AND PROFESSOR OROSS'S RETURN TO WORK

**164.*** Since the 2021 fall semester, there have been no changes to the "fundamental alterations policy," even for faculty with disabilities who are at high risk for serious Covid-19 related illness or death. **Exh. B, RFA2 No. 32.**

**165.*** Pursuant to the TRO issued by the Court on December 12, 2021 and the ensuing agreement mediated by Judge Rice to avert further litigation over Dr. Oross's right to preliminary injunctive relief, KU allowed him to return to work full-time for the 2022 winter term.

**166.*** Since then, Dr. Oross has continued to teach his full course load in a remote format.

**167.*** The Psychology Department has planned for Dr. Oross to have a remote work schedule to accommodate his disability, thereby avoiding any need to convert his courses from in-person to online after publication and student registration.

**168.*** Neither the Dean nor the Chair of the Psychology Department have raised any objection to providing Dr. Oross with a remote work schedule, nor has his remote work schedule imposed any hardship on the Department or its operations.

170. Defendants do not dispute that the statements Professor Oross made to University administration, directly and indirectly through

the faculty list serve and/or on social media regarding its refusal to provide him with remote work accommodations, and the legal basis therefore, constituted protected activity under Section 504 that was protected from retaliation, interference, or other forms of coercive action. **Exh. B, RFA2 No. 40**.

171.   Defendants do not dispute that the public statements Professor Oross made on on behalf of others regarding KU's denial of accommodations to high-risk faculty and students, as described in his Complaint, constituted protected activity under Section 504 that was protected from retaliation, interference, or other forms of coercive action. **Exh. B, RFA2 No. 41**.

172.   Defendants do not dispute that Professor Oross's public statements criticizing the manner in which they were responding to requests for accommodation by high-risk faculty and students, and the legality thereof under governing disability law, pertained to a matter of public concern. **Exh. B, RFA2 No. 42**.

173.   Defendant Pena does not dispute that Professor Oross had a well-established right under the 1st Amendment to the U.S. Constitution to express opposition to what he perceived as KU's failure to comply with its legal duties to provide disability-related accommodations to himself, as well as other faculty and students and faculty at high risk for Covid-19 and its potential consequences, that was protected from retaliation, interference, or other forms of coercive action. **Exh. B, RFA2 No. 43**.

174.  Defendant Hawkinson does not dispute that Professor Oross had a well-established right under Section 504 to express opposition to what he alleged to be KU's failure to comply with its legal duties to provide disability-related accommodations for students and faculty at high risk for Covid-19 that was protected from retaliation, interference, or other forms of coercive action. **Exh. B, RFA2 No. 44**.

175.  Defendant Hawkinson does not dispute that Professor Oross had a well-established right under the 1st Amendment to the U.S. Constitution to express opposition to what he alleged to be KU's failure to comply with its legal duties to provide disability-related accommodations for students and faculty at high risk for Covid-19 and its potential consequences that was protected from retaliation, interference, or other forms of coercive action. **Exh. B, RFA2 No. 45**.

178.  Professor Oross had a well-established right under Section 504 to oppose, administration, and in public, to oppose how it handled and denied his requests for accommodation constituted protected opposition statements made on behalf of himself and others, and in opposition to what he alleged to be KU's failure to comply with its legal duties to provide disability-related accommodations for students and faculty at high risk for Covid-19. to what he perceived to be part constitute protected opposition and pertained to a matter of public concern, and are therefore protected from retaliation,  interference, or other forms of coercive action under Section 504 and the 1st Amendment. **Exh. B, RFA2 No. 46**.

Respectfully submitted,

**LORRIE McKINLEY, ESQUIRE**
Attorney I.D. No. 41211
**McKINLEY & RYAN, LLC**
238 West Miner Street
West Chester, PA 19382
(610) 436-6060

**RALPH E. LAMAR**
201 N. 3rd Street, No. 323
Allentown, PA 18102
(610) 563-0726
ralphlamar@ymail.com

*Counsel for Plaintiff, Stephen Oross, III*

DATE: October 14, 2022

**Lorrie McKinley**

---

| | |
|---|---|
| **From:** | Lorrie McKinley |
| **Sent:** | Thursday, September 29, 2022 4:37 PM |
| **To:** | Le, Kathy |
| **Cc:** | Ralph Lamar |
| **Subject:** | Draft Joint Statement of Undisputed Facts |
| **Attachments:** | Statement of Undisputed Facts.2.pdf |

Kathy-

Pursuant to Judge Schmehl's standing order regarding Rule 56 motions, I am sending a draft Joint Statement of Undisputed Facts. As you will see, I have incorporated the facts that have already been admitted, which you will see in a big Verdana font. I have placed them in context with other facts which I think are either undisputed or cannot reasonably be disputed. You will see those in a regular font with starred and bolded Paragraph numbers.

What I think makes sense is to eliminate what we don't need to discuss, and then focus on the rest. The admitted facts are what they are, so unless you find a transcription error, we should not have to address them at all. What I am asking you to do is to review the other proposed facts and let me know which of them you will agree to without further modification. Once we have narrowed down the ones we have to discuss, we can set up a time to do that.

Lorrie

-------------------------------------------------------------------
*Lorrie McKinley*
Lorrie McKinley, Esquire
McKinley & Ryan, LLC
238 West Miner Street
West Chester, PA 19382
(610) 436-6060
Fax: (610) 436-6804

1

**Lorrie McKinley**

| | |
|---|---|
| **From:** | Lorrie McKinley |
| **Sent:** | Thursday, October 13, 2022 8:20 PM |
| **To:** | Le, Kathy |
| **Cc:** | Ralph Lamar |
| **Subject:** | RE: Oross Statement of Undisputed Facts |

Kathy, it is not possible, nor is it remotely fair to ask me to comb through all of this now. You have had these for 2 weeks. The brief is due tomorrow, and I simply don't have the time.

Lorrie

------------------------------------------------------------------

*Lorrie McKinley*
Lorrie McKinley, Esquire
McKinley & Ryan, LLC
238 West Miner Street
West Chester, PA  19382
(610) 436-6060
Fax:  (610) 436-6804

**From:** Le, Kathy <kle@attorneygeneral.gov>
**Sent:** Thursday, October 13, 2022 5:49 PM
**To:** Lorrie McKinley <LMcKinley@mckinleyryan.com>
**Subject:** Oross Statement of Undisputed Facts

Lorrie,

Sorry for the delay. Attached are my edits to the joint SUMF except for the last section on Protected Activity. I am still working through that section but wanted to send this part to you so you can review. I will send you the remainder in a couple hours.

**Kathy A. Le**
Deputy Attorney General
Pennsylvania Office of Attorney General
Eastern Regional Office, Civil Litigation Section
1600 Arch Street, Suite 300
Philadelphia, PA 19103
Phone: (215) 560-2141
Fax: (717) 772-4526
kle@attorneygeneral.gov

The information transmitted is intended only for the person or entity to whom it is addressed and may contain confidential and/or privileged material.  Any use of this information other than by the intended recipient is prohibited. If you receive this message in error, please send a reply e-mail to the sender and delete the material from any and all computers.  Unintended transmissions shall not constitute waiver of any applicable attorney-client or any other applicable privilege. PA-OAG

This message has been scanned for malware by Websense. www.websense.com

## CERTIFICATE OF SERVICE

I hereby certify that on this date, October 14, 2022 , a true and correct copy of the foregoing

Plaintiff's Statement of Undisputed Facts was served upon counsel by E-mail as follows:

>    Kathy A. Le, Esquire
>    Deputy Attorney General
>    Pennsylvania Office of Attorney General
>    Eastern Regional Office, Civil Litigation Section
>    1600 Arch Street, Suite 300
>    Philadelphia, PA 19103
>    kle@attorneygeneral.gov

LORRIE McKINLEY, ESQUIRE

-34-