Jennifer Weidman

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN OROSS, III,           :
          PLAINTIFF           :   CIVIL ACTION
                              :
          VS                  :   NO. 21-5032
                              :
KUTZTOWN UNIVERSITY, et al.,: 
          DEFENDANTS          :

_____


ZOOM DEPOSITION OF JENNIFER WEIDMAN



DATE AND TIME:  Monday, March 7, 2022
                at 10:02 a.m.




_____




KAPLAN LEAMAN & WOLFE
COURT REPORTING & LITIGATION SUPPORT
230 SOUTH BROAD STREET, SUITE 1303
PHILADELPHIA, PENNSYLVANIA 19102
(215) 922-7112 1-877-KLW-DEPO
www.klwreporters.com

Jennifer Weidman

## Page 2

```
 1    APPEARANCES:
 2    McKINLEY & RYAN, LLC
      By: Lorrie McKinley, Esquire
 3    238 West Miner Street
      West Chester, PA 19382
 4    (610) 436-6060
      lmckinley@mckinleyryan.com
 5
          Representing the Plaintiff
 6
 7    PENNSYLVANIA OFFICE OF ATTORNEY GENERAL
      By: Kathy Le, Deputy Attorney General
 8    By: Melissa Zeigler, Deputy Attorney General
      Eastern Regional Office, Civil Litigation Section
      1600 Arch Street, Suite 300
 9    Philadelphia, PA 19103
      (215) 560-2141
10    kle@attorneygeneral.gov
11        Representing the Defendants
      ALSO PRESENT:
12
13        Stephen Oross, III
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

I N D E X

| WITNESS | EXAMINED BY | PAGE |
|---|---|---|
| Jennifer Weidman | Ms. McKinley | 4 |
| | Ms. Le | 146 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| SO Exhibit 9 - Guide for Spring 2022 COVID-19 Information, 12/8/21; Guide for Fall Semester COVID-19 Information, 8/8/21; Guide for Fall Semester COVID-19 Information, 8/8/21 | | 22 |
| SO Exhibit 10 - Guide for Spring 2022 COVID-19 Information, 3/22/22 | | 23 |
| SO Exhibit 11 - Guide for Fall Semester COVID-19 Information, 8/8/21 | | 26 |
| SO Exhibit 12 - Various correspondence | | 31 |
| SO Exhibit 13 - Kutztown University Policy DIV-002 and DIV-008 | | 40 |
| SO Exhibit 14 - Letter dated 8/24/21 and letter dated 8/11/21 | | 69 |
| SO Exhibit 15 - Various correspondence | | 74 |
| SO Exhibit 16 - Letter dated 10/14/21 | | 93 |
| SO Exhibit 17 - Letter dated 10/4/21 | | 99 |
| SO Exhibit 18 - Letter dated 10/13/21 | | 101 |
| SO Exhibit 19 - Interim Agreement | | 131 |
| SO Exhibit 20 - Various correspondence | | 117 |
| SO Exhibit 21 - Various correspondence | | 134 |
| SO Exhibit 22 - Various correspondence | | 62 |

## Page 4

```
 1            STIPULATION
 2            It is hereby stipulated by and between
 3    counsel for the respective parties that reading,
 4    signing, sealing, certification and filing are waived;
 5    and that all objections except as to the form of the
 6    question are reserved to the time of trial.
 7
 8            JENNIFER WEIDMAN, called as a witness, duly
 9    being sworn, testified as follows:
10
11            EXAMINATION
12
13    BY MS. McKINLEY:
14        Q     Good morning, Ms. Weidman.  My name is
15    Lorrie McKinley, as I'm sure you know, and I'm
16    obviously going to be asking you questions today.  You
17    have had your deposition taken before, haven't you?
18        A     I have not.
19        Q     Oh, you haven't.  Okay.  All right.
20    Well, then I will give you a little fuller explanation
21    than I was planning about what we're going to do
22    today.
23            I'm going to be asking you questions
24    pertaining to the case that Dr. Oross has brought
25    against Kutztown University.  When I ask you a
```

## Page 5

```
 1    question, if you don't understand it or if you can't
 2    hear me or, you know, what have you, just let me know
 3    and I'll be happy to rephrase it or repeat it.
 4            If you do answer a question and you don't
 5    tell me you don't understand it or couldn't hear me,
 6    I'm going to assume that you did hear me and did
 7    understand it.  Does that sound fair to you?
 8        A     That's fine.
 9        Q     Okay, good.  One of the most important
10    things to remember about a deposition, and especially
11    in a Zoom deposition like this, is we have a court
12    reporter who is going to take down everything that I
13    say and everything that you say and so it's very
14    important that we not speak over each other.
15            So if you can wait until I finish my
16    question and I'll try to wait until you finish your
17    answer.  Sometimes, you know, we're thinking through
18    what we're going to say and sometimes there's a little
19    bit of a pause so you have to sort of rely on body
20    language once in a while.
21            The other thing is that I -- I can see
22    when you shake your head or -- one way or the other,
23    but the court reporter can only take down verbal
24    responses.  So if you do shake your head, you also
25    have to say something; otherwise, we won't be on the
```

Jennifer Weidman

Page 6

1  record.  Okay?
2     A    Understood.
3     Q    If at any point you need to take a break,
4  just let me know and we can do that, as long as
5  there's no question pending.  And we probably will
6  take a couple short breaks, at least, because you'll
7  probably be here for a little while.  We'll try to be
8  as efficient as possible, but we have a lot of
9  documents and other things to get through.
10           Before we get started, do you have any
11  questions for me about the process?
12     A    No, I do not.
13     Q    Okay.  So I understand that you are the
14  human resources director at Kutztown; is that correct?
15  Is that your official title?
16     A    That is correct.
17     Q    Okay.  And how long have you had that
18  job?
19     A    I have been the current director of human
20  resources since August of 2020.
21     Q    Okay.  I'm having a little trouble
22  hearing you.  Are you close enough to the microphone
23  and can you hear me okay?
24     A    I can hear you fine.  Is that better?
25     Q    Okay, good.  I can hear you a lot better

Page 7

1  now, too, and I can see you better also.
2           So you said 2020?
3     A    Yes.
4     Q    Okay.  And prior to that you were also
5  working in the human resources office?
6     A    Yes, prior to that -- I became the
7  interim director for human resources operations in
8  August of 2019.
9     Q    Okay.  And before that what was your job?
10     A    Prior to that I was the associate
11  director of human resources.
12     Q    Okay.  And how did that process unfold,
13  going from one job to the other job?  I mean, was it a
14  promotion or was it just a reclassification?  How did
15  that work?
16     A    In August of 2019 the vice-president of
17  academic -- of admin and finance for Kutztown
18  University at the time, Jerry Silberman, had retired
19  and so the associate vice-president for human
20  resources, Sharon Picus, took his role on an interim
21  basis and then I took her role in a limited fashion on
22  an interim basis in August of '19.  And then in August
23  of 2020, I became the director of human resources on a
24  permanent basis, as she was retiring.
25     Q    Was that a competitive process?  In other

Page 8

1  words, did other people apply for the job or was it
2  just a -- you know, sort of moving you up?
3     A    It was not.  It was an internal
4  promotion.
5     Q    Okay.  All right.  So I know that you've
6  been at Kutztown for about 20 years; is that right?
7     A    I'm in my 23rd year now.
8     Q    Oh, 23rd.  Okay.  So tell me about your
9  career at Kutztown.
10     A    Do you mean from the start?
11     Q    Yes.
12     A    Oh.  So I came into the university in
13  February of 2020 as a fiscal assistant.
14     Q    2020?
15     A    I'm sorry, 2000.
16     Q    Okay.
17     A    In the year 2000 as a fiscal assistant
18  and several years after that I was re-classed to a
19  fiscal technician and then to a management technician.
20           In 2008 I became the manager of payroll
21  and in 2015, I believe, the assistant director of
22  human resources.  And I remained in that until 2019 --
23  early in 2019 when I became the associate director
24  through the re-class process.  Each of those
25  promotions was through the re-class process.

Page 9

1     Q    Okay.  So you've been working in human
2  resources in some capacity since 2015; is that right?
3     A    All of my career has been within human
4  resources.  The payroll function is --
5     Q    Payroll is part of that?
6     A    Yes.
7     Q    Okay.  And in terms of human resources
8  management, not counting payroll, you've been in --
9  you've been doing that since 2015; is that correct?
10     A    Correct.
11     Q    Okay.  Tell me what kind of formal
12  education or training you have in human resources.
13     A    I have a bachelor's from Kutztown in
14  political science and a master's in public
15  administration from Kutztown.
16     Q    Okay.  And as part of either one of those
17  things, formal training, does either one -- I'm sorry,
18  let me back up.
19           Do either one of those things include
20  formal training on human resources management?
21     A    Yes, the master's of public
22  administration program includes human resources
23  management.
24     Q    Okay.  And what kinds of things does it
25  include?

Jennifer Weidman

| Page 10 | Page 11 |
|---|---|

**Page 10**

1    A   The human resources management course
2  work covers things like hiring and selection and
3  recruitment and Fair Labor Standards Act and FMLA and
4  ADA. Pretty much a broad range of the entire human
5  resources function.
6    Q   Tell me about the formal training with
7  regard to the ADA.
8    A   There is a segment within that course
9  that speaks to the ADA.
10    Q   Okay. When you say "that course," do you
11  mean the curriculum or do you mean a course within the
12  curriculum?
13    A   So within the curriculum there is a
14  specific human resources management course and within
15  that course work for that class there is a segment on
16  ADA.
17    Q   And how much of the course is focused on
18  the ADA?
19    A   It was a chapter in the book.
20    Q   Okay. Other than that, have you had any
21  other formal training on the ADA?
22    A   I had -- I participated in a training
23  provided by state system legal on the ADA in the
24  summer of 2020 and then there was another one again in
25  the summer of 2021.

**Page 11**

1    Q   All right. And what were those -- what
2  did they -- well, first of all, tell me how long they
3  were.
4    A   They were -- I don't remember
5  specifically how long they were.
6    Q   I mean, was it a number of hours or a
7  number of days --
8    A   Oh.
9    Q   -- or weeks?
10    A   No. No, it was -- it was within a day.
11    Q   Okay. So some portion of the day --
12    A   Uh-huh.
13    Q   -- in 2020, 2021?
14    A   Uh-huh.
15    Q   Anything other than that?
16    A   No.
17    Q   Okay.
18    MS. McKINLEY: Kathy, could you send her
19  Exhibit 4.
20    MS. LE: Yes.
21    MS. McKINLEY: I'm going to close my
22  door.
23  BY MS. McKINLEY:
24    Q   Ms. Weidman, what's going to happen when
25  I refer to a document, Kathy will send it to you and

| Page 12 | Page 13 |
|---|---|

**Page 12**

1  then you can open it up. If you have any problems
2  with it, let me know. Okay.
3    So what I'm showing you we marked as SO
4  Exhibit 3 last week and this is Kutztown's Division of
5  Equity and Compliance organizational chart. And I
6  just want you to tell me a little bit about -- first
7  of all, it looks like you're a direct report to Jesus
8  Pena who's the vice-president of the division; is that
9  right?
10    A   Kathy, did you -- I don't see Exhibit 4.
11    MS. LE: Sorry, I sent you -- and,
12  Lorrie, just so you know, I tried to streamline the
13  process by going ahead and sending Jennifer the
14  exhibits that you sent me Friday, but then I did just
15  send her Exhibit 4 so --
16    MS. McKINLEY: Okay.
17    MS. LE: You should have received a
18  second email from me, Jennifer, that just is titled
19  Exhibit 4.
20    A   Yes, I have that.
21  BY MS. McKINLEY:
22    Q   Okay, good. So you report directly to
23  Jesus Pena; is that correct?
24    A   That is correct.
25    Q   Okay. And how long have you been

**Page 13**

1  reporting to him?
2    A   Since August of 2020.
3    Q   Okay. And prior to that did you work
4  with him at all, other than in a reporting capacity?
5    A   I -- prior to that I had some interaction
6  with his office on a limited basis.
7    Q   Okay. So was there a reorganization or
8  how did that all work out?
9    A   Yes. So in August 2020, with the
10  announced retirement of my former supervisor, Sharon
11  Picus, there was a reorganization where HR was moved
12  under the Division of Equity and Compliance under Mr.
13  Pena.
14    Q   Okay. So how frequently do you consult
15  with him?
16    A   Very frequently on a variety of -- on any
17  variety of topics.
18    Q   Okay. Is it like a daily basis or ...
19    A   Some weeks it's daily and some weeks
20  it's, you know, a couple times a week.
21    Q   Okay. And with regard to your role as HR
22  director with regard to implementation of the ADA,
23  what, if any, communication do you have with him about
24  that? And I mean right now, just general, in general.
25    A   In general, I would say it's limited,

Jennifer Weidman

Page 14

1    unless there's something -- unless there's some kind
2    of a question.
3          Q     And has he provided you with any
4    materials or any written expectations as to what that
5    implementation process is supposed to look like?
6          A     No.
7          Q     And to what extent do you report to him
8    or confer with him in terms of the implementation of
9    the ADA in your capacity?
10         A     Again, if it's something that's out of
11   the ordinary or anything where there's a question, I
12   would consult with him, but if it's a -- you know, a
13   standard request, then I -- you know, I don't
14   necessarily seek his approval before approving those.
15         Q     Okay.  So what is your role with regard
16   to implementation of the ADA at Kutztown?
17         A     So Alexis Martin in my office, when those
18   requests are sent to our -- forwarded to our office
19   from disability services, she will review those and
20   she would generally work with the employee and the
21   supervisor to facilitate that interactive process and
22   then those come to me for approval.  And if there's
23   any sort of a question, you know, in that interactive
24   process, those come to me as well.
25         Q     So are you her supervisor?

Page 15

1          A     Yes, I am.
2          Q     Okay.  So what kind of training have you
3    provided her with regard to her role in the
4    interactive process?
5          A     She also has had some ADA training as
6    well.
7          Q     What kind of training?
8          A     I don't remember off the top of my head
9    which -- you know, which she -- which trainings she
10   had prior to my becoming the director of human
11   resources since she, you know, would have reported to
12   my former supervisor at the time.
13         Q     Well, how does she know what your
14   expectations are?
15         A     Because we discuss those.
16         Q     And -- okay.  So you said you haven't
17   given her any materials or training.  So I'm trying to
18   understand how you communicate with her what the
19   expectations are for the interactive process and how
20   you supervise that process in terms of how she's
21   conducting it.
22              MS. LE:  Objection to form.
23         A     So if I may back up.  She also had
24   attended those PASSHE trainings on the ADA.  I was
25   speaking to what her history of training might have

Page 16

1    been before that, before I took over as her
2    supervisor.
3    BY MS. McKINLEY:
4          Q     So it sounds like you don't actually
5    know.
6          A     I don't remember --
7              MS. LE:  Objection.
8          A     -- off the top of my head.
9    BY MS. McKINLEY:
10         Q     Okay.  So what kinds of documentation is
11   she required to maintain with regard to requests for
12   accommodation that she handles?
13         A     So the way the process works is an
14   employee makes that request through our disability
15   services office and provides all the documentation,
16   the medical documentation and so forth, along with
17   their request for accommodation.
18              The disability services director reviews
19   that to see that it conforms to the criteria under the
20   ADA; and, if so, then that is forwarded to human
21   resources to review the actual accommodation request
22   itself for reasonableness and works with the employee
23   and the supervisor in that interactive process at that
24   point.
25         Q     So are you ordinarily involved in that

Page 17

1    process?
2              MS. LE:  Objection to form.
3              MS. McKINLEY:  Let me rephrase it.
4    BY MS. McKINLEY:
5          Q     Under ordinary circumstances, it sounds
6    like what you're telling me is that she handles that
7    mostly independently; is that correct?
8          A     That would be correct.
9          Q     Okay.  So under what circumstances would
10   you have personal involvement in the interactive
11   process?
12         A     I would only be involved when there is
13   some question or if there is some issue, say, in the
14   interactive process between the employee and the
15   supervisor or if there is some sort of a larger issue.
16         Q     So tell me step by step what you expect
17   the interactive process to look like when she handles
18   it on her own.
19         A     Again, when that request comes into our
20   office, she reviews it and then she would reach out to
21   the supervisor to discuss and then to the employee and
22   facilitate that conversation back and forth as might
23   be necessary.  She would involve me if there any
24   kind of a question or issue with that process.
25         Q     Okay.  What kind of documentation does

Jennifer Weidman

## Page 18

1  she maintain to -- with regard to what happens in the
2  process, like who talks to whom, what happens?
3      A      She would maintain those emails and notes
4  that --
5      Q      Do you know what she maintains?
6      A      That's what I'm saying.  She would -- she
7  would maintain those emails and notes that would go
8  with that request.
9      Q      That's your expectation; is that correct?
10     A      That is my expectation.
11     Q      Is there anything else that you expect
12  her to maintain in the way of documentation with
13  regard to specific accommodation requests?
14     A      Anything that would pertain to that
15  request.
16     Q      And do you ever review the files to make
17  sure that they comply with those expectations?
18     A      I have not needed to.
19     Q      How do you know?
20     A      I'm sorry?
21     Q      I said, "How do you know?"
22     A      How do I --
23     Q      How do you know what she's doing if you
24  haven't looked at any of the files?
25     A      Because those requests come to me for

## Page 19

1  signature and approval before they actually are
2  implemented.
3      Q      Okay.  So you have to sign off on every
4  accommodation is what you're saying?
5      A      That is correct.
6      Q      Okay.  So other than the form that you
7  sign when you do that, do you receive a file to inform
8  you this is what the process looked like and what the
9  basis is and we're either granting or denying the
10  accommodation?
11     A      So we discuss those when those forms come
12  to me.
13     Q      Every time?
14     A      Yes.
15     Q      About how many requests for reasonable
16  accommodation do you get in the course of a typical
17  year?
18     A      In the course of a typical year, very
19  few.
20     Q      Okay.  Is anyone else involved in that
21  process, the interactive process in the granting or
22  denying of accommodations, other than what you've told
23  me about so far?
24     A      No.
25     Q      All right.  I'm just going to go through

## Page 20

1  some of the exhibits.  So if you take a look at
2  Exhibit 6.
3          MS. LE:  I have to send it to her.
4          I sent it over, Jennifer.
5      A      I'm just waiting for it to come through.
6  BY MS. McKINLEY:
7      Q      Okay.  Do you have it?
8      A      I do not.  I'm still waiting for it to
9  come through.
10     Q      Okay.
11     A      Sorry.
12     Q      Just let me know when you get it.
13     A      Um-hum.
14         Okay, I have it.
15     Q      You've got it.  Okay.  So does this look
16  like the -- some materials from the website with
17  regard to the role of disability services?
18     A      This does.
19     Q      Okay.  So it talks about how DSO is
20  responsible for coordinating disability services for
21  students, employees, university guests and so on.
22         So other than what you already told me
23  about, the DSO, I guess, evaluates whether the person
24  has a disability; is that right?
25     A      Correct.

## Page 21

1      Q      Okay.  So if DSO decides -- and I'm
2  talking about the employment context right now.
3      A      Um-hum.
4      Q      So if DSO decides that the person does
5  not have a disability that qualifies for the
6  protection of the ADA or a Section 504, would they
7  send that to you -- would they send the referral -- or
8  the request to you or would it stop there?
9      A      I'm trying to remember if I've ever
10  gotten one from them that said someone didn't meet the
11  criteria.  I don't remember if they have ever sent me
12  one where someone did not meet the criteria.
13     Q      Okay.  So of the ones that you have
14  received, have you basically assumed that based on
15  DSO's initial evaluation that the person does meet the
16  criteria for disability under the ADA?
17     A      When we get that request forwarded to us,
18  it says, you know, this employee has submitted this
19  accommodation request and the documentation and we
20  have reviewed it and it meets the criteria of a
21  disability under the ADA.
22     Q      Okay.  So there would be no dispute about
23  that, in other words?
24     A      Correct.
25     Q      Now, I see that DSO has a lot of

Jennifer Weidman

Page 22

1    involvement with accommodations for students.  Do you
2    have any involvement with that or not?
3        A    No.
4        Q    So if you take a look at Exhibit 8 -- or,
5    I'm sorry, Exhibit 9 -- no -- yeah, Exhibit 9.
6            (SO Exhibit Number 9 produced and marked
7    for identification.)
8        MS. LE:  That should be in the initial
9    email I sent you this morning, Jennifer.
10       A    Yes.
11       MS. LE:  9 on will be in that email.
12       A    Okay.
13   BY MS. McKINLEY:
14       Q    Do you have it?
15       A    Yes, I do.
16       Q    Oh, okay.  I can't tell unless you tell
17   me --
18       A    I'm sorry.
19       Q    -- you have it or you don't have it.
20       A    Yes.
21       Q    Sometimes I try to read people's faces,
22   but it's a little difficult to do on Zoom.
23       All right.  So if you look at pages 6 to
24   8 at the end of the exhibit.
25       A    Okay.

Page 23

1        Q    And so -- okay, I'm sorry, those are for
2    student accommodations.  I was looking for the
3    definition.
4            Oh, I'm sorry, I really was meaning to
5    look at Exhibit 10.  I apologize.
6            (SO Exhibit Number 10 produced and marked
7    for identification.)
8    BY MS. McKINLEY:
9        Q    Who maintains the HR website?
10       A    Who maintains the HR website?  One of my
11   staff does.
12       Q    Okay.  And does that -- does the
13   information that you put on the website have to be
14   approved by anyone or do you guys handle it pretty
15   much independently?
16       A    In general, that's done independently.
17       Q    I'm sorry, I didn't hear you.
18       A    I'm sorry.  In general, that is done
19   independently.  Each department puts their own
20   information out there.
21       Q    Okay.  So Exhibit 10, do you have that in
22   front of you?
23       A    Yes.
24       Q    Okay.  So it says that you're a strategic
25   partner with the university leadership to develop and

Page 24

1    deliver innovative, fiscally responsible human
2    resources programs and services.
3            Tell me what that entails, if anything,
4    that we haven't already talked about with regard to
5    the disability implementation -- disability rights
6    implementation for employees?  Is there anything else?
7            MS. LE:  Objection to form.  You can
8    answer.
9        A    So, I'm sorry, I'm not sure I understand.
10   BY MS. McKINLEY:
11       Q    I'm asking you in -- under that umbrella
12   of the strategic partnership with the university
13   leadership -- well, first of all, tell me what the
14   university leadership means.
15       A    The administration, the president, and
16   the cabinet.
17       Q    Okay.  So in relation to the
18   administration of the ADA, for instance, under what
19   circumstances would you have communication with the
20   president?
21       A    In general, for an ordinary ADA request,
22   we wouldn't typically, unless it was an ADA request
23   for a direct report of his.
24       Q    Right.  Okay.  And has that -- have you
25   had any communication with the president with regard

Page 25

1    to ADA implementation during the last two years?
2        A    Directly with him, not specifically about
3    ADA, but in terms of remote -- the conversion of
4    in-person classes to online.
5        Q    You're talking about the request made by
6    immune-compromised employees who are requesting remote
7    teaching accommodations; is that right?
8            MS. LE:  Objection to form.
9        A    Not specifically immune-comprised
10   employees.
11   BY MS. McKINLEY:
12       Q    Okay.  So who are we talking about then?
13       A    Any faculty member who had requested to
14   convert in-person classes to online remote teaching.
15       Q    Okay.  And how many are we talking about?
16   And I'm talking about under the ADA.
17       A    Under the ADA?
18       Q    Yes.
19       A    There were three at the time.
20       Q    What time?
21       A    In the period prior to the fall
22   semester -- prior to the start of the fall semester.
23       Q    Of this academic year?
24       A    I'm sorry, in the period prior to the
25   fall 2021 semester.

7 (Pages 22 to 25)

Jennifer Weidman

Page 26

1    Q    Okay.  So before we get too far into
2  that, I'd like you to take a look at Exhibit 11.
3         (SO Exhibit Number 11 produced and marked
4  for identification.)
5    A    Okay.
6  BY MS. McKINLEY:
7    Q    So tell me about this because I -- I know
8  that there was a separate process, a flexible work
9  arrangement process, during the last academic year.
10  So tell me about that and how it differs from the ADA
11  process.
12    A    That is correct.  This was separate and
13  distinct from the ADA process.  For the 2020-2021
14  academic year, the state system -- the Pennsylvania
15  State System of Higher Education implemented a -- what
16  they called a framework for university operations
17  which allowed this concept of a flexible work
18  arrangement, wherein the employee would make the
19  request -- and it wasn't necessarily for remote work
20  specifically, but in most cases that's what is
21  involved, and they would provide documentation of the
22  reason behind the request.
23         And if it met certain criteria and there,
24  you know -- and there weren't operationally -- or it
25  could be done under whatever arrangement they were

Page 27

1  requesting, then those were approved.
2    Q    Okay.  So in order to be eligible for a
3  flexible work arrangement last year, the individual
4  did not have to meet the criteria for a disability
5  under the ADA; is that right?
6    A    That is correct.  It was a broader sort
7  of qualification.
8    Q    I'm sorry -- oh, you said broader?
9    A    It was broader than strict ADA.
10    Q    Okay.  So tell me what that means.
11    A    So this was if they -- if they were at
12  risk of severe illness, if they met the criteria under
13  the CDC guidance at the time, they could request
14  remote work or a flexible work arrangement and -- and
15  in general those would be approved, again, depending
16  on the work and the operational need and so forth.
17    Q    Okay.  So who approved those?
18    A    Those came through my office as well.
19    Q    Okay.  But who in your office approved
20  them or disapproved them?
21    A    I did.
22    Q    You did yourself?
23    A    Yes.
24    Q    Okay.
25    A    Well, I'm sorry, let me back up there.

Page 28

1  Those were reviewed with the vice-president or cabinet
2  member over each of those divisions to approve whether
3  or not the work was operationally feasible.
4    Q    How many tenured faculty last year taught
5  their classes remotely under a flexible work
6  arrangement?
7    A    When you say "last year," do you mean --
8    Q    I mean --
9    A    -- the academic year?
10    Q    -- 2020 to '21.
11    A    I couldn't tell you off the top of my
12  head the number of tenured faculty.
13    Q    Well, do you know how many faculty in
14  general received a flexible work arrangement to teach
15  remotely last year?
16    A    Again, I couldn't tell you the exact
17  number.
18    Q    Well, was it over a hundred?
19    A    I believe so, yes.
20    Q    Was it over 150?
21    A    I wouldn't be able to give you an exact
22  answer.
23    Q    Okay.  So in terms of the approval
24  process for them to teach their classes remotely,
25  what, if anything, did they have to provide in the way

Page 29

1  of documentation that they could meet the learning
2  objectives for their courses?
3    A    I'm sorry, could you repeat that?
4    Q    Yes.  You said that they would come to
5  you with the documentation that made them potentially
6  eligible under the CDC guidance.
7         And my question now is:  What, if
8  anything, did you require them to provide to show that
9  they would be able to meet the learning objectives or
10  outcomes for the classes that they're asking to teach
11  remotely?
12    A    They did not provide information to human
13  resources about how they would meet learning
14  objectives.  They simply provided medical
15  documentation to human resources and then human
16  resources provided a list of the faculty involved and
17  the specific accommodation -- or specific arrangement
18  they were requesting to the -- to the provost and the
19  dean in question and the dean and provost approved or
20  disapproved those requests based upon that
21  information.
22    Q    Okay.  In the psychology department, do
23  you know whether the dean or the provost denied any of
24  the requests for faculty flexible work arrangements to
25  teach remotely last year?

Jennifer Weidman

| Page 30 | Page 31 |
|---|---|

**Page 30**

1   A    I don't remember off the top of my head.
2   Q    Would that documentation be available in
3   your office?  Do you keep records?
4   A    Yes.
5   Q    Okay.  So if you look at the last page of
6   that exhibit -- actually, I guess it's a page that
7   didn't get numbered.  But in any case, where it says
8   "Dear campus community," and it doesn't have a date on
9   it, am I correct that this was the letter that was
10  sent out informing people about the flexible work
11  arrangements during the 2020 to '21 school year?
12  A    2020-2021, yes.
13  Q    Okay.  All right.  So it talks about if
14  the person has a disability under the ADA that was a
15  different process --
16  A    Yes.
17  Q    -- right?
18       Okay.  So last year did anyone go through
19  the ADA process for remote teaching accommodation as
20  opposed to the flexible work arrangement?
21  A    I remember that there were some faculty
22  who went through the ADA process at that time.  I
23  don't specifically remember which ones or what their
24  specific accommodations were.
25  Q    Did you deny any of them?

**Page 31**

1   A    Again, I don't remember specifically who
2   was involved or any of their details.
3   Q    Okay.  You said that three people applied
4   for remote teaching accommodations this year.  Last
5   year, with regard to the ADA process, was it more or
6   less?
7   A    Again, I don't remember specifically how
8   many were involved in 2020-2021.
9   Q    Okay.  So let's turn our attention to Dr.
10  Oross.  What was the first communication you had with
11  him pertaining to his plans to request a remote
12  teaching accommodation?
13  A    I first became aware of his request to
14  teach -- of his plans to request remote accommodation
15  in early August.
16  Q    So let's take a look at Exhibit 12.
17       (SO Exhibit Number 12 produced and marked
18  for identification.)
19  A    Okay.
20  BY MS. McKINLEY:
21  Q    Okay.  So the first page of this exhibit
22  is an email from Dr. Oross dated August 2nd, 2021.
23  A    Um-hum -- yes.
24  Q    Was this the very first time you
25  communicated with him about his situation?

| Page 32 | Page 33 |
|---|---|

**Page 32**

1   A    I don't remember specifically if I had
2   any direct communication with him prior to that date.
3   Q    Did you have any communication with the
4   dean or the chair of the department?
5   A    The dean of liberal arts and sciences had
6   forwarded an email to me in late July.
7   Q    And what did he say?
8   A    It was a forwarded copy of an email with
9   several faculty on where Dr. Oross, I believe,
10  indicated he wanted to request to convert his classes
11  to online for fall.
12  Q    He was already scheduled to teach two of
13  his classes online, wasn't he?
14       MS. LE:  Objection to form.
15  A    Again, I don't remember how many of his
16  classes were in person or online.
17  BY MS. McKINLEY:
18  Q    Well, you recall, don't you, that some of
19  his classes were already scheduled to be online?
20       MS. LE:  Objection to form.
21  A    Again, I don't remember what his schedule
22  was prior to his request.
23  BY MS. McKINLEY:
24  Q    Well, you're the one that denied his
25  accommodation, right?

**Page 33**

1   A    Correct.
2   Q    Okay.  And it was a denial of the
3   accommodation altogether, right?  He wasn't allowed to
4   teach any classes.
5   A    The request was to convert in-person
6   classes to online and that was the request that was
7   denied.
8   Q    All right.  So let's look at this first
9   email that says "Unfortunately, I find myself in a
10  position of having to request approval to teach the
11  classes remotely."
12       What was your understanding of the reason
13  that he was making that request?
14  A    From reading -- seeing prior emails and
15  being aware of his leave status in the spring
16  semester, I understood that he had a heart transplant
17  in the spring semester of 2021 and could not come back
18  into the classroom because of his immune-suppressed
19  state.
20  Q    I'm sorry, I couldn't hear you.  I
21  couldn't hear the end of what you said.
22  A    That he had had a heart transplant during
23  the spring semester of 2021 and could not come back
24  into the classroom in the fall of 2021 because of his
25  immune-suppressed state.

Jennifer Weidman

Page 34

```
 1      Q      And you don't dispute, do you, that he
 2  qualified as a person with a disability under the ADA,
 3  right?
 4      A      I don't dispute that his
 5  immune-suppressed state qualifies as a disability
 6  under the ADA.
 7      Q      In fact, that's what DSO communicated to
 8  you on August 12th, correct?
 9      A      The DSO indicated that he qualified --
10  that he qualified as a person with a disability under
11  the ADA.
12      Q      And you don't dispute that, do you?
13      A      Correct.
14      Q      If you take a look at Exhibit 8, you can
15  see the DSO email.
16          MS. LE:  Oh, I have to send that to her.
17          MS. McKINLEY:  Okay.
18          MS. LE:  Sent.
19      A      Okay.
20  BY MS. McKINLEY:
21      Q      All right.  So is that the email you're
22  referring to, the email from DSO pertaining to Dr.
23  Oross?
24      A      Yes.
25      Q      Okay.  And Linda Lantaff said that his
```

Page 35

```
 1  medical provider is recommending a low risk teaching
 2  environment and to work remotely.  Did you think that
 3  was an unreasonable request under the circumstances of
 4  his medical situation?
 5      A      Are you asking my opinion?
 6      Q      Yes.
 7      A      My opinion doesn't factor into that.
 8      Q      Well, I'm asking if you thought it was
 9  unreasonable of him, having had a recent heart
10  transplant, to request a remote teaching accommodation
11  under the circumstances that he was facing medically
12  and with regard to the pandemic.
13          MS. LE:  Objection to form.
14      A      And, again, if you're asking my opinion,
15  my opinion doesn't factor -- my personal opinion
16  doesn't --
17  BY MS. McKINLEY:
18      Q      I get to ask the questions and that's a
19  legitimate question and so I'm asking you to answer
20  it.
21          MS. LE:  Objection to form.
22      A      So, again, you're asking for my personal
23  opinion?
24  BY MS. McKINLEY:
25      Q      Yes.
```

Page 36

```
 1      A      My personal opinion is that I certainly
 2  understand his concern about contracting COVID.
 3      Q      All right.  So going back to the
 4  emails -- I'm sorry to be flipping around like this
 5  but -- now I lost my place.
 6          All right.  So he had been in touch with
 7  you on August 2nd in writing and you said that there
 8  had been some communications earlier than that, I
 9  think?
10      A      Yes, there was an email that was
11  forwarded to me by the dean.
12      Q      Okay.  And did you have any
13  communications with the dean with regard to that
14  email?
15      A      I had a conversation with the dean, not
16  specifically about Dr. Oross's request but because he
17  had -- he was not the only faculty member to request
18  online classes.
19      Q      Right.  You told me there were at least
20  -- were there three others or were there three in all?
21      A      Under the ADA, at that time there were
22  three that had requested.
23      Q      Okay.  So at the time that he made his
24  request or he first communicated with you, had the
25  other two people already made that communication?
```

Page 37

```
 1      A      I know one had already made that request
 2  prior and one -- I think it was kind of simultaneous.
 3      Q      I'm sorry, I couldn't hear you.
 4      A      I said one of those had already made the
 5  request and one of those -- the other one was about
 6  the same time.  They were pretty simultaneous.
 7      Q      Okay.  And there had been a decision made
 8  between you and Jesus Pena with regard to how to
 9  handle those requests before you received the request
10  from Steve -- or from Dr. Oross, correct?
11      A      There was a conversation about the
12  conversion of online classes -- excuse me.  There was
13  a conversation about the conversion of in-person
14  classes to online as it pertained to reasonable
15  accommodation.
16      Q      And the decision was that all of those
17  accommodation requests would be denied, correct?
18      A      The decision made -- excuse me.  The
19  decision that -- that was discussed was between
20  myself, Mr. Pena, Linda Lantaff and university legal
21  counsel.
22          MS. LE:  Well, hold on.  The witness
23  should not reveal any communications with counsel that
24  are privileged.
25          MS. McKINLEY:  Okay.  Well, I didn't ask
```

Page 38

1    her to do that, but in any event --
2              MS. LE:  No, I understand.  I'm just
3    cautioning her.
4              MS. McKINLEY:  I know.
5              MS. LE:  I wasn't saying you made a
6    mistake.  I'm just cautioning her that if she's now
7    mentioning conversations with counsel, then she
8    shouldn't discuss the conversations with counsel; but
9    obviously to the extent there's non-privileged
10   communications, or something like that, that's fine.
11   BY MS. McKINLEY:
12        Q     First of all, was there -- well, let's
13   start at the beginning.  Was there more than one
14   discussion?
15        A     With counsel?
16        Q     No, no.  Was there more than one
17   discussion about this particular topic?
18        A     I believe we may have had two
19   conversations about it.
20        Q     And did one of those conversations -- or
21   did either of those conversations not involve counsel?
22        A     I believe the first conversation did not
23   and then the second conversation did.
24        Q     All right.  So who was included in the
25   first conversation?

Page 39

1         A     Linda Lantaff, myself, Mr. Pena and I
2    believe Alexis Martin.
3         Q     Okay.  And when did that conversation
4    take place?
5         A     Late July.
6         Q     Where did it take place?
7         A     It was either a phone call or on Zoom.
8         Q     Okay.  And when you had that
9    conversation, had Dr. Oross's situation come to light
10   or were you talking about the previous requests?
11        A     I don't specifically think -- I think it
12   was at the same time as we were discussing it, not
13   necessarily about him specifically but the larger
14   question of converting in person to online.
15        Q     Okay.  And the decision was that we're
16   not going to do it, right?
17        A     It was not a decision to outright reject
18   any request that came in with that, you know, request
19   necessarily because they would each need to be
20   reviewed individually on their own merits, but there
21   was a decision that such a request, because it would
22   so fundamentally alter the course, presented an undue
23   hardship or burden on the employer because of the
24   impact on our students.
25        Q     Well, a fundamental hardship is not a

Page 40

1    criteria for an employee accommodation under the ADA,
2    is it?
3              MS. LE:  Objection to form.
4         A     A fundamental alteration from an
5    employer's standpoint is not but a hardship or burden
6    is.
7    BY MS. McKINLEY:
8         Q     Okay.  Well, undue hardship under the ADA
9    does not -- for an employee does not include
10   fundamental alteration, does it?
11             MS. LE:  Objection to form.
12        A     Again, that such a transformation,
13   because of an impact on our students, would be an
14   undue hardship.
15   BY MS. McKINLEY:
16        Q     In any of those -- in any class?
17        A     As a general concept.
18        Q     That's not what your policy says, is it?
19        A     What policy are you referring to?
20        Q     Why don't you take a look at Exhibit 13.
21        A     I'm sorry, 13?
22        Q     13, yes.
23             (SO Exhibit Number 13 produced and marked
24   for identification.)
25   BY MS. McKINLEY:

Page 41

1         Q     Do you have it?
2         A     Yes, I'm looking at it now.
3         Q     Okay.  Tell me when you're ready.
4         A     Okay.
5         Q     Okay.  Now, it says "Reasonable
6    Accommodations for Employees" and it says at the top
7    "Kutztown University Policy DIV-002."  Have you ever
8    seen this document before?
9         A     Yes.
10        Q     Okay.  How have you seen it?
11        A     It's in our University Policy Register.
12        Q     And are you one of the people that's
13   responsible for implementing it?
14        A     Yes.
15        Q     Okay.  So let's look at the "Objective."
16   It says "To institute a process for assessing the
17   reasonableness of an accommodation and a method of
18   record keeping."
19             What method of record keeping
20   specifically is this policy referring to?
21        A     I don't know.
22        Q     Is there another document that lays out
23   what the record keeping method is supposed to be?
24        A     I am unaware of that.
25        Q     So you have not created a document and

Jennifer Weidman

Page 42

1  said this is what the method is, this is the criteria,
2  this is what needs to be here or there or anything
3  like that?
4        A      The policy says that all reasonable
5  accommodation request forms and related documentation
6  will be kept on file by the director of disability
7  services.
8        Q      Okay.  Well, once disability services
9  sends the referral to you, what, if any, documentation
10 do they receive to maintain?
11       A      They receive a copy of the completed form
12 when a decision is made.
13       Q      Okay.  Do they receive anything else from
14 your office?
15       A      No, they receive the completed form.
16       Q      Okay.  So other than that, is there any
17 specific method of record keeping in your office with
18 regard to ADA requests?
19       A      So as I said before, that Alexis, as part
20 of, you know, facilitating that interactive process,
21 would keep those emails and forms together; but once
22 they're completed and I've signed off and the
23 supervisor has signed off, and the employee, that
24 completed form eventually goes back to the disability
25 services office.

Page 43

1        Q      Okay.  So I understand that part.  With
2  regard to the documentation maintained in your office,
3  is there any kind of checklist?  You know, this is
4  what you need to do, A, B, C, D?
5        A      No, because we don't receive any
6  documentation, other than the email from disability
7  services office saying that somebody meets the
8  criteria.
9        Q      Okay.  So you don't even receive a copy
10 of the accommodation request, do you?
11       A      No.
12       Q      If Alexis creates any documentation with
13 regard to an accommodation request, where would that
14 be maintained?
15              In other words, is it -- let me ask you.
16 Is it a computer file?  Is it a physical file?  What
17 is the method?
18       A      I don't specifically know if she has it
19 printed out in a physical file or just maintains those
20 digitally.
21       Q      Okay.  Well, if Alexis decided to move to
22 -- I don't know -- Paris next week, how would you know
23 where this documentation is?
24       A      I would look in her computer.
25       Q      Okay.  But you just said you don't know

Page 44

1  if it's on the computer or if it's in a physical file.
2        MS. LE:  Objection to form.
3        A      I would look in her computer and her desk
4  drawer.
5  BY MS. McKINLEY:
6        Q      Okay.  That doesn't sound like much of a
7  method to me.  Is there anything more formalized than
8  that?
9        A      There is not.
10       Q      Okay.  So it says "The Director of
11 Disability Services" -- we've talked about her -- "the
12 Assistant Vice-President for Human Resources."  Who is
13 that?
14       A      That is what my position was formerly
15 called.  This was last reviewed in 2017.
16       Q      Okay.  And the "Deputy to the President
17 for Compliance."  That's Pena, right?
18       A      And, again, he is -- he's now the
19 vice-president of equity compliance.
20       Q      Okay.  So the three of you are
21 responsible for implementing this policy as it's
22 written, correct?
23       A      Correct.
24       Q      Okay.  So under "Definition" it says
25 "The accommodation is not required if it would cause

Page 45

1  an undue hardship."
2              Where do you see anything in this policy
3  that indicates that fundamental alteration has
4  anyplace whatsoever in the evaluation of a reasonable
5  accommodation for an employee under your own policy?
6        A      Fundamental alteration in and of itself
7  does not, but the undue hardship that it creates by
8  the effect on our students is what makes that
9  unreasonable.
10       Q      Where in the policy do you see that?
11       A      I don't see that written out
12 specifically.
13       Q      Right.  Do you know what part of the ADA
14 the fundamental alteration provision is in?
15       A      It's under -- it's not under the employer
16 section.  It's under the --
17       Q      Right.  It's under public accommodations,
18 correct?
19       A      I believe so.
20       Q      Right.  So it applies to students, for
21 instance, right?
22       A      Yes.
23       Q      Okay.  It does not apply to employees,
24 does it?
25       MS. LE:  Objection to form.

12 (Pages 42 to 45)

Jennifer Weidman

Page 46

```
 1        A    No.
 2   BY MS. McKINLEY:
 3        Q    So what is your understanding of the
 4   actual definition of undue hardship?
 5        A    So undue hardship is where there is, for
 6   example, a significant cost, an unreasonable cost to
 7   the employer.
 8        Q    Right.
 9        A    Something that would be so burdensome as
10   to make it impossible.
11        Q    So when Dr. Oross asked to convert two of
12   his classes to online, that wouldn't have cost
13   Kutztown anything, right?
14        MS. LE:  Objection to form.
15        A    At that time we had publicly announced
16   that we were returning to in-person operations.  The
17   university is primarily a brick-and-mortar institution
18   and in person is the mode of teaching for the majority
19   of our courses.  And to alter the delivery of courses
20   that were scheduled when students registered for in
21   person was felt to not -- not be true to that stated
22   objective.
23   BY MS. McKINLEY:
24        Q    Okay.  So providing an accommodation to
25   one person would not change the primary mode of
```

Page 47

```
 1   operation with regard to in-person instruction on the
 2   university level, correct?
 3        A    I can't say.
 4        Q    You don't know, right?
 5        A    I'm sure -- I'm not sure there was a
 6   question there.
 7        Q    Well, you said you can't say.  I'm asking
 8   you if that means you don't know.
 9        A    What was the original question?
10        Q    I don't know what the original question
11   was, but you said, "I can't say."  I said making an
12   accommodation for one person wouldn't change the
13   overall in-person character of the university, would
14   it?
15        A    The feeling is that we wanted to honor
16   that commitment to our students that --
17        Q    Whose feeling?
18        A    The university leadership had made this
19   commitment to students.
20        Q    So they made a -- did they make a
21   commitment to not provide reasonable accommodations to
22   someone who needed a remote teaching accommodation,
23   even if it wouldn't change the overall character of
24   the in-person university?
25        A    No.  I mean, as part of making that
```

Page 48

```
 1   commitment to students, there was not a decision that
 2   therefore we're going to ignore everything else.
 3        Q    Well, how many faculty do you have at
 4   Kutztown?
 5        A    We have just over 400.
 6        Q    And how many courses are offered every
 7   year --
 8        A    I don't know.
 9        Q    -- approximately?
10             It's several -- it's more than 10,000,
11   right?
12        A    It's a lot.
13        Q    Okay.  And Dr. Oross was asking to
14   convert two of his classes to online, right?
15        MS. LE:  Objection to form.
16        A    And, again, I don't remember how many
17   were scheduled in person and how many were scheduled
18   online.
19   BY MS. McKINLEY:
20        Q    Well, if he was scheduled to teach some
21   of his classes online, there wouldn't have been any
22   kind of conversion required, right?
23        A    Correct.
24        Q    There wouldn't have been any kind of
25   accommodation needed with those classes, correct?
```

Page 49

```
 1        A    Correct.
 2        Q    In fact, under your own policy it says
 3   "All reasonable employment accommodations that do not
 4   pose an undue hardship will and must be made for any
 5   individual with a disability."
 6             That's your understanding of what the
 7   policy is supposed to provide, correct?
 8        A    Correct.
 9        Q    I'm just going back to the emails now.
10   We're on Exhibit 12.
11        A    Okay.
12        Q    Okay.  So I'm looking at the second page.
13        A    Yes.
14        Q    So the first email was August 2nd and
15   this one is August 8th.  Why did it take six days to
16   get back to him?
17        A    So August is the busiest time of the year
18   in human resources as we are off-boarding faculty for
19   not teaching in the fall and we are on-boarding all
20   new faculty.
21             At this same time our office was in
22   transition and we were moving from one building to
23   another.  So there was a significant disruption to our
24   activities, which is why I was answering emails on a
25   Sunday night.
```

13 (Pages 46 to 49)

Jennifer Weidman

Page 50

1    Q    Okay.  So between August 2nd and August
2  8th, did you talk to anyone else about Dr. Oross's
3  request?
4    A    I don't remember off the top of my head
5  who I talked to.
6    Q    Okay.  So you say in this email "Changing
7  the modality of a course from in person to online
8  would be considered a fundamental alteration."
9    You didn't know what courses he was
10  teaching, did you?
11    MS. LE:  Objection to form.
12    A    Specifically which courses, as in the
13  course titles or ...
14  BY MS. McKINLEY:
15    Q    Did you have any idea whatsoever what
16  classes he was teaching?
17    A    At the time I'm sure I looked at his
18  schedule.
19    Q    And what criteria did you use to
20  determine whether it would be a fundamental alteration
21  for any of those classes to be converted to online, to
22  the extent that they weren't already online?
23    A    I'm not sure I understand your question.
24    Q    Did you make any individualized
25  determination based on the classes that he was

Page 51

1  scheduled to teach in person as to whether there would
2  be any kind of deviation from anyone's expectations
3  with regard to the learning outcomes for those
4  classes?
5    A    Are you asking if I considered any
6  alteration in learning outcomes?
7    Q    Well, I'm asking you really what, if
8  anything, you did to make an individualized
9  determination with regard to the specific request he
10  was making with regard to the specific courses that he
11  was scheduled to teach.
12    A    A determination in terms of the fact that
13  we were converting the modality.
14    Q    So that's all you needed to know, right?
15    A    That was the basis.
16    Q    Okay.  So then you said he could continue
17  his contiguous FMLA, 15 sick days, two personal days.
18  So basically he wasn't going to be teaching at all,
19  right?
20    MS. LE:  Objection to form.
21    A    So here I'm talking about what his other
22  options would be.
23  BY MS. McKINLEY:
24    Q    Right.  These are the only options that
25  you offered him, correct, that he could use up his own

Page 52

1  time and after that he would be on unpaid leave for
2  the rest of the semester?
3    MS. LE:  Objection to form.
4    A    Correct.  His leave options were somewhat
5  limited, as he had used 75 days of leave in the spring
6  semester and by law he was limited to 90 paid days in
7  the calendar year.
8  BY MS. McKINLEY:
9    Q    Okay.  So, again, when you wrote that to
10  him, did you have any idea that he was already
11  scheduled to teach two classes online?
12    MS. LE:  Objection to form.
13    A    Again, I can't speak to that as fact
14  because I don't know that.
15  BY MS. McKINLEY:
16    Q    You weren't involved in any kind of
17  interactive process with Dr. Oross, were you?
18    A    So this email is prior to his actual
19  request.
20    Q    I'm aware of that.  You're already
21  telling him that the only option he has is if he uses
22  up his own time and if he goes on unpaid leave.  You
23  never offered him anything else, did you?
24    MS. LE:  Objection to form.
25    A    Again, so -- first of all, this was not

Page 53

1  an ADA response here.  I was speaking in general
2  terms.  And if we're shifting to the discussion around
3  his ADA request, I had a later conversation with him
4  where we made an alternate offer.
5  BY MS. McKINLEY:
6    Q    You're talking about after the sabbatical
7  -- the accommodation request was denied and his
8  request for a restoration of health sabbatical was
9  also denied, correct?
10    A    Correct.
11    Q    So would you agree with me the
12  interactive process is supposed to take place before
13  the request for accommodation is denied?
14    MS. LE:  Objection to form.
15    A    It's a back-and-forth process.
16  BY MS. McKINLEY:
17    Q    Okay.  But before you deny a request for
18  an accommodation, isn't it true, under your own
19  policy, that there is supposed to be an interactive
20  process?
21    A    That --
22    MS. LE:  Objection.
23    A    I'm sorry?
24  BY MS. McKINLEY:
25    Q    You can answer.

Jennifer Weidman

Page 54

```
1              MS. LE: I was just objecting. You can
2    answer.
3         A     Okay. So we might deny the initial
4    request and propose an alternative and then that can
5    go back to the employee. You know, that's --
6    BY MS. McKINLEY:
7         Q     Well, that's not answering my question.
8    It's really simple. You're the head of HR, right?
9    You're the one that's in charge of making sure the ADA
10   policy is implemented throughout the university; isn't
11   that right?
12        A     Correct.
13        Q     Under the policy, isn't it true that
14   before a request for accommodation is denied you are
15   required to engage in an interactive process?
16        A     Correct.
17        Q     Okay. And do you understand that that
18   process has legal criteria?
19        A     Correct.
20        Q     And you were not involved in that process
21   with Dr. Oross before you denied his request for
22   accommodation, were you?
23            MS. LE: Objection to form.
24        A     The process was perhaps not as clear-cut
25   as it could have been.
```

Page 55

```
1    BY MS. McKINLEY:
2         Q     Okay. Well, Alexis is the one that
3    handled that process for Dr. Oross, isn't she?
4         A     Alexis was not as directly involved in
5    this particular request because of the nature of it.
6         Q     Because he was requesting a remote
7    teaching accomodation because of his heart transplant
8    and his immune-suppressed condition, right?
9         A     Because of his request to convert
10   in-person classes to online.
11        Q     Okay. So because -- you're not disputing
12   the medical basis for the request, are you?
13        A     No.
14        Q     Okay. So --
15        A     Excuse me, I'm sorry. We're not
16   disputing the fact that he has a medical condition
17   meeting the definition of disability under the ADA.
18        Q     Okay. Did you have any medical basis for
19   believing that the doctor's recommendation that he not
20   teach in person was not appropriate?
21        A     No.
22        Q     So you didn't have a medical consultant
23   or anyone else look at the request and say, "Yes, this
24   sounds medically correct," or, "No, it doesn't;" is
25   that right?
```

Page 56

```
1         A     No.
2         Q     Okay. I'd like you to take a look at
3    SO-1.
4            MS. LE: I have to send it to her.
5            Lorrie, can we take a break --
6            MS. McKINLEY: Yes, I was just --
7            MS. LE: -- when you have a logical
8    stopping point?
9            MS. McKINLEY: -- going to say that.
10   Sure. Let's just do it after we do this
11   document.
12           MS. LE: Yep. I just sent it over,
13   Jennifer.
14        A     I'm just waiting for it to come through.
15           Still waiting.
16           Oh, there it is.
17   BY MS. McKINLEY:
18        Q     Okay. I'm looking at page 3.
19        A     All right. Just a moment.
20           All right. You said page 3, yes.
21        Q     Okay. So is that -- it says this is a
22   "Reasonable Accommodation Confirmation/Resolution Form
23   for Employees."
24        A     Um-hum.
25        Q     Is that your signature at the bottom?
```

Page 57

```
1         A     That is.
2         Q     Okay. And it says "Denied," and it says
3    "Provide rationale." Do you see that?
4         A     Yes.
5         Q     Who wrote the language that was inserted
6    on this denial form?
7         A     The language was developed in
8    consultation with legal counsel.
9         Q     Were you involved in writing this?
10        A     Yes.
11        Q     Who instructed Alexis to incorporate this
12   specific language?
13        A     I did.
14        Q     Okay. What documents, if any, did you
15   review before you instructed her to put that language
16   on this form to deny this accommodation?
17        A     I'm not sure I know what you mean as far
18   as documentation.
19        Q     Did you review anything at all with
20   regard to what Dr. Oross was requesting, what his
21   medical situation was, the specific individualized
22   circumstances of his -- you know, the basis for his
23   request or anything at all? Did you look at anything?
24        A     I reviewed his request. I was aware of
25   his medical circumstances due to his FMLA request the
```

Jennifer Weidman

Page 58

1  semester prior.  We reviewed his schedule and in
2  consultation with Mr. Pena and legal counsel developed
3  this language.
4      Q     Well, you're the one who had the
5  responsibility for denying the request, right?
6      A     Correct.
7      Q     Okay.  Is this the same language that you
8  used on the other ones, the other people that had
9  requested remote teaching accommodations?
10      A     If not the same, similar.
11      Q     And I was a little confused by what you
12  said earlier because I thought you told me you had not
13  seen his reasonable accommodation request form.
14      A     I don't remember saying that.
15      Q     I thought you told me that DSO looks at
16  the request and they send you the email but they don't
17  send you anything else.
18      A     They send an email and a blank request
19  form -- a blank -- you know, this form here, a blank
20  one.
21      Q     Right.  Okay.  But you don't see the
22  actual request for accommodation; is that correct?
23      A     Correct.
24      MS. McKINLEY:  So let's take a break.
25  Kathy, Dr. Oross sent me a few additional documents

Page 59

1  this morning.  I'm going to just make copies and email
2  them to you.
3      MS. LE:  Very good.
4      (Break taken.)
5  BY MS. McKINLEY:
6      Q     Okay.  So before we look at the new
7  exhibit -- and your name is on SO-1, page 3, which is
8  the denial -- did you talk to Jesus Pena about this
9  particular situation with regard to Dr. Oross?
10      A     (Witness muted.)
11      Q     We can't hear you.  You're muted.
12      A     I'm sorry.  It's almost two years and I
13  still haven't got the hang of it.
14      So prior to issuing the denial, he had
15  been part of those conversations with myself and Linda
16  Lantaff and legal counsel.
17      Q     Did he direct you to deny Dr. Oross's
18  accommodation?
19      A     It was not a direct order, no.
20      Q     So did you have the authority to grant it
21  in spite of the conversations you had with Jesus Pena?
22      A     Did I have the authority to make that
23  decision, yes, that was -- that was my decision.
24      Q     So you're saying the buck stops with you?
25      A     Correct.

Page 60

1      Q     Did you have any conversations with Dr.
2  Hawkinson?
3      MS. LE:  Objection to form.
4      A     Not specifically prior to issuing the
5  denial.
6  BY MS. McKINLEY:
7      Q     Did you have any conversations with Dr.
8  Hawkinson before you issued the denial pertaining to
9  Dr. Oross?
10      A     I don't remember any specifically about
11  Dr. Oross.
12      Q     Were you copied on any correspondence
13  between you and/or Jesus Pena -- I'm sorry, let me
14  start over.
15      Were you copied on any correspondence
16  between Mr. Pena and Dr. Hawkinson regarding Professor
17  Oross before the accommodation was denied?
18      A     I don't remember.
19      Q     Would you look at the next page.  It says
20  "Employee signature" and then it says "Provide a copy
21  to DSO."  So did you forward this to DSO?
22      A     I'm sorry, we're still looking at the --
23      Q     Yeah, SO-1, the denial form.  Where is
24  this form today?
25      A     Well, Alexis would have forwarded a copy

Page 61

1  of the completed form to DSO.
2      Q     Did you forward a copy of it to Jesus
3  Pena?
4      A     I don't remember having done so.  That
5  wouldn't have been a normal part of our process.
6      Q     Did he follow up with you and say, "What
7  happened with the Dr. Oross accommodation"?
8      A     I'm sure that was a conversation we had.
9      Q     Okay.  Can you tell me about that
10  conversation.
11      A     Again, I don't -- I can't remember a
12  specific conversation on a specific date, other than,
13  you know, a normal sort of update between him and I.
14      Q     Okay.  In any conversation that you had
15  with him after you denied the request, did he ever
16  say, "Well, maybe we better go back and look at that
17  again," or anything along those lines?
18      A     Not that I recall, no.
19      Q     Okay.  After you denied the
20  accommodation, did you have any conversations with Dr.
21  Hawkinson about Dr. Oross?
22      A     I know that we had a conversation at some
23  point after -- at some point in time after the denial.
24  I can't tell you how close in time it was to the
25  denial.

Jennifer Weidman

Page 62

1    Q      Okay.  All right.  So let's look at
2    Exhibit 22.
3              (SO Exhibit Number 22 produced and marked
4    for identification.)
5              MS. LE:  Oh, let me -- sorry, I didn't
6    get a chance to forward it to Jennifer yet.
7              I just sent that over.
8       A      Okay.
9    BY MS. McKINLEY:
10      Q      Okay.  Do you have it?
11      A      Yeah, it just came through.
12             Okay.
13      Q      All right.  So the first page looks like
14   an email from Dr. Oross -- oh, okay.  So at the very
15   top of the page it says 7/30 and it looks like Dr.
16   is it -- how do you pronounce that?
17      A      Beougher.
18      Q      Beougher.  Shared the July 26 email from
19   Dr. Oross which asked some specific questions about
20   the safety of campus in relation to his medical
21   condition.  Do you recall that?
22      A      Yes.
23      Q      Okay.  Did you look at the link that he
24   sent regarding background information with respect to
25   immunocompromised people and COVID precautions?

Page 63

1       A      I'm sure I did.
2       Q      And did you have a conversation with
3    anyone about them in relation to Dr. Oross?
4       A      No, not specifically that I recall.
5       Q      Okay.  So he indicates that he would
6    really prefer to come back to campus but he wants to
7    know about whether he would be allowed to ask students
8    to wear masks in the classroom and you said no, right?
9    If you look at the top of page 2.
10      A      That's not what I said.
11      Q      You said you can ask them to but you
12   can't require it, right?
13      A      So at this time the university had not
14   implemented the mask requirement yet, which was, in
15   fact, later so --
16      Q      Right.  So at the time you were -- I'm
17   sorry, go ahead.
18      A      So at this time that I was answering
19   this, we said, you know, that faculty could ask their
20   students to wear a mask in class but could not compel
21   them to do so.
22      Q      Okay.  And when did that change, if it
23   did?
24      A      It did change.  I don't remember the
25   specific date.  It was prior to the start of the

Page 64

1    semester.
2       Q      Did it change before or after Dr. Oross's
3    request for accommodation was denied?
4       A      Again, I don't remember the specific
5    date.
6       Q      Well, when you evaluated the
7    accommodation issue before you signed your name, you
8    were basing that on the current circumstances on
9    campus, correct?
10      A      That is correct.
11      Q      Okay.  So then you indicate that no, you
12   can't ask anyone what their vaccination status is or
13   -- right?
14      A      I'm sorry, is there a question?
15      Q      You wouldn't have any idea whether --
16   what the vaccination status of any of the students in
17   the classroom would be, correct?
18      A      Correct.  He asked if he could ask
19   them --
20      Q      And did you understand why that was such
21   an important concern for him in light of his recent
22   heart transplant?
23      A      Yes.
24      Q      And he asked about social distancing.
25   You said you can certainly ask someone to stand or sit

Page 65

1    further away from you when conversing, et cetera, but
2    classrooms will be back to normal layouts and
3    capacities.
4              So he would have no guarantee if he came
5    back or no assurance that there would be social
6    distancing in the classroom, right?
7       A      Correct, they were back to the normal
8    layout.
9       Q      And you indicate that there had been no
10   changes to the existing HVAC systems, correct?
11      A      That is correct.
12      Q      All of these things that you have listed
13   on page 22 [sic] were still the case at the time you
14   denied his accommodation request, correct?
15      A      On page 2, correct.
16      Q      Did you review the EEOC guidance on
17   telecommuting or reasonable accommodations for people
18   with immune-suppression and immune-compromise?
19      A      At what point?
20      Q      At the time we're talking about in the
21   end of July.
22      A      I was aware of them, yes.  I don't
23   remember that I specifically opened them up and looked
24   at them in looking at this.
25      Q      At the time that you were having this

Jennifer Weidman

Page 66

1    email exchange, when was the last time you had looked
2    at those -- at the EEOC guidance?
3        A    I don't remember a specific date.
4        Q    Was it in 2021?
5        A    -- again, sometime prior to that, the
6    months prior. I don't remember a date.
7        Q    What about the CDC's guidance for
8    institutions of higher education?
9        A    I am a part of the university's emergency
10   management team so that was something that we reviewed
11   on a relatively regular basis.
12       Q    So were you aware that the CDC's guidance
13   for IHEs with respect to people with
14   immune-compromised, immune-suppression, solid organ
15   transplants and other high risk conditions was that
16   they be permitted to work remotely to the extent
17   possible?
18           MS. LE: Objection to form.
19   BY MS. McKINLEY:
20       Q    You are aware of that, right?
21       A    Yes.
22       Q    And did you have any conversation with
23   Jesus Pena about those recommendations in relation to
24   Dr. Oross?
25       A    No.

Page 67

1        Q    How about with Dr. Hawkinson?
2        A    No.
3        Q    So when you -- so how did -- tell me
4    procedurally how this document, the denial form, gets
5    transmitted to -- well, actually, withdraw that. I'm
6    withdrawing the question. I have the emails right
7    here.
8            So when you officially denied the
9    request, you didn't provide Dr. Oross with any
10   additional information than you had provided him
11   before with regard to his options, right?
12       A    Correct. We had previously discussed the
13   leave options.
14       Q    Okay. So the only option you offered him
15   was using up his time and then leave without pay,
16   correct, at that point in time?
17       A    It seemed clear from the other
18   communications that he had this was what he was
19   interested in. He was not interested in any other
20   sort of operation.
21       Q    Did he indicate to you at any point in
22   time that he was not interested in teaching his online
23   classes online?
24           MS. LE: Objection to form.
25       A    I'm sorry, can you repeat that?

Page 68

1    BY MS. McKINLEY:
2        Q    Did he ever indicate to you in any way
3    whatsoever that he was not interested in teaching his
4    online classes online?
5            MS. LE: Objection to form.
6        A    Exactly. It was my understanding that
7    that was his only interest, was teaching his classes
8    online.
9    BY MS. McKINLEY:
10       Q    Right, but did you understand that he was
11   already scheduled to teach two of his classes online?
12           MS. LE: Objection to form.
13       A    That's not my understanding.
14   BY MS. McKINLEY:
15       Q    Okay. So when you denied the
16   accommodation request, it was your understanding that
17   he would be using up his time and leave without pay,
18   right?
19       A    Correct.
20       Q    And it was clear in your mind that you
21   didn't think that you had to -- that it was necessary
22   to send him anything further to communicate that
23   information that you had already communicated,
24   correct?
25       A    Correct.

Page 69

1        Q    Do you know what kind of technology or
2    new technology the university had purchased and
3    installed to facilitate online instruction from, you
4    know, the spring of 2020 forward to the time that
5    we're talking about here in July of 2021?
6        A    I remember that the university purchased
7    some number of specialized cameras that were installed
8    in a number of classrooms to facilitate the, you know,
9    projection of faculty in classrooms and so forth.
10       Q    Would you take a look at Exhibit 7.
11           MS. LE: Jennifer, have I sent you that
12   one already?
13       A    I'm not sure. I'm just trying to see.
14           MS. McKINLEY: You know what, we'll come
15   back to that one. Don't worry about it. We'll do it
16   later.
17           MS. LE: Okay. I'll send it for now so
18   she'll have it.
19           (SO Exhibit Number 14 produced and marked
20   for identification.)
21   BY MS. McKINLEY:
22       Q    So please take a look at Exhibit 14.
23       A    Hold on a second.
24           Okay.
25       Q    Okay. So this is a letter from Dr. Oross

Jennifer Weidman

Page 70

1   on August 24th to President Hawkinson regarding a
2   request for sabbatical leave.  Did you have a
3   conversation with Dr. Hawkinson about this issue?
4       A      Yes.
5       Q      Okay.  Did you see a copy of his letter?
6       A      Yes.
7       Q      Dr. Oross's letter?
8       A      Yes.
9       Q      Okay.  So tell me procedurally, first of
10  all, how this works in relation to you as the HR
11  person in relation to a sabbatical request for
12  restoration of health.
13      A      So this is the first request for a
14  sabbatical for restoration of health that has come to
15  me during my tenure as HR director.  So it's not --
16  it's not necessarily there's an established practice
17  for that, but the granting of the sabbatical is at the
18  president's discretion so --
19      Q      Is there any policy that says how a
20  restoration of health sabbatical -- what the criteria
21  are?
22      A      No.
23      Q      I understand, and correct me if I'm
24  wrong, that the process and criteria for a regular
25  sabbatical, an academic sabbatical --

Page 71

1       A      Um-hum.
2       Q      -- is set out in the union contract; is
3   that correct?
4       A      That is correct.
5       Q      And are you aware of anything in the
6   union contract that pertains to a restoration of
7   health sabbatical?
8       A      No, I believe the contract specifies that
9   the faculty member has to be eligible for a regular
10  sabbatical in order to be able to request a medical
11  sabbatical, but other than that, that's the only
12  requirement that I know of.
13      Q      You mean in terms of longevity with the
14  university?
15      A      In terms of the years of service and
16  prior sabbaticals and so forth.
17      Q      Okay.  So other than that, you're saying
18  you don't know what, if any, criteria there are to
19  guide the discretion with regard to a restoration of
20  health sabbatical?
21      A      Correct.
22      Q      Okay.  So tell me about what happened
23  with this particular one.
24      A      So Dr. Oross submitted it to the
25  president, the president discussed it with Mr. Pena

Page 72

1   and I and it -- the decision was that the sabbatical
2   is intended for the restoration of health and since
3   Dr. Oross had been released to be able to teach, only
4   in a remote capacity, just not in the classroom, that
5   there wasn't any necessarily restoration to be had.
6       Q      Well, did you have any reason to believe
7   that he had -- I guess I'm confused.  So you denied
8   his accommodation request because his medical
9   condition made it impossible for him to come back to
10  work on campus, given the pandemic and the issues that
11  he was having with immune-suppression and so forth,
12  right?
13          MS. LE:  Objection to form.
14      A      We denied the accommodation request to
15  convert online -- to convert in-person classes to
16  online based on the fact that the fundamental
17  alteration of those was an undue hardship under the --
18  BY MS. McKINLEY:
19      Q      Okay.  Well, I understand that and we
20  already talked about why fundamental alteration
21  doesn't have anything to do with undue hardship.
22          My question is:  It was because of his
23  medical condition and the needs that he had as a
24  result of that condition that you denied the specific
25  kind of accommodation that he needed, right?

Page 73

1           MS. LE:  Objection to form.
2       A      Can you repeat that?
3   BY MS. McKINLEY:
4       Q      Yes.  I said it was because of his
5   medical condition and the type of accommodations that
6   ensued from that that you denied his request for
7   accommodation, right?
8           MS. LE:  Objection to form.
9       A      No, we denied the request for
10  accommodation based on the type of accommodation
11  requested and the reasonableness of that.
12  BY MS. McKINLEY:
13      Q      Okay.  And that had to do with -- we've
14  already established that -- you have no dispute that
15  he has a medical condition and that was the basis for
16  his request, right?
17      A      We do not dispute that his medical
18  condition qualifies as --
19      Q      Right.  So now he's saying, "Okay, well,
20  you're not letting me come back to work.  I'd like to
21  have a restoration of health sabbatical so maybe --
22  you know, hopefully I'll be able to come back to work
23  on campus soon," and you're saying that that was not
24  satisfactory in relation to what?
25      A      The sabbatical, as indicated in the

Jennifer Weidman

Page 74

1    contract, is intended for the restoration of health
2    and the decision was that he had been released to
3    teach, just not in person, so that was the decision,
4    that that wasn't necessarily the restoration.
5        Q      And what guided that decision?
6        A      Again, in consultation with legal
7    counsel.
8        Q      Okay. You just told me you talked to
9    Hawkinson and Pena, correct?
10       A      Correct.
11       Q      Okay.
12       A      And there was a conversation between -- I
13   don't remember specifically if Dr. Hawkinson was on
14   the call with university legal counsel or not.
15       Q      But you did speak with Hawkinson and Pena
16   themselves, right?
17       A      Yes.
18       Q      Okay. And the decision was made, "No,
19   we're not going to give a restoration of health
20   sabbatical," right?
21       A      Correct.
22       Q      Okay. So you sent this letter to Dr.
23   Oross. Did you give him anything -- I'm sorry, let me
24   take that back.
25           (SO Exhibit Number 15 produced and marked

Page 75

1    for identification.)
2    BY MS. McKINLEY:
3        Q      Okay. I'm sorry, we're going to go to
4    Exhibit 15.
5        A      I'm sorry, did you say 15?
6        Q      I did say that, yes.
7        A      Okay.
8        Q      Okay. So you said "Dr. Hawkinson has
9    reviewed your request for a sabbatical." What kind of
10   documentation, if any, was created in relation to the
11   denial of the sabbatical, other than the letter which
12   we just looked at -- or, I'm sorry, the letter we have
13   in front of us?
14       A      Other than 15?
15       Q      Yes.
16       A      That's -- that is the -- there was no
17   other letter from the president's office, in other
18   words.
19       Q      Okay. But is there any other
20   documentation regarding the evaluation of the
21   sabbatical request?
22       A      No, I do not -- I do not believe so.
23       Q      Whose job is it to maintain whatever
24   documentation there might be regarding a sabbatical
25   request for a restoration of health?

Page 76

1        A      It happens so rarely I don't know that
2    there is a formal process built in for us, and there
3    may be other -- there may be other processes built in,
4    say, in the president's office that I'm unaware of.
5        Q      You're not involved in it, is that what
6    you're saying?
7        A      Exactly. To the extent that I am
8    involved in it, this is the part that I know about.
9        Q      Okay. You said that you -- in this
10   letter you said "Per our telephone conversation
11   yesterday" -- I'm assuming you mean with Dr. Oross,
12   right?
13       A      Yes.
14       Q      What happened during that conversation?
15       A      So I called him to convey that the
16   president was declining to approve his sabbatical for
17   the restoration of health and also to make an offer of
18   two courses to be taught online that would be the
19   subject tbd, to be decided, in consultation with the
20   dean and the provost -- excuse me, the dean and the
21   department chair to start mid-semester based upon
22   student need in the psychology department.
23       Q      Well, you didn't actually have any
24   courses to offer him, did you?
25       A      Correct. They were to be decided after

Page 77

1    drop-and-add once they could establish what student
2    need was.
3        Q      Had you talked to the chair of the
4    psychology department or the interim chair and say,
5    "Is there any kind of need that you see coming up for
6    this kind of course"?
7        A      I did not. That portion of the process
8    was being handled under the provost's office between
9    the provost and the dean and the department chair.
10       Q      Okay. So when you encouraged Dr. Oross
11   to discuss this was the chair and the dean, did you
12   have any reason to believe that they had absolutely no
13   idea that this might be going on?
14       A      It was my understanding that the provost
15   was going to be talking to the department chair.
16       Q      Okay. But would you agree with me that
17   you can't actually offer an accomodation for something
18   you don't have to offer?
19           MS. LE: Objection to form.
20       A      This was being offered not as an ADA
21   accommodation but as a way of meeting student need and
22   also offered something to Dr. Oross to be able to
23   continue to teach.
24   BY MS. McKINLEY:
25       Q      Okay. Well, I guess the reason I'm

Jennifer Weidman

Page 78

1  having trouble with your use of the word offer is that
2  you didn't have anything in hand to give him, did you?
3      A     So the way it was framed, and then I
4  conveyed to him, to Dr. Oross, was that they would
5  review student need and where -- so in other words,
6  what -- where courses might be offered in the
7  psychology department and they would start
8  mid-semester and that would be -- it was to be
9  decided.  So in the moment that we were having the
10  conversation, they were as yet unknown.
11      Q     Right.  And do you have any knowledge of
12  the psychology department ever offering those kinds of
13  courses mid-semester?
14      A     I have no knowledge of that, but I
15  wouldn't.
16      Q     And you didn't have any knowledge of it
17  then either, did you?
18      A     Correct.  I would not ordinarily have
19  knowledge of what kind of courses are given department
20  offers.
21      Q     So you said that Dr. Oross -- this would
22  give him the ability to teach half time.  He would
23  have been teaching half time if he had been able to
24  teach his online classes online, right?
25          MS. LE:  Objection to form.

Page 79

1      A     Again, I'm not sure that he was scheduled
2  to teach online for the fall semester.
3  BY MS. McKINLEY:
4      Q     That's a pretty important thing to
5  understand in the context of an accommodation denial,
6  isn't it?
7          MS. LE:  Objection to form.
8      A     And, again, that was the reason that they
9  were denied, is the converting from in-person to
10  online.
11  BY MS. McKINLEY:
12      Q     How many?
13      A     I heard you say that he was scheduled to
14  teach two online and I'm not certain that that's fact.
15      Q     Okay.  Well, aren't you the one that is
16  supposed to know before you sign your name on that
17  form?
18          MS. LE:  Objection to form.
19      A     Yes, I would have known that at that
20  time.
21  BY MS. McKINLEY:
22      Q     Okay.  Well, did you review any documents
23  in preparation for your deposition today?
24      A     I did.  I reviewed notes.
25      Q     Okay.  And did you review anything to

Page 80

1  refresh your recollection as to how many courses Dr.
2  Oross was scheduled to teach online or in person for
3  the fall semester?
4      A     I did not review his schedule at the
5  time, no.
6      Q     Okay.  So on the next page, Dr. Oross
7  wrote back to you on August 30th and he asked you a
8  series of questions, right?
9      A     Uh-huh.
10      Q     "What would the topic be of the high
11  demand courses?"
12          Did you think that was a legitimate
13  question?
14      A     It was, and it was in my conversation
15  with him that -- we covered that.  We didn't know yet
16  what those topics would be.
17      Q     Right.  He didn't --
18      A     That would be decided after drop-and-add.
19          (Simultaneous crosstalk.)
20          (Court reporter clarification.)
21      A     So in our conversation we -- I had told
22  him that we didn't know yet what those topics would
23  be, that that would be to be decided after
24  drop-and-add.
25  BY MS. McKINLEY:

Page 81

1      Q     In fact, you didn't know whether there
2  would be any topics, right?
3      A     I -- the knowledge that I had was that we
4  were offering two courses to be -- to start
5  mid-semester after drop-and-add, topic to be decided.
6      Q     Okay.  Well, he says here that he talked
7  to his chair, which is what you recommended that he
8  do, and he does not see any high demand for additional
9  courses at this time.
10          Did you do any investigation, once you
11  received this information, to determine whether or not
12  this was actually something that was feasible or might
13  happen?
14      A     The decision about offering courses and
15  how many students it takes to run a class or what
16  topics are offered is strictly under the academic
17  affairs division under the provost through the deans
18  so that is not a conversation that I would be involved
19  in.
20      Q     Well, he's asking questions that would be
21  really important in terms of evaluating what you're
22  proposing and whether it's real, right?
23      A     And I had referred him to his dean and
24  his chair.
25      Q     Right.  And he told you that he went

Jennifer Weidman

Page 82

```
1    there and they said, "We don't know what you're
2    talking about."
3           My question is did you do anything, when
4    you got that information, to investigate to see if
5    there was actually anything to offer?
6       A    Again, I -- I wouldn't be able to answer
7    those questions and that was why I had referred him to
8    his dean.
9       Q    Okay. Well, if you look at page 4,
10   you're the one who said "In light of your response
11   that you are not able to accept our offer."
12      A    Yes.
13      Q    You were speaking on behalf of the
14   university, right?
15      A    In this instance, yes.
16      Q    Okay. But you haven't told me what the
17   offer was -- any tangible offer. You're saying maybe
18   this would happen, but you don't seem to have any idea
19   whether that was actually a possibility in real life.
20      MS. LE:   Objection to form.
21      A    And, again, beyond reiterating that he
22   was offered to teach two online courses of a subject
23   to be decided and they would run, you know, on a
24   shorter semester basis, again, based on need in the
25   department.
```

Page 83

```
1    BY MS. McKINLEY:
2       Q    So did the psychology department identify
3    a high demand need and offer those courses
4    mid-semester?
5       A    After not -- you know, after him not
6    accepting the offer, no.
7       Q    Okay. So whether -- so if there was a
8    need, there was no course offered to meet it; is that
9    right?
10      A    Sometimes need goes unmet, I guess.
11      Q    But you would have no actual idea whether
12   there was a need or the psychology department would
13   have offered any such course, right?
14      A    Again, ordinarily human resources would
15   not be involved in academic planning and
16   administration.
17      Q    Okay. And Dr. Oross didn't say, "I
18   reject an offer," he asked you specifically, "What is
19   the offer?"
20          So I guess I'm wondering -- well, let me
21   ask you this: After you received his email on August
22   30th asking these questions about what is the offer,
23   when will it be, how many students, you know, what are
24   the topics, how much time am I going to have to get
25   ready, did you talk to anyone and say, "Look, he's got
```

Page 84

```
1    some questions here that I think deserve an answer"?
2       A    It seemed clear to me from this, given
3    the timing and the questions, the questions that I had
4    already addressed in my conversation with him, that he
5    was not interested in exploring this offer. I
6    reviewed that with Mr. Pena who concurred and that was
7    the reason for my response.
8       Q    Okay. So you disagree that what you put
9    in your letter that you're calling an offer lacks the
10   details needed to make a decision?
11      A    A decision ...
12      Q    Well, he says, "You haven't given me
13   enough information for me to accept or reject your
14   offer," and then you wrote back, after you talked to
15   Pena, and said, "Okay, well, you didn't accept our
16   offer so, you know, you're going to be on leave
17   without pay."
18          And my question is: Do you disagree that
19   he did not accept or reject the offer and he was
20   asking you for more information?
21      A    And, again, so much of what he was asking
22   we had already discussed and those answers weren't
23   available --
24      Q    Right.
25      A    -- in that moment.
```

Page 85

```
1       Q    Exactly. They weren't available. Did
2    you give him any information between August 27th and
3    when you wrote your letter on -- I'm sorry, the email
4    on August 30th to answer any of the questions that he
5    presented?
6       A    There was no new information.
7       Q    Right. Okay. And Pena didn't give you
8    any new information, right?
9       A    No.
10      Q    And did you talk to Dr. Hawkinson about
11   this?
12      A    No.
13      Q    None of the provosts?
14      A    Again, not in that moment.
15      Q    Or any moment, right?
16      A    I'm sorry?
17      Q    Or any moment; isn't that right?
18      A    Did I talk to the provost?
19      Q    Right. You said the provost was going to
20   be involved in talking to someone about this so I'm
21   asking you if you ever talked to the provost about it.
22      A    When?
23      Q    Between August 27th and August 30th.
24      A    I did not talk to the provost in that
25   time.
```

22 (Pages 82 to 85)

Jennifer Weidman

Page 86

1    Q      Okay.  So on page 7 Dr. Oross wrote to
2  you and asked you for any documentation outlining the
3  reason why his sabbatical request was denied.
4         Did you ever provide him with any
5  information, other than that letter saying it's -- Dr.
6  Hawkinson denied it?
7    A      There was no other correspondence beyond
8  my email from August 27th.  I communicated to him, you
9  know, verbally but no written.
10   Q      You mentioned earlier something about the
11 emergency management team.
12   A      Yes.
13   Q      What is that?
14   A      The emergency management team is a group
15 comprised of managers, faculty, staff and some
16 students that has been engaged in formulating the
17 university's COVID protocols.
18   Q      And did that -- did any of the
19 conversations that took place in that group pertain to
20 requests for accommodation by faculty who needed
21 remote work accommodations?
22   A      No.
23   Q      Was there ever any discussion about the
24 CDC guidelines for IHEs with regard to that issue?
25   A      About CDC protocols in regards to

Page 87

1  requests for remote work?
2    A      Yes.
3    A      No.
4    Q      Okay.  Were you ever involved in a
5  conversation with Jesus Pena in which that issue was
6  discussed specifically?
7    A      Remote work and CDC protocols, no.
8    Q      How about EEOC guidelines and regulations
9  with regard to evaluating those kinds of accomodation
10 requests?
11   A      Not specifically, no.
12   Q      In relation to you -- I mean, you told me
13 he is your supervisor -- what is his role in terms of
14 making sure that you have the information that you
15 need to properly implement the ADA policy or the
16 reasonable accommodation policy?
17   A      What is Jesus's role?
18   Q      Right.
19   A      He is -- he's my resource in a
20 consultative fashion.
21   Q      Okay.  So did he provide you with any
22 resources to address these kinds of requests, other
23 than what we've already discussed?
24   A      Not beyond what we've already discussed,
25 no.

Page 88

1    Q      Before you denied the accommodation
2  request, did you have a conversation with the interim
3  chair as to how they are going to cover Dr. Oross's
4  classes if his accommodation request was denied?
5    A      With the interim chair, no.
6    Q      How about the dean?
7    A      About how courses would be covered, I
8  don't think so.
9    Q      Do you have any idea what kind of -- did
10 you know what they were going to do if Dr. Oross was
11 not going to be able to teach his classes for the fall
12 semester?
13   A      I had -- I did not discuss what their
14 specific coverage plans were.  I know in a general
15 sense what their options are.
16   Q      Okay.  Did you know whether it was going
17 to be burdensome for the department to cover those
18 classes if Dr. Oross couldn't teach them?
19   A      I did not discuss that with them, no.
20   Q      So tell me about the sabbatical in
21 relation to the leave without pay as it pertains to
22 accrual of leave time.  So if a person is on
23 sabbatical, would they be accruing, like, sick time,
24 vacation time, that sort of thing?
25   A      The bargaining unit specifies what the

Page 89

1  accrual is during sabbatical.  I don't remember off
2  the top of my head.  Faculty do not have annual or
3  vacation time.  They only accrue sick and personal.
4    Q      Okay.  So is there a difference between
5  the accrual of sick and personal time if you're on
6  sabbatical as opposed to if you're on leave without
7  pay?
8    A      If you're on leave without pay, you
9  wouldn't be accruing them and I don't remember off the
10 top of my head what it is if you're on sabbatical.
11   Q      Do you think that would be in the
12 contract?
13   A      Yes, it is in the contract.
14   Q      Okay.  How about contributions to
15 retirement funds?  Is there a distinction between
16 leave without pay and sabbatical in that regard?
17   A      In the sense that sabbatical is paid and
18 so those contributions would be continuing versus
19 leave without pay and obviously those contributions
20 would not be counted in.
21   Q      Now, under your policy, a leave without
22 pay is something that has to be requested in writing,
23 right?
24   A      If it is a stand-alone policy -- I mean,
25 if it's a stand-alone request, yes.  In this case, it

Jennifer Weidman

| Page 90 |
| --- |

1  would -- it was tied to a contiguous FMLA related
2  request which had already been approved.
3      Q     Well, but he didn't ask for FMLA or leave
4  without pay for the fall semester, though, did he?
5      A     There was a serious health condition form
6  that was -- excuse me, he submitted a serious health
7  condition form to our office upon request of
8  recertification of his FMLA health condition.
9      Q     When?
10     A     In early September.
11     Q     You're not suggesting, are you, that
12 putting him on FMLA or a leave without pay was an
13 accommodation, are you?
14     A     No, merely that the leave provisions are
15 an alternative.
16         MS. McKINLEY:  Why don't we take a half
17 hour lunch break and then we'll come back.  What time
18 is it now?
19         MS. LE:  It's 12:23.
20         MS. McKINLEY:  All right.  Do you want to
21 come back at 1:00?
22         MS. LE:  Sure.
23         MS. McKINLEY:  Okay, that sounds good.
24         (Luncheon recess taken.)
25 BY MS. McKINLEY:

| Page 91 |
| --- |

1      Q     Ms. Weidman, do you ever receive copies
2  of the meet-and-discuss minutes?
3      A     I believe they're emailed out, but I
4  don't typically review them.
5      Q     Okay.  Do you remember in August Jason
6  Lanter, the vice-president of the union, reaching out
7  to you for data on how many faculty requested remote
8  teaching accommodations for the fall?
9      A     I remember getting a request.
10     Q     You do or you don't?  I couldn't hear
11 you.
12     A     I'm sorry, I do remember the request.
13     Q     Did you respond to it?
14     A     I don't remember that I responded to
15 that.  I'm not sure.  I don't remember specifically if
16 someone else was going to respond.
17     Q     Did Jesus Pena talk to you about the
18 discussion at the meet-and-discuss about this issue in
19 August?
20     A     He may have mentioned it.  I don't
21 remember anything specific.
22     Q     Okay.  Did he give you any instructions
23 or any -- anything to follow up on with regard to the
24 accommodation issues for people who needed -- or
25 faculty, I'm sorry, who needed remote teaching

| Page 92 |
| --- |

1  accommodations?
2      A     Did Jesus give me any instructions to
3  follow up?
4      Q     Right.
5      A     Nothing specific that I remember.
6      Q     So when you denied the accommodation
7  request for Professor Oross, did you make any
8  determination as to whether allowing him to teach
9  online would have cost any money at all?
10     A     So you're asking --
11     Q     Would you have had to, you know, buy
12 equipment?  Was there anything at all in way of
13 expenses that would have been associated with his
14 request?
15     A     Faculty who teach better than 80 percent
16 online receive a per student stipend, a per student
17 amount that's in a separate payment.
18     Q     I'm sorry, I couldn't hear what you said.
19     A     I'm sorry, is it -- I keep forgetting I
20 have to --
21     Q     That's okay.
22     A     I apologize.
23     Q     You know, sometimes with Zoom, you know,
24 we don't hear sometimes as well as we hear ourselves
25 so ...

| Page 93 |
| --- |

1      A     As far as additional expense that's
2  associated with online teaching, there's a provision
3  in the faculty bargaining agreement that allows for an
4  extra per -- it's an extra amount per student for each
5  class that's taught 80 percent or better online.
6      Q     Okay.  In terms of an accommodation
7  discussion -- well, that was never brought up, right?
8      A     Correct, that was not.
9      Q     Okay, it wasn't.  It had nothing to do
10 with the denial of the request, correct?
11     A     Correct.
12     Q     Okay.  Have you reviewed the complaint in
13 this case?
14     A     Not in depth.
15     Q     Okay.  And have you reviewed the answer?
16     A     Again, not in depth.
17     Q     I'm just looking through my notes.
18 Actually, I covered more ground than I thought I had.
19 I think we're up to October now.
20         Okay.  So, yeah, let's go to October.
21 All right.  Let's take a look at Exhibit 16.
22         (SO Exhibit Number 16 produced and marked
23 for identification.)
24 BY MS. McKINLEY:
25     Q     Do you have that?

Jennifer Weidman

<table>
<tr><td colspan="2">

Page 94

1    A    Yep, I'm just getting it here.
2    MS. LE:  I just want to ask.  Lorrie, the
exhibit starts on page 2 of something that may be with
the letter.  Was that intentional?
5    MS. McKINLEY:  Yeah, it's a two-page
letter and I think it's the email transmittal, is the
third page.
8    MS. LE:  Okay.  I only have -- what you
sent me is only two pages.
10    MS. McKINLEY:  Oh, you know why, because
mine is only two also -- no, it is.  It's three.  I
have an email in the back.  Which page don't you have?
13    MS. LE:  I don't have page 1 of the
letter.  I have page 2 of the letter and then the
email, but not page 1 of the letter.
16    MS. McKINLEY:  All right.  That's weird.
All right.  Let me go get that.  I'm going to go up
front because I don't want to mess up the Zoom.
19    MS. LE:  Yeah.
20    (Discussion held off the record.)
21 BY MS. McKINLEY:
22    Q    So let me go back to August for a minute.
So after the accomodation was denied for Dr. Oross,
were you aware of the publicity concerning his
situation?

</td></tr>
</table>

**Page 94**

1    A    Yep, I'm just getting it here.
2    MS. LE:  I just want to ask.  Lorrie, the exhibit starts on page 2 of something that may be with the letter.  Was that intentional?
5    MS. McKINLEY:  Yeah, it's a two-page letter and I think it's the email transmittal, is the third page.
8    MS. LE:  Okay.  I only have -- what you sent me is only two pages.
10    MS. McKINLEY:  Oh, you know why, because mine is only two also -- no, it is.  It's three.  I have an email in the back.  Which page don't you have?
13    MS. LE:  I don't have page 1 of the letter.  I have page 2 of the letter and then the email, but not page 1 of the letter.
16    MS. McKINLEY:  All right.  That's weird. All right.  Let me go get that.  I'm going to go up front because I don't want to mess up the Zoom.
19    MS. LE:  Yeah.
20    (Discussion held off the record.)
21 BY MS. McKINLEY:
22    Q    So let me go back to August for a minute. So after the accomodation was denied for Dr. Oross, were you aware of the publicity concerning his situation?

**Page 95**

1    A    Yes, I was.
2    Q    Okay.  And how did you become aware of that?
4    A    It was publicized by email.  I had other people who saw it who said, "Hey, did you see this?"
6    Q    See what, an email or something else?
7    A    No, the articles themselves.
8    Q    Okay.  So there's an article in The Inquirer on August 24th.
10    A    Yes.
11    Q    And you saw that?
12    A    Um-hum.
13    Q    Okay.  And did you see any of the articles that followed that?
15    A    I think I saw all of them.
16    Q    And did you discuss any of them with anyone in your office?
18    A    Beyond our just normal discussion of, you know, this is in the news; this is something to be aware of.
21    Q    What did you think about it?
22    A    I mean, anytime -- anytime the university appears in a less than favorable way, you know, it's not something we're all happy about.
25    Q    Did you understand why he was upset?

**Page 96**

1    A    Absolutely.
2    Q    Did you talk with Jesus Pena about it?
3    A    I'm sure we did.
4    Q    Okay.  So tell me about those conversations.
6    A    Again, beyond, you know, discussing the event, this is in the news, you know, we didn't have any discussion about anything else that should happen or be done about this.  It is what it is.
10    Q    Did you talk to Dr. Hawkinson?
11    A    I don't remember that I specifically had any conversation with him about it.
13    Q    Do you know if Jesus talked to Dr. Hawkinson about it?
15    A    I don't know that.
16    Q    Okay.  So let's --
17    MS. McKINLEY:  Did you get it, Kathy?
18    MS. LE:  I did and I forwarded it to Jennifer.
20    MS. McKINLEY:  Okay.  All right.  Yeah, I'm sorry, it just, I guess, mis-scanned.
22    MS. LE:  It happens to the best of us.
23    MS. McKINLEY:  Well, I'm not one of those so ...
25    A    Okay.  I see it.

**Page 97**

1 BY MS. McKINLEY:
2    Q    Do you have it?
3    A    Um-hum.  Yes.
4    Q    So this is a letter to Morris Scott who's at the Disciplinary Rights Project -- or I'm sorry. They keep changing their name.  Disability Rights of Pennsylvania dated October 14th to Mr. Scott who is a lawyer there, I guess, and it's about Dr. Oross.
9    And among other things it says that "the university would be more than happy to engage with you in discussions regarding Dr. Oross's request for accommodation."
13    That would mean you and your office, correct?
15    MS. LE:  Objection to form.
16 BY MS. McKINLEY:
17    Q    Well, who else would he have a discussion with regarding the interactive process?
19    I'm sorry, let me back up.  So did you know about this letter?
21    A    No, I did not.
22    Q    Jesus Pena didn't tell you about it?
23    A    I believe I was aware that there was some sort of an inquiry from a disability rights group.  I was not privy to any of the specifics and I have not

| Page 98 | Page 99 |
|---|---|

**Page 98**

1  seen this letter before.
2  Q.  Okay.  Well, if the university would be
3  engaging in a request for -- or an interactive process
4  of some kind, wouldn't your office have to be
5  involved?
6  A.  Typically.
7  Q.  So when was the first time that you were
8  aware that the PASSHE lawyer had offered to engage in
9  an interactive process with Dr. Oross?
10  A.  That Mr. Ferguson had offered to engage
11  in the interactive process with Dr. Oross?
12  Q.  Well, what he said was -- yeah.  Well,
13  let's start with the first sentence.
14  A.  That "the university would be more than
15  happy to engage with you" -- Disability Rights of PA
16  -- "in discussions regarding Dr. Oross and his request
17  for accommodation."
18  Q.  Okay.  But that was conditioned on him
19  not continuing to publicize his case or talk about it
20  in public; isn't that right?
21  A.  Again, this is the first time I'm seeing
22  this.  So, yes, that's what I read.
23  Q.  You've never seen this letter in your
24  life until today?
25  A.  I have not.

**Page 99**

1  Q.  Well, would you agree with me that Dr.
2  Oross had a right to object to the way his
3  accommodation request was handled?
4  A.  I don't dispute that it was his right to
5  express his displeasure however -- however he chose,
6  or his disagreement.
7  Q.  And based on your experience in your
8  current position, would you agree with me that it's
9  not okay for an employer to retaliate against someone
10  who is opposing something that they consider to be an
11  unlawful act under the ADA or the Rehabilitation Act?
12  A.  I agree that retaliation is not -- is not
13  permitted.
14  Q.  And would you also agree that the
15  interactive process is something that a person is
16  entitled to if they request an accommodation, not
17  something that can be conditioned on giving up some
18  other rights, such as the right to free speech?
19  A.  I do.
20  (SO Exhibit Number 17 produced and marked
21  for identification.)
22  BY MS. McKINLEY:
23  Q.  So take a look at the next exhibit and
24  maybe -- and just tell me whether you ever saw the
25  actual letter from Disciplinary Rights of PA that Mr.

| Page 100 | Page 101 |
|---|---|

**Page 100**

1  Ferguson was responding to.
2  A.  Is this Exhibit 17?
3  Q.  It is, yes.
4  A.  I have not seen this.
5  Q.  Well, did anyone ever tell you that Dr.
6  Oross or anyone on his behalf had contacted the
7  university and asked for accommodations for the
8  spring?
9  MS. LE:  Objection to form.
10  A.  Did anyone ever tell me that Dr. Oross
11  had requested accommodations for spring?
12  BY MS. McKINLEY:
13  Q.  Right.
14  A.  Via this other letter?
15  Q.  Yeah, I'm sorry.  Let me rephrase it just
16  so it's not confusing.
17  Okay.  Yes, I'm looking at page 5 under
18  "Requested Relief," and it says "Dr. Oross seeks
19  assurance from Kutztown University that it will allow
20  him to teach a full course load and conduct office
21  hours both remotely if needed in the spring of 2022
22  per the medical advice of Dr. Oross's physicians."
23  Were you advised by Jesus Pena that such
24  a request had been made on Dr. Oross's behalf?
25  A.  No, I did not know about this letter.

**Page 101**

1  Q.  Okay.
2  (SO Exhibit Number 18 produced and marked
3  for identification.)
4  BY MS. McKINLEY:
5  Q.  So take a look at Exhibit 18.
6  A.  Okay.
7  Q.  Do you have that?
8  A.  Yes.
9  Q.  Okay.  Now, this is a transmittal email
10  from you, I guess, on October 13th and then there's a
11  letter and then a couple of attachments.
12  A.  Um-hum.
13  Q.  And this was the day before the letter
14  from Mr. Ferguson to Mr. Scott.  So you indicate in
15  this letter that -- you're talking about the winter
16  semester and you knew that he was scheduled to teach
17  online, right?
18  A.  Um-hum, yes.
19  Q.  And you had absolutely no reason to
20  believe that he would not be able to perform the
21  duties of teaching his online course, right?
22  A.  Correct.
23  Q.  Okay.  And you knew that he was scheduled
24  to teach two online classes in the spring, correct?
25  A.  Correct.

Jennifer Weidman

Page 102

1    Q     And you didn't have any reason to think
2  that he would not be able to fully perform the
3  functions of that position, right?
4    A     Correct.
5    Q     Okay.  But you said "He will not be able
6  to teach those classes" -- meaning the online
7  classes -- "without a full-time full duty release
8  prior to the start of any classes."
9          So what prompted you to write to Dr.
10  Oross on October 13th to say you're not allowed to
11  come back and teach even your online classes unless
12  you can do "full-time full duty," in quotes?
13    A     So this letter began to be developed as
14  part of our FMLA process.
15    Q     I can't hear you.  I'm sorry.
16    A     I'm sorry.
17    Q     That's okay.  That's fine.  I just want
18  to tell you when I don't hear you.
19    A     Yeah, absolutely.
20          So this letter was developed as a result
21  of our FMLA leave of absence process.  So in
22  September, Dr. Oross submitted his updated serious
23  health condition form as requested, which, you know,
24  documented the nature of his medical need that he was
25  immune-suppressed and couldn't be in the classroom but

Page 103

1  could otherwise teach online.
2          And in the process -- in the course of
3  processing that request into our HR system, our leave
4  administrator was looking forward to what sort of
5  communication she needed to send on a routine basis
6  and she -- so she would have been sending this out as
7  part of a -- the normal process.
8          And in confirming with the system office,
9  the Pennsylvania State System benefit staff in
10  Harrisburg, that -- her understanding of what the
11  timeline was as far as how long his benefits would
12  continue without pay and when he would run out of
13  benefits entitlement and so forth, she asked to
14  confirm that with them.
15          And they came back and said, no, that our
16  understanding was not correct and that his benefits
17  would in fact end -- his entitlement to benefits on
18  leave without pay would end December 29th, as
19  indicated in the letter.
20          And so when she brought that to me, we
21  started having that conversation.  I saw that he was
22  scheduled to teach on an online winter class and so I
23  wanted to raise that with the benefit staff as well.
24          So the way the processing works, he had a
25  12-week entitlement to FMLA, during which he used his

Page 104

1  paid sick leave in the spring semester, and he could
2  continue after that 12 weeks to use his paid leave, up
3  to the extent allowed by law, so that was the 17 days
4  that he used in the fall.
5          After that point, he moved into a leave
6  without pay -- an extended leave without pay status
7  with benefits, which can continue -- I think it's
8  another 12 weeks until -- until December 29th, after
9  which then he would be entitled to -- I think it's
10  till June -- another so many weeks.  And then these
11  are all -- these are timelines that we confirm with
12  the benefit staff because they are relatively complex.
13          So we had started having that
14  conversation with them back in September when he had
15  submitted his form and we had several back and forths
16  with them because they said, no, he couldn't teach in
17  winter because that would be -- that would constitute
18  a part-time return to work and at the stage where he
19  was at with the -- in the leave without pay status,
20  that at that point all that would be allowed would be
21  a full-time return to work.  There was no provision
22  for an intermittent or partial return.
23          And it took us a little longer to work
24  through and develop the letter because I, you know,
25  reached out to confirm that that was in fact the

Page 105

1  understanding and then the correct interpretation of
2  the benefits provisions.
3    Q     All right.  So you've given me a lot of
4  information, and I haven't really written much of it
5  down, so let me see how I do with this.
6          So who -- what are the names of the
7  people that you consulted with?
8    A     Okay.  Debora Longenhagen, who signed the
9  form that's attached to that letter, is our leave
10  administrator.  She is the one that has been -- had
11  been corresponding with Dr. Oross previous to that
12  during his spring absence.
13    Q     Who else?
14    A     The system benefit staff at the
15  Pennsylvania State System Office.  So Linda Harrison
16  and Agnes Peiffer.
17    Q     I'm sorry, what?  Piper?
18    A     Peiffer.
19    Q     P-i-f-e-r?
20    A     I want to say P-e-i-f-f-e-r, I think.
21    Q     And what was the first name?
22    A     Agnes.
23    Q     And who is she?
24    A     She works with the benefit staff.
25    Q     And this is at PASSHE?

Jennifer Weidman

Page 106

```
 1       A    This is at PASSHE, yes.
 2       Q    Anyone else?
 3       A    Brenda Mundell who is in the system
 4  office in the HR benefits side.
 5       Q    Did you say Mandel or Mondale?
 6       A    Mundell, M-u-n-d-e-l-l.  And I also
 7  consulted with system labor relations staff to confirm
 8  our understanding.
 9       Q    Labor relations where?
10       A    At PASSHE.
11       Q    Who is that person?
12       A    I confirmed that with Melissa Mullen,
13  M-u-l-l-e-n.
14       Q    Did you consult with Jesus Pena about
15  this situation before you sent out the letter?
16       A    Beyond letting him know that this is what
17  was going to be happening, no.  The system benefit
18  rules are independent of our interpretation, in other
19  words.
20       Q    All right.  Well, isn't it true that if
21  Dr. Oross had received the accommodation he requested
22  in the fall, we wouldn't be at this point with regard
23  to the benefits?
24       A    That's true.
25       Q    Okay.  Now, you mentioned FMLA.  And I'm
```

Page 107

```
 1  looking at the FMLA designation notice that's attached
 2  and the date I see on it is January 19th, 2021.  And
 3  you were mentioning something about September and I
 4  don't see that here.  Am I missing something?
 5       A    So this is page 4 in Exhibit 18.
 6       Q    Well, the date is on the next page where
 7  it says Debora Longenhagen signed it on the 19th of
 8  January 2021.
 9       A    Yes, and so this is -- this is the
10  original form because that was when his FMLA
11  progression began.
12       Q    Okay.  So Dr. Oross did not ask for a
13  leave without pay for the spring semester, did he?
14       MS. LE:  Objection.
15       A    For which spring semester?
16  BY MS. McKINLEY:
17       Q    Well, you say here -- on the second
18  sentence of the second paragraph, it says "Extended
19  leave without pay is approved from 9/23/21 to
20  6/23/22," which would take him through that spring
21  semester, correct?
22       A    That's correct.
23       Q    Okay.  But he didn't ask for a leave
24  without pay for the spring semester, did he?
25       A    So, no, but he would have to provide a
```

Page 108

```
 1  release to return to work full duty in order to be
 2  able to return.
 3       Q    Well, what do you mean by "full duty"?
 4       A    Full duty is interpreted for him to mean
 5  teaching in the classroom.
 6       Q    Where do you see that?
 7       A    That's not listed in here.
 8       Q    Right.  It's not listed anywhere, is it?
 9       A    That is my understanding of full duty.
10       Q    Okay.  But where did you see it?
11       A    I didn't see it written there anywhere.
12       Q    Right.  It's not in the contract, right?
13       A    It's not specified in the contract, no.
14       Q    Would you agree with me that the duties
15  of a tenured professor -- and maybe some other people,
16  too, but let's just talk about those people right now.
17  The essential functions of that position are
18  identified in the contract?
19       A    I would -- I would say that the essential
20  functions of a faculty member at Kutztown University
21  include in-the-classroom teaching unless they were
22  specifically hired to teach online.
23       Q    Is there a job description that you're
24  aware of that would apply to an associate professor at
25  Kutztown that says essential functions means teaching
```

Page 109

```
 1  in the classroom?
 2       A    I do not know if that exists.
 3       Q    Because there are other professors --
 4  tenured professors who teach online, right?
 5       A    There are other tenured professors who
 6  teach online.  I don't know if there are any that
 7  teach exclusively online.
 8       Q    You don't know?
 9       A    I can't say if there are or there are
10  not.  I'm not familiar enough with faculty schedules.
11       Q    Well, if there are people that teach
12  exclusively online, it would be difficult, wouldn't
13  it, to say that full duty for Dr. Oross means he has
14  to be in a classroom?
15       MS. LE:  Objection to form.
16       A    I believe that would depend on the
17  program involved.
18  BY MS. McKINLEY:
19       Q    Okay.  What I'm trying to figure out is
20  where on earth did you find this definition of full
21  duty that you're referring to in this letter?
22       A    That came from the system benefits staff.
23       Q    Where?
24       A    I'm sorry, are you asking about the --
25  where the language came from or the definition --
```

28 (Pages 106 to 109)

Jennifer Weidman

Page 110

1    Q    Yes.
2    A    -- that we used?
3    Q    Well, you're using the language full duty
4 so I guess I was defining it -- you know, I was
5 clumping it together maybe. And if they're separate,
6 you can tell me that, but I want to know where it came
7 from.
8    A    That came from the system benefit staff.
9    Q    All right. So are they -- the people
10 that are administering FMLA at the PASSHE level?
11    A    Yes.
12    Q    Okay. So the fact that someone runs out
13 of FMLA time doesn't mean that we're not still talking
14 about the ADA and whether they can come back to work
15 with a reasonable accommodation, right?
16    A    I'm sorry, I didn't hear all that.
17    Q    I said the fact that someone runs out of
18 FMLA time doesn't mean that we're moving towards, you
19 know, pushing them out of -- well, let me rephrase it.
20       The termination of FMLA -- the expiration
21 of FMLA doesn't mean we're not talking about
22 accommodations at that point, correct?
23    A    So in other words, the end of their FMLA
24 entitlement does not negate ADA.
25    Q    Correct.

Page 111

1    A    I agree with that.
2    Q    Yeah. In fact, isn't that what it says
3 on page 10 at the bottom, where it says "Return to
4 Work Rights" and it talks about -- it talks about
5 returning to the same position, FLMA, and then I think
6 it's in that section where it -- it talks about
7 vacancies and so forth.
8       But you would agree with me, right, that
9 the -- when someone is requesting accommodation at the
10 end of FMLA, that is something that requires an
11 interactive process, right?
12    A    Yes.
13    Q    You can't just, like, tell them you're
14 out of time and, you know, we're at the end of this --
15 on this specific date you're done? That's not how it
16 works, is it?
17       MS. LE: Objection to form.
18    A    So when ADA enters into it, that is
19 correct.
20 BY MS. McKINLEY:
21    Q    Yeah. And you knew that Dr. Oross wanted
22 to come back to work, right?
23    A    Um-hum, yes.
24    Q    I mean, in addition to the newspaper
25 articles, he had talked on campus at a rally. You

Page 112

1 knew about that, right?
2    A    Yes.
3    Q    And that was in the paper. He had sent
4 emails to the entire faculty, some of which were
5 copied to you, correct?
6    A    Yes.
7    Q    And would you agree with me that one of
8 the types of accommodations, you know, in a case like
9 this that would have to be considered, if necessary,
10 is not only whether he can have a remote accommodation
11 but a part-time work -- or a modified work schedule?
12    A    Correct, a modified work schedule could
13 be considered an ADA accommodation.
14    Q    Right. Exactly. And if someone is on a
15 modified work schedule for purposes of reasonable
16 accommodation, that would not lead to the kind of
17 letter that you're -- that you sent him on October
18 13th, right?
19    A    I'm sorry, I --
20    Q    Well, if he's receiving a modified work
21 accommodation, we're not going to say to him, like, at
22 the end of the specific period of time that would
23 apply for FMLA that, you know, all of the things you
24 talk about in this letter are going to happen, that
25 your benefits are going to get cut off and all those

Page 113

1 things?
2       MS. LE: Objection to form.
3    A    So are you talking about, like, if he
4 would be getting a modified accommodation in the
5 spring?
6 BY MS. McKINLEY:
7    Q    Right.
8    A    Which would have happened after the date
9 of the letter, after --
10    Q    Right.
11    A    -- December 29th.
12    Q    But you knew -- but my first question
13 was, and I think you said yes, is that you knew he
14 wanted an accommodation for the spring. One type of
15 accommodation that could be considered is a remote
16 work accommodation that you knew he wanted, right?
17    A    So I was not aware of the letter from the
18 Pennsylvania Disability Rights Organization that
19 stated his desire for the spring accommodation. So at
20 the --
21    Q    Well, you knew from reading -- oh, I'm
22 sorry. I didn't mean to cut you off.
23    A    So at the time of sending this out -- how
24 do I do this? So at the time that I sent this letter
25 out, we weren't even looking forward to the spring

Jennifer Weidman

---

Page 114

```
 1   because we were still working through this period in
 2   the fall and having just had the conversation about
 3   whether or not he could teach during the winter.
 4       Q     Well, it says "We received information
 5   that you're scheduled to teach online classes for the
 6   spring.  You will not be able to teach these classes
 7   without a full-time full duty release for the spring."
 8           So I'm not understanding why you're
 9   saying you're not talking about the spring.
10       A     Okay.  I'm sorry, I -- I misunderstood
11   the question.  So the reason for that language in
12   there, that language refers strictly to the --
13   strictly to him outside of the intersection between
14   ADA and FMLA.  So I'm looking at it strictly from an
15   FMLA perspective.
16           At the point that he was at in his
17   progression, a part-time return or an intermittent
18   return would not be permitted.  He had to return on a
19   full-time basis.  So that was exclusive of any ADA
20   accommodation that might be developed.
21       Q     So are you telling me that at no time
22   before or after you sent this letter did Jesus Pena
23   ever tell you Dr. Oross wants an accommodation for the
24   spring?
25       A     No.  I think it was understood that his
```

Page 115

```
 1   desire for a full-time online schedule remained the
 2   same.
 3       Q     Right.  And you knew that he was already
 4   scheduled to teach two classes online?
 5       A     Correct.
 6       Q     Right.  And so did anyone ever call him
 7   up and say, you know, let's talk about a modified work
 8   schedule before we go down this path?
 9       A     Not someone from my office, no.
10       Q     Well, you knew he was pretty upset about
11   receiving this letter, didn't you?
12       A     Yes, I did.
13       Q     Because he told you himself, right?
14       A     Yep.
15       Q     So having received those communications,
16   did you do anything to say, "Oh, I'm sorry, let's talk
17   about the ADA.  Forget about the FMLA letter I just
18   sent you"?
19       A     Well, the ADA for spring would not negate
20   the FMLA from fall.
21       Q     Well, are you suggesting that an
22   accommodation would not have stopped the clock on this
23   FMLA expiration -- well, regardless of whether the
24   FMLA was still in effect or not, but it wouldn't have
25   pushed him into a situation where his benefits are
```

Page 116

```
 1   being terminated and he's being threatened with
 2   termination from his job?
 3           MS. LE:  Objection to form.
 4       A     I can't --
 5   BY MS. McKINLEY:
 6       Q     I mean, are you really saying that?
 7       A     I can't speak to what if because anything
 8   that we would have received I would have had to -- I
 9   would have had to confirm with system benefits to see
10   how those two different things intersect, and labor
11   relations probably, because of the way they do
12   intersect.
13       Q     Well, there's no doubt in your mind, was
14   there, that he thought there was a connection between
15   those things?  You're saying your FMLA is stopping,
16   you need a full-time full duty release to come and
17   even teach your online classes, and your medical
18   benefits are terminated on the 29th if you don't come
19   back to work with a full duty release, right?
20           MS. LE:  Objection.  You can answer.
21       A     Oh, I'm sorry.  So those -- this letter
22   relates to these benefit things that are happening
23   related to his leave from the spring.  So this is not
24   any kind of -- this is not any kind of retaliation.
25   This is simply a timeline.
```

Page 117

```
 1   BY MS. McKINLEY:
 2       Q     Well, you're aware that he thought those
 3   things were connected, right?  He was really clear
 4   about it, wasn't he?
 5           MS. LE:  Objection to form.
 6       A     Again, what he thought I can't control.
 7   BY MS. McKINLEY:
 8       Q     Well, I'm not asking you what he thought
 9   -- or maybe I did.  I'm sorry.  I can rephrase it, but
10   he told you that "I was released to full duty work,
11   what do you mean?"
12       A     And, again, our interpretation of full
13   duty includes in-the-classroom teaching.  That is an
14   essential function of the faculty.
15       Q     Well, I heard that.
16           (SO Exhibit Number 20 produced and marked
17   for identification.)
18   BY MS. McKINLEY:
19       Q     Let's look at Exhibit 20.
20       A     Do I have that?
21       Q     I don't know if you do or not.
22           MS. LE:  It would be in the first email I
23   sent you.
24   BY MS. McKINLEY:
25       Q     Okay.  So he is specifically asking you
```

30 (Pages 114 to 117)

Page 118

1  "What do you mean full-time, full duty?  I've been
2  approved to teach my online classes, at the very
3  least, for the winter and the spring," right?
4      A     Yes, I read that.
5      Q     And so he asked you specifically "What is
6  full-time, full duty?  What do you mean by that,"
7  right?
8      A     Yes.
9      Q     Okay.
10     A     I'm sorry, the email seems to be -- I
11 don't know if it's out of order or --
12     Q     Well, it's an email string so there's
13 probably a couple things that are repeated just
14 because it was hard to sort of separate them out.
15     A     Um-hum.
16     Q     So the first page is -- you know, the
17 first thing on top of -- the October 25th email from
18 Dr. Oross would be -- yeah, that's what this is.  He
19 has some, I think, language that he quoted from you
20 in a previous email, which I believe is -- well, he sent
21 you an email on October 21st, right, and said "As
22 you're fully aware, I was medically cleared to return
23 to work full-time, full duty."
24         Did you respond to that?
25     A     So I responded to -- I'm having trouble

Page 119

1  following here on these emails.  So I responded, it
2  looks like, October -- October 27th when I answered
3  that "teaching in person in the classroom is
4  considered an essential function of the faculty
5  position, a return to full duty would include a
6  release to teach in person in the classroom."
7      Q     Okay.  Again, where did you get that
8  information?
9      A     We confirmed that understanding with
10 system legal counsel, with university legal counsel.
11     Q     Why did it take you six days to get back
12 to him?
13     A     Again, I had to confirm my understanding
14 of that definition with legal counsel.
15     Q     You're aware that not only Dr. Oross was
16 objecting to the use of that term in relation to the
17 essential functions of his job, but you, Hawkinson and
18 Pena were getting, for lack of a better word, pushback
19 from other members of the faculty too, right?
20         MS. LE:  Objection to form.
21     A     I don't know what emails other people
22 were getting.
23 BY MS. McKINLEY:
24     Q     All right.  Well, let's just look at one
25 of them, because I didn't put them all in here, but if

Page 120

1  you look at page 5 of the document that you're on, at
2  the bottom -- actually, that's the wrong page.
3         Oh, I'm sorry.  Page 7.
4      A     Okay.
5      Q     Okay.  So you see here an email from
6  Glenn Richardson.  "I have searched our CBA for any
7  reference to 'full duty' and I can find none."
8         And then he goes on to say that he
9  doesn't -- I'm sorry.  "I see none of the enumerated
10 duties of faculty provided by Article 4 and by
11 extension Article 12.1 as incompatible with a fully
12 online teaching load."
13         You received that, didn't you?
14     A     Yes.
15     Q     And that wasn't the first time Glenn
16 Richardson had expressed his concern about the way the
17 accommodation issues for faculty who needed them for
18 purposes of immune-compromise and immune-suppression
19 and similar conditions during this academic year?
20         MS. LE:  Objection to form.
21     A     I'm sorry, was your question --
22 BY MS. McKINLEY:
23     Q     I'm sorry.  Yeah, let me just restate it
24 again.  This wasn't the first time you had heard from
25 Glenn Richardson about this issue, right?

Page 121

1      A     I don't believe it was, correct.
2      Q     He had been very vocal about his concern
3  about what was going on, right?
4      A     I believe I read emails from him before.
5      Q     In fact, the faculty, in general, is very
6  supportive of Dr. Oross and the other faculty members
7  who are in his position, right?
8         MS. LE:  Objection to form.
9      A     Again, there are over 400 faculty and I
10 couldn't say who did or didn't support him.
11 BY MS. McKINLEY:
12     Q     You were copied on some of those emails,
13 right?
14     A     Correct.
15     Q     Okay.  So in light of the fact that there
16 was faculty concern being expressed, did you and Jesus
17 Pena talk about the situation and try to come up with
18 some sort of compromise?
19     A     I would say that being in human resources
20 means that -- being on the side of making unpopular or
21 unpleasant decisions isn't unusual.  So the fact that
22 this was not a popular decision or the fact that this
23 was not -- that people objected to this decision
24 doesn't necessarily mean that it was wrong.
25     Q     Well, Dr. Hawkinson made it clear to you

Jennifer Weidman

Page 122

1  and to Pena that he wasn't going to allow those kinds
2  of accommodations, right?
3              MS. LE:  Objection to form.
4      A     So the decision about the interpretation
5  of converting in-person classes to online was not made
6  at his direction.
7  BY MS. McKINLEY:
8      Q     Well, he's made multiple public
9  statements on the issue, hasn't he?
10             MS. LE:  Objection to form.
11     A     I mean -- I'm not sure to what you're
12  referring.
13  BY MS. McKINLEY:
14     Q     Have you ever heard Dr. Hawkinson state
15  in public that he is not going to allow accommodations
16  for people such as Dr. Oross who are asking for remote
17  work accommodations?
18     A     I don't know that I ever have heard him
19  make that statement.
20     Q     Well, in January he issued an update.  Do
21  you remember reading it?  It says -- let me just -- he
22  talks about "as to ongoing questions and concerns
23  about appropriate accommodations for employees during
24  the pandemic, KU remains committed to serving the
25  needs of our students," and then he talks about the --

Page 123

1  you know, the emergency order.
2              And he said "200 faculty requests for
3  accommodation happened last year."  That's not true,
4  is it?
5      A     That would have been the flexible work
6  arrangement.
7      Q     Right.  And you heard him talk about "if
8  I have to accommodate one person, I have to
9  accommodate a whole lot of people," right?
10     A     I don't know that I ever heard him make
11  that statement.
12     Q     Well, that isn't a legitimate basis for
13  denying an accommodation, is it?
14     A     No, that's correct.
15     Q     So other than the -- do you know that you
16  sent on -- I can't actually remember if I asked this
17  specifically but -- actually, it's page 7a of this
18  exhibit.
19             MS. LE:  Jennifer, it's page 8 of the
20  actual file.
21             MS. McKINLEY:  Yeah, I'm sorry.  I missed
22  a page.  It was Friday night and --
23             MS. LE:  No problem.
24             MS. McKINLEY: -- I made it 7a.  I'm
25  really sorry.  I hope you'll forgive me.

Page 124

1      A     Understood.  Okay.  Oh, I see at the
2  bottom where you have 7a.  Okay.  So what was the
3  question?  I'm sorry.
4  BY MS. McKINLEY:
5      Q     My question was other than that statement
6  that you made -- "teaching in person in the classroom
7  is considered an essential function of your faculty
8  position" -- did you ever respond to him in any other
9  way in response to his emails regarding "What do you
10  mean by full duty"?
11     A     That was my only response to him.  I
12  mean, that answered the question.
13     Q     Okay.  Well, did you ask anyone at -- I
14  think you said at -- is it PASSHE or PASSHA?
15     A     PASSHE.
16     Q     That's how you pronounce it, PASSHE?
17     A     PASSHE, yes.
18     Q     Okay.  Did you ask them to provide
19  anything in writing because people are asking
20  questions about this?
21     A     I don't remember if I have it in an email
22  or if it was a conversation.
23     Q     I mean, I think what you told me so far
24  is that you haven't seen it, right?
25     A     What, that teaching in person is an

Page 125

1  essential function of the job?
2      Q     Right.
3      A     That, again, was -- that was information
4  that was developed in consultation with --
5      Q     But my question was you have not seen it,
6  have you?
7      A     No, they didn't send me an email and
8  said, "This is what you should say."
9      Q     Who sent you that email?
10     A     No, I said they have not.
11     Q     Oh, okay.  Did you ask them for it?
12     A     Yes, that's what I'm saying.  This was
13  language that was developed and confirmed with system
14  legal counsel.
15     Q     Okay.  When was it developed?
16     A     When he asked the question.
17     Q     Okay.  So as far as you know, it wasn't
18  developed before then?
19     A     It was understood before then, but in
20  order to be able to answer his question in a correct
21  fashion, I confirmed that language with them.
22     Q     Okay.  But -- all right.  So to go back
23  to the FMLA issue then, you knew that this wasn't
24  going to be a satisfactory answer, right?
25     A     You mean when I sent the letter to --

Jennifer Weidman

Page 126

1    Q    Right. When you said "full-time, full
2  duty means in the classroom in person," or however you
3  said that, right?
4    A    Okay, yes.
5    Q    Okay. So that being the case, because
6  not only Dr. Oross was challenging it, but other
7  people were too, did you go back to him and say,
8  "Look, I need something more, you know, definitive?
9  You know, send it to me so I can send it to them"?
10   A    No, because, I mean, that's what they
11 gave me. That was what I -- that's what we asked for
12 to clarify that this is -- this is how we should
13 express this and that's what we got.
14   Q    Okay.
15   A    So I didn't go back for anything more.
16   Q    Okay. So just let me understand this
17 because I'm confused. So there is no specific job
18 description for an associate professor that says this,
19 right, that says full duty means full-time in the
20 classroom?
21   A    There is no generic job description that
22 comes as a result of the bargaining agreement.
23   Q    Right. And --
24   A    There is -- there is a job description
25 that we offer as a supplement to the FMLA to the

Page 127

1  serious health condition form for the employee's
2  physician or a medical provider to review.
3    Q    For staff, not faculty you mean?
4    A    For faculty we have a generic job
5  description which talks about in general -- in general
6  terms about duties --
7    Q    Where is it?
8    A    -- of the faculty member.
9    Q    Where is it?
10   A    Do you mean where is it housed?
11   Q    Right.
12   A    Our office has that file.
13   Q    Okay. Well, is it on your website?
14   A    It's not on a public website, no.
15   Q    And has it ever been provided to Dr.
16 Oross?
17   A    I believe it was provided -- it would
18 have been provided with the FMLA paperwork that was
19 initially sent out for his serious health condition
20 form to be provided to his physician.
21   Q    Well, it was never provided to him before
22 he requested an accommodation, right?
23   A    It would have been provided in January
24 when -- in January of 2021 when he requested the FMLA
25 leave initially.

Page 128

1    Q    And where was that again?
2    A    It should have been provided with the
3  serious health condition form in the FMLA paperwork
4  that was provided in January of 2021.
5    Q    All right. So when you're talking about
6  full-time, full duty, are you talking about returning
7  from FMLA? Is that where this -- I'm confused about
8  where the language is coming from and where it goes.
9    A    Okay, that -- the return to full-time,
10 full duty is -- we're talking about ending the FMLA
11 leave, which is what the letter was generated to
12 discuss.
13   Q    So it does not mean that you can't have
14 an accommodation that would entail remote work
15 accommodations or a modified work schedule; is that
16 what you're saying?
17   A    Correct. That letter is exclusive and
18 does not pertain to any ADA accommodations that might
19 be offered in the intervening period.
20   Q    Well, when you understood that he thought
21 that that's what you were saying, did you do anything
22 and say, "Oh, that's not what we meant. Here, come on
23 in and let's talk about the spring"?
24        MS. LE: Objection to form.
25   A    No, because we weren't aware that he had

Page 129

1  requested anything for the spring.
2  BY MS. McKINLEY:
3    Q    Well, Jesus Pena was aware of it, right?
4  We just looked at the letter.
5    A    So I would say, on one hand, I was not
6  aware of that letter; but, on the other hand, my
7  understanding was that he still wanted a 100 percent
8  online schedule and for spring he was scheduled for
9  two online courses and two multi-modal courses, and
10 multi-modal would have required his presence in the
11 classroom at least some portion of the time.
12   Q    Right. He would be required to be in the
13 classroom but the students could or not, depending on
14 how they --
15   A    Correct.
16   Q    They decide whether they want to be
17 there, but he would have to be there himself no matter
18 what?
19   A    Correct.
20   Q    And that was not something that was
21 discussed with him in any kind of interactive process,
22 correct?
23   A    No. It was very clear that that was not
24 something that was -- that he was interested in.
25   Q    Well, but there was no discussion with

Jennifer Weidman

Page 130

1  him, was there?
2      A    No. It was very clear from all of his
3  emails and comments in the media that he was still
4  looking for a 100 percent online schedule which would
5  have involved the conversion of classes to online.
6      Q    Right, as a reasonable accommodation?
7      A    Correct.
8      Q    How many tenured professors have at least
9  part-time remote work schedules; in other words, are
10  teaching remotely? Not as an accommodation. I didn't
11  mean it that way.
12      A    I don't know. I don't -- I don't have
13  any knowledge of which professors have which
14  schedules.
15      Q    Do you have any knowledge of how many
16  professors in the psychology department teach at least
17  part of their -- part of their teaching load online?
18      A    I do not.
19      Q    Do you know how many or what percentage
20  of the courses at Kutztown as an overall university
21  offered online in the fall semester?
22      A    In the fall of 2021, no, I don't.
23      Q    How about the spring?
24      A    Again, I don't -- I don't know those
25  figures off the top of my head.

Page 131

1      Q    Would you take a look at Exhibit 20 --
2  I'm sorry, 19.
3      A    19?
4      Q    Yes.
5      A    Okay.
6           (SO Exhibit Number 19 produced and marked
7  for identification.)
8  BY MS. McKINLEY:
9      Q    Okay. So this is labeled the "Interim
10  Agreement Regarding Distance Education and Instruction
11  for Academic Year 2021-22." Have you seen this
12  before?
13      A    Yes.
14      Q    Okay. And tell me how you saw it.
15      A    It was provided to the HR directors and
16  universities, you know, to be added to our contract.
17      Q    Okay. So it's dated -- well, on one side
18  10/4/21 and on the other side 10/5/21. Did you
19  receive it around that time?
20      A    I don't know exactly when I received it,
21  but I would expect around that time or shortly
22  thereafter.
23      Q    Okay. And were you involved at all in
24  the negotiations that led to this agreement?
25      A    I was not.

Page 132

1      Q    Were you provided with any instructions
2  as to how it would be implemented at Kutztown?
3      A    I was not.
4      Q    Since you've received it, have you had
5  any discussions with Jesus Pena about it?
6      A    I have not. The scheduling of course
7  modality is not a matter that HR has any interaction
8  with.
9      Q    Well, if there is an addenda to the
10  contract that basically relaxes what you've been
11  talking about as, you know, policy, so to speak, that
12  we don't want to convert classes, this would be pretty
13  important for purposes of the interactive process,
14  wouldn't it?
15           MS. LE: Objection to form.
16      A    This particular document talks about
17  lifting the requirement that -- courses to be offered
18  in distance education modality need to be approved by
19  university curriculum committees. It reiterates just
20  that faculty members may not change the modality
21  without prior approval from the administration, but
22  beyond that that doesn't -- that doesn't speak to
23  anything regarding ADA.
24  BY MS. McKINLEY:
25      Q    Well, everything has an impact on the

Page 133

1  interactive process, doesn't it, in terms of the
2  circumstances -- the individualized circumstances of
3  the employee, the interests and the context that's
4  going on in the workplace? Everything is supposed to
5  be considered, isn't it?
6      A    Yes.
7      Q    So did you or anyone that you know of in
8  HR or in the division of human equity -- Jesus's, you
9  know, domain -- ever have a conversation about how, if
10  at all, this document might provide some latitude or
11  some flexibility that would allow some of these people
12  who have been asking for remote work accommodations
13  for really serious health impairments during the
14  pandemic, how this might be something that you could
15  use?
16      A    As I understand this document, this
17  merely speaks to lifting the requirement that a course
18  needs to pass university curriculum committee before
19  being offered as online. So since Dr. Oross's
20  accommodation request was not rejected on the basis
21  that those courses had not passed university
22  curriculum committee, I don't see that this has any
23  impact in any way on our decision.
24      Q    Well, his department was very supportive
25  of his request, wasn't it?

Jennifer Weidman

Page 134

```
1              MS. LE:  Objection to form.
2       A     I don't really know that we had -- I did
3   not have a discussion.  That's my understanding, but I
4   didn't have a discussion with them.
5              (SO Exhibit Number 21 produced and marked
6   for identification.)
7   BY MS. McKINLEY:
8       Q     Would you take a look at Exhibit 21.
9       A     Okay.
10      Q     So this is another email string.
11  Fortunately, it's shorter than the last couple we've
12  looked at.  So the first email is at the bottom from
13  you to Dr. Oross.
14      A     Um-hum.
15      Q     And it talks about planning for the fall
16  semester.
17      A     Um-hum.
18      Q     And it asks if he intends again to
19  request an accommodation.  Did you ever send him a
20  similar email at any time with regard to the spring
21  semester?
22      A     I did not.
23      Q     Now, were you aware that what Dr. Oross
24  was requesting was a synchronous teaching schedule,
25  not a multi-modal thing or asynchronous?  Did you know
```

Page 135

```
1   that that's what he was asking for?
2       A     I'm sorry, I missed what you said.  Did I
3   know that Dr. Oross --
4       Q     That's okay.  Were you aware that his
5   accommodation request was for synchronous instruction?
6       A     Synchronous online.  I don't remember if
7   I specifically knew that but -- again, I don't think
8   that would have influenced our decision.
9       Q     Okay.  Well, the reason I'm asking is
10  because that's not what he has.  So can you tell me
11  how -- I mean, he's obviously back to work and there's
12  a lawsuit and we all know there was a TRO at one
13  point.  So tell me how that worked out in terms of how
14  we got from where we were in October to where we are
15  now so that --
16             MS. LE:  Objection.
17  BY MS. McKINLEY:
18      Q     -- you were in a situation to send him an
19  email like this?
20             MS. LE:  Objection to form.
21             MS. McKINLEY:  I know.  It's a terrible
22  question.  Let me try it again.  I'm getting tired.
23             MS. LE:  It's a long day.
24             MS. McKINLEY:  It has been a long day.
25  BY MS. McKINLEY:
```

Page 136

```
1       Q     So you say do you intend -- you're asking
2   him if he intends to again request an accommodation
3   and then you said that if you want the same thing you
4   already have, you don't have to do anything.
5              So my question is:  Were you aware that
6   what he has in the way of his accommodations right now
7   is not what he asked for to begin with?
8              MS. LE:  Objection to form.
9       A     Okay.  Yes, I understand.  So I said "If
10  there is no change to the accommodations requested,
11  there is no need to submit a new request form; only
12  the updated medical information is needed.  And if you
13  wish to change the accommodation, submit a new form."
14  BY MS. McKINLEY:
15      Q     All right.  So that's why I'm confused
16  because I think there's a distinction between the
17  accommodation he requested and the accommodation that
18  he has, and I don't know if you were aware of that
19  when you wrote this email or if I'm being
20  hyper-technical, but he asked for synchronous and he's
21  not asynchronous.  So how does that fit into this
22  email, I guess is what I'm asking you?  Do you
23  understand my question?
24             MS. LE:  Objection.
25      A     Yes.  Yes, I do understand.  I was not
```

Page 137

```
1   aware of what the online schedule he was granted for
2   the spring, if it was synchronous or asynchronous.  I
3   just knew that it was online.
4              So that was -- but that was the intention
5   of the email, was to establish forward planning, what
6   was desired for fall, if it was the same as what was
7   previously requested or if there was some alteration
8   to that.
9   BY MS. McKINLEY:
10      Q     Okay.  So if he wanted a synchronous
11  teaching schedule for the fall when he has an
12  asynchronous teaching schedule now, where does that
13  leave him in relation to this email?  In other words,
14  does he have to submit more information or not?
15      A     So to be honest, I didn't take into
16  account the synchronous versus asynchronous aspect of
17  that because I -- I don't even know if that -- I would
18  have to go back and look at the original request to
19  see if that was spelled out in the original request.
20      Q     Well, we can look at it if you want, but
21  -- it is Exhibit 2.
22      A     Exhibit 2.  Do I have that?
23             MS. LE:  I don't know.  Let me send it to
24  you in case you don't have it.  I don't think we've
25  looked at it today.
```

Jennifer Weidman

Page 138

1   A    Yeah.
2   BY MS. McKINLEY:
3       Q    All right. Actually, I don't see it on
4   here, but I know we had some other -- it doesn't
5   matter. If you don't know, it's fine.
6            So when you -- with regard to your email,
7   you are referring to remote accommodation, not a
8   specific type of remote accommodation; is that right?
9       A    Yes, so I didn't -- I didn't address that
10  synchronous versus asynchronous aspect. Like I said,
11  I did not take that into account necessarily.
12      Q    Okay. I guess my fundamental question is
13  given the conversation we've had today and everything
14  that, you know, has happened, are you expecting him to
15  submit anything further if he needs an accommodation
16  for the fall that entails a remote teaching schedule
17  full-time?
18      A    I think that's a valid question that you
19  raised, whether it's synchronous or asynchronous, and
20  I would think that that would be something that we
21  would need to know so that we could take that into
22  account and plan accordingly or factor that in there.
23      Q    I guess maybe one of the things I'm also
24  wondering about is with regard to your role in HR, as
25  opposed to the role, you know, of the dean and the

Page 139

1   chair, I mean, do you need to get involved in -- you
2   know, in the specific type of remote accommodation or
3   is your job just kind of limited to, yes, he can have
4   the remote accommodation and you guys go figure it out
5   based on what you need and you agree on?
6       A    Unless it's specified in the
7   accommodation request as one thing or the other, we --
8   HR typically would not be driving that conversation.
9   That part of it would be developed between the dean
10  and the chair and the employee.
11      Q    So let's assume that -- we don't
12  know what's going to happen with the pandemic between
13  now and the fall. Assume for now we're planning on,
14  you know, at least possibly needing that remote
15  accommodation in the fall. Does he need to send you
16  anything new in response to your email?
17      A    Well, we still need the -- we still need
18  the updated medical just because of --
19      Q    Okay. All right.
20      A    I don't think --
21      Q    Well, since you're here, I wanted to ask
22  you because I was confused about it.
23      A    Okay. I'm sorry. I was going to say I
24  don't think it would be a bad idea just to clarify the
25  synchronous versus asynchronous aspect.

Page 140

1       Q    I think that's a -- yeah, that's fair.
2            I think I went through my exhibits, but I
3   did want to go back and ask you a couple random things
4   to sort of tie things up. So when we talked about --
5   you said there were three people who asked for remote
6   teaching accommodations for this current school year.
7   What are their names?
8            MS. LE:  Without revealing -- don't
9   reveal any possible medical information you have.
10           MS. McKINLEY:  No, I don't want that.
11  BY MS. McKINLEY:
12      Q    I just -- for purposes of discovery,
13  we're going to need names so -- I know one of them is
14  Carolyn Gardner. I can save you time for that. Who
15  are the other -- who is the other one? Is there one
16  or two more?
17      A    So at the time that that -- he had
18  submitted the request, there were two others. That
19  was Judith Rauenzahn --
20      Q    I'm sorry, repeat that. I didn't hear
21  that.
22      A    Let me spell it for you. Judith
23  Rauenzahn. R-a-u-e-n-z-a-h-n.
24      Q    Thank you for that. Okay. And do you
25  know what department she's in?

Page 141

1       A    Psychology.
2       Q    Psychology. Okay. And who are the
3   others?
4       A    Kristin Bazley, B-a-z-l-e-y.
5            And then there were some that were
6   received subsequent to that. Carolyn Gardner, of
7   course, was one in business administration. I'm
8   trying to think who else. Christine Rhoads,
9   R-h-o-a-d-s, I think was one.
10      Q    Okay. All right. Anyone else?
11      A    I'm trying to think of who else may have
12  been included in there. I feel like there was one
13  other, except I can't -- I'm not hitting on the name
14  right now.
15      Q    Okay. Well, we made a request so
16  presumably we'll get that information, but I just
17  wanted to know the names so that I can make sure to
18  know what to check for when I get that information.
19           So with regard to Dr. Oross, before we
20  move any farther, is there anything in the way of HR
21  documentation that indicates right now, yes, he has an
22  accommodation -- a remote work accommodation for
23  classes this semester?
24      A    Beyond which we've noted in the HR
25  system, in the leave of absence documentation that,

Jennifer Weidman

Page 142

```
1    you know -- we have a -- it's like a diary with the
2    different dates that things happen in there.  And we
3    do have it notated that, you know, this timeline
4    progression is suspended because of the restraining
5    order.
6         Q     Okay.  So that's what I was really asking
7    you.  Is that how it's listed or is it listed that
8    he's receiving a reasonable accommodation?  Do you
9    understand -- I mean, I'm trying to make a distinction
10   between the legal piece and the way it's documented in
11   HR, if there is a distinction.
12        A     Understood.  It is documented as being in
13   place because of the restraining order, not because of
14   the reasonable accommodation.
15        Q     Okay.  So has there been any change in
16   terms of the policy of not providing remote
17   accommodations for people as a result of
18   immune-suppression and so forth that we've been
19   discussing with regard to teaching schedules?
20        MS. LE:  Objection to form.
21        A     It was not a denial because of their
22   status but rather the conversion from in person to
23   online.
24   BY MS. McKINLEY:
25        Q     Well, I know, we've been through that.
```

Page 143

```
1    It's because of their medical condition that we're in
2    this -- we're having this conversation, right?
3         A     It has to do with that conversion.  So,
4    you know, we have begun that interactive process of
5    looking forward to be able to schedule proactively.
6         Q     Okay.  I understand that, but we're
7    talking about a specific subset of people with
8    disabilities.  I mean, we're not talking about people
9    who need a wheelchair ramp or something like that,
10   right?
11        A     Understood.
12        Q     It's a specific kind of disability that
13   requires a certain kind of accommodation that -- we're
14   talking about that subset of people, aren't we?
15        A     Yes.
16        Q     Okay.  So my question was with regard to
17   those people has there been any change in the -- and I
18   know that the word policy is a loaded word, but I
19   can't think of a better one but -- the practice, or
20   whatever you want to call it, with regard to how these
21   things have been handled so far this year, has there
22   been any change from the administration?
23        A     So there hasn't been a change in our
24   interpretation that converting classes from in person
25   to online is not a reasonable accommodation, but we
```

Page 144

```
1    have begun the process of reaching out proactively to
2    look forward to the fall to try and schedule
3    accordingly to avoid that issue.
4         MS. McKINLEY:  I just want to take a look
5    at the complaint one more time.  We can take a
6    five-minute break while I do that.
7         MS. LE:  Sure.
8         (Break taken.)
9    BY MS. McKINLEY:
10        Q     I think we're just about done.  I just
11   have a couple of questions.
12        So we were talking about the way Dr.
13   Oross's accommodations are being carried right now in
14   the HR department.
15        A     Yes.
16        Q     So is it your understanding that that is
17   going to remain the case until we resolve the lawsuit
18   one way or the other?
19        MS. LE:  Objection to form.
20        A     It's my understanding --
21   BY MS. McKINLEY:
22        Q     And I don't know -- I'm just asking what
23   you think or what you can tell me right now.
24        A     It's my understanding that they will
25   remain that way through the end of the spring semester
```

Page 145

```
1    and I would want to confirm that it should continue
2    that way for the fall semester.
3         Q     Okay.  So have you heard back yet from
4    his department?
5         A     About?
6         Q     The spring -- his spring schedule.
7         A     About his --
8         Q     Don't worry about it.  Let me just ask
9    you one more question.
10        So if, let's say, voilà, the pandemic
11   goes away and he wants to come back to work in person,
12   let's say that, you know, the doctors says, "Yeah, I
13   mean, now you're good to go," I mean, would he be able
14   to do that in the fall, even if he requests an
15   accommodation now on the -- you know, because we don't
16   know?
17        A     So is the question that -- are you asking
18   if his schedule -- if his courses were scheduled
19   online and he wanted to come back in person?
20        Q     Right.
21        A     I don't know.  I -- if students were
22   already registering for them and so forth, I'm not
23   sure how that would be addressed.
24        Q     The final thing I wanted to ask you about
25   is with regard to the other people that you mentioned
```

Page 146

1  by name a few minutes ago.
2      A    Um-hum.
3      Q    Were some of those people allowed to
4  teach some of their classes online and then -- in
5  other words, like, I know that four classes are a
6  full-time schedule. So were all of them denied the
7  opportunity to teach at all or were some of them
8  allowed to teach their online classes?
9      A    So there were two of those that I
10 mentioned who had some portion of their schedule
11 already scheduled online and were permitted to teach
12 that portion of it -- to continue teaching that
13 portion of it online and use leave for the remainder
14 to make up the difference.
15     Q    Okay.
16          MS. McKINLEY: I don't have any other
17 questions. It's been a long day. Thank you for your
18 time.
19     A    You're welcome.
20          MS. LE: I just have a couple of
21 follow-up questions.
22
23          EXAMINATION
24
25 BY MS. LE:

Page 147

1      Q    Ms. Weidman, did you have any involvement
2  or input in the scheduling of Dr. Oross's classes for
3  the spring 2022 semester before the court order was
4  put in place?
5      A    Did I have any input? No, I had no -- I
6  have no influence over faculty scheduling.
7      Q    And did you have any input or involvement
8  in the rescheduling or change in those classes for the
9  spring 2022 semester for Dr. Oross after the court
10 order was issued?
11     A    No, beyond -- beyond communicating that
12 to the department that that was what was supposed to
13 happen, that they were supposed to be offered online.
14     Q    Okay. And what is your understanding of
15 who is in charge of creating the class schedules for
16 faculty members?
17     A    That's done through academic affairs
18 between the deans and the chairs with approval from
19 the provost.
20     Q    You testified earlier about an option
21 that you offered to Dr. Oross in -- I believe it was
22 late August. I think the email was August 26 or 27.
23 It was for the creation of two high -- I think it was
24 high demand classes that he would be -- that would be
25 created for him to teach for the fall semester.

Page 148

1      Q    Where did you -- let me ask. Did you
2  come up with those options yourself?
3      A    No.
4      Q    Where did you get that option to offer to
5  Dr. Oross?
6      A    That was developed -- that idea was
7  developed by the president and the provost.
8      Q    Okay. Was it your understanding when you
9  offered those classes to -- let me back up.
10          Was it your understanding when you made
11 that offer to Dr. Oross that the creation of the two
12 classes was not contingent on later information but
13 only the details of what those two classes would be
14 were dependent on information to be gleaned later?
15          MS. McKINLEY: I object to the form of
16 the question.
17     A    Correct. It was my understanding that
18 the fact that two courses were being offered was --
19 was fact and that it was just the question of what the
20 subject matter would be that was to be determined
21 after drop-and-add.
22          MS. LE: I don't have any further
23 questions. Thank you.
24          MS. McKINLEY: I have nothing. We're
25 done.

Page 149

1          THE COURT REPORTER: Ms. Le, would you
2  like a copy of the transcript?
3          MS. LE: Yes, I would, please.
4          THE COURT REPORTER: Is PDF good?
5          MS. LE: Yes, we prefer electronic.
6          THE COURT REPORTER: Thank you.
7          MS. McKINLEY: And we do too.
8          THE COURT REPORTER: And you too, Ms.
9  McKinley?
10         MS. McKINLEY: Yes.
11         THE COURT REPORTER: Thank you.
12 (The virtual deposition was concluded at 2:44 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Jennifer Weidman

Page 150

1   COMMONWEALTH OF PENNSYLVANIA     : §.
2   COUNTY OF CUMBERLAND       :
3        I, Teresa K. Bear, a Court Reporter and
Notary Public in and for the Commonwealth of
4   Pennsylvania and County of Cumberland, do hereby
certify that the foregoing virtual deposition was taken
5   before me at the time and place hereinbefore set forth,
and that it is the testimony of:
6
           JENNIFER WEIDMAN
7
        I further certify that said witness was
8   by me duly sworn to testify the whole and complete
truth in said cause; that the testimony then given was
9   reported by me stenographically, and subsequently
transcribed under my direction and supervision; and
10  that the foregoing is a full, true and correct
transcript to the best of my ability of my original
11  shorthand notes.
12       I further certify that I am not counsel for
or related to any of the parties to the foregoing
13  cause, or employed by them or their attorneys, and am
not interested in the subject matter or outcome
14  thereof.
15       In testimony whereof, I have hereunto
subscribed my hand this 15th day of March 2022.
16
17
18      Teresa K. Bear, Notary Public
         Court Reporter
19
20
21       (The foregoing certification of this
transcript does not apply to any reproduction of the
22  same by any means unless under the direct control
and/or supervision of the certifying reporter.)
23
24
     My commission expires:
25  April 25, 2023

Jennifer Weidman

**A**

**a.m** 1:13
**ability** 78:22
  150:10
**able** 28:21 29:9
  71:10 72:3
  73:22 77:22
  78:23 82:6,11
  88:11 101:20
  102:2,5 108:2
  114:6 125:20
  143:5 145:13
**absence** 102:21
  105:12 141:25
**absolutely** 77:12
  96:1 101:19
  102:19
**academic** 7:17
  25:23 26:9,14
  28:9 70:25
  81:16 83:15
  120:19 131:11
  147:17
**accept** 82:11
  84:13,15,19
**accepting** 83:6
**accommodate**
  123:8,9
**accommodation**
  16:12,17,21
  18:13 19:4,10
  19:16 21:19
  29:17 30:19
  31:12,14 32:25
  33:3 35:10
  37:15,17 40:1
  41:17 42:5
  43:10,13 44:25
  45:5 46:24
  47:12,22 48:25
  53:7,13,18
  54:14,22 56:22
  57:16 58:13,22
  59:18 60:17
  61:7,20 64:3,7
  65:14 68:16

72:8,14,25
73:7,10,10
77:21 79:5
86:20 87:16
88:1,4 90:13
91:24 92:6
93:6 97:12
98:17 99:3,16
106:21 110:15
111:9 112:10
112:13,16,21
113:4,14,15,16
113:19 114:20
114:23 115:22
120:17 123:3
123:13 127:22
128:14 130:6
130:10 133:20
134:19 135:5
136:2,13,17,17
138:7,8,15
139:2,4,7,15
141:22,22
142:8,14
143:13,25
145:15
**accommodati...**
  19:22 22:1
  23:2 25:7
  30:24 31:4
  41:6 45:17
  47:21 49:3
  58:9 65:17
  73:5 86:21
  91:8 92:1
  100:7,11
  110:22 112:8
  122:2,15,17,23
  128:15,18
  133:12 136:6
  136:10 140:6
  142:17 144:13
**accomodation**
  55:7 77:17
  87:9 94:23
**account** 137:16

138:11,22
**accrual** 88:22
  89:1,5
**accrue** 89:3
**accruing** 88:23
  89:9
**act** 10:3 99:11
  99:11
**ACTION** 1:3
**activities** 49:24
**actual** 16:21
  46:4 52:18
  58:22 83:11
  99:25 123:20
**ADA** 10:4,7,9,16
  10:18,21,23
  13:22 14:9,16
  15:5,24 16:20
  21:6,16,21
  24:18,21,22
  25:1,3,16,17
  26:10,13 27:5
  27:9 30:14,19
  30:22 31:5
  34:2,6,11
  36:21 40:1,8
  42:18 45:13
  53:1,3 54:9
  55:17 77:20
  87:15 99:11
  110:14,24
  111:18 112:13
  114:14,19
  115:17,19
  128:18 132:23
**added** 131:16
**addenda** 132:9
**addition** 111:24
**additional** 58:25
  67:10 81:8
  93:1
**address** 87:22
  138:9
**addressed** 84:4
  145:23
**admin** 7:17

**administering**
  110:10
**administration**
  9:15,22 24:15
  24:18 83:16
  132:21 141:7
  143:22
**administrator**
  103:4 105:10
**advice** 100:22
**advised** 100:23
**affairs** 81:17
  147:17
**Agnes** 105:16,22
**ago** 146:1
**agree** 53:11
  77:16 99:1,8
  99:12,14
  108:14 111:1,8
  112:7 139:5
**agreement** 3:21
  93:3 126:22
  131:10,24
**ahead** 12:13
  63:17
**al** 1:5
**Alexis** 14:17
  39:2 42:19
  43:12,21 55:2
  55:4 57:11
  60:25
**allow** 100:19
  122:1,15
  133:11
**allowed** 26:17
  33:3 63:7
  102:10 104:3
  104:20 146:3,8
**allowing** 92:8
**allows** 93:3
**alter** 39:22
  46:19
**alteration** 40:4
  40:10 45:3,6
  45:14 50:8,20
  51:6 72:17,20

137:7
**alternate** 53:4
**alternative** 54:4
  90:15
**altogether** 33:3
**amount** 92:17
  93:4
**and/or** 60:13
  150:22
**announced**
  13:10 46:15
**annual** 89:2
**answer** 5:4,17
  24:8 28:22
  35:19 53:25
  54:2 82:6 84:1
  85:4 93:15
  116:20 125:20
  125:24
**answered** 119:2
  124:12
**answering** 49:24
  54:7 63:18
**answers** 84:22
**anyone's** 51:2
**anyplace** 45:4
**anytime** 95:22
  95:22
**apologize** 23:5
  92:22
**APPEARAN...**
  2:1
**appears** 95:23
**applied** 31:3
**applies** 45:20
**apply** 8:1 45:23
  108:24 112:23
  150:21
**appropriate**
  55:20 122:23
**approval** 14:14
  14:22 19:1
  28:23 33:10
  132:21 147:18
**approve** 28:2
  76:16

Jennifer Weidman

**approved** 23:14
  27:1,15,17,19
  29:19 90:2
  107:19 118:2
  132:18
**approving** 14:14
**approximately**
  48:9
**April** 150:25
**Arch** 2:8
**arrangement**
  26:9,18,25
  27:3,14 28:6
  28:14 29:17
  30:20 123:6
**arrangements**
  29:24 30:11
**article** 95:8
  120:10,11
**articles** 95:7,14
  111:25
**arts** 32:5
**asked** 46:11
  62:19 64:18,24
  80:7 83:18
  86:2 100:7
  103:13 118:5
  123:16 125:16
  126:11 136:7
  136:20 140:5
**asking** 4:16,23
  24:11 29:10
  35:5,8,14,19
  35:22 47:7
  48:13 51:5,7
  81:20 83:22
  84:20,21 85:21
  92:10 109:24
  117:8,25
  122:16 124:19
  133:12 135:1,9
  136:1,22 142:6
  144:22 145:17
**asks** 134:18
**aspect** 137:16
  138:10 139:25

**assessing** 41:16
**assistant** 8:13,17
  8:21 44:12
**associate** 7:10
  7:19 8:23
  108:24 126:18
**associated** 92:13
  93:2
**assume** 5:6
  139:11,13
**assumed** 21:14
**assuming** 76:11
**assurance** 65:5
  100:19
**asynchronous**
  134:25 136:21
  137:2,12,16
  138:10,19
  139:25
**attached** 105:9
  107:1
**attachments**
  101:11
**attended** 15:24
**attention** 31:9
**Attorney** 2:6,7,7
**attorneys**
  150:13
**August** 6:20 7:8
  7:16,22,22
  13:2,9 31:15
  31:22 34:8
  36:7 49:14,15
  49:17 50:1,1
  70:1 80:7
  83:21 85:2,4
  85:23,23 86:8
  91:5,19 94:22
  95:9 147:22,22
**authority** 59:20
  59:22
**available** 30:2
  84:23 85:1
**avoid** 144:3
**aware** 31:13
  33:15 52:20

57:24 65:22
  66:12,20 71:5
  94:24 95:2,20
  97:23 98:8
  108:24 113:17
  117:2 118:22
  119:15 128:25
  129:3,6 134:23
  135:4 136:5,18
  137:1

**B**
**B** 43:4
**B-a-z-l-e-y**
  141:4
**bachelor's** 9:13
**back** 9:18 15:23
  17:22 27:25
  33:17,23 36:3
  42:24 49:9,16
  54:5 61:16
  63:6 65:2,5,7
  69:15 72:9
  73:20,22 74:24
  80:7 84:14
  90:17,21 94:12
  94:22 97:19
  102:11 103:15
  104:14,15
  110:14 111:22
  116:19 119:11
  125:22 126:7
  126:15 135:11
  137:18 140:3
  145:3,11,19
  148:9
**back-and-forth**
  53:15
**background**
  62:24
**bad** 139:24
**bargaining**
  88:25 93:3
  126:22
**based** 21:14
  29:20 50:25

72:16 73:10
  76:21 82:24
  99:7 139:5
**basically** 21:14
  51:18 132:10
**basing** 64:8
**basis** 7:21,22,24
  13:6,18 19:9
  51:15 55:12,18
  57:22 66:11
  73:15 82:24
  103:5 114:19
  123:12 133:20
**Bazley** 141:4
**Bear** 150:3,18
**becoming** 15:10
**began** 102:13
  107:11
**beginning** 38:13
**begun** 143:4
  144:1
**behalf** 82:13
  100:6,24
**believe** 8:21
  28:19 32:9
  38:18,22 39:2
  45:19 71:8
  72:6 75:22
  77:12 91:3
  97:23 101:20
  109:16 118:20
  121:1,4 127:17
  147:21
**believing** 55:19
**benefit** 103:9,23
  104:12 105:14
  105:24 106:17
  110:8 116:22
**benefits** 103:11
  103:13,16,17
  104:7 105:2
  106:4,23
  109:22 112:25
  115:25 116:9
  116:18
**Beougher** 62:17

62:18
**best** 96:22
  150:10
**better** 6:24,25
  7:1 61:16
  92:15 93:5
  119:18 143:19
**beyond** 82:21
  86:7 87:24
  95:18 96:6
  106:16 132:22
  141:24 147:11
  147:11
**bit** 5:19 12:6
**blank** 58:18,19
  58:19
**body** 5:19
**book** 10:19
**bottom** 56:25
  111:3 120:2
  124:2 134:12
**break** 6:3 56:5
  58:24 59:4
  90:17 144:6,8
**breaks** 6:6
**Brenda** 106:3
**brick-and-mo...**
  46:17
**broad** 1:23 10:4
**broader** 27:6,8,9
**brought** 4:24
  93:7 103:20
**buck** 59:24
**building** 49:22
**built** 76:2,3
**burden** 39:23
  40:5
**burdensome**
  46:9 88:17
**busiest** 49:17
**business** 141:7
**buy** 92:11

**C**
**C** 43:4
**cabinet** 24:16

28:1
calendar 52:7
call 39:7 74:14
115:6 143:20
called 4:8 26:16
44:15 76:15
calling 84:9
cameras 69:7
campus 30:8
62:20 63:6
64:9 72:10
73:23 111:25
capacities 65:3
capacity 9:2
13:4 14:9 72:4
career 8:9 9:3
Carolyn 140:14
141:6
carried 144:13
case 4:24 30:7
65:13 89:25
93:13 98:19
112:8 126:5
137:24 144:17
cases 26:20
cause 44:25
150:8,13
cautioning 38:3
38:6
CBA 120:6
CDC 27:13 29:6
86:24,25 87:7
CDC's 66:7,12
certain 26:23
79:14 143:13
certainly 36:1
64:25
certification 4:4
150:21
certify 150:4,7
150:12
certifying
150:22
cetera 65:1
chair 32:4 76:21
77:3,4,9,11,15

81:7,24 88:3,5
139:1,10
chairs 147:18
challenging
126:6
chance 62:6
change 46:25
47:12,23 63:22
63:24 64:2
132:20 136:10
136:13 142:15
143:17,22,23
147:8
changes 65:10
changing 50:6
97:6
chapter 10:19
character 47:13
47:23
charge 54:9
145:15
chart 12:5
check 141:18
checklist 43:3
Chester 2:3
chose 99:5
Christine 141:8
circumstances
17:5,9 24:19
35:3,11 57:22
57:25 64:8
133:2,2
Civil 1:3 2:8
clarification
80:20
clarify 126:12
139:24
class 10:15
40:16 63:20
81:15 93:5
103:22 147:15
classes 25:4,14
28:5,24 29:10
32:10,13,16,19
33:4,6,11
36:18 37:12,14

46:12 48:14,21
48:25 50:16,21
50:25 51:4
52:11 55:10
67:23 68:4,7
68:11 72:15
78:24 88:4,11
88:18 101:24
102:6,7,8,11
114:5,6 115:4
116:17 118:2
122:5 130:5
132:12 141:23
143:24 146:4,5
146:8 147:2,8
147:24 148:9
148:12,13
classroom 33:18
33:24 63:8
64:17 65:6
72:4 102:25
108:5 109:1,14
119:3,6 124:6
126:2,20
129:11,13
classrooms 65:2
69:8,9
clear 67:17
68:20 84:2
117:3 121:25
129:23 130:2
clear-cut 54:24
cleared 118:22
clock 115:22
close 6:22 11:21
61:24
clumping 110:5
come 14:22,24
18:25 19:11
20:5,9 29:4
33:17,23 39:9
56:14 63:6
69:14 70:14
72:9 73:20,22
90:17,21
102:11 110:14

111:22 116:16
116:18 121:17
128:22 145:11
145:19 148:2
comes 17:19
126:22
coming 77:5
128:8
comments 130:3
commission
150:24
commitment
47:16,19,21
48:1
committed
122:24
committee
133:18,22
committees
132:19
Commonwealth
150:1,3
communicate
15:18 68:22
communicated
31:25 34:7
36:24 68:23
86:8
communicating
147:11
communication
13:23 24:19,25
31:10 32:2,3
36:25 103:5
communicatio...
36:8,13 37:23
38:10 67:18
115:15
community 30:8
compel 63:20
competitive 7:25
complaint 93:12
144:5
complete 150:8
completed 42:11
42:15,22,24

61:1
complex 104:12
compliance 12:5
13:12 44:17,19
comply 18:17
comprised 86:15
compromise
121:18
computer 43:16
43:24 44:1,3
concept 26:17
40:17
concern 36:2
64:21 120:16
121:2,16
concerning
94:24
concerns 122:22
concluded
149:12
concurred 84:6
condition 55:8
55:16 62:21
72:9,23,24
73:5,15,18
90:5,7,8
102:23 127:1
127:19 128:3
143:1
conditioned
98:18 99:17
conditions 66:15
120:19
conduct 100:20
conducting
15:21
confer 14:8
confirm 103:14
104:11,25
106:7 116:9
119:13 145:1
Confirmation/...
56:22
confirmed
106:12 119:9
125:13,21

confirming
103:8
conforms 16:19
confused 58:11
72:7 126:17
128:7 136:15
139:22
confusing
100:16
connected 117:3
connection
116:14
consider 99:10
considered 50:8
51:5 112:9,13
113:15 119:4
124:7 133:5
constitute
104:17
consult 13:14
14:12 106:14
consultant 55:22
consultation
57:8 58:2 74:6
76:19 125:4
consultative
87:20
consulted 105:7
106:7
contacted 100:6
context 21:2
79:5 133:3
contiguous
51:17 90:1
contingent
148:12
continue 51:16
77:23 103:12
104:2,7 145:1
146:12
continuing
89:18 98:19
contract 71:2,6
71:8 74:1
89:12,13
108:12,13,18

131:16 132:10
contracting 36:2
contributions
89:14,18,19
control 117:6
150:22
conversation
17:22 36:15
37:11,13 38:22
38:23,25 39:3
39:9 53:3 61:8
61:10,12,14,22
63:2 66:22
70:3 74:12
76:10,14 78:10
80:14,21 81:18
84:4 87:5 88:2
96:12 103:21
104:14 114:2
124:22 133:9
138:13 139:8
143:2
conversations
38:7,8,19,20
38:21 59:15,21
60:1,7 61:20
86:19 96:5
conversing 65:1
conversion 25:3
37:12,13 48:22
130:5 142:22
143:3
convert 25:14
32:10 33:5
46:11 48:14
55:9 72:15,15
132:12
converted 50:21
converting
39:14 51:13
79:9 122:5
143:24
convey 76:15
conveyed 78:4
coordinating
20:20

copied 60:12,15
112:5 121:12
contracting 36:2
copies 59:1 91:1
copy 32:8 42:11
43:9 60:20,25
61:2 70:5
149:2
correct 6:14,16
9:9,10 12:23
12:24 17:7,8
18:9 19:5
20:25 21:24
26:12 27:6
30:9 33:1 34:8
34:13 37:10,17
44:22,23 45:18
47:2 48:23,25
49:1,7,8 51:25
52:4 53:9,10
54:12,16,19
55:24 58:6,22
58:23 59:25
64:9,10,17,18
65:7,10,11,14
65:15 67:12,16
68:19,24,25
70:23 71:3,4
71:21 74:9,10
74:21 76:25
78:18 93:8,10
93:11 97:14
101:22,24,25
102:4 103:16
105:1 107:21
107:22 110:22
110:25 111:19
112:5,12 115:5
121:1,14
123:14 125:20
128:17 129:15
129:19,22
130:7 148:17
150:10
correspondence
3:13,17,22,23
3:24 60:12,15

86:7
corresponding
105:11
cost 46:6,6,12
92:9
counsel 4:3
37:21,23 38:7
38:8,15,21
57:8 58:2
59:16 74:7,14
119:10,10,14
125:14 150:12
counted 89:20
counting 9:8
County 150:2,4
couple 6:6 13:20
101:11 118:13
134:11 140:3
144:11 146:20
course 10:1,8,10
10:11,14,15,17
19:16,18 39:22
50:7,13 77:6
83:8,13 100:20
101:21 103:2
132:6 133:17
141:7
courses 29:2
46:19,19 48:6
50:9,12 51:10
76:18,24 78:6
78:13,19 80:1
80:11 81:4,9
81:14 82:22
83:3 88:7
129:9,9 130:20
132:17 133:21
145:18 148:18
court 1:1,22
5:11,23 80:20
147:3,9 149:1
149:4,6,8,11
150:3,18
cover 88:3,17
coverage 88:14
covered 80:15

88:7 93:18
covers 10:2
COVID 36:2
62:25 86:17
COVID-19 3:8,8
3:9,11,12
created 41:25
75:10 147:25
creates 43:12
45:7
creating 147:15
creation 147:23
148:11
criteria 16:19
21:11,12,16,20
26:23 27:4,12
40:1 42:1 43:8
50:19 54:18
70:20,24 71:18
crosstalk 80:19
Cumberland
150:2,4
current 6:19
64:8 99:8
140:6
curriculum
10:11,12,13
132:19 133:18
133:22
cut 112:25
113:22

_____

**D**

D 3:1 43:4
daily 13:18,19
data 91:7
date 1:13 30:8
32:2 61:12
63:25 64:5
66:3,6 107:2,6
111:15 113:8
dated 3:16,16,18
3:19,20 31:22
97:7 131:17
dates 142:2
day 11:10,11

101:13 135:23
135:24 146:17
150:15
**days** 11:7 49:15
51:17,17 52:5
52:6 104:3
119:11
**dean** 29:19,19
29:23 32:4,5
36:11,13,15
76:20,20 77:9
77:11 81:23
82:8 88:6
138:25 139:9
**deans** 81:17
147:18
**Dear** 30:8
**Debora** 105:8
107:7
**December**
103:18 104:8
113:11
**decide** 129:16
**decided** 43:21
76:19,25 78:9
80:18,23 81:5
82:23
**decides** 21:1,4
**decision** 37:7,16
37:18,19 39:15
39:17,21 42:12
48:1 59:23,23
72:1 74:2,3,5
74:18 81:14
84:10,11
121:22,23
122:4 133:23
135:8
**decisions** 121:21
**declining** 76:16
**Defendants** 1:5
2:11
**defining** 110:4
**definition** 23:3
44:24 46:4
55:17 109:20

109:25 119:14
**definitive** 126:8
**deliver** 24:1
**delivery** 46:19
**demand** 80:11
81:8 83:3
147:24
**denial** 33:2 57:6
59:8,14 60:5,8
60:23 61:23,25
67:4 75:11
79:5 93:10
142:21
**denied** 29:23
32:24 33:7
37:17 53:7,9
53:13 54:14,21
57:2 60:17
61:15,19 64:3
65:14 67:8
68:15 72:7,14
72:24 73:6,9
79:9 86:3,6
88:1,4 92:6
94:23 146:6
**deny** 30:25
53:17 54:3
57:16 59:17
**denying** 19:9,22
58:5 123:13
**department**
23:19 29:22
32:4 76:21,22
77:4,9,15 78:7
78:12,19 82:25
83:2,12 88:17
130:16 133:24
140:25 144:14
145:4 147:12
**depend** 109:16
**dependent**
148:14
**depending**
27:15 129:13
**deposition** 1:10
4:17 5:10,11

79:23 149:12
150:4
**depth** 93:14,16
**Deputy** 2:7,7
44:16
**description** 3:6
108:23 126:18
126:21,24
127:5
**deserve** 84:1
**designation**
107:1
**desire** 113:19
115:1
**desired** 137:6
**desk** 44:3
**details** 31:2
84:10 148:13
**determination**
50:25 51:9,12
92:8
**determine** 50:20
81:11
**determined**
148:20
**develop** 23:25
104:24
**developed** 57:7
58:2 102:13,20
114:20 125:4
125:13,15,18
139:9 148:6,7
**deviation** 51:2
**diary** 142:1
**difference** 89:4
146:14
**different** 30:15
116:10 142:2
**differs** 26:10
**difficult** 22:22
109:12
**digitally** 43:20
**direct** 12:7
24:23 32:2
59:17,19
150:22

**direction** 122:6
150:9
**directly** 12:22
25:2 55:4
**director** 6:14,19
7:7,11,23 8:21
8:23 13:22
15:10 16:18
42:6 44:10
70:15
**directors** 131:15
**disabilities**
143:8
**disability** 14:19
16:14,18 20:17
20:20,24 21:5
21:16,21 24:5
24:5 27:4
30:14 34:2,5
34:10 42:6,8
42:24 43:6
44:11 49:5
55:17 97:6,24
98:15 113:18
143:12
**disagree** 84:8,18
**disagreement**
99:6
**disapproved**
27:20 29:20
**Disciplinary**
97:5 99:25
**discovery**
140:12
**discretion** 70:18
71:19
**discuss** 15:15
17:21 19:11
38:8 77:11
88:13,19 95:16
128:12
**discussed** 37:19
67:12 71:25
84:22 87:6,23
87:24 129:21
**discussing** 39:12

96:6 142:19
**discussion** 38:14
38:17 53:2
86:23 91:18
93:7 94:20
95:18 96:8
97:17 129:25
134:3,4
**discussions**
97:11 98:16
132:5
**displeasure** 99:5
**dispute** 21:22
34:1,4,12
73:14,17 99:4
**disputing** 55:11
55:16
**disruption**
49:23
**distance** 131:10
132:18
**distancing** 64:24
65:6
**distinct** 26:13
**distinction**
89:15 136:16
142:9,11
**DISTRICT** 1:1
1:1
**DIV-002** 3:15
41:7
**DIV-008** 3:15
**division** 12:4,8
13:12 81:17
133:8
**divisions** 28:2
**doctor's** 55:19
**doctors** 145:12
**document** 11:25
41:8,22,25
56:11 67:4
120:1 132:16
133:10,16
**documentation**
16:10,15,16
17:25 18:12

21:19 26:21
29:1,5,15 30:2
42:5,9 43:2,6
43:12,23 57:18
75:10,20,24
86:2 141:21,25
**documented**
102:24 142:10
142:12
**documents** 6:9
57:14 58:25
79:22
**doing** 9:9 18:23
**domain** 133:9
**door** 11:22
**doubt** 116:13
**Dr** 4:24 31:9,22
32:9 34:22
36:16 37:10
39:9 46:11
48:13 50:2
52:17 54:21
55:3 57:20
58:25 59:9,17
60:1,7,9,11,16
61:7,20,21
62:14,15,19
63:3 64:2
66:24 67:1,9
69:25 70:3,7
71:24 72:3
74:13,22 75:8
76:11 77:10,22
78:4,21 80:1,6
83:17 85:10
86:1,5 88:3,10
88:18 94:23
96:10,13 97:8
97:11 98:9,11
98:16 99:1
100:5,10,18,22
100:24 102:9
102:22 105:11
106:21 107:12
109:13 111:21
114:23 118:18

119:15 121:6
121:25 122:14
122:16 126:6
127:15 133:19
134:13,23
135:3 141:19
144:12 147:2,9
147:21 148:5
148:11
**drawer** 44:4
**driving** 139:8
**drop-and-add**
77:1 80:18,24
81:5 148:21
**DSO** 20:19,23
21:1,4,25 34:7
34:9,15,22
58:15 60:21,21
61:1
**DSO's** 21:15
**due** 57:25
**duly** 4:8 150:8
**duties** 101:21
108:14 120:10
127:6
**duty** 102:7,12
108:1,3,4,9
109:13,21
110:3 114:7
116:16,19
117:10,13
118:1,6,23
119:5 124:10
126:2,19 128:6
128:10
**duty'** 120:7

**E**

**E** 3:1
**earlier** 36:8
58:12 86:10
147:20
**early** 8:23 31:15
90:10
**earth** 109:20
**Eastern** 1:1 2:8

**education** 9:12
26:15 66:8
131:10 132:18
**EEOC** 65:16
66:2 87:8
**effect** 45:8
115:24
**efficient** 6:8
**either** 9:16,17
9:19 19:9
38:21 39:7
78:17
**electronic** 149:5
**eligible** 27:2
29:6 71:9
**email** 12:18 22:9
22:11 31:22
32:6,8 33:9
34:15,21,22
36:10,14 43:6
49:14 50:6
52:18 58:16,18
59:1 62:14,18
66:1 83:21
85:3 86:8 94:6
94:12,15 95:4
95:6 101:9
117:22 118:10
118:12,17,20
118:21 120:5
124:21 125:7,9
134:10,12,20
135:19 136:19
136:22 137:5
137:13 138:6
139:16 147:22
**emailed** 91:3
**emails** 18:3,7
33:14 36:4
42:21 49:9,24
67:6 112:4
119:1,21 121:4
121:12 124:9
130:3
**emergency** 66:9
86:11,14 123:1

**employed**
150:13
**employee** 14:20
16:14,22 17:14
17:21 21:18
26:18 40:1,9
42:23 45:5
54:5 60:20
133:3 139:10
**employee's**
127:1
**employees** 20:21
24:6 25:6,10
41:6 45:23
56:23 122:23
**employer** 39:23
45:15 46:7
99:9
**employer's** 40:5
**employment**
21:2 49:3
**encouraged**
77:10
**engage** 54:15
97:10 98:8,10
98:15
**engaged** 86:16
**engaging** 98:3
**ensued** 73:6
**entail** 128:14
**entails** 24:3
138:16
**enters** 111:18
**entire** 10:4
112:4
**entitled** 99:16
104:9
**entitlement**
103:13,17,25
110:24
**enumerated**
120:9
**environment**
35:2
**equipment**
92:12

**employed**
150:13
**equity** 12:5
13:12 44:19
133:8
**especially** 5:10
**Esquire** 2:2
**essential** 108:17
108:19,25
117:14 119:4
119:17 124:7
125:1
**establish** 77:1
137:5
**established**
70:16 73:14
**et** 1:5 65:1
**evaluated** 64:6
**evaluates** 20:23
**evaluating** 81:21
87:9
**evaluation** 21:15
45:4 75:20
**event** 38:1 96:7
**eventually** 42:24
**exact** 28:16,21
**exactly** 68:6
76:7 85:1
112:14 131:20
**EXAMINATI...**
4:11 146:23
**EXAMINED**
3:2
**example** 46:6
**exchange** 66:1
**exclusive** 114:19
128:17
**exclusively**
109:7,12
**excuse** 37:12,18
55:15 76:20
90:6
**exhibit** 3:7,10,12
3:13,14,16,17
3:18,19,20,21
3:22,23,24
11:19 12:4,10
12:15,19 20:2

22:4,5,5,6,24
23:5,6,21 26:2
26:3 30:6
31:16,17,21
34:14 40:20,23
49:10 59:7
62:2,3 69:10
69:19,22 74:25
75:4 93:21,22
94:3 99:20,23
100:2 101:2,5
107:5 117:16
117:19 123:18
131:1,6 134:5
134:8 137:21
137:22
**exhibits** 3:5
12:14 20:1
140:2
**existing** 65:10
**exists** 109:2
**expect** 17:16
18:11 131:21
**expectation** 18:9
18:10
**expectations**
14:4 15:14,19
18:17 51:2
**expecting**
138:14
**expense** 93:1
**expenses** 92:13
**experience** 99:7
**expiration**
110:20 115:23
**expires** 150:24
**explanation**
4:20
**exploring** 84:5
**express** 99:5
126:13
**expressed**
120:16 121:16
**extended** 104:6
107:18
**extension**

120:11
**extent** 14:7 38:9
50:22 66:16
76:7 104:3
**extra** 93:4,4

**F**

**faces** 22:21
**facilitate** 14:21
17:22 69:3,8
**facilitating**
42:20
**facing** 35:11
**fact** 34:7 49:2
51:12 52:13
55:16 63:15
72:16 79:14
81:1 103:17
104:25 110:12
110:17 111:2
121:5,15,21,22
148:18,19
**factor** 35:7,15
138:22
**faculty** 25:13
28:4,12,13
29:16,24 30:21
32:9 36:17
48:3 49:18,20
63:19 69:9
71:9 86:15,20
89:2 91:7,25
92:15 93:3
108:20 109:10
112:4 117:14
119:4,19
120:10,17
121:5,6,9,16
123:2 124:7
127:3,4,8
132:20 147:6
147:16
**fair** 5:7 10:3
140:1
**fall** 3:8,9,12
25:21,22,25

32:11 33:24
49:19 79:2
80:3 88:11
90:4 91:8
104:4 106:22
114:2 115:20
130:21,22
134:15 137:6
137:11 138:16
139:13,15
144:2 145:2,14
147:25
**familiar** 109:10
**far** 19:23 26:1
57:17 93:1
103:11 124:23
125:17 143:21
**farther** 141:20
**fashion** 7:21
87:20 125:21
**favorable** 95:23
**feasible** 28:3
81:12
**February** 8:13
**feel** 141:12
**feeling** 47:15,17
**felt** 46:21
**Ferguson** 98:10
100:1 101:14
**figure** 109:19
139:4
**figures** 130:25
**file** 19:7 42:6
43:16,16,19
44:1 123:20
127:12
**files** 18:16,24
**filing** 4:4
**final** 145:24
**finance** 7:17
**find** 33:9 109:20
120:7
**fine** 5:8 6:24
38:10 102:17
138:5
**finish** 5:15,16

**first** 11:2 12:6
24:13 31:10,13
31:21,24 33:8
36:24 38:12,22
38:25 49:14
52:25 62:13
70:9,13 98:7
98:13,21
105:21 113:12
117:22 118:16
118:17 120:15
120:24 134:12
**fiscal** 8:13,17,19
**fiscally** 24:1
**fit** 136:21
**five-minute**
144:6
**flexibility**
133:11
**flexible** 26:8,17
27:3,14 28:5
28:14 29:24
30:10,20 123:5
**flipping** 36:4
**FLMA** 111:5
**FMLA** 10:3
51:17 57:25
90:1,3,8,12
102:14,21
103:25 106:25
107:1,10
110:10,13,18
110:20,21,23
111:10 112:23
114:14,15
115:17,20,23
115:24 116:15
125:23 126:25
127:18,24
128:3,7,10
**focused** 10:17
**follow** 61:6
91:23 92:3
**follow-up**
146:21
**followed** 95:14

**following** 119:1
**follows** 4:9
**foregoing** 150:4
150:10,12,21
**Forget** 115:17
**forgetting** 92:19
**forgive** 123:25
**form** 4:5 15:22
17:2 19:6 24:7
25:8 32:14,20
35:13,21 40:3
40:11 42:11,15
42:24 44:2
45:25 46:14
48:15 50:11
51:20 52:3,12
52:24 53:14
54:23 56:22
57:6,16 58:13
58:19,19 60:3
60:23,24 61:1
66:18 67:4,24
68:5,12 72:13
73:1,8 77:19
78:25 79:7,17
79:18 82:20
90:5,7 97:15
100:9 102:23
104:15 105:9
107:10 109:15
111:17 113:2
116:3 117:5
119:20 120:20
121:8 122:3,10
127:1,20 128:3
128:24 132:15
134:1 135:20
136:8,11,13
142:20 144:19
148:15
**formal** 9:11,17
9:20 10:6,21
76:2
**formalized** 44:7
**former** 13:10
15:12

formerly 44:14
forms 19:11
    42:5,21
formulating
    86:16
forth 16:16
    17:22 27:16
    69:9 71:16
    72:11 103:13
    111:7 142:18
    145:22 150:5
forths 104:15
Fortunately
    134:11
forward 60:21
    61:2 62:6 69:4
    103:4 113:25
    137:5 143:5
    144:2
forwarded
    14:18 16:20
    21:17 32:6,8
    36:11 60:25
    96:18
four 146:5
framed 78:3
framework
    26:16
free 99:18
frequently 13:14
    13:16
Friday 12:14
    123:22
front 23:22
    75:13 94:18
full 100:20
    102:7,12 108:1
    108:3,4,9
    109:13,20
    110:3 114:7
    116:16,19
    117:10,12
    118:1,6,23
    119:5 120:7
    124:10 126:1
    126:19 128:6

128:10 150:10
full-time 102:7
    102:12 104:21
    114:7,19 115:1
    116:16 118:1,6
    118:23 126:1
    126:19 128:6,9
    138:17 146:6
fuller 4:20
fully 102:2
    118:22 120:11
function 9:4
    10:5 117:14
    119:4 124:7
    125:1
functions 102:3
    108:17,20,25
    119:17
fundamental
    39:25 40:4,10
    45:3,6,14 50:8
    50:20 72:16,20
    138:12
fundamentally
    39:22
funds 89:15
further 65:1
    68:22 138:15
    148:22 150:7
    150:12

_____

**G**

Gardner 140:14
    141:6
general 2:6,7,7
    13:24,24,25
    23:16,18 24:21
    27:15 28:14
    40:17 53:1
    88:14 121:5
    127:5,5
generally 14:20
generated
    128:11
generic 126:21
    127:4

getting 91:9
    94:1 113:4
    119:18,22
    135:22
give 4:20 28:21
    74:19,23 78:2
    78:22 85:2,7
    91:22 92:2
given 15:17
    72:10 78:19
    84:2,12 105:3
    138:13 150:8
giving 99:17
gleaned 148:14
Glenn 120:6,15
    120:25
go 18:7 19:25
    30:18 54:5
    61:16 63:17
    75:3 93:20
    94:17,17,22
    115:8 125:22
    126:7,15
    137:18 139:4
    140:3 145:13
goes 42:24 52:22
    83:10 120:8
    128:8 145:11
going 4:16,21,23
    5:6,12,18 7:13
    11:21,24 12:13
    19:25 36:3
    39:16 48:2
    49:9 51:18
    56:9 59:1
    74:19 75:3
    77:13,15 83:24
    84:16 85:19
    88:3,10,11,16
    91:16 94:17
    106:17 112:21
    112:24,25
    121:3 122:1,15
    125:24 133:4
    139:12,23
    140:13 144:17

good 4:14 5:9
    6:25 12:22
    59:3 90:23
    145:13 149:4
gotten 21:10
grant 59:20
granted 137:1
granting 19:9,21
    70:17
ground 93:18
group 86:14,19
    97:24
guarantee 65:4
guess 20:23 30:6
    72:7 77:25
    83:10,20 96:21
    97:8 101:10
    110:4 136:22
    138:12,23
guests 20:21
guidance 27:13
    29:6 65:16
    66:2,7,12
guide 3:7,8,9,10
    3:12 71:19
guided 74:5
guidelines 86:24
    87:8
guys 23:14
    139:4

_____

**H**

half 78:22,23
    90:16
hand 78:2 129:5
    129:6 150:15
handle 23:14
    37:9
handled 55:3
    77:8 99:3
    143:21
handles 16:12
    17:6,17
hang 59:13
happen 11:24
    81:13 82:18

96:8 112:24
    139:12 142:2
    147:13
happened 61:7
    71:22 76:14
    113:8 123:3
    138:14
happening
    106:17 116:22
happens 18:1,2
    76:1 96:22
happy 5:3 95:24
    97:10 98:15
hard 118:14
hardship 39:23
    39:25 40:5,8
    40:14 45:1,7
    46:4,5 49:4
    72:17,21
Harrisburg
    103:10
Harrison 105:15
Hawkinson 60:2
    60:8,16 61:21
    67:1 70:1,3
    74:9,13,15
    75:8 85:10
    86:6 96:10,14
    119:17 121:25
    122:14
head 5:22,24
    15:8 16:8
    28:12 30:1
    50:4 54:8 89:2
    89:10 130:25
health 53:8
    70:12,14,20
    71:7,20 72:2
    73:21 74:1,19
    75:25 76:17
    90:5,6,8
    102:23 127:1
    127:19 128:3
    133:13
hear 5:2,5,6
    6:23,24,25

23:17 33:20,21
37:3 59:11
91:10 92:18,24
92:24 102:15
102:18 110:16
140:20
**heard** 79:13
117:15 120:24
122:14,18
123:7,10 145:3
**hearing** 6:22
**heart** 33:16,22
35:9 55:7
64:22
**held** 94:20
**hereinbefore**
150:5
**hereunto** 150:15
**Hey** 95:5
**high** 66:15 80:10
81:8 83:3
147:23,24
**higher** 26:15
66:8
**hired** 108:22
**hiring** 10:2
**history** 15:25
**hitting** 141:13
**hold** 37:22 69:23
**honest** 137:15
**honor** 47:15
**hope** 123:25
**hopefully** 73:22
**hour** 90:17
**hours** 11:6
100:21
**housed** 127:10
**HR** 13:11,21
23:9,10 54:8
70:10,15 103:3
106:4 131:15
132:7 133:8
138:24 139:8
141:20,24
142:11 144:14
**human** 6:14,19

7:5,7,11,19,23
8:22 9:1,3,7,12
9:20,22 10:1,4
10:14 15:10
16:20 24:1
29:12,15,15
44:12 49:18
83:14 121:19
133:8
**hundred** 28:18
**HVAC** 65:10
**hyper-technical**
136:20

**I**

**idea** 50:15 52:10
64:15 77:13
82:18 83:11
88:9 139:24
148:6
**identification**
22:7 23:7 26:4
31:18 40:24
62:4 69:20
75:1 93:23
99:21 101:3
117:17 131:7
134:6
**identified**
108:18
**identify** 83:2
**ignore** 48:2
**IHEs** 66:13
86:24
**III** 1:2 2:13
**illness** 27:12
**immune-comp...**
25:9
**immune-comp...**
65:18 120:18
**immune-comp...**
25:6 66:14
**immune-supp...**
33:18,25 34:5
55:8 102:25
**immune-supp...**

65:18 66:14
72:11 120:18
142:18
**immunocomp...**
62:25
**impact** 39:24
40:13 132:25
133:23
**impairments**
133:13
**implement**
87:15
**implementation**
13:22 14:5,8
14:16 24:5,6
25:1
**implemented**
19:2 26:15
54:10 63:14
132:2
**implementing**
41:13 44:21
**important** 5:9
5:14 64:21
79:4 81:21
132:13
**impossible**
46:10 72:9
**in-person** 25:4
25:14 33:5
37:13 46:16
47:1,13,24
55:10 72:15
79:9 122:5
**in-the-classro...**
108:21 117:13
**include** 9:19,25
40:9 108:21
119:5
**included** 38:24
141:12
**includes** 9:22
117:13
**incompatible**
120:11
**incorporate**

57:11
**independent**
106:18
**independently**
17:7 23:15,16
23:19
**indicate** 64:11
65:9 67:21
68:2 101:14
**indicated** 32:10
34:9 73:25
103:19
**indicates** 45:3
63:5 141:21
**individual** 27:3
49:5
**individualized**
50:24 51:8
57:21 133:2
**individually**
39:20
**influence** 147:6
**influenced**
135:8
**inform** 19:7
**information** 3:8
3:8,9,11,12
23:13,20 29:12
29:21 62:24
67:10 68:23
81:11 82:4
84:13,20 85:2
85:6,8 86:5
87:14 105:4
114:4 119:8
125:3 136:12
137:14 140:9
141:16,18
148:12,14
**informing** 30:10
**initial** 21:15
22:8 54:3
**initially** 127:19
127:25
**innovative** 24:1
**input** 147:2,5,7

**Inquirer** 95:9
**inquiry** 97:24
**inserted** 57:5
**installed** 69:3,7
**instance** 24:18
45:21 82:15
**institute** 41:16
**institution** 46:17
**institutions** 66:8
**instructed** 57:11
57:15
**instruction** 47:1
69:3 131:10
135:5
**instructions**
91:22 92:2
132:1
**intend** 136:1
**intended** 72:2
74:1
**intends** 134:18
136:2
**intention** 137:4
**intentional** 94:4
**interaction** 13:5
132:7
**interactive**
14:21,23 15:4
15:19 16:23
17:10,14,17
19:21 42:20
52:17 53:12,19
54:15 97:18
98:3,9,11
99:15 111:11
129:21 132:13
133:1 143:4
**interest** 68:7
**interested** 67:19
67:19,22 68:3
84:5 129:24
150:13
**interests** 133:3
**interim** 3:21 7:7
7:20,22 77:4
88:2,5 131:9

**intermittent**
104:22 114:17
**internal** 8:3
**interpretation**
105:1 106:18
117:12 122:4
143:24
**interpreted**
108:4
**intersect** 116:10
116:12
**intersection**
114:13
**intervening**
128:19
**investigate** 82:4
**investigation**
81:10
**involve** 17:23
38:21
**involved** 16:25
17:12 19:20
26:21 29:16
31:2,8 52:16
54:20 55:4
57:9 76:5,8
81:18 83:15
85:20 87:4
98:5 109:17
130:5 131:23
139:1
**involvement**
17:10 22:1,2
147:1,7
**issue** 17:13,15
17:24 64:7
70:3 86:24
87:5 91:18
120:25 122:9
125:23 144:3
**issued** 60:8
122:20 147:10
**issues** 72:10
91:24 120:17
**issuing** 59:14
60:4

**J**

**January** 107:2,8
122:20 127:23
127:24 128:4
**Jason** 91:5
**Jennifer** 1:10
3:3 4:8 12:13
12:18 20:4
22:9 56:13
62:6 69:11
96:19 123:19
150:6
**Jerry** 7:18
**Jesus** 12:7,23
37:8 59:8,21
60:13 61:2
66:23 87:5
91:17 92:2
96:2,13 97:22
100:23 106:14
114:22 121:16
129:3 132:5
**Jesus's** 87:17
133:8
**job** 6:18 7:9,13
7:13 8:1 75:23
108:23 116:2
119:17 125:1
126:17,21,24
127:4 139:3
**Judith** 140:19
140:22
**July** 32:6 39:5
62:18 65:21
69:5
**June** 104:10

**K**

**K** 150:3,18
**KAPLAN** 1:22
**Kathy** 2:7 11:18
11:25 12:10
58:25 96:17
**keep** 30:3 42:21
92:19 97:6
**keeping** 41:18

41:19,23 42:17
**kept** 42:6
**kind** 9:11 14:1
15:2,7 17:24
17:25 37:2
43:3 48:22,24
51:2 52:16
69:1 72:25
75:9 77:5,6
78:19 88:9
98:4 112:16
116:24,24
129:21 139:3
143:12,13
**kinds** 9:24 16:10
78:12 87:9,22
122:1
**kle@attorney...**
2:10
**knew** 101:16,23
111:21 112:1
113:12,13,16
113:21 115:3
115:10 125:23
135:7 137:3
**know** 4:15 5:2,2
5:17 6:4 8:2,5
12:2,12 13:20
14:12,13,23
15:9,11,13
16:5 18:5,19
18:21,23 20:12
21:18 26:7,24
28:13 29:23
37:1 38:4
39:18 41:21
42:20 43:3,18
43:22,22,25
45:13 47:4,8
47:10 48:8
50:9 51:14
52:14 54:5
57:17,22 58:19
61:13,22 63:7
63:19 69:1,4,8
69:14 71:12,18

73:22 76:1,8
79:16 80:15,22
81:1 82:1,23
83:5,23 84:16
86:9 88:10,14
88:16 92:11,23
92:23 94:10
95:19,23 96:6
96:7,13,15
97:20 100:25
102:23 104:24
106:16 109:2,6
109:8 110:4,6
110:19 111:14
112:8,23 115:7
117:21 118:11
118:16 119:21
122:18 123:1
123:10,15
125:17 126:8,9
130:12,19,24
131:16,20
132:11 133:7,9
134:2,25 135:3
135:12,21
136:18 137:17
137:23 138:4,5
138:14,21,25
139:2,12,14
140:13,25
141:17,18
142:1,3,25
143:4,18
144:22 145:12
145:15,16,21
146:5
**knowledge**
78:11,14,16,19
81:3 130:13,15
**known** 79:19
**Kristin** 141:4
**KU** 122:24
**Kutztown** 1:5
3:14 4:25 6:14
7:17 8:6,9 9:13
9:15 14:16

41:7 46:13
48:4 100:19
108:20,25
130:20 132:2
**Kutztown's** 12:4

**L**

**labeled** 131:9
**labor** 10:3 106:7
106:9 116:10
**lack** 119:18
**lacks** 84:9
**language** 5:20
57:5,7,12,15
58:3,7 109:25
110:3 114:11
114:12 118:19
125:13,21
128:8
**Lantaff** 34:25
37:20 39:1
59:16
**Lanter** 91:6
**larger** 17:15
39:13
**late** 32:6 39:5
147:22
**latitude** 133:10
**law** 52:6 104:3
**lawsuit** 135:12
144:17
**lawyer** 97:8 98:8
**layout** 65:8
**layouts** 65:2
**lays** 41:22
**Le** 2:7 3:3 11:20
12:11,17 15:22
16:7 17:2 20:3
22:8,11 24:7
25:8 32:14,20
34:16,18 35:13
35:21 37:22
38:2,5 40:3,11
44:2 45:25
46:14 48:15
50:11 51:20

52:3,12,24
53:14,22 54:1
54:23 56:4,7
56:12 59:3
60:3 62:5
66:18 67:24
68:5,12 69:11
69:17 72:13
73:1,8 77:19
78:25 79:7,18
82:20 90:19,22
94:2,8,13,19
96:18,22 97:15
100:9 107:14
109:15 111:17
113:2 116:3,20
117:5,22
119:20 120:20
121:8 122:3,10
123:19,23
128:24 132:15
134:1 135:16
135:20,23
136:8,24
137:23 140:8
142:20 144:7
144:19 146:20
146:25 148:22
149:1,3,5
**lead** 112:16
**leadership** 23:25
24:13,14 47:18
**LEAMAN** 1:22
**learning** 29:1,9
29:13 51:3,6
**leave** 33:15 52:1
52:4,5,22
67:13,15 68:17
70:2 84:16
88:21,22 89:6
89:8,16,19,21
90:3,12,14
102:21 103:3
103:18 104:1,2
104:5,6,19
105:9 107:13

107:19,23
116:23 127:25
128:11 137:13
141:25 146:13
**led** 131:24
**legal** 10:23
37:20 54:18
57:8 58:2
59:16 74:6,14
119:10,10,14
125:14 142:10
**legitimate** 35:19
80:12 123:12
**let's** 31:9,16
33:8 38:12
41:15 56:10
58:24 62:1
93:20,21 96:16
98:13 108:16
115:7,16
117:19 119:24
128:23 139:11
145:10,12
**letter** 3:16,16,18
3:19,20 30:9
69:25 70:5,7
74:22 75:11,12
75:17 76:10
84:9 85:3 86:5
94:4,6,14,16
94:15 97:4,20
98:1,23 99:25
100:14,25
101:11,13,15
102:13,20
103:19 104:24
105:9 106:15
109:21 112:17
112:24 113:9
113:17,24
114:22 115:11
115:17 116:21
125:25 128:11
128:17 129:4,6
**letting** 73:20
106:16

**level** 47:2
110:10
**liberal** 32:5
**life** 82:19 98:24
**lifting** 132:17
133:17
**light** 39:9 64:21
82:10 121:15
**limited** 7:21
13:6,25 52:5,6
139:3
**Linda** 34:25
37:20 39:1
59:15 105:15
**lines** 61:17
**link** 62:23
**list** 29:16
**listed** 65:12
108:7,8 142:7
142:7
**Litigation** 1:22
2:8
**little** 4:20 5:18
6:7,21 12:6
22:22 58:11
104:23
**LLC** 2:2
**lmckinley@m...**
2:4
**load** 100:20
120:12 130:17
**loaded** 143:18
**logical** 56:7
**long** 6:4,17 11:2
11:5 12:25
103:11 135:23
135:24 146:17
**Longenhagen**
105:8 107:7
**longer** 104:23
**longevity** 71:13
**look** 14:5 17:17
20:1,15 22:4
22:23 23:5
26:2 30:5
31:16 33:8

34:14 40:20
41:15 43:24
44:3 55:23
56:2 57:23
59:6 60:19
61:16 62:1,23
63:9 69:10,22
82:9 83:25
93:21 99:23
101:5 117:19
119:24 120:1
126:8 131:1
134:8 137:18
137:20 144:2,4
**looked** 18:24
19:8 50:17
65:23 66:1
75:12 129:4
134:12 137:25
**looking** 23:2
41:2 49:12
56:18 60:22
65:24 93:17
100:17 103:4
107:1 113:25
114:14 130:4
143:5
**looks** 12:7 58:15
62:13,15 119:2
**Lorrie** 2:4 4:15
12:12 56:5
94:2
**lost** 36:5
**lot** 6:8,25 21:25
48:12 105:3
123:9
**low** 35:1
**lunch** 90:17
**Luncheon** 90:24

**M**

**M-u-l-l-e-n**
106:13
**M-u-n-d-e-l-l**
106:6
**maintain** 16:11

18:1,3,7,12
42:10 75:23
**maintained** 43:2
43:14
**maintains** 18:5
23:9,10 43:19
**majority** 46:18
**making** 33:13
47:11,25 51:10
54:9 87:14
121:20
**management**
8:19 9:8,20,23
10:1,14 66:10
86:11,14
**manager** 8:20
**managers** 86:15
**Mandel** 106:5
**March** 1:13
150:15
**marked** 12:3
22:6 23:6 26:3
31:17 40:23
62:3 69:19
74:25 93:22
99:20 101:2
117:16 131:6
134:5
**Martin** 14:17
39:2
**mask** 63:14,20
**masks** 63:8
**master's** 9:14,21
**materials** 14:4
15:17 20:16
**matter** 129:17
132:7 138:5
148:20 150:13
**McKINLEY** 2:2
2:2 3:3 4:13,15
11:18,21,23
12:16,21 16:3
16:9 17:3,4
20:6 22:13
23:8 24:10
25:11 26:6

31:20 32:17,23
34:17,20 35:17
35:24 37:25
38:4,11 40:7
40:15,25 44:5
46:2,23 48:19
50:14 51:23
52:8,15 53:5
53:16,24 54:6
55:1 56:6,9,17
58:24 59:5
60:6 62:9
66:19 68:1,9
68:14 69:14,21
72:18 73:3,12
75:2 77:24
79:3,11,21
80:25 83:1
90:16,20,23,25
93:24 94:5,10
94:16,21 96:17
96:20,23 97:1
97:16 99:22
100:12 101:4
107:16 109:18
111:20 113:6
116:5 117:1,7
117:18,24
119:23 120:22
121:11 122:7
122:13 123:21
123:24 124:4
129:2 131:8
132:24 134:7
135:17,21,24
135:25 136:14
137:9 138:2
140:10,11
142:24 144:4,9
144:21 146:16
148:15,24
149:7,9,10
**mean** 7:13 8:10
  10:11,11 11:6
  13:24 28:7,8
  47:25 57:17

71:13 76:11
87:12 89:24
95:22 97:13
108:3,4 110:13
110:18,21
111:24 113:22
116:6 117:11
118:1,6 121:24
122:11 124:10
124:12,23
125:25 126:10
127:3,10
128:13 130:11
135:11 139:1
142:9 143:8
145:13,13
**meaning** 23:4
  102:6
**means** 24:14
  27:10 47:8
  108:25 109:13
  121:20 126:2
  126:19 150:22
**meant** 128:22
**media** 130:3
**medical** 16:16
  29:14 35:1,4
  55:12,16,18,22
  57:21,25 62:20
  71:10 72:8,23
  73:5,15,17
  100:22 102:24
  116:17 127:2
  136:12 139:18
  140:9 143:1
**medically** 35:11
  55:24 118:22
**meet** 21:10,12
  21:15 27:4
  29:1,9,13 83:8
**meet-and-disc...**
  91:2,18
**meeting** 55:17
  77:21
**meets** 21:20 43:7
**Melissa** 2:7

106:12
**member** 25:13
  28:2 36:17
  71:9 108:20
  127:8
**members** 119:19
  121:6 132:20
  147:16
**mentioned**
  86:10 91:20
  106:25 145:25
  146:10
**mentioning** 38:7
  107:3
**merely** 90:14
  133:17
**merits** 39:20
**mess** 94:18
**met** 26:23 27:12
**method** 41:17
  41:19,23 42:1
  42:17 43:17
  44:7
**microphone**
  6:22
**mid-semester**
  76:21 78:8,13
  81:5 83:4
**mind** 68:20
  116:13
**mine** 94:11
**Miner** 2:3
**minute** 94:22
**minutes** 91:2
  146:1
**mis-scanned**
  96:21
**missed** 123:21
  135:2
**missing** 107:4
**mistake** 38:6
**misunderstood**
  114:10
**modality** 50:7
  51:13 132:7,18
  132:20

**mode** 46:18,25
**modified** 112:11
  112:12,15,20
  113:4 115:7
  128:15
**moment** 56:19
  78:9 84:25
  85:14,15,17
**Mondale** 106:5
**Monday** 1:13
**money** 92:9
**months** 66:6
**morning** 4:14
  22:9 59:1
**Morris** 97:4
**move** 43:21
  141:20
**moved** 13:11
  104:5
**moving** 8:2
  49:22 110:18
**Mullen** 106:12
**multi-modal**
  129:9,10
  134:25
**multiple** 122:8
**Mundell** 106:3,6
**muted** 59:10,11

────────

**N**

**N** 3:1
**name** 4:14 59:7
  64:7 79:16
  97:6 105:21
  141:13 146:1
**names** 105:6
  140:7,13
  141:17
**nature** 55:5
  102:24
**necessarily**
  14:14 26:19
  39:13,19 70:16
  72:5 74:4
  121:24 138:11
**necessary** 17:23

68:21 112:9
**need** 6:3 27:16
  39:19 43:4
  76:22 77:2,5
  77:21 78:5
  82:24 83:3,8
  83:10,12 87:15
  102:24 116:16
  126:8 132:18
  136:11 138:21
  139:1,5,15,17
  139:17 140:13
  143:9
**needed** 18:18
  47:22 48:25
  51:14 72:25
  84:10 86:20
  91:24,25
  100:21 103:5
  120:17 136:12
**needing** 139:14
**needs** 42:2 72:23
  122:25 133:18
  138:15
**negate** 110:24
  115:19
**negotiations**
  131:24
**never** 52:23 93:7
  98:23 127:21
**new** 49:20 59:6
  69:2 85:6,8
  136:11,13
  139:16
**news** 95:19 96:7
**newspaper**
  111:24
**night** 49:25
  123:22
**non-privileged**
  38:9
**normal** 61:5,13
  65:2,7 95:18
  103:7
**Notary** 150:3,18
**notated** 142:3

**noted** 141:24
**notes** 18:3,7
  79:24 93:17
  150:11
**notice** 107:1
**number** 3:6 11:6
  11:7 22:6 23:6
  26:3 28:12,17
  31:17 40:23
  62:3 69:7,8,19
  74:25 93:22
  99:20 101:2
  117:16 131:6
  134:5
**numbered** 30:7

      **O**

**object** 99:2
  148:15
**objected** 121:23
**objecting** 54:1
  119:16
**Objection** 15:22
  16:7 17:2 24:7
  25:8 32:14,20
  35:13,21 40:3
  40:11 44:2
  45:25 46:14
  48:15 50:11
  51:20 52:3,12
  52:24 53:14,22
  54:23 60:3
  66:18 67:24
  68:5,12 72:13
  73:1,8 77:19
  78:25 79:7,18
  82:20 97:15
  100:9 107:14
  109:15 111:17
  113:2 116:3,20
  117:5 119:20
  120:20 121:8
  122:3,10
  128:24 132:15
  134:1 135:16
  135:20 136:8

136:24 142:20
  144:19
**objections** 4:5
**objective** 41:15
  46:22
**objectives** 29:2
  29:9,14
**obviously** 4:16
  38:9 89:19
  135:11
**October** 93:19
  93:20 97:7
  101:10 102:10
  112:17 118:17
  118:21 119:2,2
  135:14
**off-boarding**
  49:18
**offer** 53:4 76:17
  76:24 77:17,18
  78:1 82:5,11
  82:17,17 83:3
  83:6,18,19,22
  84:5,9,14,16
  84:19 126:25
  148:4,11
**offered** 48:6
  51:25 52:23
  67:14 77:20,22
  78:6 81:16
  82:22 83:8,13
  98:8,10 128:19
  130:21 132:17
  133:19 147:13
  147:21 148:9
  148:18
**offering** 78:12
  81:4,14
**offers** 78:20
**office** 2:6,8 7:5
  13:6 14:17,18
  16:15 17:20
  27:18,19 30:3
  42:14,17,25
  43:2,7 49:21
  75:17 76:4

77:8 90:7
95:17 97:13
98:4 100:20
103:8 105:15
106:4 115:9
127:12
**official** 6:15
**officially** 67:8
**oh** 4:19 8:8,12
  11:8 22:16
  23:4 27:8
  34:16 56:16
  62:5,14 94:10
  113:21 115:16
  116:21 120:3
  124:1 125:11
  128:22
**okay** 4:19 5:9
  6:1,13,17,21
  6:23,25 7:4,9
  7:12 8:5,8,16
  9:1,7,11,16,24
  10:10,20 11:11
  11:17 12:2,16
  12:22,25 13:3
  13:7,14,18,21
  14:15 15:2,16
  16:10 17:9,25
  19:3,6,20 20:7
  20:10,14,15,19
  21:1,13,22
  22:12,16,25
  23:1,12,21,24
  24:17,24 25:12
  25:15 26:1,5
  27:2,10,17,19
  27:24 28:23
  29:22 30:5,13
  30:18 31:3,9
  31:19,21 33:2
  34:17,19,25
  36:3,12,23
  37:7,25 39:3,8
  39:15 40:8
  41:3,4,5,10,15
  42:8,13,16

43:1,9,21,25
44:6,10,16,20
44:24 45:23
46:24 48:13
49:11,12 50:1
50:6 51:16
52:9 53:17
54:3,17 55:2
55:11,14,18
56:2,18,21
57:2,14 58:7
58:21 59:6
61:9,14,19
62:1,8,10,12
62:14,23 63:5
63:22 64:11
67:14 68:15
69:17,24,25
70:5,9 71:17
71:22 72:19
73:13,19 74:8
74:11,18,22
75:3,7,8,19
76:9 77:10,16
77:25 79:15,22
79:25 80:6
81:6 82:9,16
83:7,17 84:8
84:15 85:7
86:1 87:4,21
88:16 89:4,14
90:23 91:5,22
92:21 93:6,9
93:12,15,20
94:8 95:2,8,13
96:4,16,20,25
98:2,18 99:9
100:17 101:1,6
101:9,23 102:5
102:17 105:8
106:25 107:12
107:23 108:10
109:19 110:12
114:10 117:25
118:9 119:7
120:4,5 121:15

124:1,2,13,18
125:11,15,17
125:22 126:4,5
126:14,16
127:13 128:9
131:5,9,14,17
131:23 134:9
135:4,9 136:9
137:10 138:12
139:11,19,23
140:24 141:2
141:10,15
142:6,15 143:6
143:16 145:3
146:15 147:14
148:8
**on-boarding**
  49:19
**once** 5:20 42:8
  42:21 77:1
  81:10
**ones** 21:13 30:23
  58:8
**ongoing** 122:22
**online** 25:4,14
  32:11,13,16,19
  33:6 36:18
  37:12,14 39:14
  46:12 48:14,18
  48:21 50:7,21
  50:22 52:11
  55:10 67:22,23
  68:4,4,8,11
  69:3 72:15,16
  76:18 78:24,24
  79:2,10,14
  80:2 82:22
  92:9,16 93:2,5
  101:17,21,24
  102:6,11 103:1
  103:22 108:22
  109:4,6,7,12
  114:5 115:1,4
  116:17 118:2
  120:12 122:5
  129:8,9 130:4

130:5,17,21
133:19 135:6
137:1,3 142:23
143:25 145:19
146:4,8,11,13
147:13
**open** 12:1
**opened** 65:23
**operation** 47:1
67:20
**operational**
27:16
**operationally**
26:24 28:3
**operations** 7:7
26:16 46:16
**opinion** 35:5,7
35:14,15,15,23
36:1
**opportunity**
146:7
**opposed** 30:20
89:6 138:25
**opposing** 99:10
**option** 52:21
67:14 147:20
148:4
**options** 51:22,24
52:4 67:11,13
88:15 148:2
**order** 27:2 59:19
71:10 108:1
118:11 123:1
125:20 142:5
142:13 147:3
147:10
**ordinarily** 16:25
78:18 83:14
**ordinary** 14:11
17:5 24:21
**organ** 66:14
**Organization**
113:18
**organizational**
12:5
**original** 47:9,10

107:10 137:18
137:19 150:10
**Oross** 1:2 2:13
4:24 31:10,22
32:9 34:23
37:10 46:11
48:13 52:17
54:21 55:3
57:20 58:25
59:9 60:9,11
60:17 61:7,21
62:14,19 63:3
66:24 67:9
69:25 71:24
72:3 74:23
76:11 77:10,22
78:4,21 80:2,6
83:17 86:1
88:10,18 92:7
94:23 97:8
98:9,11,16
99:2 100:6,10
100:18 102:10
102:22 105:11
106:21 107:12
109:13 111:21
114:23 118:18
119:15 121:6
122:16 126:6
127:16 134:13
134:23 135:3
141:19 147:9
147:21 148:5
148:11
**Oross's** 36:16
39:9 50:2
59:17 64:2
70:7 88:3
97:11 100:22
100:24 133:19
144:13 147:2
**outcome** 150:13
**outcomes** 29:10
51:3,6
**outlining** 86:2
**outright** 39:17

**outside** 114:13
**overall** 47:13,23
130:20

---

**P**

**P-e-i-f-f-e-r**
105:20
**P-i-f-e-r** 105:19
**p.m** 149:12
**PA** 2:3,9 98:15
99:25
**page** 3:2,6 30:5
30:6 31:21
49:12 56:18,20
59:7 60:19
62:13,15 63:9
65:13,15 80:6
82:9 86:1 94:3
94:7,12,13,14
94:15 100:17
107:5,6 111:3
118:16 120:1,2
120:3 123:17
123:19,22
**pages** 22:23 94:9
**paid** 52:6 89:17
104:1,2
**pandemic** 35:12
72:10 122:24
133:14 139:12
145:10
**paper** 112:3
**paperwork**
127:18 128:3
**paragraph**
107:18
**Paris** 43:22
**part** 9:5,16
42:19 43:1
45:13 47:25
59:15 61:5
66:9 76:8
102:14 103:7
130:17,17
139:9
**part-time**

104:18 112:11
114:17 130:9
**partial** 104:22
**participated**
10:22
**particular** 38:17
55:5 59:9
71:23 132:16
**parties** 4:3
150:12
**partner** 23:25
**partnership**
24:12
**pass** 133:18
**passed** 133:21
**PASSHA** 124:14
**PASSHE** 15:24
98:8 105:25
106:1,10
110:10 124:14
124:15,16,17
**path** 115:8
**pause** 5:19
**pay** 67:15 68:17
84:17 88:21
89:7,8,16,19
89:22 90:4,12
103:12,18
104:6,6,19
107:13,19,24
**payment** 92:17
**payroll** 8:20 9:4
9:5,8
**PDF** 149:4
**Peiffer** 105:16
105:18
**Pena** 12:8,23
13:13 37:8,20
39:1 44:17
58:2 59:8,21
60:13,16 61:3
66:23 71:25
74:9,15 84:6
84:15 85:7
87:5 91:17
96:2 97:22

100:23 106:14
114:22 119:18
121:17 122:1
129:3 132:5
**pending** 6:5
**Pennsylvania**
1:1,23 2:6
26:14 97:7
103:9 105:15
113:18 150:1,4
**people** 8:1 30:10
31:3 36:25
41:12 58:8
62:25 65:17
66:13 91:24
95:5 105:7
108:15,16
109:11 110:9
119:21 121:23
122:16 123:9
124:19 126:7
133:11 140:5
142:17 143:7,8
143:14,17
145:25 146:3
**people's** 22:21
**percent** 92:15
93:5 129:7
130:4
**percentage**
130:19
**perform** 101:20
102:2
**period** 25:21,24
112:22 114:1
128:19
**permanent** 7:24
**permitted** 66:16
99:13 114:18
146:11
**person** 20:23
21:4,15 30:14
32:16 34:2,10
39:14 46:18,21
46:25 47:12
48:17 50:7

Jennifer Weidman

51:1 55:20
70:11 74:3
80:2 88:22
99:15 106:11
119:3,6 123:8
124:6,25 126:2
142:22 143:24
145:11,19
**personal** 17:10
35:15,22 36:1
51:17 89:3,5
**perspective**
114:15
**pertain** 18:14
86:19 128:18
**pertained** 37:14
**pertaining** 4:24
31:11 34:22
60:8
**pertains** 71:6
88:21
**Philadelphia**
1:23 2:9
**phone** 39:7
**physical** 43:16
43:19 44:1
**physician** 127:2
127:20
**physicians**
100:22
**Picus** 7:20 13:11
**piece** 142:10
**Piper** 105:17
**place** 36:5 39:4
39:6 53:12
86:19 142:13
147:4 150:5
**Plaintiff** 1:3 2:5
**plan** 138:22
**planning** 4:21
83:15 134:15
137:5 139:13
**plans** 31:11,14
88:14
**please** 69:22
149:3

**point** 6:3 16:24
56:8 61:23,23
65:19 67:16,21
104:5,20
106:22 110:22
114:16 135:13
**policy** 3:14
40:18,19 41:7
41:11,20 42:4
44:21 45:2,5
45:10 49:2,7
53:19 54:10,13
70:19 87:15,16
89:21,24
132:11 142:16
143:18
**political** 9:14
**popular** 121:22
**portion** 11:11
77:7 129:11
146:10,12,13
**pose** 49:4
**position** 33:10
44:14 99:8
102:3 108:17
111:5 119:5
121:7 124:8
**possibility** 82:19
**possible** 6:8
66:17 140:9
**possibly** 139:14
**potentially** 29:5
**practice** 70:16
143:19
**precautions**
62:25
**prefer** 63:6
149:5
**preparation**
79:23
**presence** 129:10
**PRESENT** 2:12
**presented** 39:22
85:5
**president** 24:15
24:20,25 44:16

70:1 71:25,25
76:16 148:7
**president's**
70:18 75:17
76:4
**presumably**
141:16
**pretty** 10:4
23:14 37:6
79:4 115:10
132:12
**previous** 39:10
105:11 118:20
**previously** 67:12
137:7
**primarily** 46:17
**primary** 46:25
**printed** 43:19
**prior** 7:4,6,10
13:3,5 15:10
25:21,22,24
32:2,22 33:14
37:2 52:18
58:1 59:14
60:4 63:25
66:5,6 71:16
102:8 132:21
**privileged** 37:24
**privy** 97:25
**proactively**
143:5 144:1
**probably** 6:5,7
116:11 118:13
**problem** 123:23
**problems** 12:1
**procedurally**
67:4 70:9
**process** 6:11
7:12,25 8:24
8:25 12:13
14:5,21,24
15:4,19,20
16:13,23 17:1
17:11,14,17,24
18:2 19:8,21
19:21 26:8,9

26:11,13 28:24
30:15,19,22
31:5 41:16
42:20 52:17
53:12,15,20
54:15,18,20,24
55:3 61:5
70:24 76:2
77:7 97:18
98:3,9,11
99:15 102:14
102:21 103:2,7
111:11 129:21
132:13 133:1
143:4 144:1
**processes** 76:3
**processing**
103:3,24
**produced** 22:6
23:6 26:3
31:17 40:23
62:3 69:19
74:25 93:22
99:20 101:2
117:16 131:6
134:5
**professor** 60:16
92:7 108:15,24
126:18
**professors** 109:3
109:4,5 130:8
130:13,16
**program** 9:22
109:17
**programs** 24:2
**progression**
107:11 114:17
142:4
**Project** 97:5
**projection** 69:9
**promotion** 7:14
8:4
**promotions** 8:25
**prompted** 102:9
**pronounce**
62:16 124:16

**properly** 87:15
**propose** 54:4
**proposing** 81:22
**protection** 21:6
**protocols** 86:17
86:25 87:7
**provide** 26:21
28:25 29:8,12
47:21 49:7
57:3 60:20
67:9 86:4
87:21 107:25
124:18 133:10
**provided** 10:23
14:3 15:3
29:14,16 67:10
120:10 127:15
127:17,18,20
127:21,23
128:2,4 131:15
132:1
**provider** 35:1
127:2
**provides** 16:15
**providing** 46:24
142:16
**provision** 45:14
93:2 104:21
**provisions** 90:14
105:2
**provost** 29:18
29:19,23 76:20
77:9,14 81:17
85:18,19,21,24
147:19 148:7
**provost's** 77:8
**provosts** 85:13
**psychology**
29:22 76:22
77:4 78:7,12
83:2,12 130:16
141:1,2
**public** 9:14,21
45:17 98:20
122:8,15
127:14 150:3

150:18
**publicity** 94:24
**publicize** 98:19
**publicized** 95:4
**publicly** 46:15
**purchased** 69:2
69:6
**purposes** 112:15
120:18 132:13
140:12
**pushback**
119:18
**pushed** 115:25
**pushing** 110:19
**put** 23:13 57:15
84:8 119:25
147:4
**puts** 23:19
**putting** 90:12

**Q**

**qualification**
27:7
**qualified** 34:2,9
34:10
**qualifies** 21:5
34:5 73:18
**question** 4:6 5:1
5:4,16 6:5 14:2
14:11,23 17:13
17:24 29:7,19
35:19 39:14
47:6,9,10
50:23 54:7
64:14 67:6
72:22 80:13
82:3 84:18
113:12 114:11
120:21 124:3,5
124:12 125:5
125:16,20
135:22 136:5
136:23 138:12
138:18 143:16
145:9,17
148:16,19

**questions** 4:16
4:23 6:11
35:18 62:19
80:8 81:20
82:7 83:22
84:1,3,3 85:4
122:22 124:20
144:11 146:17
146:21 148:23
**quoted** 118:19
**quotes** 102:12

**R**

**R-a-u-e-n-z-a-...**
140:23
**R-h-o-a-d-s**
141:9
**raise** 103:23
**raised** 138:19
**rally** 111:25
**ramp** 143:9
**random** 140:3
**range** 10:4
**rarely** 76:1
**rationale** 57:3
**Rauenzahn**
140:19,23
**re-class** 8:24,25
**re-classed** 8:18
**reach** 17:20
**reached** 104:25
**reaching** 91:6
144:1
**read** 22:21
98:22 118:4
121:4
**reading** 4:3
33:14 113:21
122:21
**ready** 41:3
83:25
**real** 81:22 82:19
**really** 23:4 51:7
54:8 63:6
81:21 105:4
116:6 117:3

123:25 133:13
134:2 142:6
**reason** 26:22
33:12 72:6
77:12,25 79:8
84:7 86:3
101:19 102:1
114:11 135:9
**reasonable**
19:15 37:14
41:5 42:4 45:4
47:21 49:3
56:22 58:13
65:17 87:16
110:15 112:15
130:6 142:8,14
143:25
**reasonableness**
16:22 41:17
73:11
**recall** 32:18
61:18 62:21
63:4
**receive** 19:7
42:10,11,13,15
43:5,9 91:1
92:16 131:19
**received** 12:17
21:14 28:14
37:9 81:11
83:21 106:21
114:4 115:15
116:8 120:13
131:20 132:4
141:6
**receiving** 112:20
115:11 142:8
**recertification**
90:8
**recess** 90:24
**reclassification**
7:14
**recollection** 80:1
**recommendati...**
55:19
**recommendati...**

66:23
**recommended**
81:7
**recommending**
35:1
**record** 6:1 41:18
41:19,23 42:17
94:20
**records** 30:3
**recruitment**
10:3
**refer** 11:25
**reference** 120:7
**referral** 21:7
42:9
**referred** 81:23
82:7
**referring** 34:22
40:19 41:20
109:21 122:12
138:7
**refers** 114:12
**refresh** 80:1
**regard** 10:7
13:21,22 14:15
15:3 16:11
18:1,13 20:17
24:4,25 31:5
35:12 36:13
37:8 42:18
43:2,13 47:1
51:3,9,10
57:20 59:9
67:11 71:19
86:24 87:9
89:16 91:23
106:22 134:20
138:6,24
141:19 142:19
143:16,20
145:25
**regarding** 60:16
62:24 70:1
75:20,24 97:11
97:18 98:16
124:9 131:10

132:23
**regardless**
115:23
**regards** 86:25
**Regional** 2:8
**Register** 41:11
**registered** 46:20
**registering**
145:22
**regular** 66:11
70:24 71:9
**regulations** 87:8
**Rehabilitation**
99:11
**reiterates**
132:19
**reiterating**
82:21
**reject** 39:17
83:18 84:13,19
**rejected** 133:20
**related** 42:5
90:1 116:23
150:12
**relates** 116:22
**relation** 24:17
62:20 63:3
66:23 70:10,11
73:24 75:10
87:12 88:21
119:16 137:13
**relations** 106:7
106:9 116:11
**relatively** 66:11
104:12
**relaxes** 132:10
**release** 102:7
108:1 114:7
116:16,19
119:6
**released** 72:3
74:2 117:10
**Relief** 100:18
**rely** 5:19
**remain** 144:17
144:25

remainder
146:13
remained 8:22
115:1
remains 122:24
remember 5:10
11:4 15:8 16:6
21:9,11 30:1
30:21,23 31:1
31:7 32:1,15
32:21 48:16
50:4 58:14
60:10,18 61:4
61:11 63:24
64:4 65:23
66:3,6 69:6
74:13 89:1,9
91:5,9,12,14
91:15,21 92:5
96:11 122:21
123:16 124:21
135:6
remote 25:3,6
25:14 26:19
27:14 30:19
31:4,11,14
35:10 47:22
55:6 58:9 72:4
86:21 87:1,7
91:7,25 112:10
113:15 122:16
128:14 130:9
133:12 138:7,8
138:16 139:2,4
139:14 140:5
141:22 142:16
remotely 28:5
28:15,24 29:11
29:25 33:11
35:2 66:16
100:21 130:10
reorganization
13:7,11
repeat 5:3 29:3
67:25 73:2
140:20

repeated 118:13
rephrase 5:3
17:3 100:15
110:19 117:9
report 12:7,22
14:7 24:23
reported 15:11
150:9
reporter 5:12,23
80:20 149:1,4
149:6,8,11
150:3,18,22
reporting 1:22
13:1,4
Representing
2:5,11
reproduction
150:21
request 14:13
16:14,17,21
17:19 18:8,15
21:8,17,19
24:21,22 25:5
26:19,22 27:13
31:11,13,14
32:10,22 33:5
33:6,10,13
35:3,10 36:16
36:17,24 37:1
37:5,9 39:18
39:18,21 42:5
43:10,13 50:3
51:9 52:19
53:3,7,8,13,17
54:4,14,21
55:5,9,12,23
57:23,24,25
58:5,13,16,18
58:22 61:15
64:3 65:14
67:9 68:16
70:2,11,13
71:10 72:8,14
73:6,9,16 75:9
75:21,25 86:3
88:2,4 89:25

90:2,7 91:9,12
92:7,14 93:10
97:11 98:3,16
99:3,16 100:24
103:3 133:20
133:25 134:19
135:5 136:2,11
137:18,19
139:7 140:18
141:15
requested 25:13
36:22 58:9
73:11 89:22
91:7 100:11,18
102:23 106:21
127:22,24
129:1 136:10
136:17 137:7
requesting 25:6
27:1 29:18
55:6 57:20
111:9 134:24
requests 14:18
16:11 18:13,25
19:15 29:20,24
37:9,17 39:10
42:18 86:20
87:1,10,22
123:2 145:14
require 29:8
63:12
required 16:11
44:25 48:22
54:15 129:10
129:12
requirement
63:14 71:12
132:17 133:17
requires 111:10
143:13
rescheduling
147:8
reserved 4:6
resolve 144:17
resource 87:19
resources 6:14

6:20 7:5,7,11
7:20,23 8:22
9:2,4,7,12,20
9:22 10:1,5,14
15:11 16:21
24:2 29:13,15
29:16 44:12
49:18 83:14
87:22 121:19
respect 62:24
66:13
respective 4:3
respond 91:13
91:16 118:24
124:8
responded 91:14
118:25 119:1
responding
100:1
response 53:1
82:10 84:7
124:9,11
139:16
responses 5:24
responsibility
58:5
responsible
20:20 24:1
41:13 44:21
rest 52:2
restate 120:23
restoration 53:8
70:12,14,20
71:6,19 72:2,5
73:21 74:1,4
74:19 75:25
76:17
restraining
142:4,13
result 72:24
102:20 126:22
142:17
retaliate 99:9
retaliation 99:12
116:24
retired 7:18

retirement
13:10 89:15
retiring 7:24
return 104:18
104:21,22
108:1,2 111:3
114:17,18,18
118:22 119:5
128:9
returning 46:16
111:5 128:6
reveal 37:23
140:9
revealing 140:8
review 14:19
16:21 18:16
57:15,19 65:16
78:5 79:22,25
80:4 91:4
127:2
reviewed 21:20
28:1 39:20
44:15 57:24
58:1 66:10
75:9 79:24
84:6 93:12,15
reviews 16:18
17:20
Rhoads 141:8
Richardson
120:6,16,25
right 4:19 8:5,6
9:2 11:1 12:9
13:24 19:25
20:24 21:2
22:23 24:24
25:7 27:5
30:13,17 32:25
33:3,8 34:3,21
36:3,6,19
38:24 39:16
44:17 45:13,17
45:20,21 46:8
46:13 47:4
48:11,14,22
51:14,19,24

54:8,11 55:8
55:25 56:19,20
58:5,21 62:1
62:13 63:8,12
63:16 64:13
65:6 66:20
67:6,11 68:10
68:18 72:12,25
73:7,16,19
74:16,20 76:12
78:11,24 80:8
80:17 81:2,22
81:25 82:14
83:9,13 84:24
85:7,8,15,17
85:19 87:18
89:23 90:20
92:4 93:7,21
94:16,17 96:20
98:20 99:2,4
99:18 100:13
101:17,21
102:3 105:3
106:20 108:8
108:12,12,16
109:4 110:9,15
111:8,11,22
112:1,14,18
113:7,10,16
115:3,6,13
116:19 117:3
118:3,7,21
119:19,24
120:25 121:3,7
121:13 122:2
123:7,9 124:24
125:2,22,24
126:1,3,19,23
127:11,22
128:5 129:3,12
130:6 136:6,15
138:3,8 139:19
141:10,14,21
143:2,10
144:13,23
145:20

**rights** 24:5 97:5
97:6,24 98:15
99:18,25 111:4
113:18
**risk** 27:12 35:1
66:15
**role** 7:20,21
13:21 14:15
15:3 20:17
87:13,17
138:24,25
**routine** 103:5
**rules** 106:18
**run** 81:15 82:23
103:12
**runs** 110:12,17
**RYAN** 2:2

**S**

**sabbatical** 53:6
53:8 70:2,11
70:14,17,20,25
70:25 71:7,10
71:11,20 72:1
73:21,25 74:20
75:9,11,21,24
76:16 86:3
88:20,23 89:1
89:6,10,16,17
**sabbaticals**
71:16
**safety** 62:20
**satisfactory**
73:24 125:24
**save** 140:14
**saw** 95:5,11,15
99:24 103:21
131:14
**saying** 18:6 19:4
38:5 43:7
58:14 59:24
71:17 73:19,23
76:6 82:17
86:5 114:9
116:6,15
125:12 128:16

128:21
**says** 21:18 23:24
30:7 33:9
40:18 41:5,6
41:16 42:4
44:10,24 49:2
56:21 57:2,2
60:19,20 62:15
70:19 81:6
84:12 97:9
100:18 107:7
107:18 108:25
111:2,3 114:4
122:21 126:18
126:19 145:12
**schedule** 32:21
50:18 58:1
80:4 112:11,12
112:15 115:1,8
128:15 129:8
130:4 134:24
137:1,11,12
138:16 143:5
144:2 145:6,18
146:6,10
**scheduled** 32:12
32:19 46:20
48:17,17,20
51:1,11 52:11
68:11 79:1,13
80:2 101:16,23
103:22 114:5
115:4 129:8
145:18 146:11
**schedules**
109:10 130:9
130:14 142:19
147:15
**scheduling**
132:6 147:2,6
**school** 30:11
140:6
**science** 9:14
**sciences** 32:5
**Scott** 97:4,7
101:14

**sealing** 4:4
**searched** 120:6
**second** 12:18
38:23 49:12
69:23 107:17
107:18
**section** 2:8 21:6
45:16 111:6
**see** 5:21 7:1
12:10 16:19
21:25 34:15
45:2,10,11
57:3 58:21
69:13 70:5
77:5 81:8 82:4
95:5,6,13
96:25 105:5
107:2,4 108:6
108:10,11
116:9 120:5,9
124:1 133:22
137:19 138:3
**seeing** 33:14
98:21
**seek** 14:14
**seeks** 100:18
**seen** 41:8,10
58:13 98:1,23
100:4 124:24
125:5 131:11
**segment** 10:8,15
**selection** 10:2
**semester** 3:8,9
3:12 25:22,22
25:25 33:16,17
33:23 52:2,6
58:1 64:1 79:2
80:3 82:24
88:12 90:4
101:16 104:1
107:13,15,21
107:24 130:21
134:16,21
141:23 144:25
145:2 147:3,9
147:25

**send** 11:18,25
12:15 20:3
21:7,7 34:16
56:4 58:16,17
58:18 68:22
69:17 103:5
125:7 126:9,9
134:19 135:18
137:23 139:15
**sending** 12:13
103:6 113:23
**sends** 42:9
**sense** 88:15
89:17
**sent** 12:11,14
14:18 20:4
21:11 22:9
30:10 34:18
56:12 58:25
62:7,24 69:11
74:22 94:9
106:15 112:3
112:17 113:24
114:22 115:18
117:23 118:20
123:16 125:9
125:25 127:19
**sentence** 98:13
107:18
**separate** 26:8,12
92:17 110:5
118:14
**September**
90:10 102:22
104:14 107:3
**series** 80:8
**serious** 90:5,6
102:22 127:1
127:19 128:3
133:13
**service** 71:15
**services** 14:19
16:15,18 20:17
20:20 24:2
42:7,8,25 43:7
44:11

**serving** 122:24
**set** 71:2 150:5
**severe** 27:12
**shake** 5:22,24
**Shared** 62:18
**Sharon** 7:20
  13:10
**she'll** 69:18
**shifting** 53:2
**short** 6:6
**shorter** 82:24
  134:11
**shorthand**
  150:11
**shortly** 131:21
**show** 29:8
**showing** 12:3
**sic** 65:13
**sick** 51:17 88:23
  89:3,5 104:1
**side** 106:4
  121:20 131:17
  131:18
**sign** 19:3,7
  79:16
**signature** 19:1
  56:25 60:20
**signed** 42:22,23
  64:7 105:8
  107:7
**significant** 46:6
  49:23
**signing** 4:4
**Silberman** 7:18
**similar** 58:10
  120:19 134:20
**simple** 54:8
**simply** 29:14
  116:25
**simultaneous**
  37:2,6 80:19
**sit** 64:25
**situation** 31:25
  35:4 39:9
  57:21 59:9
  94:25 106:15

115:25 121:17
  135:18
**six** 49:15 119:11
**SO-1** 56:3 59:7
  60:23
**social** 64:24 65:5
**solid** 66:14
**somebody** 43:7
**somewhat** 52:4
**soon** 73:23
**sorry** 8:15 9:17
  12:11 18:20
  20:11 22:5,18
  23:1,4,17,18
  24:9 25:24
  27:8,25 29:3
  33:20 36:4
  37:3 40:21
  53:23 55:15
  59:12 60:13,22
  62:5 63:17
  64:14 67:25
  74:23 75:3,5
  75:12 85:3,16
  91:12,25 92:18
  92:19 96:21
  97:5,19 100:15
  102:15,16
  105:17 109:24
  110:16 112:19
  113:22 114:10
  115:16 116:21
  117:9 118:10
  120:3,9,21,23
  123:21,25
  124:3 131:2
  135:2 139:23
  140:20
**sort** 5:19 8:2
  14:23 17:15
  27:6 61:13
  67:20 88:24
  97:24 103:4
  118:14 121:18
  140:4
**sound** 5:7 44:6

**sounds** 16:4
  17:5 55:24
  90:23
**SOUTH** 1:23
**speak** 5:14
  52:13 74:15
  116:7 132:11
  132:22
**speaking** 15:25
  53:1 82:13
**speaks** 10:9
  133:17
**specialized** 69:7
**specific** 10:14
  18:13 29:17,17
  30:24 42:17
  51:9,10 57:12
  57:21 61:12,12
  62:19 63:25
  64:4 66:3
  72:24 88:14
  91:21 92:5
  111:15 112:22
  126:17 138:8
  139:2 143:7,12
**specifically** 11:5
  25:2,9 26:20
  30:23 31:1,7
  32:1 36:16
  39:11,13 41:20
  43:18 45:12
  50:12 60:4,10
  63:4 65:23
  74:13 83:18
  87:6,11 91:15
  96:11 108:22
  117:25 118:5
  123:17 135:7
**specifics** 97:25
**specified** 108:13
  139:6
**specifies** 71:8
  88:25
**speech** 99:18
**spell** 140:22
**spelled** 137:19

**spite** 59:21
**spring** 3:7,10
  33:15,17,23
  52:5 69:4
  100:8,11,21
  101:24 104:1
  105:12 107:13
  107:15,20,24
  113:5,14,19,25
  114:6,7,9,24
  115:19 116:23
  118:3 128:23
  129:1,8 130:23
  134:20 137:2
  144:25 145:6,6
  147:3,9
**staff** 23:11 86:15
  103:9,23
  104:12 105:14
  105:24 106:7
  109:22 110:8
  127:3
**stage** 104:18
**stand** 64:25
**stand-alone**
  89:24,25
**standard** 14:13
**Standards** 10:3
**standpoint** 40:5
**start** 8:10 25:22
  38:13 60:14
  63:25 76:21
  78:7 81:4
  98:13 102:8
**started** 6:10
  103:21 104:13
**starts** 94:3
**state** 10:23
  26:14,15 33:19
  33:25 34:5
  103:9 105:15
  122:14
**stated** 46:21
  113:19
**statement**
  122:19 123:11

124:5
**statements**
  122:9
**STATES** 1:1
**status** 33:15
  64:12,16 104:6
  104:19 142:22
**stenographica...**
  150:9
**step** 17:16,16
**Stephen** 1:2
  2:13
**Steve** 37:10
**stipend** 92:16
**stipulated** 4:2
**STIPULATION**
  4:1
**stop** 21:8
**stopped** 115:22
**stopping** 56:8
  116:15
**stops** 59:24
**strategic** 23:24
  24:12
**streamline**
  12:12
**Street** 1:23 2:3,8
**strict** 27:9
**strictly** 81:16
  114:12,13,14
**string** 118:12
  134:10
**student** 23:2
  76:22 77:1,21
  78:5 92:16,16
  93:4
**students** 20:21
  22:1 39:24
  40:13 45:8,20
  46:20 47:16,19
  48:1 63:7,20
  64:16 81:15
  83:23 86:16
  122:25 129:13
  145:21
**subject** 76:19

82:22 148:20
150:13
**submit** 136:11
136:13 137:14
138:15
**submitted** 21:18
71:24 90:6
102:22 104:15
140:18
**subscribed**
150:15
**subsequent**
141:6
**subsequently**
150:9
**subset** 143:7,14
**suggesting** 90:11
115:21
**Suite** 1:23 2:8
**summer** 10:24
10:25
**Sunday** 49:25
**supervise** 15:20
**supervision**
150:9,22
**supervisor**
13:10 14:21,25
15:12 16:2,23
17:15,21 42:23
87:13
**supplement**
126:25
**support** 1:22
121:10
**supportive**
121:6 133:24
**supposed** 14:5
41:23 49:7
53:12,19 79:16
133:4 147:12
147:13
**sure** 4:15 18:17
24:9 47:5,5
50:17,23 54:9
56:10 57:17
61:8 63:1

69:13 79:1
87:14 90:22
91:15 96:3
122:11 141:17
144:7 145:23
**suspended**
142:4
**sworn** 4:9 150:8
**synchronous**
134:24 135:5,6
136:20 137:2
137:10,16
138:10,19
139:25
**system** 10:23
26:14,15 103:3
103:8,9 105:14
105:15 106:3,7
106:17 109:22
110:8 116:9
119:10 125:13
141:25
**systems** 65:10

— **T** —
**take** 5:12,23 6:3
6:6 20:1 22:4
26:2 31:16
34:14 39:4,6
40:20 49:15
53:12 56:2,5
58:24 69:10,22
74:24 90:16
93:21 99:23
101:5 107:20
119:11 131:1
134:8 137:15
138:11,21
144:4,5
**taken** 4:17 59:4
90:24 144:8
150:4
**takes** 81:15
**talk** 50:2 59:8
83:25 85:10,18
85:24 91:17

96:2,10 98:19
108:16 112:24
115:7,16
121:17 123:7
128:23
**talked** 24:4
44:11 50:5
72:20 74:8
77:3 81:6
84:14 85:21
96:13 111:25
140:4
**talking** 21:2
25:5,12,15,16
39:10 51:21
53:6 65:20
69:5 77:15
82:2 85:20
101:15 110:13
110:21 113:3
114:9 128:5,6
128:10 132:11
143:7,8,14
144:12
**talks** 18:2 20:19
30:13 111:4,4
111:6 122:22
122:25 127:5
132:16 134:15
**tangible** 82:17
**taught** 28:4
76:18 93:5
**tbd** 76:19
**teach** 28:14,24
29:10,25 31:14
32:12 33:4,10
48:20 51:1,11
52:11 55:20
68:11 72:3
74:3 77:23
78:22,24 79:2
79:14 80:2
82:22 88:11,18
92:8,15 100:20
101:16,24
102:6,11 103:1

103:22 104:16
108:22 109:4,6
109:7,11 114:3
114:5,6 115:4
116:17 118:2
119:6 130:16
146:4,7,8,11
147:25
**teaching** 25:7,14
30:19 31:4,12
35:1,10 46:18
47:22 49:19
50:10,16 51:18
55:7 58:9
67:22 68:3,7
78:23 91:8,25
93:2 101:21
108:5,21,25
117:13 119:3
120:12 124:6
124:25 130:10
130:17 134:24
137:11,12
138:16 140:6
142:19 146:12
**team** 66:10
86:11,14
**technician** 8:19
8:19
**technology** 69:1
69:2
**telecommuting**
65:17
**telephone** 76:10
**tell** 5:5 8:8 9:11
10:6 11:2 12:6
17:16 22:16,16
24:3,13 26:7
26:10 27:10
28:11,16 41:3
61:9,24 67:3
70:9 71:22
88:20 96:4
97:22 99:24
100:5,10
102:18 110:6

111:13 114:23
131:14 135:10
135:13 144:23
**telling** 17:6
52:21 114:21
**tenure** 70:15
**tenured** 28:4,12
108:15 109:4,5
130:8
**Teresa** 150:3,18
**term** 119:16
**terminated**
116:1,18
**termination**
110:20 116:2
**terms** 9:7 14:8
15:20 25:3
28:23 51:12
53:2 71:13,15
81:21 87:13
93:6 127:6
133:1 135:13
142:16
**terrible** 135:21
**testified** 4:9
147:20
**testify** 150:8
**testimony** 150:5
150:8,15
**Thank** 140:24
146:17 148:23
149:6,11
**thereof** 150:14
**thing** 5:21 79:4
88:24 118:17
134:25 136:3
139:7 145:24
**things** 5:10 6:9
9:17,19,24
10:2 65:12
97:9 112:23
113:1 116:10
116:15,22
117:3 118:13
138:23 140:3,4
142:2 143:21

think 35:2 36:9
  37:2 39:11,11
  68:21 80:12
  84:1 88:8
  89:11 93:19
  94:6 95:15,21
  102:1 104:7,9
  105:20 111:5
  113:13 114:25
  118:19 124:14
  124:23 135:7
  136:16 137:24
  138:18,20
  139:20,24
  140:1,2 141:8
  141:9,11
  143:19 144:10
  144:23 147:22
  147:23
thinking 5:17
third 94:7
thought 35:8
  58:12,15 93:18
  116:14 117:2,6
  117:8 128:20
threatened
  116:1
three 25:19 31:3
  36:20,20,22
  44:20 94:11
  140:5
tie 140:4
tied 90:1
till 104:10
time 1:13 4:6
  7:18 15:12
  19:13 25:19,20
  27:13 30:22
  31:24 36:21,23
  37:6 39:12
  46:15 49:17,21
  50:17 52:1,22
  61:23,24 63:13
  63:16,18 65:13
  65:20,25 66:1
  67:15,16,22

68:17 69:4
  78:22,23 79:20
  80:5 81:9
  83:24 85:25
  88:22,23,24
  89:3,5 90:17
  98:7,21 110:13
  110:18 111:14
  112:22 113:23
  113:24 114:21
  120:15,24
  129:11 131:19
  131:21 134:20
  140:14,17
  144:5 146:18
  150:5
timeline 103:11
  116:25 142:3
timelines 104:11
times 13:20
timing 84:3
tired 135:22
title 6:15
titled 12:18
titles 50:13
today 4:16,22
  60:24 79:23
  98:24 137:25
  138:13
told 19:22 20:22
  36:19 58:12,15
  74:8 80:21
  81:25 82:16
  87:12 115:13
  117:10 124:23
top 15:8 16:8
  28:11 30:1
  41:6 50:4
  62:15 63:9
  89:2,10 118:17
  130:25
topic 38:17
  80:10 81:5
topics 13:17
  80:16,22 81:2
  81:16 83:24

touch 36:6
training 9:12,17
  9:20 10:6,21
  10:22 15:2,5,7
  15:17,25
trainings 15:9
  15:24
transcribed
  150:9
transcript 149:2
  150:10,21
transformation
  40:12
transition 49:22
transmittal 94:6
  101:9
transmitted
  67:5
transplant 33:16
  33:22 35:10
  55:7 64:22
transplants
  66:15
trial 4:6
tried 12:12
TRO 135:12
trouble 6:21
  78:1 118:25
true 46:21 53:18
  54:13 106:20
  106:24 123:3
  150:10
truth 150:8
try 5:16 6:7
  22:21 121:17
  135:22 144:2
trying 15:17
  21:9 69:13
  109:19 141:8
  141:11 142:9
turn 31:9
two 25:1 32:12
  36:25 38:18
  46:11 48:14
  51:17 52:11
  59:12 68:11

76:18 79:14
  81:4 82:22
  94:9,11 101:24
  115:4 116:10
  129:9,9 140:16
  140:18 146:9
  147:23 148:11
  148:13,18
two-page 94:5
type 73:5,10
  113:14 138:8
  139:2
types 112:8
typical 19:16,18
typically 24:22
  91:4 98:6
  139:8

_____

U

Uh-huh 11:12
  11:14 80:9
Um-hum 20:13
  21:3 31:23
  56:24 71:1
  95:12 97:3
  101:12,18
  111:23 118:15
  134:14,17
  146:2
umbrella 24:11
unaware 41:24
  76:4
understand 5:1
  5:5,7 6:13
  15:18 24:9
  36:2 38:2 43:1
  50:23 54:17
  64:20 68:10
  70:23 72:19
  79:5 95:25
  126:16 133:16
  136:9,23,25
  142:9 143:6
understanding
  33:12 46:3
  49:6 68:6,13

68:16 77:14
  103:10,16
  105:1 106:8
  108:9 114:8
  119:9,13 129:7
  134:3 144:16
  144:20,24
  147:14 148:8
  148:10,17
understood 6:2
  33:16 114:25
  124:1 125:19
  128:20 142:12
  143:11
undue 39:22
  40:8,14 45:1,7
  46:4,5 49:4
  72:17,21
unfold 7:12
Unfortunately
  33:9
union 71:2,6
  91:6
unit 88:25
UNITED 1:1
universities
  131:16
university 1:5
  3:14 4:25 7:18
  8:12 20:21
  23:25 24:12,14
  26:16 37:20
  41:7,11 46:17
  47:2,13,18,24
  54:10 63:13
  69:2,6 71:14
  74:14 82:14
  95:22 97:10
  98:2,14 100:7
  100:19 108:20
  119:10 130:20
  132:19 133:18
  133:21
university's 66:9
  86:17
unknown 78:10

unlawful 99:11
unmet 83:10
unpaid 52:1,22
unpleasant
  121:21
unpopular
  121:20
unreasonable
  35:3,9 45:9
  46:6
unusual 121:21
update 61:13
  122:20
updated 102:22
  136:12 139:18
upset 95:25
  115:10
use 50:19 51:25
  78:1 104:2
  119:16 133:15
  146:13
uses 52:21

**V**

vacancies 111:7
vacation 88:24
  89:3
vaccination
  64:12,16
valid 138:18
variety 13:16,17
Various 3:13,17
  3:22,23,24
verbal 5:23
verbally 86:9
versus 89:18
  137:16 138:10
  139:25
vice-president
  7:16,19 12:8
  28:1 44:12,19
  91:6
virtual 149:12
  150:4
vocal 121:2
voilà 145:10

VS 1:4

**W**

wait 5:15,16
waiting 20:5,8
  56:14,15
waived 4:4
want 12:6 90:20
  94:2,18 102:17
  105:20 110:6
  129:16 132:12
  136:3 137:20
  140:3,10
  143:20 144:4
  145:1
wanted 32:10
  47:15 103:23
  111:21 113:14
  113:16 129:7
  137:10 139:21
  141:17 145:19
  145:24
wants 63:6
  114:23 145:11
wasn't 26:19
  32:13 33:3
  38:5 51:18
  72:5 74:4 93:9
  117:4 120:15
  120:24 122:1
  125:17,23
  133:25
way 5:22 16:13
  18:12 28:25
  68:2 77:21
  78:3 92:12
  95:23 99:2
  103:24 116:11
  120:16 124:9
  130:11 133:23
  136:6 141:20
  142:10 144:12
  144:18,25
  145:2
we'll 6:7 69:14
  69:15 90:17

141:16
we're 4:21 5:17
  5:18 19:9
  39:15 48:2
  49:10 53:2
  55:15 60:22
  65:20 69:5
  74:19 75:3
  93:19 95:24
  110:13,18,21
  111:14 112:21
  128:10 139:13
  140:13 143:1,2
  143:6,8,13
  144:10 148:24
we've 44:11
  73:13 87:23,24
  134:11 137:24
  138:13 141:24
  142:18,25
wear 63:8,20
website 20:16
  23:9,10,13
  127:13,14
week 12:4 13:20
  43:22
weeks 11:9
  13:19,19 104:2
  104:8,10
Weidman 1:10
  3:3 4:8,14
  11:24 91:1
  147:1 150:6
weird 94:16
welcome 146:19
went 30:22
  81:25 140:2
weren't 26:24
  50:22 52:16
  84:22 85:1
  113:25 128:25
West 2:3,3
whatsoever 45:4
  50:15 68:3
wheelchair
  143:9

whereof 150:15
winter 101:15
  103:22 104:17
  114:3 118:3
wish 136:13
withdraw 67:5
withdrawing
  67:6
witness 3:2 4:8
  37:22 59:10
  150:7
WOLFE 1:22
wondering
  83:20 138:24
word 78:1
  119:18 143:18
  143:18
words 8:1 21:23
  43:15 75:18
  78:5 106:19
  110:23 130:9
  137:13 146:5
work 7:15 10:2
  10:15 13:3,8
  14:20 26:8,17
  26:19 27:3,14
  27:14,16 28:3
  28:5,14 29:24
  30:10,20 35:2
  66:16 72:10
  73:20,22 86:21
  87:1,7 104:18
  104:21,23
  108:1 110:14
  111:4,22
  112:11,11,12
  112:15,20
  113:16 115:7
  116:19 117:10
  118:23 122:17
  123:5 128:14
  128:15 130:9
  133:12 135:11
  141:22 145:11
worked 135:13
working 7:5 9:1

114:1
workplace 133:4
works 16:13,22
  70:10 103:24
  105:24 111:16
worry 69:15
  145:8
wouldn't 24:22
  28:21 46:12
  47:12,23 48:21
  48:24 61:5
  64:15 78:15
  82:6 89:9 98:4
  106:22 109:12
  115:24 132:14
write 102:9
writing 36:7
  57:9 89:22
  124:19
written 14:4
  44:22 45:11
  86:9 105:4
  108:11
wrong 70:24
  120:2 121:24
wrote 52:9 57:5
  80:7 84:14
  85:3 86:1
  136:19
www.klwrepo...
  1:24

**X**

X 3:1

**Y**

yeah 22:5 60:23
  62:11 93:20
  94:5,19 96:20
  98:12 100:15
  102:19 111:2
  111:21 118:18
  120:23 123:21
  138:1 140:1
  145:12
year 8:7,17

Jennifer Weidman

19:17,18 25:23
26:9,14 27:3
28:4,7,9,15
29:25 30:11,18
31:4,5 48:7
49:17 52:7
120:19 123:3
131:11 140:6
143:21
**years** 8:6,18
25:1 59:12
71:15
**Yep** 56:12 94:1
115:14
**yesterday** 76:11

---

**Z**

**Zeigler** 2:7
**Zoom** 1:10 5:11
22:22 39:7
92:23 94:18

---

**0**

---

**1**

**1** 94:13,15
**1-877-KLW-D...**
1:24
**1:00** 90:21
**10** 3:10 23:5,6
23:21 111:3
**10,000** 48:10
**10/13/21** 3:20
**10/14/21** 3:18
**10/4/21** 3:19
131:18
**10/5/21** 131:18
**10:02** 1:13
**100** 129:7 130:4
**101** 3:20
**11** 3:12 26:2,3
**117** 3:22
**12** 3:13 31:16,17
49:10 104:2,8
**12-week** 103:25
**12.1** 120:11
**12/8/21** 3:8

**12:23** 90:19
**12th** 34:8
**13** 3:14 40:20,21
40:22,23
**1303** 1:23
**131** 3:21
**134** 3:23
**13th** 101:10
102:10 112:18
**14** 3:16 69:19,22
**146** 3:3
**14th** 97:7
**15** 3:17 51:17
74:25 75:4,5
75:14
**150** 28:20
**15th** 150:15
**16** 3:18 93:21,22
**1600** 2:8
**17** 3:19 99:20
100:2 104:3
**18** 3:20 101:2,5
107:5
**19** 3:21 7:22
131:2,3,6
**19102** 1:23
**19103** 2:9
**19382** 2:3
**19th** 107:2,7

---

**2**

**2** 63:9 65:15
94:3,14 137:21
137:22
**2:44** 149:12
**20** 3:22 8:6
117:16,19
131:1
**200** 123:2
**2000** 8:15,17
**2008** 8:20
**2015** 8:21 9:2,9
**2017** 44:15
**2019** 7:8,16 8:22
8:23
**2020** 6:20 7:2,23

8:13,14 10:24
11:13 13:2,9
28:10 30:11
69:4
**2020-2021** 26:13
30:12 31:8
**2021** 10:25
11:13 25:25
31:22 33:17,23
33:24 66:4
69:5 107:2,8
127:24 128:4
130:22
**2021-22** 131:11
**2022** 1:13 3:7,10
100:21 147:3,9
150:15
**2023** 150:25
**21** 3:23 28:10
30:11 134:5,8
**21-5032** 1:4
**215** 1:24 2:9
**21st** 118:21
**22** 3:7,24 62:2,3
65:13
**23** 3:10
**230** 1:23
**238** 2:3
**23rd** 8:7,8
**24th** 70:1 95:9
**25** 150:25
**25th** 118:17
**26** 3:12 62:18
147:22
**27** 147:22
**27th** 85:2,23
86:8 119:2
**29th** 103:18
104:8 113:11
116:18
**2nd** 31:22 36:7
49:14 50:1

---

**3**

**3** 12:4 56:18,20
59:7

**3/2/22** 3:11
**300** 2:8
**30th** 80:7 83:22
85:4,23
**31** 3:13

---

**4**

**4** 3:3 11:19
12:10,15,19
82:9 107:5
120:10
**40** 3:14
**400** 48:5 121:9
**436-6060** 2:4

---

**5**

**5** 100:17 120:1
**504** 21:6
**560-2141** 2:9

---

**6**

**6** 20:2 22:23
**6/23/22** 107:20
**610** 2:4
**62** 3:24
**69** 3:16

---

**7**

**7** 1:13 69:10
86:1 120:3
**7/30** 62:15
**74** 3:17
**75** 52:5
**7a** 123:17,24
124:2

---

**8**

**8** 22:4,24 34:14
123:19
**8/11/21** 3:16
**8/24/21** 3:16
**8/8/21** 3:8,9,12
**80** 92:15 93:5
**8th** 49:15 50:2

---

**9**

**9** 3:7 22:5,5,6,11

**9/23/21** 107:19
**90** 52:6
**922-7112** 1:24
**93** 3:18
**99** 3:19