## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN OROSS, III                          :

    Plaintiff                          :           CIVIL ACTION
                                 :
                                 :           NO. 21-5032
       v.                          :
                                 :
                                 :

KUTZTOWN UNIVERSITY, *et al.*:

    Defendants

## PLAINTIFF'S AMENDED MEMORANDUM OF LAW IN SUPPORT OF
## HIS MOTION FOR SUMMARY JUDGMENT

Dr. Stephen Oross, III, a tenured professor of Psychology at Kutztown University ("KU") brought this lawsuit against the University and the named defendants pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C. §794, *et seq.* (Section 504) to redress their refusal to provide him with a remote work accommodation after he was medically released for full-time employment in August, 2021, several months after receiving a heart transplant. His medical conditions and the drugs he needs to prevent organ rejection suppress and compromise his immune system, he is at high-risk for serious illness or death if he contracts Covid-19, so it was necessary for him to resume his professional duties at KU remotely, not in-person. It is hard to imagine a clearer case of entitlement to a remote work accommodation under Section 504, but KU denied his request without engaging in an interactive process and then forced him onto a leave without pay ("LWOP") pursuant to a blanket no-remote work accommodations rule its administrators designed weeks before he made his request, and that dictated its outcome.

Based upon the uncontested facts and admissions on the record, Dr. Oross brings this motion pursuant to Rule 56 for summary judgment as to his discrimination claims in Count I of his Complaint (failure to accommodate), Count II (facially invalidity of KU's full-duty standards), Count III (intentional discrimination), and Count V (prohibited standards, criteria, or methods of administration). He also seeks judgment against KU for its interference with his rights under Section 504 and for violations of his right to free speech and expression guaranteed by the 1st and 14th Amendments and Section 1983 in Counts IX and X.

## SUMMARY OF THE UNDISPUTED FACTS

As evidenced by the Statement of Undisputed Facts ("SUF")(Doc. No. 45), most of the essential facts relating to Plaintiff's claims have been admitted, and there is little to dispute about the basic chronology, most of which is documented in writing. There is no reason to reiterate that extensive factual presentation, which this Motion incorporates by reference. This summary highlights the most salient undisputed facts as they relate specifically to the claims upon which Plaintiff seeks summary judgment, and briefly explains why some of the facts Defendants either have either not admitted, or have attempted to dispute, do not present genuine issues for trial.

### 1.    Statutory Coverage

There is no dispute that as a federal fund recipient, KU is a covered employer under Section 504. **SUF ¶1**. Likewise, Defendants admit that because of his heart condition and his solid organ transplant, Dr. Oross has a covered disability under Section 504. ***Id., ¶¶-3; 8***. They do not dispute that the immune-suppressing drugs he needs to prevent organ rejection place him at high risk for serious illness or death if he contracts Covid-19, and that these impairments to his immune functioning

significantly restrict the location and manner in which he can safely interact with others. *Id.,* ¶¶ **14-16.**
According to the CDC, it is "especially important" for people like Professor Oross "to protect
themselves from getting COVID-19." Among other things, they should "limit their interactions with
other people as much as possible," and avoid public settings, in-person visits, and "events or
gatherings." *Id.,* ¶**18.**[1] Accordingly, although Dr. Oross's medical team at Hershey Medical Center
released him to return to work in August, 2021, they specified that he should do so remotely to limit his
risk for contracting infection. They imposed no other restrictions on his ability to work. *Id.,* ¶**17; 19.**

## 2.    Pre-Request Inquiry

Professor Oross told his Dean and the Psychology Department in July that he was "trying with
all [his] might to return to work on campus for the 2021 fall semester. **Exh. K at 1.** He was scheduled
to teach his four courses in-person, something that had been determined before he went on medical
leave at the end of the 2020 fall semester, well before his heart failed, and before he knew he would be
having a heart transplant. No one foresaw how long the pandemic would last, so that was not taken into
account during the scheduling process. **SUF ¶12-13.** At that time, Dr. Oross was teaching all four of
his courses remotely, as he had been doing since the Covid-19 shutdown started in March, 2020. *Id.,*
¶**11.** Even before the pandemic, he had taught each of his courses in remote formats many times over
many years. Ordinarily he taught at least one course online during the regular school year, but in
planning for fall 2021, his Department Chair suggested listing them all in-person because that would
reserve classroom space, thereby making it easier to convert them to a different modality if that became

---

[1]    *See generally* Simson, Gary J., *"It's Alright Ma, It's Life Only: Have Universities
Been Meeting Their Legal Obligations to High-Risk Faculty During the Pandemic?,* 48 Pepperdine
L. Rev. 649, 662-67 (2021).

necessary. **Exh. Z, 65-66.**

Under President Hawkinson's plan for the 2021 fall semester, all faculty were expected to return to work on campus. **SUF ¶¶22-30.** In consultation with his medical team, Dr. Oross asked what safety protocols would be in place. Jennifer Weidman, the Director of Human Resources ("HR"), confirmed in an E-mail on July 27th that there would be no masking, vaccine or social distancing requirements, and that KU had made no changes to its existing HVAC systems. *Id.,* **¶¶ 20-21.** Professor Oross sought permission from the Dean to teach all of his classes remotely, and then asked Weidman what type of medical documentation she would need to support that request. *Id.,* **¶32.** Almost a week later, on August 8th, she said there was "no provision for him to convert in-person courses to on-line modality for the Fall," and that "flexible work arrangements only pertained to the last academic year." *Id.,* **¶33.**[2] Although he could apply for ADA accommodation, due to "the constraints within which we are operating at this time," a shift in a course scheduled as in-person to an online modality would be considered "a fundamental alteration" to the "essential nature" of the services the University offered, and therefore not reasonable. His only option would be LWOP for the fall semester. *Id.,* **¶36-41.** When Dr. Oross asked why shifting his classes to a remote format would constitute a "fundamental alteration that by definition, and without further inquiry, would be unreasonable," she told him that if he submitted a formal accommodation request, it would be evaluated pursuant to KU's reasonable accommodation process. *Id.,* **¶42.** Defendants admit that the legal standard for evaluating employee requests for accommodations under that policy and Section 504 alike is undue hardship, not

---

[2] "Flexible work arrangements" during the Covid-19 shutdown were not accommodations under the ADA, and are not relevant to any of the issues in this case. *Id.,* **¶¶34-35.**

fundamental alteration. *Id.,* ¶77. Likewise, KU has no policy calling for the denial of employee requests for reasonable disability-based accommodations on the ground that it "fundamentally alters" any of the University's course offerings, services or methods of operation or administration. *Id.,* ¶76.[3]

### 3.    KU's Reasonable Accommodation Policy for Employees and Creation of the Blanket No-Remote Work Accommodations Policy

During her communications with Dr. Oross in early August, Weidman not only misrepresented the legal standard for evaluating accommodation requests, but also failed to disclose that the "constraints" under which she said "we are operating at this time" had been imposed by KU's administration, with her full participation, in the form of a blanket policy designed specifically to deny all requests by high-risk faculty for remote work accommodations. Alexis Martin, the HR employee charged with conducting the interactive process ("IAP"), testified that well before Dr. Oross made his request for accommodation, "as these types of requests were coming in," KU's administration, including Weidman and Pena, "were already in talks to develop broad language as to how we were going to deny these." *Id.,* ¶¶ **59, 70; Exh. V at 30-31; 50-51.** There was no discussion about different circumstances for different people. Remote teaching assignments were "no longer an option anymore." *Id.* **at 21.**

The "blanket policy" KU's administrators designed for high-risk faculty needing remote work accommodations directly contradicts the University's governing ADA policy for employees which requires each request to be evaluated on an individual basis to determine whether the accommodation

---

[3]    Fundamental alteration is a public accommodation standard under Title III of the Americans with Disabilities Act. 42 U.S.C. §12201 (f) & 42 U.S.C. §12182 (b)(2)(A). Title I and Section 504 require employers to provide reasonable accommodations unless it would create undue hardship. 42 U.S.C. § 12111 (8); *Ford v. Schering-Plough Corp.,* 145 F.3d 601, 612 (3d Cir. 1998).

can be provided without undue hardship, which the policy correctly defines in accordance with Section 504 as "significant difficulty or expense." **SUF ¶¶47; 50; 69-70.**[4] Absent such hardship, accommodations "should be provided." *Id.,* **¶52.**

Defendants admit that for people with impairments and disabilities that place them at higher risk for serious illness or death, returning to campus is inherently less safe than it is for people without those risks. KU's senior administrators adopted the blanket no-remote accommodations policy in accordance with Hawkinson's plan to require all faculty to return to work in-person, without exception, even if they had health conditions or disabilities that placed them at high risk for serious illness or death. *Id.,* **¶¶ 28; 31; Exh. Y at 15; 23-24.** Thus, while the pandemic placed the entire faculty at risk for Covid-19, Dr. Oross and other faculty whose disabilities placed them at high-risk faced terms and conditions of employment that were significantly more dangerous as Covid-19 continued to wreak havoc on the most basic aspects of everyday life for the people who were most vulnerable to its worst consequences. **SUF ¶116.** The CDC's "Guidance for Institutions of Higher Education (IHE) recommended "options for accommodations, modifications, and assistance to students, faculty, and staff at increased risk for severe illness that limit their exposure to risk and allow for education and or work opportunities (such as virtual learning, telework, and modified job responsibilities), both as a matter of public safety and health equity. *Id.,* **¶ 29; Exh. CC at 10; 14.** Nonetheless, Hawkinson, intended to allow no changes in course modality to enable high-risk faculty to convert classes previously scheduled to be in-person to a remote delivery format unless he was ordered to do so by the Governor.

---

[4]    The mechanics of KU's process for evaluating employee requests for reasonable accommodation is set forth at SUF ¶¶ 43-52.

**SUF ¶ 30; Exh. Y at 41; 65.** The blanket policy was designed specifically to foreclose remote work accommodations for high-risk faculty like Dr. Oross crafted to avert the IAP by making his individualized circumstances irrelevant.

4.     **Request for Reasonable Accommodation and Automatic Denial**

In accordance with KU's employee ADA policy, Dr. Oross submitted a request for a remote work accommodation and supporting medical documentation on August 11, 2021. Other than teaching his courses synchronously, he requested no changes to the course requirements, materials, or learning objectives for any of his classes. **SUF ¶¶54-55.**[5] That request triggered KU's duty to engage in the IAP, and it is undisputed that no such process occurred. **Id., ¶¶58.** Using the template provided, Martin prepared the paperwork for Weidman's signature stating that "converting an in-person course to online would constitute a fundamental alteration in course delivery." It is undisputed that the denial was based on the blanket policy, not Dr. Oross's individualized circumstances, that his request was practically feasible, and would have entailed no significant difficulty or expense. **Id., ¶¶ 54-67; 78-86.**[6] That was not why it was denied. **Id., ¶66.** Indeed, KU has not pled undue hardship as an affirmative defense. **Doc. No. 1, ¶¶ 134-36.**[7] Neither the Dean nor the Department Chair objected to providing the

---

[5]      Defendants now admit that there is nothing in the CBA that makes it essential to conduct office hours in person. **SUF ¶ 27.**

[6]      Defendants senior administrators have tried to create a factual dispute by claiming that Weidman conducted the IAP for faculty seeking remote accommodations, not Martin, but there can be no dispute that no one did. Those shifting explanations from witness to witness what Martin says she did at Weidman's and Pena's direction, and Weidman admits that she did not conduct an IAP. **SUF ¶¶ 61-65.**

[7]      *Willis v. Conopco, Inc.*, 108 F.3d 282, 286 (11th Cir. 1997) ("undue hardship is an affirmative defense to be pled and proven by an ADA defendant."). *See also Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007); and *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000).

accommodation, but Weidman never spoke with either of them, nor did she know how disruptive it would be for them to find replacements faculty to teach Dr. Oross's specialized classes. **SUF ¶¶64-65; 73-74.**

### 5.   Denial of Professor Oross's Request for Medical Sabbatical

On August 24, 2021, Professor Oross requested a restoration to health sabbatical, not for purposes of accommodation, which had already been denied, but to prevent the financial hardship he was about to experience under the forced LWOP. **SUF ¶¶ 87-88.** By this time he had begun speaking out publicly about KU's systematic refusal to provide remote accommodations to himself, other faculty, and to students. This was not in the course of his job duties, as he was not working, and certainly not on KU's behalf, but as a private citizen on what had long been an issue of broad community concern, for faculty, staff, and students alike. *Id.,* **¶¶ 106-110.**

Hawkinson denied the sabbatical without speaking with Dr. Oross, purportedly because he had been released to return to work. *Id.,* **¶¶ 89-91; 93.**[8] When Weidman conveyed the news to Dr. Oross, she said Hawkinson had asked her to review "the other options for the fall semester." It is undisputed that she had never presented any option other than LWOP. *Id.,* **¶¶ 94-95.** Now she wrote that KU was considering adding 2 "high demand" on-line psychology courses to the fall schedule, not for purposes of providing him with a reasonable accommodation, but "to meet student need" in the Department. *Id.,* **¶96.** She did not identify what the classes would be, but she encouraged Dr. Oross to discuss that with his Chair and the Dean, and then let her know by the end of the day on August 30th,

---

[8]      Dr. Oross had been released to return to work remotely, not in-person. Furthermore, Hawkinson claimed that he denied the sabbatical based on past practice and established criteria in the PASSHE system, but there was no such practice or criteria. **SUF ¶¶ 92-93.**

the first day of the semester. *Id.,* ¶¶97-98. Dr. Oross reported to Weidman on August 30th that the information he obtained from the Department was that it had no plans to add new courses to the fall schedule. Therefore, without further details, he had no meaningful basis to either accept or reject her "offer." *Id.,* ¶¶ 100-101. What would the courses be? When they would start? And how students would know about them? Those were reasonable questions, Weidman admits, but without answering them, she said because he was "not able to accept our offer," Dr. Oross's only option was to continue on sick leave. *Id.,* ¶¶ 102-103.[9] The Psychology Department had never offered any "high-demand" courses during the past five years, nor did it do so during the 2021 fall semester. *Id.,* ¶¶96; 104.

6. **Professor Oross's Protected Activities and the Imposition of the Full-time/Full Duty Rule**

Professor Oross continued to speak out during September and October about KU's treatment of immune-compromised faculty, staff, and students, both on the faculty listserve and on social media. He also spoke with the press, and was featured in a number of newspaper articles and other publications, including one on the front page of the Philadelphia Inquirer on September 24th. SUF ¶¶ **111-118; 121-129; 145.** Defendants admit that his statements and other expressive activities constituted protected activity under Section 504 and the 1st Amendment. *Id.,* ¶¶ **119-120; 130.**

---

[9] The accommodation request was denied before Dr. Oross asked for a sabbatical, so it is puzzling why Defendants have tried so hard to create a factual issue about whether Weidman told Dr. Oross that the classes she was "offering" would start mid-semester, something her E-mail did not convey. No one disputes that there would have been no classes to "offer" unless the Department identified a need for them, which it never did. Even if KU's effort to blame Dr. Oross for rejecting its "offer" to teach unidentified classes that never materialized were not factually baseless, it would be irrelevant because he did not request the sabbatical for purposes of accommodation, and Defendants admit that they did not make their "offer" for purposes of accommodating him. SUF ¶96.

On October 4th, Disability Rights-PA (DRP) sent a demand letter to Defendant Pena on Dr. Oross's behalf outlining his failure to accommodate claim, seeking his reinstatement with accommodations for the spring semester and reimbursement for the pay and other benefits he had lost since the beginning of his forced LWOP. *Id.,* **¶¶131-132**. Pena told Hawkinson about the letter, and sent it to Michael Ferguson, an attorney in PASSHE's legal office. After collaborating with Pena, Ferguson responded on KU's behalf on October 14, 2021. *Id.,* **¶¶133-134; 140-141**. Among other things he said that "if and when [Dr. Oross] desists from publishing his case in a public manner," KU would engage in an IAP. But "neither he nor the University" would engage "in a PR battle with him." He provided a link to Professor Oross's Facebook (FB) page.[10] *Id.,* **¶¶142; 144.**

There is no dispute that an individual's right to the IAP under Section 504 cannot be conditioned on the forfeiture of other rights, including but not limited to the right to free speech. **Exh. W at 99.** Furthermore, Ferguson's letter came the day after Weidman specifically said in her own letter that there would be no such process. In her October 13th letter, she purported to grant his "request" for extended LWOP from 9/23/21 through 6/23/22, although it is undisputed that he made no such request. **SUF ¶¶ 148-150.** She also said that unless he produced a "full-time, full-duty" medical release by December 29, 2021, he could not return to work at all, not even to teach the classes that were already scheduled to be online. Absent release, his medical benefits would expire that night. Thereafter

---

[10]     Dr. Oross had never used FB to share "written information" regarding himself and KU's administration "in a public manner" until October 8th. **SUF ¶146.** None of the defense witnesses admit having provided Ferguson with FB link, but that is immaterial. There is no dispute that Pena reviewed the letter before it was sent, and that Ferguson was speaking on behalf of the University and within the scope of his authority. Both Hawkinson and Pena received the letter and neither of them ever disavowed it. **SUF ¶¶155-156.**

-10-

he would have "limited return to work rights" and KU purportedly would have the discretion to terminate him. *Id.,* **¶¶ 151-152.**

Weidman's letter did not define "full-time, full-duty," so on October 21st Dr. Oross asked for an explanation. *Id.,* **¶¶ 153-154; 157-158.** On October 25th, having waited 93 hours for an answer, he E-mailed her again, this time copying Hawkinson and Peña as well as the faculty and administration. Finally, after 129 hours, Weidman said that full-time/full-duty meant "in-person, in the classroom." *Id.,* **¶¶ 160-161.** Hawkinson testified that he did not know what full-time/full-duty meant, and Defendants have now admitted that there is no such policy. Weidman knew from the outset what it meant because she orchestrated it with PASSHE's benefits office: "I would like to specifically highlight," she said, "the fact that he will not be able to teach the online winter class he is scheduled for, nor the 2 online classes in spring. Any suggestions on how to insert a line to that effect in here somewhere?"[11]

## ARGUMENT

## I.    PLAINTIFF IS A QUALIFIED PERSON WITH A DISABILITY

A qualified person with a disability is one who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position. 42 U.S.C. Sec. 12111(8); 29 C.F.R. § 1630.2 (m); *Turner v. Hershey Chocolate USA,* 440 F.3d 604 (3rd Cir. 2006); *Deane v. Pocono Medical Center,* 142 F.3d 138, 145 (3rd Cir. 1998). There can be no genuine or material dispute that Dr. Oross is "otherwise qualified" for his position as

---

[11]    It is apparent that Weidman had begun preparing for Dr. Oross's termination by mid-September. **Exh. P.**

-11-

Associate Professor, with or without accommodation, a job he has held and fully performed since 2002, and for which KU granted him tenure in 2008. **SUF, ¶¶ 4-7.** Furthermore, given remote access to the workplace, Dr. Oross is fully capable of performing the job just as he is doing now, and has been doing since the Court issued the TRO in December, 2021, including teaching all of the same courses he was scheduled to teach during the 2021 fall semester. *Wishkin v. Potter*, 476 F.3d 180, 187 (3d Cir. 2007) (plaintiff had been performing essential job functions for many years, and there was no evidence that he could not continue to do so). All this is enough by itself to warrant summary judgment on the qualification issue.

Notwithstanding Dr. Oross's stellar credentials, and 20 year history at KU as a dedicated teacher, productive researcher, and valued colleague, Defendants have refused to admit that he is "otherwise qualified," contending that teaching in the classroom is an essential function of his job. Essential functions are those that are fundamental to the purpose of the job, and the results to be accomplished, not the manner in which they are performed. The essential functions of Dr. Oross's job are, teaching, service and scholarship, which are the three criteria upon which the University evaluates faculty performance. **Exh. FF.** As defined by the Collective Bargaining Agreement (CBA), the universal requirement of the job is effective teaching. The essential function of teaching is delivering content and achieving learning outcomes, all indisputably things that can be accomplished in any number of KU's own remote formats. **Exh. H at 14.** Nothing in the CBA states that to be "effective," teaching must take place in-person. Indeed, the University offers a plethora of courses online every semester, conducts formal certification programs to ensure effective online teaching, employs a dedicated Distance Education staff and has invested heavily in technology "to ensure that the online experience

reflects the rigorous education for which [it] is known." Indeed, well before the pandemic, distance

education at KU had become a "critical component to [its] mission to lead the University into the

future." **SUF, ¶83-86**. That the learning outcomes Dr. Oross is employed to achieve through his

teaching and office hours with his students are all achievable on-line is evident from his own work

history, the recent experience of the faculty as a whole during the pandemic.[12]

It takes more than an unsupported assertion made well after an accommodation is denied to

make a job function essential, i.e., fundamental to the purpose of the job and the results to be

accomplished. *C.f.*, 29 C.F.R § 1630.2 (n)(1)-(3). There is no policy, contractual definition, or pre-

existing job description defining "full duty" for an Associate Professor, much less one stating that

teaching in-person in the classroom is an essential function of the job. **SUF ¶162.** Weidman admits that

when she told Dr. Oross that teaching in-person was an essential function of his job, "so that's what

full-duty means," she had never it written anywhere, and admits that it does not appear in the CBA. *Id.,*

**¶¶ 160-162.**[13] Even the University President did not know what it meant. **Exh. W at 48.**

Furthermore, the fact that Hawkinson wanted all faculty to return in-person with no exceptions,

even for those at high-risk for serious illness or death, does not control the inquiry as to whether Dr.

Oross was a qualified person with a disability. Section 504 uses essential functions as part of the

qualification analysis because its purposes would be significantly impeded if "any employer that does

---

[12]     Not only did Dr. Oross and every other professor conduct all of their professional activities remotely between March and June, 2020, but well over half of them continued to do so throughout the 2021-22 academic year. **SUF ¶¶ 9-11.**

[13]     There is no official job description for Associate Professor. KU has a generic one it uses for purposes of FMLA certifications, but it is not controlling, and nowhere does it say that teaching in-person in the classroom is an essential function of the job of Associate Professor. **Exh. W at 126.**

not wish to be *inconvenienced* by making a reasonable accommodation, could, simply by asserting that the function is essential, avoid the clear congressional mandate that [they] make reasonable accommodations....". *Holly v. Clairson Industries, LLC,* 2007 U.S. App. LEXIS 17151 (11th Cir. July 19, 2007).

## II.   PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON HIS FAILURE TO ACCOMMODATE CLAIM

Section 504 creates an affirmative duty – an "unvarnished obligation" – to provide reasonable accommodations to enable a qualified employee to perform the essential functions of the job. It also prohibits employers from denying accommodations necessary for the employee to enjoy the privileges and benefits of employment equal to the same extent as non-disabled employees. 42 U.S.C. §12112 (b)(5)(A) & (B); *Hohider v. United Parcel Service, Inc.,* 574 F.3d 169, 186-87 (3rd Cir. 2009); *accord Exby-Stolley v. Board of County Comm'rs,* 979 F.3d 784, 795 (10th Cir. 2020)(*en banc*); *Fedro v. Reno,* 21 F.3d 1391, 1395-96 (7th Cir. 1994); *Molyneaux v. Monroe Cty.,* 2020 U.S. Dist. LEXIS 2563, at *15-17 (M.D. Pa. Jan. 8, 2020). The plaintiff is not required to show discriminatory animus because failure to accommodate the known disabilities of a plaintiff *by itself* constitutes discrimination unless the defendant can prove that the accommodation would impose an undue hardship on the operation of the business, i.e., significant difficulty or expense. 42 U.S.C. § 12111 (8); *Muhammad v. Court of Common Pleas of Allegheny Cnty., Pa.,* 483 Fed.Appx. 759, 763 (3d Cir. 2012). Liability arises "as soon as the employer, with adequate notice of the request for accommodation, fails to provide it. *See also Drasek v. Burwell,* 2015 WL 4910499 (D.D.C. Aug. 17, 2015)(failure to accommodate "is, essentially, a strict liability violation").

-14-

There being no dispute that Defendants knew about Professor Oross's disability, no material dispute that he is otherwise qualified, that he made a request for reasonable accommodation on August 11, 2021, and that KU denied it on August 16th, he is entitled to summary judgment if he could have been reasonably accommodated *or* Defendants did not make a good faith effort to make such accommodation. The record establishes both. *See, e.g., Decker v. Alliant Technologies, LLC*, 871 F. Supp. 2d 413, 430-31 (E.D.Pa. 2012), *Belles v. Wilkes-Barre Area Sch. Dist.*, 2020 U.S. Dist. LEXIS 36152 (M.D. Pa. March, 3, 2020)(There are two avenues through which an employee can establish the third element of a failure-to-accommodate cause of action, by establishing that the employer failed to provide a reasonable accommodation, or the employer failed to engage in the interactive process); *accord Lett, supra.*[14]

*First,* Defendants cannot claim undue hardship when they failed to engage in the IAP. There was no such process because they made the decision to deny faculty requests for remote work accommodations well before they received the one from Dr. Oross. Senior administrators' efforts to create a dispute by contradicting themselves and each other, and Martin, most of all, does not create a genuine issue for trial. Likewise, their efforts to deny that the policy they devised specifically to deny faculty remote teaching requests was not a "blanket policy" defies the record and common sense. **SUF ¶ 66; Exh. W at 54; Exh. X at 92.** Weidman, for instance, claimed that the was that such accommodations would "so fundamentally alter a course" that it would impact students. *Id.*, **at 39-40.**

---

[14]  Once an employee asks for a reasonable accommodation, the employer is obligated to initiate an IAP with him aimed at determining the employee's limitations and possible ways of accommodating them. *See Mengine v. Runyon*, 114 F.3d 415 (3rd Cir. 1997); *Taylor v. Phoenixville School District,* 184 F.3d 296 (3rd Cir. 1999).

That is the very definition of a blanket policy. Thus, even if there had been a "process" to discuss the requests, it would not have qualified as an IAP for purposes of Section 504 because the only possible outcome would be the denial of the accommodation. That was baked into the blanket policy, and its application to Dr. Oross, a qualified person with a disability, entitles him to summary judgment. The duty to engage in the IAP is not optional, but a mandatory obligation that is fundamental to the effectuation of the purposes of the Act. An employer simply cannot abrogate the requirements of the law by carving out a category of employees who are not entitled to it.

*Second*, Defendants denied Dr. Oross's request for accommodation and forced him onto LWOP as a matter of policy, not because his request was unreasonable, infeasible, or would have caused an undue hardship. There can be no dispute about these fundamental facts. Dr. Oross was qualified to provide remote instruction, having been certified to do so by KU itself in 2015, and KU could had the technology to convert his classes to a remote format without significant (or any) expense. **SUF ¶ 78-81.** Neither his Dean nor his Department ever made any objection to so accommodating him, nor have they done so since then. **SUF ¶¶ 73-74.**[15]

*Third*, the fact that Hawkinson made the unilateral decision to require every member of the faculty to return to work on campus is not a defense, nor is his vow to allow no conversion of an in-person course to a remote format unless the Governor ordered it. Since 1974, Congress told Hawkinson that he had to make such accommodations for faculty like Dr. Oross, whose disproportionately high risk for Covid-19 and its very worst consequences creates a barrier to the

---

[15]     In fact, they have planned for his classes to be advertised and delivered online to avoid any issues pertaining to course conversion. SUF **¶¶167.** *See also* **Exh. U.**

workplace that people without such disabilities do not face, one that can be removed by way of a remote work accommodation.[16] Section 504 expressly requires employers to make modifications or adjustments that enable an employee with a disability to perform the essential functions of his job, *or* enjoy the terms and conditions of employment to the same extent and on an equal basis as their people without disabilities. The term "reasonable accommodation" means (ii) modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed. 29 C.F.R. § 1630.2 (o)(1) (ii) & (iii); *Exby-Stolley v. Bd. of Cty. Comm'rs*, 979 at 795 ("[t]his regulation requires employers to make modifications and adjustments, not just to minimally permit disabled employees to do their job, but also to permit them to enjoy all of the 'benefits and privileges' of the job as would any other employee."), *citing U.S. Airways, Inc., v. Barnett*, 535 U.S. at 397 ("the ADA requires reasonable accommodations that are needed for those with disabilities to obtain the same workplace opportunities that those without disabilities automatically enjoy"); *accord Nawrot v. CPC Int'l*, 259 F. Supp. 2d 716, 721 (N.D. Ill. 2003).[17] Different treatment "is the essence of reasonable accommodation," and withholding it constitutes unequal treatment, which is

---

[16]    Congress was very aware when it passed the ADA that technology would open doors to accommodations for people with disabilities that heretofore had not been possible. *See e.g.,* Unreasonable Accommodation and Due Hardship, 62 Fla. L. Rev. 1119, 1142-44 (2010). Federal courts, including the Supreme Court, had also recognized the same possibilities. *See e.g., Southeastern Community College v. Davis*, 442 U.S. 397, 412-13 (1979)(a student accommodation case decided pursuant to the fundamental alterations rule, noting that technological advances can be expected to enhance opportunities for rehabilitation and accommodation without imposing undue financial and administrative burdens upon a State. Thus, situations may arise where a refusal to modify an existing program might become unreasonable and discriminatory).

[17]    "The obligation to make reasonable accommodation is a form of non-discrimination." Interpretive Guidance on Title I of the ADA, 29 C.F.R. 1630.9. This requirement is best understood as a "means by which barriers to the equal employment opportunity of an individual with a disability are removed or alleviated."

exactly how Section 504 defines discrimination. 42 U.S.C. §12112 (b)(5)(B); *McWright v. Alexander*, 982 F. 2d 222, 227 (7th Cir. 1992).[18] KU's blanket in-person teaching requirement says, in essence, "high-risk faculty with disabilities cannot work here," and there is no legal defense to that.

*Fourth*, "fundamental alteration" is not the applicable standard for evaluating employee accommodation requests under Section 504, but even if it were, that would still not support KU's blanket denial of Dr. Oross's request for a remote work accommodation. *See* n. 3, *infra*; **SUF ¶¶76-77.** Dr. Oross's request to teach his classes synchronously while his students were in the classroom while all other aspects of instruction remained the same does not qualify as the fundamental alteration of course delivery, much less a fundamental alteration in the way the University itself operates its business (which is how KU's defense has evolved over time). The only difference would have been the way that Dr. Oross would have accessed the classroom.

The Supreme Court's decision in *Martin v. PGA Tour*, 532 U.S. 661 2001) forecloses any such argument. *Martin* was a public accommodations case under case Title III of the ADA, not an employment case, so the applicable standard there was fundamental alteration. Casey Martin, a professional golfer, had a disability that significantly impaired his ability to walk the golf course during the PGA Tour, but he was otherwise fully capable of completing it. PGA argued that to let him

---

[18]   *See also Merrill v. McCarthy*, 184 F.Supp.3d 221, 238 (E.D.N.C. 2016) (requiring reasonable accommodation if needed to enable the employee 'to enjoy equal benefits and privileges of employment'), *citing EEOC v. Life Techs. Corp.*, 2010 U.S. Dist. LEXIS 117563 *4 (D. Md. Nov. 4, 2010); *McWright v. Alexander*, at 227 ("The Rehabilitation Act calls for reasonable accommodations that permit handicapped individuals to lead normal lives, not merely accommodations that facilitate the performance of specific employment tasks"). *See also Gleed v. AT&T Mobile Services, LLC*, 613 F. App'x 535, 539 (6th Cir. 2015) (employer may not deny an accommodation that allows the employee to work "without great pain and a heightened risk of infection" merely because he is "physically capable" of performing the job without an accommodation).

-18-

participate in the tours final stage by using a golf cart, while everyone else walked, would constitute a fundamental alteration of the tournament's rules. The Supreme Court rejected that argument for two reasons. First, the manner in which Martin navigated the field was only peripheral to the game. The essential function was what he did when he got to the hole, not how he got there. Second, the PGS's refusal to consider Martin's personal circumstances in deciding whether to accommodate his disability violated the clear language and purpose of the ADA. *Id.,* at 668.[19] Without an accommodation to help him get from place to place, he had, literally, an unlevel playing field which made it far harder for him that others to fulfill the functions of the game. Therefore, providing the accommodation did not constitute a fundamental alteration.

The same is true here. Dr. Oross needed an accommodation to access the workplace. Once that access was provided, he could fulfill all of the essential functions of the job without accommodation. KU's refusal to provide him with remote access to the workplace when it would have required no significant difficulty or expense constitutes discrimination on the basis of his disability. Even if its refusal to permit a course to be converted from in-person to online and/or to provide a fully remote work schedule to accommodate his disability could be somehow justified during ordinary times, that is not where we are now. The Covid-19 pandemic is ongoing, and that makes it unsafe for  Dr. Oross to safely work on campus. Hawkinson's so-called promise to students that he would never convert an in-person class to a remote format has no bearing on the analysis because by definition, it calls for depriving faculty with disabilities of their federally guaranteed civil rights. The CDC's July 2021

---

[19]     *See* Martha Lee Walters & Suzanne Bradley Chanti, *When the Only Way to Equal Is to Acknowledge Difference: PGA Tour, Inc. v. Martin,* 40 Brandeis L.J. 727, 751 (2002).

guidance for Institutions of Higher Education recommended  "options for accommodations, modifications, and assistance to students, faculty, and staff at increased risk for severe illness that limit their exposure to risk and allow for education and or work opportunities (such as virtual learning, telework, and modified job responsibilities, not just as a matter of health and safety, but to provide health equity to the people who are most vulnerable to the ravages of the virus, and who would otherwise be forced out of the workforce precisely because of their disabilities. **Exh. CC at 10; 14.**[20]

In enacting and amending Section 504, Congress enlisted all programs receiving federal funds in an effort "to share with handicapped Americans the opportunities for an education, transportation, housing, health care, and jobs that other Americans take for granted." *Arline, supra,* at 315, *citing* 123 Cong. Rec. 13515 (1977) (statement of Sen. Humphrey). Like the employment provisions of the ADA, which govern this case, the Act's principal purpose is to promote and expand employment opportunities for people with disabilities by eliminating unwarranted discrimination, and by removing barriers that prevent them from enjoying the same employment opportunities that are available to non-disabled employees, and "for which our society is justifiably famous." That is exactly the opposite of what KU has done, and that is why Dr. Oross is entitled to summary judgment on Count I.

## III.   KU'S BLANKET AND FULL-DUTY POLICIES VIOLATE SECTION 504 ON THEIR FACE

By definition and design, KU's blanket policy is a *per se* violation of Section 504. The same is true for the application of the purported full-time, full-duty rule Defendants eventually imposed against

---

[20]     Such accommodations were already well within the realm of reasonableness before the pandemic under Guidance from the EEOC as far back as 2002. *Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act,* EEOC Notice No. 915.002, 2002 WL 31994335 * 24 (October 17, 2002).

Dr. Oross in October, 2021 to prospectively preclude him from returning to work at all unless he could do so in-person. It has been black letter law for decades that such policies and/or practices discriminate against qualified individuals because of their disabilities, and deny them equal terms, conditions, and privileges of employment. *Hohider, supra,* 574 F.3d at 195; *Nolan v. Arkema, Inc.,* 809 F. Supp. 2d 356 (E.D. Pa. 2011). *See also Heise v. Genuine Parts Co.,* 900 F. Supp. 1137, 1154 & n.10 (D. Minn. 1995) (holding that a "must be cured" or "100% healed" policy is a *per se* violation of the ADA because the policy does not allow a case-by-case assessment of an individual's ability to perform essential functions of the individual's job, with or without accommodation). *See also Hutchinson v. United Parcel Serv., Inc.,* 883 F. Supp. 379, 397 (N.D. Iowa 1995)(such policies as applied to a qualified individual with a disability constitutes discrimination with regard to terms and conditions, and privileges of employment). 42 U.S.C. § 12112 (a). S*ee also Yellow Freight v. EEOC, Inc.,* 2002 U.S. Dist. LEXIS 16826 (2002)(collecting cases); *McGregor  v. National R.R. Passenger Corp.,* 187 F,.3d 1113, 1116 (9th Cir. 1999)(collecting cases).

For all the reasons stated above, the application of blanket no-accommodation policies and full duty work rules are antithetical to the statutory requirement that covered employers engage in an individualized, interactive process and  provide reasonable accommodations that allow the employee to perform the essential functions of the job he holds or desires, with or without accommodation and provide equal terms and conditions of employment. 42 U.S.C. §12112 (b)(3)(A). They subvert the statutory design by purporting to make reasonable accommodations for people with disabilities automatically unavailable, and their application a qualified person with a disability constitutes discrimination *per se. Hohider, supra.* Indeed, KU's blanket policy was designed to do just that.

-21-

Plaintiff is entitled to summary judgment on Count II.

## IV.   DIRECT EVIDENCE OF DISCRIMINATION

The failure to accommodate claim in Count I and the intentional discrimination claim in Count III overlap significantly, but are analytically distinct. Failure to accommodate stands alone as an adverse action without proof of intentional discrimination, but it can also support a claim for intentional discrimination on the basis of disability. That is certainly true here, where Defendants employed a blanket policy specifically designed to prevent Dr. Oross and other similarly situated faculty from returning to work on the sole basis of their disabilities, knowing those employees would require remote work accommodations due to their high-risk for severe illness or death if they contracted Covid-19. After using the blanket policy to force Dr. Oross onto LWOP, Defendants took the unprecedented step of imposing a full-time, full-duty rule even KU's own President did not know about to keep him from returning to work at all unless he secured a medical release to teach in-person, in the classroom. In other words, he could not return to work at all unless he did not need an accommodation.

Section 504 forbids an employer from denying any employment opportunity to a qualified employee because of the need to make reasonable accommodation to the physical or mental limitations of that employee. 42 U.S.C. §12112 (b)(5)(B). The blanket policy was designed specifically for use against faculty with disabilities who invoked their right to request reasonable accommodations. That is how and why it was used against Dr. Oross, and as such, it constitutes direct evidence of discrimination on the basis of his disability. The same is true for Defendants' application of the full-duty rule.

Direct evidence that an employment action was related to the disability creates a mandatory inference that the employer intentionally discriminated against the disabled individual by taking an

adverse employment action "solely" because of his or her disability." *Monette v. Electronic Data Systems*, 90 F.3d 1173, 1180 (6th Cir. 1996)("In cases in which the plaintiff alleges that he or she is the victim of discriminatory treatment, a plaintiff may attempt to establish unlawful discrimination by introducing direct evidence of discrimination, including evidence that the employer relied upon the plaintiff's disability in making its employment decision).[21] *See also Rodriguez v. ConAgra Grocery Products Co.,* 436 F. 3d 468, 480 (5th Cir. 2006). that Defendants ross were both intentional and deliberate, designed specifically to deprive him Dr. Oross and other similarly situated high-risk faculty of their rights under Section 504, deprive them of equal employment terms and conditions because of their disability, and interfere with the exercise and enjoyment of those rights. As a matter of law, KU's refusal to permit Professor Oross to return to work at all unless he can do so in-person, and without reasonable accommodation for his disabilities, constitutes intentional discrimination against him solely on the basis of his disability.

## V.   PROHIBITED STANDARDS, CRITERIA, AND METHODS OF ADMINISTRATION

The blanket and full duty rules KU used against Dr. Oross constitute prohibited standards, criteria, and methods of administration have a disparate impact on people with disabilities that have the purpose or effect of discriminating on the basis of disability, and are not job-related or supported by business necessity. *C.f.,* 42 U.S.C. §12112 (b) (3). No one with a disability who requires accommodation can possibly meet such a standard, and only people with disabilities who require

---

[21]     *See also Healy v. Southwood Psychiatric Hospital*, 78 F.3d 128, 131-32 (3d Cir. 1996)(gender discrimination)("When open and explicit use of gender is employed ... the systematic discrimination is in effect "admitted" by the employer, and the case will turn on whether such overt disparate treatment is for some reason justified under Title VII.").

accommodation are disadvantaged by them. Indeed, the blanket policy was designed specifically to screen out people with disabilities who were at high-risk for Covid-19's most serious consequences, and who would therefore require remote work accommodations to safely perform their jobs, even if such accommodations would be reasonable, feasible, and impose no significant expense on the University. It was only applied to Professor Oross because he had a disability that prevented him from accessing the workplace safely without an accommodation, something the policy was designed to preclude no matter what his personal circumstances might be. Stated another way, had Professor Oross not had a disability, he would have not needed accommodation, and had he not requested a reasonable accommodation, KU would have had no opportunity to impose its illegal policy against him. The full-time, full-duty rule, likewise, while not a real policy, was applied it to Dr. Oross in order to screen him out of his tenured employment under the unsubstantiated guise that he was by definition, unqualified to perform the essential functions of his job.

The duty to provide reasonable accommodation is mandatory, and cannot be evaded through employer policies or practices that effectively declare, "we don't do that here." Section 504 expressly forbids it. Professor Oross is entitled to summary judgment on Count V.

## VI.   INTERFERENCE WITH DR. OROSS'S STATUTORY RIGHTS

Section 504 forbids employers from coercing, intimidating, threatening, or otherwise interfering with an employee's rights under the Act or for having exercised or stood on their statutory protections. 42 U.S.C. §12112 (b)(2) & (3). Any person who engages in such interference can be held individually liable. There is no dispute here that Dr. Oross exercised his rights under the Act, and that his activities were protected. As a matter of law, KU's actions interfered with those rights, and he is entitled to

summary judgment on the interference component of Count VI.

The statutory interference provision is separate from and broader than the retaliation clause, which prohibits employers from taking adverse actions against an employee *because of* their protected activities. Causation is an element of the retaliation claim, and it provides no statutory remedy for retaliatory conduct that is causally related to an employee's protected activities unless it is "materially adverse." 42 U.S.C. § 12203 (a). By contrast, the focus of the interference clause is on employer behavior and their practical implications. It creates a remedy for behaviors that threaten, coerce or impede an individual in the current exercise or enjoyment of his statutory rights, *or* on account of his having done so whether or not they might also and separately constitute retaliation or some other form of discrimination under the Act. This prospective protection furthers the statutory purposes by removing barriers to an individual's ability to exercise and enforce their rights without infringement. As the EEOC's guidance explains, the "interference" provision serves a different function than the retaliation clause.[22] Therefore, it is not necessary for the plaintiff to show that the threat was carried out, or that he was actually deterred from pursuing his statutory protections so long as he shows that the behaviors are reasonably likely to interfere with the enjoyment of ADA rights. *Id.* at 22.

The EEOC's guidance provides some examples of behaviors that interfere with an individual's statutory rights. Specifically, issuing policies or imposing other requirements that purport to limit an employee's rights to invoke the Act's protections specifically qualify as interference, such as "a fixed leave policy that states 'no exceptions will be made for any reason.'" *Id.,* at 19. Other examples include

---

[22] https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues#III._ADA

discouraging or coercing an employee to forego an accommodation to which he is entitled, intimidating him from requesting or pursuing an accommodation by threatening an adverse action, or subjecting him to adverse treatment because he requested an accommodation. *Id.*

Here, there is direct evidence that KU did all of these things. As described herein, the blanket policy was designed specifically to avert the IAP for a sub-set of faculty with disabilities and to foreclose them from receiving remote work accommodations regardless of their individualized circumstances and without regard for whether hen no one disputes that they could have been provided with no significant difficulty or expense. As such, it violates the Act on its face. The same is true for the full-duty rule, which Defendants admit was not an actual rule, much less a University policy, although they used it to force Dr. Oross to either capitulate to their illegal demand that he return to work on-campus without an accommodation, something they knew he could not do without risking his life, or force him to either retire or forfeit his medical benefits and then his tenured job. Likewise, their misrepresentation of the fundamental alteration standard to deter Professor Oross from asserting his rights in the first place constitutes interference, as did its use of that admittedly inapplicable standard to support the illegal policies it used to threaten his livelihood. This is far more than enough to entitle him to judgment as a matter law on his interference claim.

Likewise, Ferguson's letter to DRP explicitly conditioned Dr. Oross's right to an IAP for his spring accommodation request on his agreement to forego any further public opposition to the Defendants' protracted, escalating, and illegal conduct against him and others independently qualifies as illegal interference. That is especially so when it came the day after they imposed the full-time, full-duty rule against him, which on its face precluded accommodation for the spring or any other time unless he

produced a medical release that made accommodation unnecessary. The right to accommodation and the IAP process are bedrock principles at the very heart of the Act and essential to effectuating its purposes. They do not have to be earned, nor can they be held hostage in exchange for an employee's forfeiture of another protected right. Using the IAP to extort silence from Professor Oross, especially under the undisputed circumstances, is exactly the type of deliberate, coercive, and intimidating conduct and interference with statutory rights that Section 504 proscribes.

### VII. PLAINTIFF IS ENTITLED TO JUDGMENT AGAINST HAWKINSON AND PENA ON HIS 1ST AMENDMENT FREE SPEECH CLAIMS

It is well-established that university professors have the right to speak on matters of public concern, especially outside the scope of their duties on their own time, and using public forums intended for public comment or debate. *Pickering v. Bd. of Educ. of Twp. High Sch. Dist.* 205, 391 U.S. 563 (1968). An employee's speech addresses a matter of public concern when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community. *Bloch v. Temple Univ.*, 939 F. Supp. 387, 392 (E.D. Pa. 1996), *citing Pro v. Donatucci,* 81 F.3d 1283, 1288 (3rd Cir. 1996); *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-242 (3d Cir. 2006). Defendants have admitted that Professor Oross 's public statements pertaining to his requests for a remote work accommodation and KU's failure to provide appropriate safeguards for the health and safety of its students, faculty, and staff constituted protected speech on a matter of public concern. **SUF ¶¶ 170-178.**

Dr. Oross seeks summary judgment against the individual defendants in Counts IX (Hawkinson) and XII (Pena) based on the portion of his claim premised on the Ferguson letter sent to

his DRP attorney on October 14, 2021 which specifically conditioned its agreement to initiate an IAP for the spring semester unless he stopped engaging in his protected speech.

A plaintiff claiming retaliation for engaging in protected speech under 42 U.S.C. § 1983 must show "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Starnes v. Butler Cty. Court of Common Pleas*, 971 F.3d 416, 429 (3d Cir. 2020). Because Defendants do not dispute that Dr. Oross's speech was protected, and have advanced no argument that they had any "justification for treating the him differently from any other member of the general public" as a result of the statements he made, the only issue is causation. The causation is established by the letter itself, which specifically ties Dr. Oross's access to the IAP to his forfeiture of any further exercise of his right to continue speaking out against KU's illegal policies and its refusal to enforce the provisions of federal civil rights law to which he and faculty, as well as staff and students with disabilities were entitled. Not only did Ferguson specifically condition KU's willingness to initiate an IAP on Dr. Oross's agreement not to engage in any further protected activity, but he provided the link to Dr. Oross' Facebook (FB) page, which no one disputes constituted protected activity on a matter of concern to the KU community and the public at large. **SUF ¶¶ 139-143.**

No employer is entitled to require an employee relinquish a constitutional right in order to obtain a statutory right to which he is entitled, and Defendants do not contend otherwise. Dr. Oross legal right to an IAP in response to his spring accommodation request cannot be disputed. Ferguson's statement that KU would refuse to engage in the IAP if he continued to engage in his protected speech

-28-

is on constitutes direct evidence of causation. *See e.g.,* **Exh. W at 98.** Furthermore, it was sufficient to deter a person of ordinary firmness from exercising his constitutional rights. Dr. Oross needed the accommodation in order to protect his life and his livelihood, so Ferguson's threat to withhold the IAP was directly tied to the continuation of his employment.

That would be the end of the matter had Hawkinson and Pena not raised a qualified immunity defense. Under 42 U.S.C. § 1983 an official may be entitled to such immunity if they can show the absence of any of the following: (1) has the plaintiff alleged a violation of his statutory or constitutional rights; (2) was the right alleged to have been violated clearly established in the existing law at the time of the violation; and (3) should a reasonable official have known that the alleged action violated the plaintiff's rights. *Rouse v. Plantier,* 182 F.3d 192, 196-97 (3d Cir. 1999). The burden of proving entitlement to the defense of qualified immunity is on the officials. *Crawford-El v. Britton,* 118 S.Ct. 1584 (1998). Defendants are unable as a matter of law to establish the defense.

"A court evaluating a claim of qualified immunity `must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'" *Hill v. Borough of Kutztown,* 455 F.3d 225, 244 (3d Cir. 2006). "'[T]he salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Tolan v. Cotton,* 572 U.S. 650, 656 (2014). The law is clearly established for qualified-immunity purposes only if, at the time of the public official's conduct, every reasonable official would have understood that the conduct was unlawful. *District of Columbia v. Wesby,* 138 S. Ct. 577, 589 (2018). Because Defendants have admitted that plaintiff's right to free speech was clearly

established, and that they had no right to retaliate against him on that basis, they cannot claim that any reasonable official in their place would not have known that to threaten adverse action on that basis would violate the plaintiff's rights. **Exh. X at 156-60.**

Finally, Defendants' testimony that they had no reason to think Ferguson's letter might violate Dr. Oross's 1st Amendment rights because he would not advise them to do anything illegal does not create a genuine issue for trial. Ferguson spoke on their behalf, with their full authority, and Pena and Hawkinson both admit that responsibility for the letter falls squarely on them.[23] It has been long and well-established that the type of retaliatory ultimatum set forth in Ferguson's letter in connection with a public employee's protected speech constitutes a violation of the 1st Amendment. Hawkinson and Peña's both knew that, and they are both liable for their unconstitutional conduct against Dr. Oross.

## CONCLUSION

For all the reasons stated herein, Dr. Oross respectfully requests that the Court enter an Order of Summary Judgment against Defendants on Counts I, II, III, V, VI, IX and XII of his Complaint.

---

[23]    In the context of vicarious liability, a principal is liable to third parties for the frauds, deceits, concealments, misrepresentations, torts, negligent acts and other malfeasances of his agent, even though the principal did not authorize, justify, participate in or know of such conduct or even if he forbade the acts or disapproved of them, as long as they occurred within the agent's scope of employment. *Aiello v. Ed Saxe Real Estate, Inc.,* 508 Pa. 553, 499 A.2d 282, 285 (1985).

Respectfully Submitted:

By: /s/ Lorrie McKinley

**LORRIE MCKINLEY, ESQUIRE**
Attorney I.D. No. 41211

**McKINLEY & RYAN, LLC**
238 West Miner Street
West Chester, PA 19382
(610) 436-6060

**RALPH E. LAMAR**
201 N. 3rd Street, No. 323
Allentown, PA 18101
(610) 563-0726
ralphlamar@ymail.com
201 N. 3rd Street, No. 323
Attorney for Stephen Oross, III

DATE: October 17, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on this date, October 17, 2022 , a true and correct copy of the

foregoing Plaintiff's Amended Memorandum of Law in Support of his Motion for Summary

Judgment was served upon counsel by ECF as follows:

> Kathy A. Le, Esquire
> Deputy Attorney General
> Pennsylvania Office of Attorney General
> Eastern Regional Office, Civil Litigation Section
> 1600 Arch Street, Suite 300
> Philadelphia, PA 19103
> kle@attorneygeneral.gov

LORRIE McKINLEY, ESQUIRE

DATE: October 17, 2022