IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN OROSS,
      **Plaintiff,**

    v.

                               **CIVIL ACTION**
                               **No. 21-5032**

KUTZTOWN UNIVERSITY, et al.,

      **Defendants.**

## MEMORANDUM

**SCHMEHL, J.**  **/s/JLS**                         **July 25, 2023**

      Plaintiff, a tenured Associate Professor of Psychology at Defendant Kutztown University ("Kutztown" or the "University"), brought this action claiming the Defendants Kutztown and its President, Dr. Kenneth Hawkinson ("Dr. Hawkinson") and its Vice President for Equity, Compliance, and Liaison for Legal Affairs, Jesus Pena ("Mr. Pena") violated Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, when they denied his request for a remote work accommodation for the Fall Semester of 2021. Plaintiff claims that in denying his request, the Defendants refused to consider his individual circumstances of having recently undergone a heart transplant that requires life-long immunosuppressive medications to reduce his risk of organ rejection and which place him at a higher risk of contracting COVID-19 and instead relied on a recently formulated general policy that any request to change the course modality from in-person to remote would be considered a substantial alteration to the course offerings and would represent an undue hardship to the University. Plaintiff also claims the Defendants failed to

engage in the interactive process and retaliated against him when he publicly expressed his dissatisfaction with the denial of his accommodation request.

The Complaint consists of the following 12 counts: Failure to Accommodate (Count One); Facial Invalidity of Defendants' Full-duty Requirement (Count Two); Intentional Discrimination Because of Disability (Direct Evidence)(Count Three); Intentional Discrimination Because of Disability (Pretext) (Count Four); Disparate Impact based on Prohibited Standards, Criteria, or Methods of Administration (Count Five); Kutztown University's Retaliation and Interference under Section 504(Count Six); Section 504 Retaliation and Interference Claims against Dr. Hawkinson (Count Seven); 42 U.S.C. Section 1983 claims against Dr. Hawkinson for Deprivation of Federal Statutory Rights under Section 504 (Count Eight); Section 1983 Claims against Dr. Hawkinson for Violations of First and Fourteenth Amendments (Count Nine); Mr. Pena's Retaliation and Interference under Section 504 (Count Ten); Section 1983 Claims against Mr. Pena for Violations of Plaintiff's Federal Statutory Rights under Section 504 (Count Eleven)  and Section 1983 Claims against Mr. Pena for First Amendment Violations (Count Twelve). Presently before the Court are the Defendants' motion for summary judgment and the Plaintiff's motion for partial summary judgment. For the reasons that follow, both motions are granted in part and denied in part.

**<u>STANDARD OF REVIEW</u>**

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is

"material" if it might affect the outcome of the case under governing law. *Id*. (citing *Anderson*, 477 U.S. at 248).

Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"The same standards and burdens apply on cross-motions for summary judgment." *Allah v. Ricci*, 532 F. App'x 48, 50 (3d Cir. 2013) (citing *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). "When confronted with cross-motions for

summary judgment ... 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.' " *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F. Supp. 2d 425, 430 (M.D. Pa. 2006) (quoting *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. App'x 266, 270 (3d Cir. 2006)). "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts." *Id*. (citing *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998)).

**<u>FACTS</u>**

The following facts are not in dispute:

1. Defendant Kutztown is a member of Pennsylvania's State System of Higher Education ("PASSHE"), has a graduate and undergraduate student body of approximately 7500 students, an average class size of 26, and a student to teacher ratio of 17:1. Kutztown University Fast Facts, ECF 56-1, pp. 2-7.

2. Kutztown is a program or activity that receives federal funds and is a covered employer under Section 504 of the RA. 29 U.S.C. § 794(b)(2) Complaint and Answer at ¶ 6.

3. Plaintiff Stephen Oross, III, ("Plaintiff" or "Professor Oross") has been a tenured faculty member at Kutztown since 2008. Compl. at ¶ 1. In 2008, Plaintiff was promoted to the position of Associate Professor of Psychology. He started at Kutztown in August, 2002 and has been with the University for 20 years. Oross Dep. at 5.

4. Defendants admit since he came to Kutztown in 2002, Plaintiff has been a valued colleague in the University's Department of Psychology. Complaint and Answer at ¶ 13.

5.  In July, 2014, Professor Oross suffered a serious heart attack. His treatment
    included a double by-pass operation and the installation of a pacemaker and an
    internal defibrillator. In the fall of 2015, Professor Oross returned to the
    University  and resumed his full-time teaching load and well as his other
    professional responsibilities.

6.  Dr. Hawkinson is and has been Kutztown's President since July, 2015. See
    Compl. at ¶ 7. Dr. Hawkinson is sued in his individual capacity. *Id*.

7.  Mr. Peña is Kutztown's Vice President for Equity, Compliance, and Liaison for
    Legal Affairs. See Compl. at ¶ 8. Mr. Pena is sued in his individual capacity. *Id*.

8.  Faculty members at Kutztown are represented by a union and their
    employment is governed by the terms of a collective bargaining agreement
    ("Union Agreement"). See "Agreement Between Association of Pennsylvania
    State College & University Faculties (ABSCUF) and the Pennsylvania State
    System of Higher Education," effective July 1, 2019 to June 30, 2023, ECF 56-
    1, pp. 466-675.

9.  Professor Oross testified that under the Union Agreement, it is the purview of
    the Department Chair and the Dean—not faculty—to designate which courses
    are offered in a semester, which professors are assigned to teach the courses
    and the modality for which each course will be taught. Oross Dep. at 29-30.

10. Article 6(A)(2) of the Union Agreement states, in relevant part: "The department
    chairperson is also responsible for recommending to the Dean/Director such
    matters as personnel actions, curricular changes, course offerings, teaching
    assignments and the department budget." ECF 56-1, p. 478.

11. Article 10 of the Union Agreement states, in relevant part:

    A. The STATE SYSTEM/UNIVERSITIES, at their sound
    discretion, possess the right, in accordance with applicable
    laws, to manage all operations including the direction of

5

> FACULTY and the right to plan, direct and control the operation of all facilities and property of the STATE SYSTEM, except as modified by this Agreement.
>
> B. As provided by Act 195 (Section 702), matters of inherent managerial policy are reserved exclusively to the STATE SYSTEM/UNIVERSITIES. These "include but shall not be limited to such areas of discretion or policy as the functions and programs of the public employer (STATE SYSTEM/UNIVERSITIES), standards of services, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel.

ECF 56-1. p. 490.

12. Under Article 23(A)(1)(a) of the Union Agreement, "the full workload for the academic year shall not exceed twenty-four (24) workload hours (with twelve (12) workload hours as standard for a term)." ECF 56-1, p. 559.

13. Article 23(A)(1)(c) of the Union Agreement states, in relevant part: "Full-time teaching FACULTY MEMBERS as defined in this Article shall maintain a minimum of five (5) office hours per week on no fewer than three (3) different days at such times and locations as will accommodate the needs of the students." *Id*.

14. On March 6, 2020, Pennsylvania Governor Tom Wolf ("Governor Wolf") declared a state of emergency in the Commonwealth due to COVID-19. In the ensuing weeks, Governor Wolf issued a series of executive orders requiring the closure of all businesses that are not life-sustaining throughout the Commonwealth. ECF 56-1, pp. 677-678.

15. After Governor Wolf announced the state of emergency, Kutztown, along with most other institutions of higher education ("IHEs") in the Commonwealth, had to discontinue all in-person instruction by March 16, 2020.

16. Dr. Hawkinson testified that for the remainder of the Spring 2020 semester, which ended on May 9, 2020, Kutztown converted over 1700 classes to an online modality with "various degrees of success." Hawkinson Dep. at 132-133.

17. On March 18, 2020, the Families First Coronavirus Response Act was signed into law; which provided, among other things, expanded family and medical leave for specified reasons related to COVID-19.  ECF 56-1, pp. 680-681.

18. On June 26, 2020, Jennifer Weidman ("Ms. Weidman"), Kutztown's Director of Human Resources ("HR"), sent an email to all Kutztown faculty and staff detailing procedures to make a request for accommodation, flexible work arrangements, or leave under new expanded access due to the various COVID-19-related legislation and emergency orders. ECF 56-2, pp. 2-3. The email stated that any employee who does not have a disability but is "at high risk of severe illness from COVID-19 as defined by CDC [Center for Disease Control] guidance" could submit a request with Human Resources for a flexible work arrangement. *Id*.

19. As a result, over 200 faculty and approximately 80-100 nonfaculty at Kutztown requested and were granted flexible work arrangements for the 2020-2021 academic year. Hawkinson Dep. at 165-166.

20. During the Fall 2020 semester, Professor Oross was granted a flexible work arrangement and taught his full academic load, and held office hours and served on faculty committees, all remotely. Oross Dep. at 16; Compl. at ¶ 29.

21. During the Fall 2020 semester, Professor Oross experienced a severe worsening of his heart condition. Oross Dep. at 13-14.

22. Due to the severity of his heart condition, Professor Oross was granted a full-time medical leave of absence for the Spring 2021 semester, beginning on January 19, 2021 until May 15, 2021. Oross Dep. at 13-14.

23. On February 24, 2021, Professor Oross received a heart transplant at the Penn State Milton S. Hershey Medical Center in Hershey, Pennsylvania. See Compl. ¶ 31.

24. In December, 2020, the U.S. Food and Drug Administration ("FDA") approved an Emergency Use Authorization for two COVID-19 vaccines.

25. On March 8, 2021, Dr. Hawkinson issued an announcement to Kutztown students and employees that the University intended to reopen for the Fall 2021 Semester. ECF 56-2, p. 10. The announcement stated, "fewer statewide cases and increased availability of vaccines," brought encouraging news on the state of the COVID-19 pandemic, and thus Kutztown planned to "return to a primarily face-to-face environment" for the fall 2021 semester with "course offerings and residential experience [that] will more-closely reflect our traditional on-campus environment." *Id*.

26. Dr. Hawkinson stated that as part of the reopening process, faculty would be required to conduct office hours in-person, but that faculty could meet with students remotely if the students agreed to the arrangement. Hawkinson Dep. at 77-78.

27. Dr. Hawkinson testified that when he announced plans to reopen Kutztown with its traditional on-campus environment for the Fall Semester of 2021 it was his intent for all staff and faculty to return to their duties as they were assigned pre-pandemic, with the understanding that he would have to follow any applicable legal requirements. Hawkinson Dep. at 15, 24.

28. Dr. Hawkinson testified that as of March, 2021, his reopening plans were based on consultations with an expanded emergency management team that included leaders of the faculty union, leaders of the faculty senate, faculty chair of the university safety committee, the director of the university health center, and

other staff and administrators, as well as leaders of student government. Hawkinson Dep. at 60-61.

29. Dr. Hawkinson testified that in response to communications he received from the student body and student leadership that many students said they would not return to Kutztown if they were forced to take remote classes as they had done in the 2020-2021 school year, he communicated his intention to the students that he would not force students to take remote classes by changing the modality of their classes to online if they had signed up for a face-to-face class as it would result in an undue burden on the students. Hawkinson Dep. at. 40, 65.

30. Dr. Hawkinson testified that he did not believe there was a protocol that would allow someone not to come back to work on campus because of COVID-19 concerns. Hawkinson Dep. at 23.

31. On April 4, 2021, Governor Wolf issued an Executive Order rescinding his prior Order requiring that all non-life sustaining businesses operate remotely. ECF 56-2, pp. 12-14.

32. On April 12, 2021, Governor Wolf announced that beginning on April 13, 2021, all Pennsylvania adults would be eligible to schedule an appointment for the COVID-19 vaccine. ECF 56-2, p. 16.

33. On April 12, 2021, Ms. Weidman sent an email to all Kutztown employees announcing Kutztown's plans for staff and faculty to return from flexible work arrangements for the Fall Semester of 2021. ECF 56-2, p. 18. The email advised that staff would return to work at their regular worksite in June or July of 2021 and faculty would return to in-person instruction as scheduled on August 30, 2021. *Id*.

34. On May 4, 2021, Governor Wolf announced that all mitigation orders, such as capacity limitations, except masking requirements, would be lifted on May 31, 2021. ECF 56-2, pp. 20-21.

35. On May 13, 2021, the CDC changed its masking guidance to provide that fully vaccinated individuals no longer need to wear a mask except on public transportation. ECF 56-2, pp. 23-24.

36. On May 14, 2021, Kutztown announced that, reflecting Governor Wolf's May 4 announcement, the school would lift mitigation restrictions on capacity and social distancing requirements on June 1, 2021, but mandatory masking would remain in effect. ECF 56-2, p. 26.

37. On May 26, 2021, Kutztown announced that it had "revised its mask protocols to reflect the latest CDC guidance, based on recommendations from Pennsylvania's departments of Health and Education." ECF 56-2. p. 28. The announcement stated that, effective June 1, fully vaccinated individuals would no longer need to mask while unvaccinated individuals were strongly encouraged to mask when unable to social distance. *Id*.

38. On June 10, 2021, the Pennsylvania Legislature voted to end Governor Wolf's Executive Order of March 6, 2020, declaring a state of emergency due to COVID-19 as well as all masking and stay-at-home orders. ECF 56-2, p. 30.

39. As a result of his heart transplant, Professor Oross was required to take high doses of immune-suppressing medications to prevent organ rejection, and due to this, his heart transplant doctors believed him to be at increased risk of severe illness or death from COVID-19. Eisen Dep. at 11-12; 16, 28.

40. The CDC's "Guidance for Institutions of Higher Education (IHEs)" recommended that Administrators "[o]ffer options for accommodations, modifications, and assistance to students, faculty, and staff at increased risk for

severe illness that limit their exposure to risk and allow for education and work opportunities (such as virtual learning, telework, and modified job responsibilities) to remain available to them." ECF 47-6, p. 14.

41. On July 26, 2021, Professor Oross emailed his Dean, Dr. David Beougher, and others that he was "trying with all my might to return to campus, in person, to resume teaching and other professional responsibilities following my heart transplant (February 24th, 2021)." Professor Oross also identified the safety issues that he believed may preclude him from doing so in person. ECF 56-3, pp. 92-93.

42. On July 27, 2021, the Dean forwarded Plaintiff's questions regarding Kutztown's planned fall 2021 re-opening COVID-19 protocols to Ms. Weidman, and she responded, based on the planned protocols at that time, to those questions on July 30, 2021 as follows:

a. The school had removed the mask requirement, so Professor Oross could ask students to mask but could not require it and the students were not required to comply.

b. The school did not have a vaccine requirement, so Professor Oross could not ask students about their vaccination status.

c. Professor Oross would be required to hold office hours in person.

d. Professor Oross could ask people to stand or sit further away, but classrooms would be back to normal layouts and capacities.

e. No changes had been made to existing HVAC systems.

ECF 46-2, p. 8.

43. On July 27, 2021, the CDC again updated its guidance for fully vaccinated people, recommending that everyone wear a mask in indoor public settings in

areas of substantial and high transmission regardless of vaccination status. ECF 56-2, p. 272.

44. For the Fall 2021 Semester, Professor Oross was scheduled by his department chair to teach four classes in-person. Oross Dep. at 67.

45. On August 2, 2021, Professor Oross emailed Ms. Weidman seeking "approval to conduct [his] fall 2021 courses and office hours remotely." ECF 56-3, p. 36.

46. On August 8, 2021, at 5:33 p.m., Ms. Weidman responded to Plaintiff's August 2, 2021 email by expressing her understanding of Plaintiff's concerns about returning to the classroom but informing him that there was "no provision for [him] to convert [his] in-person courses to an online modality for the fall semester." Ms. Weidman further stated that "the flexible work arrangements only applied to the prior academic year." ECF 56-3, p. 37.

47. Ms. Weidman advised Professor Oross that he could apply for an ADA [Americans with Disabilities Act] accommodation under the ADA but explained that "an accommodation is not considered reasonable if it is a fundamental alteration so significant that it changes the essential nature of the goods, services, facilities, privileges, advantages, or accommodations offered." *Id*. She further advised that "[c]hanging the modality of a course from in person to online would be considered a fundamental alteration." *Id*.

48. Ms. Weidman further advised Professor Oross that he could continue his leave "contiguous" with his Federal Medical Leave Act ("FMLA") leave from spring, using up to 15 paid sick days and two personal days for the Fall 2021 Semester and any remaining days would be unpaid with benefits. *Id*.

49. On August 9, 2021, Professor Oross responded to Ms. Weidman by expressing his displeasure at her "decision to deny [his] request for remote teaching," and asked how Kutztown had decided that "remote teaching constitutes a

fundamental alteration so significant that it changes the essential nature of the goods, services, facilities, privileges, advantages or accommodations offered." Plaintiff further stated that he found the decision "curious" "given that the framework for remote teaching has been in place, available, and has been used for quite some time extending back to actual pre-pandemic days." *Id*. at pp. 38-39.

50. Ms. Weidman responded to Professor Oross the same day, stating that her earlier email "should not be construed as a denial of an ADA request," and explained that there was a process to request an ADA accommodation through the Disability Services Office ("DSO"). *Id*. at p. 40. Ms. Weidman further explained that the "shift of a course scheduled as in-person to an online modality is the fundamental alteration [she] referred to, not remote teaching in and of itself." *Id*.

51. Other faculty members had requested remote work accommodations for the Fall 2021 Semester, but the University denied all of them. Complaint and Answer at ¶ 57.

52. On August 8, 2021 at 12:59 p.m., Kutztown announced a reinstitution of mandatory masking inside all university buildings for all individuals regardless of vaccination status, based on the CDC's revised guidelines and Berks County's increase to a "substantial" level of community transmission. ECF 56-2, p. 274.

53. Kutztown's "Guide to Fall 2021 Semester" was re-published on August 8, 2021 to advise that Kutztown would be returning to a primarily face-to-face environment and that employees were expected to return to work on campus. The Guide stated that everyone must wear masks inside all university buildings, regardless of vaccination status. ECF 56-2, pp. 276-278.

54. The "Guide to Fall 2021" stated that Kutztown would "continue to provide existing health and wellness strategies across campus in 2021-2022," including maintaining plexiglass dividers and making hand sanitizer and sanitizing wipes available in classrooms. Contact tracing, and quarantine/isolation guidelines would also be provided. *Id*.

55. The "Guide to Fall 2021" provided that the University "strongly encourages [but did not require] members of its campus community to get vaccinated before the fall semester." *Id*.

56. On August 24, 2021, Kutztown published on its website information relating to the school's COVID-related HVAC plan. ECF 56-2, pp. 280-281. This Plan stated that it was "first implemented in July 2020 in response to COVID-19," and "was developed based upon CDC guidance and recommendations." *Id*. The Plan also stated that the University had commissioned a campus wide HVAC IAQ study conducted on September 28, 2020 by an outside engineering firm, which primarily found that the school's "COVID Related HVAC Operations Plan" "meets or exceeds compliance with currently available federal, state and local requirements related to SARS-CoV-2 (COVID) for building occupancy." *Id*. The Plan further detailed some adjustments Kutztown's Facilities Management had made to the HVAC system to reduce the risk of airborne transmission of COVID-19. *Id*.

57. Kutztown's published process for "Requesting Employee Accommodations" is coordinated by the DSO upon receipt of an employee's completed request form and supporting medical documentation. See Weidman Dep. at 21.

58. If the DSO Director, Linda Lantaff, concludes that the employee's medical documentation meets the criteria for a disability under the ADA, she sends an

email to Ms. Weidman with a description of the requested accommodation.
Otherwise, the request is denied. Weidman Dep. at 21.

59. The DSO forwards the request to Ms. Weidman, and to Kutztown's Employee
Relations Manager, Alexis Martin ("Ms. Martin"), describing the accommodation
sought, and disclosing limited, if any, information, only as necessary, regarding
the nature of the employee's disability and functional limitations so that an
appropriate determination on the reasonable accommodation request can be
made. Weidman Dep. at 58; Martin Dep. at 15-17.

60. Kutztown Policy DIV-002 (the "ADA Employee Policy") governs the disposition
of requests for "Reasonable Accommodation for Employees." ECF 56-3. pp.
41-49.

61. Responsibility for the implementation of the ADA Employee Policy rests with
the Director of DSO, Ms. Weidman and Mr. Pena.

62. Both Ms. Weidman and the DSO Director report to Mr. Pena and Mr. Pena
reports to Dr. Hawkinson. Complaint and Answer at ¶ 46.

63. The ADA Employee Policy requires that all accommodation requests be
evaluated on an individual basis to determine whether the provision of such
accommodation would create an undue hardship to the University. ECF 45-1,
No. 20. The ADA Employee Policy defines "undue hardship" as "significant
difficulty or expense." ECF 56-3. p. 42.

64. The ADA Employee Policy provides that if the employee has a qualifying
disability, "a reasonable accommodation, if available, should be provided."
Complaint and Answer at ¶ 49.

65. In late July and early August of 2021, as faculty requests and informal inquiries
to utilize the ADA process to convert in-person classes to online started coming
in, Ms. Lantaff, Mr. Peña, Ms. Weidman, and Ms. Martin had conversations to

discuss what the school's obligations were with respect to granting or denying these requests. Peña Dep. at 61-65; Martin Dep. at 13, 20-21, 30; Weidman Dep. at 38-39.

66. Based on those discussions, the University determined that the ability to teach in person is an essential function of the faculty position and converting classes from in-person to online would be a fundamental alteration of the University's course offering to students, thus creating an undue hardship to the University. Peña Dep. at 65, 78, 92-94, 149-150; Weidman Dep. at 72, 79, 92.

67. The University does not have a policy calling for the denial of an employee's request for a reasonable accommodation on the ground that it "fundamentally alters" any of the University's course offerings, services or methods of operation or administration. ECF 45-1, No. 25.

68. On August 11, 2021, Professor Oross submitted a formal written accommodation request to the DSO for "approval to teach fall courses and hold office hours online. All of these courses have been previously taught online." ECF 56-3, p. 5.

69. Professor Oross did not request any changes to the course requirements, materials, or learning objectives, and he required no other accommodations. Complaint and Answer at ¶ 35.

70. In support of his request, professor Oross submitted a letter dated August 11, 2021, from Dr. Shelley Hankins of the Division of Heart Failure Services at the . Hershey Medical Center.  Dr. Hankins wrote:

> [In February 2021],he underwent heart transplantation, and as a result, Dr. Oross requires life-long immunosuppressive medications to reduce his risk of organ rejection and subsequent loss of good heart function. Over time the risk, decreases, allowing for a reduction in the amount of immunosuppression required to prevent organ rejection. Because Dr. Oross is less than a year post-

transplant, he is required to take higher doses of immunosuppression which in turn puts him at a higher risk of contracting an infection.

Because of Dr. Oross' current immunosuppressed states and the increasing rates of COVID-19 infections, I have serious concerns about him returning to teaching in person and being in close contact with students & others at this time. I have discussed at length, COVID-19 Precautions and Infection Prevention, with him, and at the last appointment in July, I recommended that he remain in a low risk teaching environment and work remotely to limit his risk of contracting an infection. As outlined above, his level of immunosuppression and thus risk will decrease over time.

ECF 56-3, p. 6.

71. In response to a question about what were the serious concerns that Plaintiff's cardiologists had with him returning to teaching in person and being in close contact with students and others, Dr. Howard Eisen, one of Plaintiff's cardiologists at Hershey Medical Center, testified "[t]hat he [Plaintiff] would contract COVID, which would be catastrophic. And we know that transplant patients -- heart transplant patients, transplant patients in general, do very poorly when they get COVID. We've actually seen that in some of our patients, and we've certainly heard about it from other people, other institutions, about what happened to their patients. And so, it's -- we know that it can be very bad, that they can die. So -- so, you know, we're well aware of what the issues are." Eisen Dep. at 43.

72. Other than working remotely, Dr. Hankins placed no other restrictions on Plaintiff's ability to return to his job. ECF 56-3, p. 6.

73. Neither the Dean nor the Department Chair objected to Plaintiff's request for a remote work accommodation. ECF 45-1, Nos.10-11.

74. HR did not receive any documentation from the Dean or the Department Chair suggesting that providing synchronous remote work accommodations to

17

Professor Oross would require any difficulty or added expense. ECF 45-1, No. 12.

75. There is no evidence in the record that by allowing Professor Oross to teach his 2021 fall courses online, the University would have entailed any significant expense.

76. The existing technology at the University would have allowed Professor Oross and his students to see and interact with each other in real time without requiring any significant difficulty or expense to the University.

77. According to Kutztown's published marketing materials, distance education is a "critical component to the University's mission to lead itself into the future." Complaint and Answer at ¶ 23.

78. The University has a dedicated team of instructional designers, media producers, and technical support staff that collaborates with faculty "to ensure that the online experience reflects the rigorous education for which [it] is known." Complaint and Answer at ¶ 25.

79. Under the University's Course Design Principles and Models, synchronous online instruction takes place 100% remotely using Zoom or other video conferencing software, which allows for virtual interaction between instructors, students and colleagues in real time. ECF 45-1, No. 13.

80. On August 18, 2021, Ms. Martin sent Plaintiff a copy of Kutztown Accommodation Confirmation/Resolution For Employees, informing him that his request for a remote accommodation for the Fall 2021 Semester had been denied. ECF 56-3, p. 2. The Resolution Form provided the following rationale:

> Your accommodation request (as listed/written above) for Fall 2021 is denied, as changing the course delivery from face-to-face instruction to on-line instruction is a fundamental alteration of course delivery. Your request to maintain office hours remotely is also denied, as this is also a fundamental

alteration to how these duties are conducted, and the
service/product expected from our students.
        The University has a duty to students who have signed
up for and expect face-to-face classes to be delivered in that
modality unless and until directed by commonwealth
authorities to discontinue face-to-face instruction.

The Form was signed by Ms. Weidman on August 16, 2021. *Id*. at p.3.

81. Defendants do not dispute that Plaintiff's request for a remote work

    accommodation on August 11, 2021 triggered their legal duty to initiate an

    interactive process before they denied his request. ECF 45-1, No. 8.

82. The responsibility for conducting the "interactive process" is ordinarily

    delegated to the Employee Relations Manager (currently Ms. Martin) with

    supervision by Ms. Weidman. Ms. Martin was not as directly involved with

    Plaintiff's request, which was handled more directly by Ms. Weidman because

    of the nature of the request of converting classes from in-person to online.

    Martin Dep. at 7; Weidman Dep. at 14, 55.

83. Ms. Martin has no independent authority to grant or deny an employee request

    for a reasonable accommodation without consulting with Ms. Weidman or Mr.

    Pena. Martin Dep. at 34.

84. The only individuals Ms. Martin communicated with about Plaintiff's request for

    an accommodation were Ms. Weidman and Mr. Pena. Martin Dep. at 41.

85. Ms. Weidman did not communicate with the Dean, the Department Chair or

    Interim Chair before she denied Plaintiff's request for an accommodation.

    Weidman Dep. at 134.

86. The only person Ms. Weidman spoke with about Plaintiff's request for an

    accommodation was Mr. Pena. Pena Dep. at 74-75.

87. Ms. Martin testified that right before the Fall 2021 Semester was to begin, the

    University had received about a half dozen requests from faculty for remote

teaching. Martin Dep. at 30.  According to Ms. Martin, "[a]t the general time right before the semester was about to start and these types of requests were coming in for remote work for the semester or academic year, I believe the administration was already kind of in talks or developing broad language as, you know, how we were going to deny these." *Id*.

88. Ms. Martin further testified that, "I remember that as they were coming in, I believe the language that was settled upon, the --  oh, man, I can't think of it --  oh, fundamental alteration. That, I believe, was what was settled upon, you know, the language that we were going to use in response to these requests, that, you know, it was just changing the structure of how we offer courses too much." Martin Dep. at 31.

89. When asked about the University's decision not to grant the accommodation of converting in-person classes to online classes, Ms. Weidman testified that "[i]t was not a decision to outright reject any request that came in with that, you know, request necessarily because they would each need to be reviewed individually on their own merits, but there was a decision that such a request, because it would so fundamentally alter the course, presented an undue hardship or burden on the employer because of the impact on our students. Weidman Dep. at 39.

90. Concerning the same issue, Mr. Pena testified that, "[t]he position we took that was converting in-person classes to online would be a fundamental alteration to our operations or the business nature or the nature of our business. We are an in-person institution. We are not an online institution. So we believe that fundamentally altering our operations or the nature of our business would constitute an undue hardship. And as such, that would not be a reasonable accommodation under the ADA." Pena Dep. at 65.

91. Mr. Pena further testified that online classes are "more of the exception rather than the rule. We will offer online courses let's say during the winter or summer months so that students have an opportunity to get additional credits, graduate on time, graduate earlier. Also if we're targeting a certain population, let's say your non-traditional students because they work all day or to supplement a program, or if a program is specifically an online program.  But that doesn't change the nature of our business. That doesn't change our business model. We are still first and foremost a brick and mortar, in-person institution.  While we have offered online courses, I would say that is the exception rather than the rule." Pena Dep. at 70-71.

92. Ms. Martin admitted that she did not author the "fundamental alteration language" and instead used a template for denying an accommodation request. Martin Dep. at 43.

93. Neither Ms. Weidman, Ms. Martin nor Mr. Pena considered Plaintiff's individual circumstances before denying his request for a remote accommodation. Weidman Dep. at 37, 51, 133; Martin Dep. at 50-51; Pena Dep. at 65, 76-79.

94. Prior to the COVID-19 pandemic, Kutztown had offered a limited number, approximately 4-5% of its course offerings, as online classes. Hawkinson Dep. at 134.

95. Prior to the COVID-19 pandemic, Kutztown had never had a faculty member who was working 100% online or remotely. Hawkinson Dep. at 16-17, 28.

96. Prior to the COVID-19 pandemic, Professor Oross had never taught more than one course online in any semester. Oross Dep. at 28-29.

97. Prior to the COVID-19 pandemic, none of the classes taught by Professor Oross had been offered exclusively as an online class; all of the classes he

taught online were also taught by him in-person in a different section that semester or another semester that school year. Oross Dep.at 33.

98. In the Fall Semester of 2021, 15% of the University's course offerings were fully online. Another 7% were delivered partially online. ECF 46-1, p. 7.

99. In the Spring Semester of 2021, Kutztown offered 67.6% of its courses online, 25.8% in person/online hybrid and 6.6% in person. ECF 45-5, p. 2.

100.    Since 2013, Professor Oross had previously taught some but not all of the classes he was scheduled to teach during the 2021-2022 school year at various times in a remote format.

101.    Since 2015, Professor Oross taught 22 classes in a remote format, including all of his classes during the 2020-2021 school year when the University converted most classes to remote format in response to the COVID-19 pandemic. In 2015, Professor Oross completed the university's certification program for online teaching.

102.    On August 24, 2021, Professor Oross sent a letter to Dr. Hawkinson requesting a restoration to health sabbatical for the Fall 2021 Semester under the faculty union contract, which would provide him up to with 18 weeks of leave at full pay. ECF 56-3, p. 50. Professor Oross included Dr. Hankins' letter specifying the medical necessity for a remote work accommodation. He also summarized HR's refusal to approve his request for a remote work accommodation. *Id*.

103.    Dr. Hawkinson testified that upon receiving Plaintiff's request, he was "sympathetic to awarding the sabbatical." He testified that he forwarded the request to Mr. Peña, Ms. Weidman, and Provost Lorin Basden Arnold, asking them for guidance and input as he had never previously responded to a similar request. Hawkinson Dep. at 93-95.

104.    On or about the same day, Dr. Hawkinson spoke to Mr. Peña and Ms. Weidman, who advised him that, after consulting with PASSHE legal, labor relations, and HR experts, Plaintiff's situation did not meet the requirements for a sabbatical for a restoration of health. Hawkinson Dep. at 95; 99; Weidman Dep. at 69; Peña Dep. at 99.

105.    Dr. Hawkinson testified that he was advised that the purpose of a sabbatical for "restoration of health" is for someone who is still actively recovering from a serious illness and unable to work. Since Professor Oross had been released by Dr. Hankins to return to work full-time, albeit in a low-risk teaching environment with a remote accommodation, he was not eligible for a restoration of health sabbatical. Hawkinson Dep. at 100-101.

106.    As a result, Dr. Hawkinson decided to deny Plaintiff's request for a restoration of health sabbatical, despite his personal sympathy for the situation, because he felt that he would not be fulfilling his responsibility as President if he granted a request outside of the PASSHE system's stated parameters for the sabbatical. Hawkinson Dep. at 95-96.

107.    Around this same time, Dr. Hawkinson explored another alternative to assist Professor Oross, which was the possibility of adding two or more new online classes in the psychology department—to commence mid-semester-- that could be assigned to Professor Oross to teach online. Hawkinson Dep. at 104-105.

108.    Dr. Hawkinson explored the possibility of adding new online classes for Professor Oross with Provost Arnold, Union President Tom Stewart, Mr. Peña, and Ms. Weidman. Hawkinson Dep. at 103-108; Peña Dep. at 101-102; Weidman Dep. at 76-77.

109.    Dr. Hawkinson testified that he believed that the mid-semester classes would be a good option for Professor Oross because the classes would meet student need and he strongly believed that the classes would meet minimum enrollment. Hawkinson Dep. at 105-106.

110.    Dr. Hawkinson testified that on August 25, 2021, Provost Arnold informed him that she had spoken to Jason Lanter, incoming Interim Chair of the Psychology Department, about the possibility of adding new online classes for Professor Oross for the Fall 2021 Semester. Hawkinson Dep. at 109. According to Dr. Hawkinson, Provost Arnold noted that Mr. Lanter was unsure if the idea "meets the needs of the department and also unsure that [Professor Oross] would be interested." *Id.* She then opined that the new courses would not have to be a general psychology class if there was a different psychology class that would better fill student need. *Id.* Dr. Hawkinson testified that Provost Arnold suggested that Ms. Weidman reach out to Professor Oross to see if he would be interested in teaching two 8-week high demand courses, and then they could have the Dean and department chair work out the specifics of the course. *Id.*

111.    At this point in time, Dr. Hawkinson authorized Ms. Weidman to offer Professor Oross two 8-week online classes for the Fall 2021 Semester, to start mid-semester, the topic of which was to be determined in conjunction with the Dean and Department Chair after the drop/add period had closed. Hawkinson Dep. at 109-110; Weidman Dep. Tr. at 80-81; Peña Dep. at 101-103.

112.    In a phone call on August 26, 2021, Ms. Weidman informed Professor Oross that Dr. Hawkinson had denied his request for a sabbatical for a restoration of health because his doctors had cleared him to return to work full-time. Oross Dep. at 95.

113.    During this phone call, Ms. Weidman also told Professor Oross about Dr.

Hawkinson's idea of adding two new classes for him to teach in the Fall 2021

Semester and explained that the two new classes would be determined based

on student demand after the drop/add period concluded in the first week of the

semester. Weidman Dep. at 76-77; 78; Oross Dep. at 92-93.

114.    In an email to Professor Oross dated August 27, 2021, Ms. Weidman

stated:

> Per our telephone conversation yesterday, the
> University is considering adding two online courses in
> Psychology to the fall schedule. They would be high demand
> courses where the student need is greatest, anticipating that
> there will be a need for capacity as students drop and add
> courses at the start of the semester. The specific courses to
> be offered will be decided in conjunction with the department
> chair and the Dean.
>      This would give you the ability to teach half-time and
> take half-time sick leave for fall. The half-time leave would be
> partially paid using the 15 sick days and 2 personal days to
> cover nearly half the semester, with the remaining half-time
> leave being unpaid.
>      I encourage you to discuss this with your chair and your
> dean. Plead advise me of your decision by 4:30 Monday
> 8/30/21.

Weidman Dep. at 75; ECF 56-3, p.52.

115.    Ms. Weidman testified that this offer was not intended as an ADA

accommodation but was a way of "meeting student need and also offered

something to [Professor] Oross to be able to continue to teach." Weidman Dep.

at 77.

116.    The first day of classes for the Fall 2021 Semester was August 30, 2021.

117.    In an email to Ms. Weidman dated August 30, 2021, Plaintiff stated that

due to the lack of details in the University's offer, he was unable to either

accept or reject the offer. The lack of details Plaintiff cited included the topic of

the courses, the manner in which students would be made aware of the courses, any minimum enrollment requirements and the starting date of the courses. Plaintiff also noted that his Chair informed him that he did not see any high demand for additional courses at the time. ECF 56-3, pp. 53-54.

118.    Ms. Weidman responded almost immediately by email stating:

> In light of your response that you are not able to accept our offer, the only remaining option is for you to continue your sick leave from the spring semester, using your remaining 15 paid sick days, two personal days, and the remainder as unpaid sick leave. This will allow your benefits to be continued.

ECF 56-3, p. 55.

119.    Plaintiff responded shortly thereafter by stating, "So be it." Weidman Dep. at 82; ECF 56-3, p. 56.

120.    Thereafter, Professor Oross was approved to continue his full-time FMLA leave through the fall of 2021 which consisted of 15 paid sick days and two paid personal days with the remainder of the days to be unpaid with benefits.

121.    The Psychology Department did not offer any "high demand" courses to the Fall 2021 Semester after the drop-add period expired, nor has it offered any such classes during the past five years. ECF 45-1, No. 17.

122.    After Plaintiff's accommodation request was denied, he began to speak out publicly expressing his disagreement with the University's actions. Complaint and Answer at ¶ 72; Weidman Dep. at 94.

123.    Defendants do not dispute that Professor Oross had a reasonable basis to believe that he was legally entitled to the remote work accommodations he requested for the Fall 2021 Semester. ECF 45-1, No. 38.

124.    Defendants do not dispute that Plaintiff's requests for disability-related accommodations constitute protected activity under Section 504 of the RA. ECF 45-1, No. 39.

125.    Through late August and September, 2021, Professor Oross made numerous posts on social media, statements to various press outlets, and posts to Kutztown's faculty listserv expressing his disagreement with the actions of the University. Weidman Dep. at 94; Peña Dep. at 187-193, Hawkinson Dep. at 181-182.

126.    On August 22, 2021, Professor Oross signed an "open letter" to Dr. Hawkinson and Chancellor Daniel Greenstein that had been circulating among faculty on Facebook and shared the link with the remark that "it behooves university administration to foster a culture of inclusiveness, where all constituents are encouraged to consider themselves as active participants in keeping everyone safe." ECF 46-8.

127.    On August 24, 2021, Professor Oross shared a Facebook link to an August 25, 2021 radio podcast hosted by a faculty member of the University's English Department, that would "dig into" the University's back to school plans and the University's decision to deny "some faculty requests to keep an all online schedule, despite being at high risk for dire consequences from contracting COVID." The podcast was scheduled to "get into" how Professor Oross was "being forced to make an awful choice between his job and his personal well-being."

128.    On September 10, 2021, Dr. Hawkinson issued an "Update on COVID-19" issues after "it came to our attention that some members of our community have been planning a demonstration to protest the university's COVID-19 protocols." Complaint and Answer at ¶ 90.

129.    Dr. Hawkinson further stated that the University's "top priority" was reopening the campus to largely in-person instruction in a safe and secure environment. Complaint and Answer at ¶ 91.

130.    Dr. Hawkinson stated that his reopening plan was fully within the COVID-19 guidance from governmental authorities, including the CDC and other health experts. Complaint and Answer at ¶ 93.

131.    A number of articles began to appear in various news outlets, including the September 24, 2021 editions of Philadelphia Inquirer and the Philadelphia Daily News that were critical of the University's actions with regard to Plaintiff. Weidman Dep. at 94-95. Weidman Dep. at 95; Pena Dep. at 86: Hawkinson Dep. at 192.

132.    Professor Oross shared both of the September 24, 2021 articles on Facebook, with a comment that Dr. Hawkinson and Kutztown administration have made the front page for "one of their outstanding accomplishments. Clearly, they have much to be proud of as a standout institution in the PASSHE system." ECF 47-8, p. 29.

133.    Other similar articles began to appear in the Morning Call and "Inside Higher Ed."

134.    On October 18, 2021, Professor Oross spoke at a faculty and student-led demonstration protesting the University's COVID-19 policies.

135.    Defendants do not dispute that the public statements Professor Oross made on behalf of others regarding the University's denial of accommodations to high-risk faculty and students, constituted protected activity under Section 504 of the RA that was protected from retaliation, interference, or other forms of coercive action. ECF 45-1, No. 41.

136.     Defendants do not dispute that Professor Oross had a well-established right under Section 504 of the RA to express opposition to what he alleged to be the University's failure to comply with its legal duties to provide disability-related accommodations for students and faculty at high risk for COVID-19 that was protected from retaliation, interference, or other forms of coercive action. ECF 45-1, No. 44.

137.     Defendants do not dispute that the statements Professor Oross made to Kutztown's administration, directly and indirectly through the faculty listserve and/ or on social media regarding its refusal to provide him with remote work accommodations, and the legal basis therefore, constituted protected activity under Section 504 of the RA that was protected from retaliation, interference, or other forms of coercive action. ECF 45-1, No. 40.

138.     On September 14, 2021, Professor Oross submitted an updated serious health condition form as required for his FMLA leave. Weidman Dep. at 102; ECF 56-2, pp. 594-595.

139.     After Professor Oross submitted his serious health form, as a part of the process of approving Plaintiff's FMLA leave, Deborah Longenhagen, Kutztown's leave administrator, spoke to PASSHE benefits staff to confirm the timeline of Professor Plaintiff's benefits entitlement. Weidman Dep. at 102-103.

140.     In response, PASSHE benefits staff informed Ms. Longenhagen that her understanding, and that of Ms. Weidman, as to the timeline of Plaintiff's benefits was incorrect. Weidman Dep. at 102-103. Specifically, PASSHE benefits staff informed Ms. Longenhagen that Plaintiff's entitlement to benefits without pay would end on December 29, 2021. Weidman Dep. at 103. As a result, Ms. Weidman began working with the PASSHE benefits staff to develop

a letter to send to Professor Oross to explain this new understanding of his benefits entitlement. Weidman Dep. at 104.

141.    On October 4, 2021, a lawyer with Disabilities Rights Pennsylvania ("DRP") wrote to Mr. Peña explaining that DRP had been contacted by Plaintiff and that Kutztown's refusal to provide accommodations to Professor Oross violated federal disability law. The letter sought reinstatement of Professor Oross with accommodations, and the restoration of the pay and other benefits that had been withheld since the beginning of his forced leave of absence. ECF 56-3, pp. 63-68.

142.    Upon receiving the letter from DRP, Mr. Peña immediately forwarded the letter to university legal counsel, Michael Ferguson ("Mr. Ferguson").  Peña Dep. at 80.

143.    Mr. Peña informed Dr. Hawkinson that he had received the DRP letter and that he had forwarded it to Mr. Ferguson and that Mr. Ferguson would respond to the letter. Peña Dep. at 82-83.

144.    Ms. Weidman does not supervise DSO. Mr. Pena supervises both HR and DSO. Pena Dep. at 28.

145.    On October 11, 2021, DSO transmitted all of the medical documentation that Professor Oross had submitted in connection with his request for reasonable accommodation to Ms. Weidman, Mr. Ferguson and Mr. Pena. Ex S at 10

146.    On October 12, 2021, Linda Harrison, PASSHE Assistant Director for Group Benefit and Retirement Programs, sent an email to Ms. Weidman with a draft letter to send to Professor Oross explaining that his benefits entitlement would end on December 29, 2021 and that he must be released to return to full time work. Weidman Dep. at 104-105; ECF 56-2, pp. 597-604.

147.     On October 12, 2021, Ms. Weidman responded to Ms. Harrison's email, informing her that Professor Oross was scheduled to teach one online class in the winter term and two in the spring 2022 semester, and asked what effect this would have on the benefits calculation. Weidman Dep. at 103-104; ECF 56-2, p. 600.

148.     Agnes Peiffer, a member of PASSHE benefits staff, responded to Ms. Weidman's email stating that, once an employee is on the extended full-time leave, such as Professor Oross, that "he must be released full time, full duty" in order to return to work, not part-time; thus Professor Oross would not be allowed to teach the winter class or two classes in spring. Weidman Dep. at 103-104; ECF 56-2, p. 602.

149.     Ms. Weidman requested language to add to the letter to explain the situation with the winter and spring classes to Professor Oross, and Ms. Peiffer provided the suggested language. ECF 56-2, pp. 602-603.

150.     In a letter dated October 13, 2021, Ms. Weidman, after conferring with Ms. Harrison, informed Plaintiff that "we received information that you are scheduled to teach an online winter class and two online classes for the spring. You will not be able to teach these classes without a full-time full-duty release prior to the start of any classes. Please note as of 12/29/2021, you will have limited return to work rights if your absence continues beyond this date….Your entitlement to benefits will expire 12/29/2021 at midnight if you remain on Extended leave without pay at that time." Both Dr. Hawkinson and Mr. Pena were copied on the letter. Weidman Dep. at 101; ECF 56-3, pp. 70-71.

151.     Ms. Weidman did not define what she meant by "full-time, full-duty." Complaint and Answer at ¶ 112.

152.     In a letter to DRP counsel dated October 14, 2021, Mr. Ferguson, stated,

in part:

> The University would be more than happy to engage
> with you in discussions regarding Dr. Oross and his request
> for accommodation. That said, neither the University nor I will
> engage with you through written means if Dr. Oross continues
> to publish all written information in a public manner. While I
> appreciate Dr. Oross's advocacy for his position. I do not
> intend to engage in a public relations battle about Dr. Oross's
> situation.

In his letter, Mr. Ferguson provided DRP with the link to Plaintiff's Facebook

account. ECF 56-3, pp. 60-61.

153.     Mr. Ferguson did not consult with Dr. Hawkinson on the letter and Dr.

Hawkinson did not review it before it was sent. See Exh. 3, Hawkinson Dep. Tr.

at 193. Mr. Ferguson did consult with Mr. Pena before the letter was sent. Pena

Dep.at 89.

154.     Mr. Peña testified that he did not discuss the specific wording of the letter

with Mr. Ferguson, but he understood Mr. Ferguson's statement in his letter to

mean that Mr. Ferguson would not engage in written discussions with the DRP

lawyer if Professor Oross continued to publish all written information in a public

manner, not that the University would not engage in the interactive process with

Professor Oross if he continued to publish. Peña Dep. at 121-125.

155.     Ms. Weidman was not aware of the letter from DRP or Mr. Ferguson's

response. Weidman Dep. at 98.

156.     On October 21, 2021, Professor Oross emailed Ms. Weidman in response

to the correspondence she sent on October 13, 2021 regarding his benefits

entitlement, asking for clarification as to the meaning of "full-time, full-duty."

Weidman Dep. Tr. at 118; ECF 56-3, pp. 81-82. Professor Oross copied only

the Dean and the Interim Department Chair. *Id*.

157.     After having received no response from Ms. Weidman by October 25,

2021, Professor Oross sent another email to Weidman demanding a response

to his October 21, 2021 email. Professor Oross copied Dr. Hawkinson, Mr.

Pena and a number of other Kutztown Administrators. Complaint and Answer at

¶ 121.

158.     After confirming her understanding of the term "full-time, full-duty" with the

University's legal counsel, Ms. Weidman responded to Professor Oross on

October 27, 2021, explaining that "as teaching in person in the classroom is

considered an essential function of your faculty position, a return to full duty

would include a release to teach in person in the classroom." Weidman Dep. at

119; ECF 56-3, p. 88.

159.     Ms. Weidman testified that she never saw a written version of a "full-time,

full-duty" rule at the University.  Weidman Dep. at 108.

160.     Dr. Hawkinson testified that he did not know what "full-time, full-duty

meant," or whether it had ever been applied to a faculty member at Kutztown.

Hawkinson Dep. at 211.

161.     On November 15, 2021, Professor Oross initiated the instant lawsuit by

filing a Complaint and a Motion for a Temporary Restraining Order ("TRO"),

seeking a court order to reinstate him to full-time status with a remote work

accommodation so that he would not lose his benefits on December 29, 2021.

(ECF No. 1-2.)

162.     On December 14, 2021, the Court, after finding that Professor Oross

would likely suffer irreparable harm if his medical benefits expired on December

29, 2021, issued a TRO, ordering Kutztown to reinstate Professor Oross to full-

time status with a remote work accommodation and enjoining the Defendants

from terminating Plaintiff's medical benefits on December 29, 2021. (ECF No.

8).

163.     Professor Oross was reinstated immediately to teach his winter class

online and has taught a full course load online in the Spring 2022 Semester and

in the Fall 2022 Semester. Oross Dep. at 150.

## DISCUSSION

Section 504 of the RA provides that "[n]o otherwise qualified individual with a

disability ... shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under any

program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  By its

terms, section 504 prohibits discrimination on the basis of disability by recipients of

federal funds such as Kutztown. As a result, courts in this Circuit have repeatedly held

that there is no individual liability under the RA since individuals are not the recipients of

the federal funds. *See A.W. v. Jersey City Public Schools,* 486 F.3d 791, 804 (3d

Cir.2007) ("Suits may be brought pursuant to Section 504 against recipients of federal

financial assistance, but not against individuals."); *Doe v. DeJoy*, 2020 WL 4382010 at

*11 (E.D. Pa. July 31, 2020); *Datto v. Harrison*, 664 F. Supp. 2d 472, 493 (E.D. Pa.

2009); *Zied-Campbell v. Richman*, 2007 WL 1031399, at *17 (M.D. Pa. Mar. 30,

2007) ("[G]enerally officials may not be held liable in their individual capacities under

Title II of the ADA or Section 504 of the Rehabilitation Act."), *aff'd*, 428 F. App'x 224 (3d

Cir. 2011).

In Count VII, Plaintiff asserts a claim against Dr. Hawkinson under Section 504 of

the RA for retaliation and interference. Likewise, in Count X, Plaintiff asserts a claim

against Mr. Pena under Section 504 of the RA for retaliation and interference. Based on

the above authority, Defendants Hawkinson and Pena are entitled to judgment on any

claim brought against them under the RA in general and on Counts VII (Hawkinson) and X (Pena) in particular.

Plaintiff has asserted two discrimination claims against the University under Section 504 of the RA. One is for intentional discrimination (Counts III and IV) and the other is for discrimination based on a failure to accommodate (Count I). The Court will begin with the claim for intentional discrimination.

The familiar framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 793–94, (1973), for discrimination claims under Title VII is equally applicable to discrimination claims under the RA. *Wishkin v. Potter*, 476 F. 3d 180, 185 (3d Cir. 2007). Under the *McDonnell Douglas* burden shifting paradigm, plaintiff has the initial burden to make a prima facie showing of discrimination, but if he does so, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment action. *McDonnell Douglas,* 411 U.S. at 802. If the defendant meets this burden, the presumption of discriminatory action raised by the prima facie case is rebutted. *Tex. Dep't. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254–55 (1981). However, the plaintiff must then be afforded an opportunity to show that the employer's stated reason for the employment action, such as plaintiff's termination, was pretextual. *McDonnell Douglas,* 411 U.S. at 804.  In order to prove the employer's explanation is pretextual, the plaintiff must "cast [ ] sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication ... or ... allow[ ] the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes v. Perskie,* 32 F.3d 759, 762 (3d Cir.1994). A plaintiff who has made out a prima facie case may defeat a motion for summary judgment by either "(i) discrediting the employer's proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct,

that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Id.* at 764.

To establish a prima facie case of discrimination under Section 504 of the RA, a plaintiff must initially show, "(1) that he or she has a disability; (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job." *Donahue v. Conrail*, 224 F. 3d 226, 229 (3d Cir. 2000) (citation omitted). "If the plaintiff is able to meet these burdens, the defendant then bears the burden of proving, as an affirmative defense, that the accommodations requested by the plaintiff are unreasonable, or would cause an undue hardship on the employer." *Id.* An undue hardship involves "significant difficulty or expense in, or resulting from, the provision of the accommodation." 29 C.F.R. § 1630, App. § 1630.2(p).

Defendants do not dispute that Plaintiff is "disabled" for purposes of establishing a prima facie case under the RA.

For a plaintiff to be "qualified" under the RA, he "must 'satisf[y] the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.' and, he must be able to 'perform the essential functions of the position held or desired, with or without reasonable accommodations.'" *Taylor v. Phoenixville School Dist.*, 184 F. 3d 296, 311 (3d Cir.1999).  There is no dispute that Plaintiff has the appropriate educational background and employment experience to perform the job of Associate Professor of Psychology at Kutztown. In fact, he is a tenured professor there. The issue concerns whether Plaintiff can perform the "essential functions" of that position, with or without reasonable accommodation.

The Defendants argue that an essential element of Plaintiff's job as Associate Professor of Psychology is to teach and conduct office hours in-person. Plaintiff responds that teaching and conducting office hours in-person is not an essential function of his job as both he and other faculty members have synchronously and successfully taught some of their classes remotely in the past and the University even has a framework in place for doing so.

It is well-established that "[w]hether a particular function is essential is a factual determination that must be made on a case-by-case basis [based upon] all relevant evidence." *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 612 (3d Cir. 2006) (quoting *Deane v. Pocono Medical Ctr.*, 142 F.3d 138, 148 (3d Cir. 1998)); see also *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 279 (3d Cir. 2001) (same). In addition to stating that the essential function determination is a factual question, our Court of Appeals has recommended that it should typically be left for the jury to decide. *See Deane, 142 F.3d at 148* (refusing to grant summary judgment on the basis that the question of whether lifting heavy objects was an essential function of a nurse was a fact question for the jury); see also *Skerski, 257 F.3d at 280* (reversing district court's holding that climbing was an essential function of installer technician and cautioning against snap judgments regarding essential functions); *Turner, 440 F.3d at 613* ("[T]he fact issue as to `essential function' must be decided by a jury.").

Whether a job duty is an "essential function" turns on whether it is "fundamental" to the employment position. 29 C.F.R. § 1630.2(n)(1); *Turner,* 440 F.3d at 612 (quoting 29 C.F.R. § 1630.2(n)(1)). The term "essential function" does not include the "marginal" functions of the position. *Id*. As stated by the Court of Appeals in *Skerski*:

> The regulations further set forth a non-exhaustive list of seven examples of evidence that are designed to assist a court in identifying the `essential functions' of a job. They include: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or

> interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; (5) the terms of a collective bargaining agreement; (7) the work experience of past incumbents in the jobs; and/or (7) the current work experience of incumbents in similar jobs.

*Skerski,* 257 F.3d at 279 (citing 29 C.F.R. § 1630.2(n)(3)).

Although the determination of whether a job duty is an "essential function" normally is a question for the jury, the Court finds that in this case there are no factual issues for a jury to resolve and the Court can make the determination as a matter of law.

Defendants do not cite to any provision in the Union Agreement or in any University job or course description which states that teaching in-person and conducting office hours in-person are essential functions of a faculty member's job in general and of Plaintiff's position in particular. On the contrary, according to Kutztown's own published marketing materials, distance education is a "critical component to the University's mission to lead itself into the future." Complaint and Answer at ¶ 23. The University admits that it has a dedicated team of instructional designers, media producers, and technical support staff that collaborates with faculty "to ensure that the online experience reflects the rigorous education for which [it] is known." Complaint and Answer at ¶ 25. Under the University's Course Design Principles and Models, synchronous online instruction takes place 100% remotely using Zoom or other video conferencing software, which allows for virtual interaction between instructors, students and colleagues in real time. ECF 45-1, No. 13.

While the Court recognizes that prior to the COVID-19 pandemic, Kutztown had never had a faculty member who taught 100% of his classes online or remotely, Kutztown had in fact offered a limited number, approximately 4-5% of its course offerings, as online classes. See Hawkinson Dep. Tr. at 134. For example, in the Spring

Semester of 2021, Kutztown offered 67.6% of its courses online, 25.8% in an in-person/online hybrid and 6.6% in-person. ECF 45-5, p.2. Dr. Hawkinson testified that for the Spring 2021 Semester, the University offered 1700 classes online. Hawkinson Dep. at 138-139. And even in the Fall Semester of 2021, which is the period involved in this litigation, 15% of the University's course offerings were fully online, while another 7% were delivered partially online. ECF 46-1, p.7.

With respect to Professor Oross in particular, since 2013, Professor Oross, who had received his certificate in online teaching from Kutztown, had previously taught some but not all of the classes he was scheduled to teach during the 2021-2022 school year at various times in a remote format. In fact, since 2015, Professor Oross taught 22 classes in a remote format, including all of his classes during the 2020-2021 school year when the University converted most classes to remote format in response to the COVID-19 pandemic. These statistics belie the University's claim that teaching in-person is an essential function of Plaintiff's job as Associate Professor of Psychology.

The Defendants did not submit any empirical data that would indicate that there was any diminution in the quality of a class as the result of the course being offered online in general or as the result of one of Professor Oross's psychology classes being offered online in particular.  In fact, neither the Dean nor the Psychology Department Chair objected to Plaintiff's request for a remote work accommodation for the Fall 2021 Semester. ECF 45-1, Nos. 10-11.

Since the Court finds that teaching in-person and conducting office hours in-person are not essential functions of the job of Associate Professor of Psychology at the University and that Professor Oross can fully perform the essential functions of his job by teaching remotely (as he had done in the past), Professor Oross has satisfied the second element of a prima facie case of discrimination under Section 504 of the RA.

Third, Plaintiff must establish that "'he has suffered an otherwise adverse employment decision as a result of discrimination.'" *Shaner v. Synthes,* 204 F.3d 494, 500 (3d Cir. 2000).  "An adverse employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998).

Professor Oross has satisfied the third element of a prima facie case of discrimination by demonstrating that he was: 1) denied a reasonable accommodation of remote teaching and office hours which forced him to use up the reminder of his paid leave and into an unpaid leave status for the Fall Semester of 2021; 2) denied a restoration of health sabbatical which also forced him to use up the remainder of his paid leave and into an unpaid leave status for the Fall Semester of 2021; and 3) informed that a "full time, full duty" release meant returning to work in-person which not only also forced him to use up the remainder of his paid leave and forced him into an unpaid leave status for the Fall Semester of 2021, but also forced him to give up his medical benefits as of December 29, 2021 and limited his return to work rights.

The Defendants have not produced any evidence of any undue burden in terms of expense or difficulty that the University would incur if the modality of Professor Oross's classes was changed from in-person teaching to remote teaching. On the contrary, the record reveals that the University had a framework for remote teaching already in place and that existing technology at the University would have allowed Professor Oross and his students to see and interact with each other in real time without requiring any significant difficulty or expense to the University. ECF 45-1, No. 13. Indeed, Professor Oross had just taught his classes in the Fall of 2000 and the Spring of 2021 using the University's remote format. And to the extent the Defendants claim that the undue burden is to the students who signed-up for Plaintiff's Fall 2021 Semester

classes on the assumption that such classes would to be in-person, student preferences simply do not qualify as an undue burden under the RA and, in any event, must yield to the requirements of Section 504 of the RA.

Having found that Plaintiff has established a prima facie case of disability discrimination under Section 504 of the RA and that the Defendants have not produced any evidence of an undue burden, the Court next considers whether the University has met its burden to articulate a facially "legitimate non-discriminatory" reason for the denial of Plaintiff's request for an accommodation. This "relatively light" burden is met "if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). Notably, a defendant "need not prove that the articulated reason actually motivated its conduct" at this stage. *Id*. Rather, "[t]he proffered reason need only raise a genuine issue of fact as to whether the employer acted impermissibly." *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003).

Here, the Court finds that, solely for this phase of the *McDonnell-Douglas* paradigm, the University has articulated a legitimate, non-discriminatory reason for not permitting Plaintiff to teach his four classes remotely and not conduct his office hours remotely, namely that converting classes and office hours from an in-person modality to a remote modality would be a fundamental alteration of the University's course offerings to students.

As a result, the burden now shifts back to Professor Oross to show that the University's legitimate non-discriminatory reason was a pretext or fabrication and that discrimination was more likely than not a motivating or determinative cause of the decision not to grant Plaintiff's request for an accommodation.

The University denies that it has a policy calling for the denial of an employee's request for a reasonable accommodation on the ground that it "fundamentally alters" any of the University's course offerings, services or methods of operation or administration. ECF 45-1, No. 25. However, the uncontradicted testimony reveals that the Defendants formulated for the first time just such a policy during the summer of 2021 to deny **any** request made by a faculty or staff member for a remote work accommodation for the Fall Semester of 2021.

Specifically, Ms. Martin testified that "[a]t the general time right before the [Fall 2021] semester was about to start and these types of requests were coming in for remote work for the semester or academic year, I believe the administration was already kind of in talks or developing broad language as, you know, how we were going to **deny** these." Martin Dep. at 30 (emphasis added).

Mr. Pena further elaborated that "[t]he position we took that was converting in-person classes to online would be a fundamental alteration to our operations or the business nature or the nature of our business. We are an in-person institution. We are not an online institution. So we believe that fundamentally altering our operations or the nature of our business would constitute an undue hardship. And as such, that would not be a reasonable accommodation under the ADA." Pena Dep. at 65.

Finally, Ms. Weidman testified that "[i]t was not a decision to outright reject any request that came in with that, you know, request necessarily because they would each need to be reviewed individually on their own merits, but there was a decision that such a request, because it would so fundamentally alter the course, presented an undue hardship or burden on the employer because of the impact on our students." Weidman Dep. at 39.

Yet, the University's ADA Employee Policy requires that all accommodation requests be evaluated on an individual basis to determine whether the provision of such accommodation would create an undue hardship to the University. ECF 45-1, No. 20. The ADA Employee Policy also provides that if the employee has a qualifying disability, "a reasonable accommodation, if available, should be provided." Complaint and Answer at ¶ 49.

However, there is no evidence in the record that any of the Defendants (or anyone else at the University) ever considered Plaintiff's particular and serious individual circumstances before denying him his request to teach and conduct office hours remotely for the Fall Semester of 2021. Weidman Dep. at 37, 51, 133; Martin Dep. at 50-51; Pena Dep. at 65, 76-79.

For instance, there apparently was no consideration given to the fact that at the time Professor Oross made his formal request for a remote accommodation on August 11, 2021, he was only six months removed from a heart transplant. According to Dr. Hankins, the transplantation of a new heart required Professor Oross to take higher doses of immunosuppression medications which, in turn, placed him at a higher risk of contracting an infection such as COVID-19. ECF 56-3, p.6. Dr. Eisen testified that it would be "catastrophic" for Plaintiff to contract COVID-19. Eisen Dep. at 43. Indeed, even the CDC's July 21, 2021 "Guidance for Institutions of Higher Education (IHE)" recommended "options for accommodations, modifications, and assistance to students, faculty, and staff at increased risk for severe illness that limit their exposure to risk and allow for education and or work opportunities (such as virtual learning, telework, and modified job responsibilities), to remain available to them." ECF 47-6, p. 14.

Instead, the record reveals that Mr. Pena, Ms. Weidman and Ms. Martin simply denied Professor Oross's request for an accommodation based on their recently devised mantra that **any** accommodation request that would change the modality for a

scheduled class would fundamentally alter the course and therefore place an undue burden on the University. Clearly, allowing Professor Oross to teach only four courses and conduct his office hours online during the Fall 2021 Semester when the University offers 1700 classes each semester, the vast majority of which are in-person, would not have fundamentally altered the University's pedagogical model.

It should be noted that Professor Oross was not seeking a permanent accommodation of teaching and conducting office hours remotely. Nor was Professor Oross requesting any changes to the course requirements, materials, or learning objectives. Complaint and Answer at ¶ 35. Rather, he was only seeking a remote accommodation to teach only four classes online for the Fall 2021 Semester. The University had just offered 1700 classes online during the Spring 2021 Semester. Dr. Hankins even indicated that over time, the amount of immunosuppression medication Professor Oross would have to take would decrease, perhaps allowing him to return to campus.

Based on the uncontroverted record in this case, the Court finds, as a matter of law, that the Defendants' legitimate non-discriminatory was pretextual and that disability discrimination was more likely than not a motivating or determinative cause of the adverse employment actions taken against him. It certainly seemed like the University was bent on returning to in-person instruction no matter what the circumstances or effect were on any individual. Accordingly, judgment will be entered in favor of Plaintiff and against the University on his claims for intentional discrimination (Counts Three and Four).

The Court now turns to Plaintiff's claim of discrimination based on a failure to accommodate. "[A]n employer discriminates against a qualified individual with a disability when the employer does 'not make reasonable accommodations to the known physical or mental limitations of the individual unless the employer can demonstrate that

the accommodation would impose an undue hardship on the operation of the business of the [employer].' " *Taylor,* 184 F.3d at 306 (quoting 42 U.S.C. § 12112(b)(5)(A)). To determine the appropriate reasonable accommodation, the employer should initiate the interactive process. *See* 29 C.F.R. § 1630.2(*o* )(3). "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. pt. 1630, app. § 1630.9. Both parties bear responsibility for participating in this process. *Taylor,* 184 F.3d at 312.

Although "an employer has a duty to offer a reasonable accommodation to a qualified employee, 'an employee cannot make [the] employer provide a specific accommodation if another reasonable accommodation is instead provided.'" *Solomon v. Sch. Dist. of Philadelphia*, 532 F. App'x 154, 158 (3d Cir. 2013) (non-precedential) (quoting *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800-01 (6th Cir. 1996)); see also *Yovtcheva v. City of Philadelphia Water Dep't*, 518 F. App'x 116, 122 (3d Cir. 2013) (non-precedential) ("[A]n employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation." (quoting *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996))); *Hofacker v. Wells Fargo Bank Nat'l Ass'n*, 179 F. Supp. 3d 463, 469 (E.D. Pa. 2016) ("[A]n employer has no requirement to provide an employee the exact accommodation that they want; rather, all the interactive process requires is that employers make a good-faith effort to seek accommodations." (internal quotation marks and alterations omitted)).

In order for an employer to be found liable for discrimination on the basis of failure to accommodate, the Plaintiff must produce evidence that: "`(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated.'" *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (quoting *Armstrong v. Burdette Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006)) (additional citations omitted). "A reasonable accommodation is one that enable[s] an individual with a disability who is qualified to perform the essential functions of that position … [or] to enjoy equal benefits and privileges of employment." 29 C.F.R. § 1630.2(o)(1)(ii)-(iii).

"Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered [the] employee's request, and offer and discuss available alternatives when the request is too burdensome." *Taylor*, 184 F. 3d at 317 (3d Cir.1999).

With regard to the first element, the University does not dispute that Professor Oross was disabled and that it was aware of his disability. There is also no dispute that Professor Oross requested an accommodation of teaching his classes and conducting office hours remotely in the Fall Semester of 2021. Based on the previous discussion concerning pretext, *supra*, and the undisputed record in this case, the Court finds, as a matter of law, that the University did not make any effort, let alone a good faith effort, to accommodate Plaintiff[1] and that Professor Oross could have easily been

---

[1] Ms. Weidman testified that the University's offer to have Professor Oross teach two remote classes in the Fall 2021 Semester was not intended as an ADA accommodation but was a way of "meeting student need and also offered something to [Professor] Oross to be able to continue to teach." Weidman Dep. at 77. In any event, when Plaintiff informed Ms. Weidman that the lack of

accommodated without causing an undue burden on the University. Therefore, judgment will be entered in favor of Plaintiff and against the University on his claim for discrimination based on a failure to accommodate (Count One).

Plaintiff next contends in Count Two that the University's policy of requiring him to return to work with no restrictions amounts to essentially a "100% healed" policy that is a *per se* violation of the RA. Our Court of Appeals has held that "'plaintiffs [cannot] reach a determination of unlawfulness under the ADA by proving only the existence of a 100% healed policy, without any inquiry into whether that policy has been used to discriminate against individuals protected by the ADA from such discrimination.'" *Solomon,* 532 Fed. App'x. at 158, quoting *Hohider v. United Parcel Serv., Inc.,* 574 F.3d 169, 195 (3d Cir.2009).

Here, the Court has already found that Plaintiff is disabled and is qualified to perform the essential functions of his job. The Court has further found that the University has applied what amounts to a no restrictions policy to Plaintiff in denying him his request for a reasonable accommodation without considering his individual circumstances. Therefore, Plaintiff is entitled to judgment on Count Two.

In Count Five, Plaintiff asserts a claim for "disparate impact based on prohibited standards, criteria, or methods of administration." Specifically, Plaintiff alleges that the "full-duty policy that [Kutztown] applied to Dr. Oross constitutes a standard or qualification criterion that has a disparate impact upon qualified employees with disabilities because it screens them out or has a tendency to do so." Complaint at ¶ 150.

---

details prevented him form accepting or rejecting the offer, she simply characterized Plaintiff's response as a rejection of the University's offer.

"A disparate impact violation is made out when an employer is shown to have used a specific employment practice, neutral on its face but causing a substantial adverse impact on a protected group, and which cannot be justified as serving a legitimate business goal of the employer." *E.E.O.C. v. Metal Serv. Co.,* 892 F.2d 341, 346 (3d Cir.1990). In order to establish a prima facie case of disparate impact discrimination, the plaintiff first identify "the specific employment practice that is challenged." *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 994 (1988). Second, the plaintiff must show causation by offering "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Id.* "The Supreme Court has held that disparate impact, by itself, does not state a prima facie case under § 504." *Hollonbeck v. U.S. Olympic Comm.,* 513 F.3d 1191, 1197 (10th Cir.2008), *cert. denied,* 555 U.S. 938 (2008), citing *Alexander v. Choate,* 469 U.S. 287, 299 (1985). "Rather, actionable disparate impact requires analysis of whether the individual is otherwise qualified and whether reasonable accommodations may provide meaningful access." *Hollonbeck,* 513 F.3d at 1197 (citing *Choate,* 469 U.S. at 299–301).

While there is no doubt that the University's full-duty policy has a disparate impact on individuals with disabilities, that is not the end of the inquiry. Section 504 protects only "qualified individuals." 42 U.S.C. § 12111(8). Accordingly, Plaintiff must put forth statistical evidence showing that the University's full-duty policy has disparately caused the exclusion or termination of employees solely on the basis of their disability, despite the fact that such employees could perform the essential functions of their position with or without accommodation. *Watson,* supra. As Plaintiff has not produced any such statistical evidence, other than for himself, his disparate impact claim must fail.

The Court now turns to Plaintiff's claim against the University for retaliation and interference under the RA (Count VI). "To establish a prima facie case of retaliation..., a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. American Sterilizer Co*., 126 F.3d 494, 500 (3d Cir. 1997). See also *Ozlek v. Potter*, 259 F. App'x. 417, 421-22 (3d Cir. 2007) (unpublished opinion) (applying the framework for analyzing a retaliation case under the ADA to a retaliation case under the Rehabilitation Act (quoting Krouse, 126 F.3d at 500)). "To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. v. DeFlaminis,* 480 F.3d 259, 267 (3d Cir. 2007).

If a plaintiff can establish a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for its actions. If the defendant satisfies its burden, the plaintiff must convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action. *Ozlek*, 259 F.App'x at 422.

The University concedes that all of Plaintiff's posts to social media and the faculty LISTSERV and as well as his statements to various press outlets and at various demonstrations expressing his disagreement with the University's decision to deny him a remote teaching accommodation and a restoration of health sabbatical constitutes protected activity under Section 504 of the RA. ECF 45-1, Nos. 40, 41, 44.

The University's adverse action of denying Professor Oross a remote work accommodation occurred on August 16, 2021 **before** he began to engage in his

protected activity on August 22, 2021. Therefore, Plaintiff has not satisfied the second element with respect to the adverse action of denying a remote work accommodation. The University's decision to deny Plaintiff's request for a sabbatical for a restoration of health thereby forcing Plaintiff to use up his paid sick leave and go on to unpaid leave occurred on or about August 26, 2021, just four days after Plaintiff began his protected activity. This unusual temporal proximity between the protected activity and the University's adverse action creates a genuine issue of material fact as to whether there is a causal relationship between the two events.

Although the decision to cut off Plaintiff's medical benefits and limit his return-to-work rights as of December 29, 2021 occurred after he began his protected activity, that decision was largely crafted by PASSHE's benefits office and not by any of the Defendants. However, Ms. Weidman testified that after consulting with the University's legal counsel, she responded to Plaintiff's demand for a clarification of a "full-time-full duty" release by explaining that "as teaching in person in the classroom is considered an essential function of your faculty position, a return to full duty would include a release to teach in person in the classroom." Weidman Dep. at 119; ECF 56-3, p. 88. As a result, there is a genuine factual dispute as to whether there is a causal connection between Plaintiff's protected activity during the Fall Semester of 2021 and the University's October 27, 2021 decision to define "full-time, full-duty" in a manner that essentially forced Plaintiff into having to choose between taking leave without pay or retiring.

In Count VI, Plaintiff has also asserted a claim under the RA against the University for interference. This claim is distinct from Plaintiff's claim for retaliation. Section 12203(b) of the Rehabilitation Act[2] states that "[i]t shall be unlawful to coerce,

---

[2] The standards of the ADA for interference claim govern the standards of a claim for interference under the RA.

intimidate, threaten, or **interfere** with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." (emphasis added). This prohibition "does not operate as a retaliation provision subject to Title VII's burden-shifting framework." *Id*. While our Court of Appeals has not previously addressed the proper standard for analyzing interference claims under section 12203(b), several other Courts of Appeal have. See e.g., *Menoken v. Dhillon*, 975 F. 3d 1, 9 (D.C. Cir. 2020); *Frakes v. Peoria School District No. 150*, 872 F.3d 545, 550 (7th Cir. 2017); *Brown v. City of Tucson*, 336 F.3d 1181, 1191 (9th Cir. 2003). The latter two cases have adopted the test for anti-interference claims under the Fair Housing Act ("FHA"), 42 U.S.C. § 3617. Our Court of Appeals has held that under the FHA, courts should give the word "interference" its dictionary definition: "'the act of meddling in or hampering an activity or process.'" *See Piotrowski v. Signature Collision Ctrs., LLC*, 2021 WL 4709721, at *2 (E.D. Pa. Oct. 8, 2021)  (quoting *Revock v. Cowpet Bay West Condo. Ass'n.*, 853 F.3d 96, 112–113 (3d. Cir. 2017)).

The University clearly meddled with Plaintiff's request for a reasonable accommodation of remote teaching by adopting an inflexible policy that would not permit remote teaching to any high-risk faculty member for the Fall 2021 Semester no matter what the individual's circumstances were. As a result, Plaintiff's request for a reasonable accommodation was essentially already dead-on arrival. The University further meddled with Plaintiff's career when it defined a "full-time, full-duty" release as requiring all teaching and conducting office hours to be in-person, despite the fact that the University had never before applied a "full-time, full-duty" requirement nor even defined the term. Weidman Dep. at 108; Hawkinson Dep. at 211. Therefore, Plaintiff is entitled to judgment on his interference claim.

Plaintiff asserts 42 U.S.C. § 1983 claims of retaliation against Dr. Hawkinson and Mr. Pena under the First Amendment (Counts IX and XII). In order to plead a retaliation claim under the First Amendment, a plaintiff must allege: "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Starnes v. Butler County Court of Common Pleas, 50th Judicial District*, 971 F. 3d 416, 429 (3d Cir. 2020).  "[T]he key question in determining whether a cognizable First Amendment claim has been stated is whether 'the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.'" *McKee v. Hart,* 436 F.3d 165, 170 (3d Cir. 2006) (quoting *Suppan v. Dadonna,* 203 F.3d 228, 235 (3d Cir. 2000)). Again, there is no dispute that Plaintiff engaged in constitutionally protected conduct. Plaintiff points to Mr. Ferguson's response letter of October 14, 2021 to counsel at DRP in which he stated that "[n]either the University nor I will engage with you through written means if Dr. Oross continues to publish all written information in a public manner" as retaliatory conduct that would deter a person of ordinary firmness from exercising his constitutional rights.

In the first instance, Plaintiff did not depose Mr. Ferguson in this matter. Mr. Pena testified that although he did not discuss the specific wording of the letter with Mr. Ferguson, he understood the statement to mean that Mr. Ferguson would not engage in written discussions with the DRP lawyer if Plaintiff continued to publish all written information in a public manner, not that the University would not further engage in the interactive process or in any other manner with Professor Oross. See Exh. 25, Peña Dep. Tr. at 121-125. Indeed, the Court finds that there is no other way for a reasonable jury to construe Mr. Ferguson's statement. And in fact, there is no evidence in the record that any Administrator at the University subsequently refused to engage with

Professor Oross in the interactive process or in any other manner, Thus, even assuming that Defendants Hawkinson and Pena had personal knowledge of or involvement in drafting the Ferguson letter, the Court finds as a matter of law that Plaintiff has failed to establish the second element of a prima facie case of retaliation because Mr. Ferguson's October 14, 2021 letter would not have deterred a person of ordinary firmness from continuing to exercise his rights under the First Amendment. Since Plaintiff has failed to establish a prima facie case of retaliation under the First Amendment, Defendants Hawkinson and Pena are entitled to judgment on that claim (Counts IX and XII).

In Count VIII, Plaintiff asserts a claim against Dr. Hawkinson under 42 U.S.C. § 1983 for violation of Plaintiff's federal statutory rights under Section 504 of the RA. In Count XI, Plaintiff asserts the same claim against Mr. Pena. Courts in this Circuit have held that there is no cause of action under 42 U.S.C. § 1983 to address a violation of Section 504 of the RA where, as here, the §1983 claim is based on the same factual predicate as the claim under Section 504 of the RA.  *See A.W. v. Jersey City Public Schools,* 486 F.3d at 806 ("There is nothing in Section 504 that . . . causes us to conclude that Congress intended to allow §1983 to be available to remedy Section 504 violations such as those alleged by A.W); *Fanciullo v. U.S. Postal Service*, 2013 WL 5467169, *4 (D.N.J. Sep. 30, 2013) (dismissing § 1983 claims against individual defendant alleging employment discrimination in violation of Section 504 of the Rehabilitation Act). Therefore, Defendants Hawkinson and Pena are entitled to summary judgment on Counts VIII and XI, respectively.

Finally, Plaintiff seeks in his prayer for relief emotional and punitive damages. However, emotional and punitive damages are not recoverable under the RA. *Cummings v. Premier Rehab Keller, P.L.LC.*, 142 S.Ct. 1562, 1572 (2022); *Barnes v. Gorman,* 536 U.S. 181, 189 (2002).

**CONCLUSION**

In sum, instead of showing compassion to a valued tenured professor who, despite having recently underwent a heart transplant and was trying with "all his might to return to campus" for the Fall 2021 Semester, the University showed callous indifference by refusing to consider Professor's Oross's individual circumstances as the law required in favor of summarily denying his request for a remote accommodation based on a recently-devised, inflexible and unsubstantiated policy that **any** request to change the course modality from in-person to remote would be considered a substantial alteration to the course offerings and would represent an undue hardship to the University and its students. The Defendants actions are all the more egregious because Professor Oross was not requesting a permanent remote accommodation, but only one that would allow him to teach his four classes during the Fall 2021 Semester when, according to his cardiologists, he was particularly vulnerable to contracting COVID-19. Providing Professor Oross with the reasonable and feasible accommodation of teaching his four classes remotely (when hundreds of other classes were still taught in-person) and conducting his office hours remotely would in no way have interfered with the University's so-called pedagogical model of being a primarily face-to-face institution. By categorically denying Professor Oross's request for an accommodation without evaluating his individual circumstances or engaging in the interactive process, the University prioritized adhering to its pedagogical model over adhering to Section 504 of the RA.